Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
Clarke V. Rogers
State Bar No. 24052901
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11 Case** |
| | § | |
| OUTSOURCE HOLDINGS, INC., | § | Case No. 11-_____ |
| | § | |
| Debtor. | § | |

## DEBTOR'S MOTION FOR ORDERS APPROVING (I) INITIAL BIDDER EXPENSE REIMBURSEMENTS, (II) AUCTION PROCEDURES, (III) FORM AND MANNER OF SALE NOTICE, AND (IV) THE USE AND SALE OF DEBTOR'S INTERESTS IN JEFFERSON BANK FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Outsource Holdings, Inc. a Texas Corporation, debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor"), and files this *Debtor's Motion for Orders Approving (i) Initial Bidder Expense Reimbursements, (ii) Auction Procedures, (iii) Form and Manner of Sale Notice, and (iv) Authorizing the Use and Sale of Debtor's Interests in Jefferson Bank Free and Clear of All Liens, Claims, Encumbrances, and Interests* (the "Motion"). In support of the Motion, the Debtor would respectfully show the Court as follows:

# I.
## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested in this Motion may be granted pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Federal Rules of Bankruptcy Procedure 2002, 6006, and 9014.

# II.
## FACTUAL BACKGROUND

2.      On April 3, 2011 (the "Petition Date") the Debtor commenced this case (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to manage its assets as a debtor-in-possession.  No committee of creditors has been appointed.

**A.      Debtor's Capital Structure and Bankruptcy Objectives**

3.      The Debtor's only significant asset is its ownership of all of the outstanding capital stock of Jefferson Bank (the "Stock"), which is a state bank with five branch locations in the Dallas/Fort Worth metroplex.

4.      The Debtor's only significant liabilities are its obligations to the holders of debt instruments issued by the Debtor.  These creditors fall into three different classes: (i) the holders of notes issued in 2010, who have claims for approximately $200,000; (ii) the holders of notes issued in 2009, who have claims for approximately $7,000,000; and (iii) the statutory trusts holding notes in the amount of $5,000,000, which are contractually subordinated to other creditors.  These statutory trusts have in turn issued trust preferred securities to various persons.

5.    For valid and justifiable business reasons,[1] the Debtor believes that a sale/merger of its interests in Jefferson Bank before August 2011 offers the best opportunity for maximizing the value of this asset for this bankruptcy estate and its creditors. However, the Debtor has been unable to obtain consent from its creditors to conduct such a sale or merger outside of bankruptcy. Such consent would be necessary for any sale/merger under applicable contractual terms.

6.    Since the Debtor believes that a sale before August 2011 is necessary to avoid significant and sudden further declines in the value of its interests in Jefferson Bank, the Debtor believes its fiduciary duties to its creditor body as a whole required the initiation of this Bankruptcy Case. This Bankruptcy Case will enable this sale/merger process to go forward in a timely fashion, thereby preserving the value of the Debtor's assets, and avoiding a situation in which a few deeply subordinated creditors could hold the Debtor's assets and other creditors hostage, leading to further, avoidable losses for those other creditors. The Debtor then plans to propose and confirm a chapter 11 plan that will enable creditors to continue to receive sale proceeds as those come in and appoint a neutral estate representative to ensure that the estate receives the full consideration due under a sale agreement.

## B.    Debtor's marketing efforts

7.    The Debtor had been marketing this asset for more than one year prior to the Petition Date. The Debtor retained the investment banking firm of Keefe, Bruyette, & Woods, Inc. ("KBW") on April 14, 2010 to help with these marketing efforts.

---

[1] To protect the value of its assets, certain confidential schedules to the Acquisition Agreement and MidSouth Agreement (as defined below) are omitted from the attached **Exhibits "A" and "B"**. The Debtor will seek to introduce the confidential schedules as exhibits under seal at the hearings on this Motion.

8.      These marketing efforts have been extensive and productive. KBW initially sent twenty-four potential investors confidentiality agreements. KBW received sixteen signed confidentiality agreements, and provided those parties with access to an online data room containing the due diligence materials and information relating to the sale. Two parties subsequently submitted formal indications of interest—MidSouth Bancorp, Inc. ("MidSouth Bancorp") and Green Bancorp, Inc. The Debtor's directors deemed the MidSouth Bancorp bid to be the only acceptable bid.

9.      MidSouth Bancorp subsequently conducted further due diligence, and proposed an alternate transaction structure. KBW proposed this new transaction structure to twelve potential investors, and nine of these potential investors returned signed confidentiality agreements, enabling them to access the data room. However, none of these parties made a bid, leaving the MidSouth Bancorp proposal as the only option for the Debtor. The details of this proposal are described below.

10.     The Debtor has not limited the scope of its marketing efforts. It has explored many different options, including transactions with companies in which certain officers and directors of the Debtor have interests. The Debtor has excluded all officers and directors with such potential conflicts of interest from this process. As discussed below, the leading offer received by the Debtor is from an entity whose directors also hold 2 of the 5 seats on the Debtor's board of directors.

11.     It should be remembered that these marketing efforts are constrained by the regulatory environment surrounding banks. State regulators must review and approve any transaction, and the parties on both sides of such transactions, to ensure that the resulting financial institutions are adequately capitalized and qualified to offer banking services. These

regulations limit the types of transactions that can be done, and narrows the range of potential buyers.

## C.    First Bank & Trust/MidSouth offers

12.    The best offer obtained by the Debtor is something of a hybrid offer involving two different investors. First, First Bank Lubbock Bancshares, Inc. ("FBLB")[2] has entered into an *Acquisition Agreement* (the "Acquisition Agreement," attached hereto as **Exhibit "A"**). Under the Acquisition Agreement, the Debtor will permit Jefferson Bank to merge with the wholly owned subsidiary of FBLB, First Bank & Trust, Lubbock, Texas ("First Bank & Trust"), resulting in the extinguishment of the Debtor's interests in Jefferson Bank. In exchange for this, FBLB will pay the Debtor $2,021,000 in cash at closing, plus up to another $8,979,000 in cash within four years of closing, subject to adjustments based on the book value of Jefferson Bank prior to closing and various losses suffered by First Bank & Trust post-merger on account of the assets that had been owned by Jefferson Bank and First Bank & Trust's ongoing obligations to MidSouth Bank, N.A. (discussed next.)[3]

13.    Second, MidSouth Bank, N.A. ("MidSouth"), a wholly owned subsidiary of MidSouth Bancorp, has entered into a *Purchase and Assumption Agreement* (the "MidSouth Agreement," attached hereto as **Exhibit "B"**) with First Bank & Trust and Jefferson Bank. Under the MidSouth Agreement, upon the merger of First Bank & Trust and Jefferson Bank, MidSouth will buy certain assets from First Bank &Trust and Jefferson Bank, including owned real estate, leased real estate, various loans, and other personal property in exchange for a payment of an estimated $11,600,000 to Jefferson Bank. The ultimate purchase price is subject

---

[2] All but one of the Debtor's directors are on the board of directors of FBLB.
[3] Acquisition Agreement, §§ 1.02. 1.04. & 1.05.

to adjustment depending on various factors, including the unpaid principal balances at closing on the loans being sold, the amount of the deposits being assumed at closing, and Jefferson Bank's cash on hand at closing.[4] MidSouth will also acquire certain liabilities from Jefferson Bank, including Jefferson Bank's liabilities to its depositors.[5] MidSouth will also offer employment to most of Jefferson Bank's employees.[6]

14. In essence, MidSouth is buying a majority of the assets of Jefferson Bank along with its branch locations and deposit liabilities for the value of those assets less the amount of those liabilities. Jefferson Bank will then merge with First Bank & Trust. After the closing of this transaction, First Bank & Trust will continue to be obligated to provide certain ongoing protections to MidSouth—First Bank & Trust will be obligated to indemnify MidSouth and hold MidSouth harmless from any losses caused by any breaches of the covenants, warranties, and representations made by Jefferson Bank to MidSouth.[7] These covenants, warranties, and representations are extensive—among other things, First Bank & Trust will be assuming Jefferson Bank's covenants to effectively transfer the loans to MidSouth and to repurchase from MidSouth loans that cease performing within three months of closing.[8]

15. Upon completion of the merger of First Bank & Trust with Jefferson Bank, First Bank & Trust will "acquire" through merger Jefferson Bank's remaining assets, along with the estimated $11,600,000 in cash that Jefferson Bank will have on hand from the sale to MidSouth. First Bank & Trust's parent holding company, FBLB, will pay the Debtor an estimated $11,000,000 in connection with the merger. The ultimate purchase price is partially subject for

---

[4] MidSouth Agreement, §§ 1.3, 1.4 & 1.5.
[5] *Id.* § 1.3.
[6] *Id.* § 4.3.
[7] *Id.* § 7.10
[8] *Id.* §§ 2.7, 2.8, & 7.5(n).

adjustments for, among other things, the unpaid principal balances at closing on the loans being sold, losses incurred as a result of the assets owned by Jefferson Bank, and liabilities incurred from First Bank & Trust to MidSouth under the MidSouth Agreement.[9] Of the $11,000,000 to be paid to the Debtor, $2,021,000 is firm, guaranteed, and not subject to adjustment if the deal closes, regardless of First Bank & Trust's future losses arising from these transactions.[10]

16.     These proposed transactions essentially set up a loss pass-through arrangement—if First Bank & Trust incurs losses due to its ongoing guarantees to MidSouth under the MidSouth Agreement, or if First Bank & Trust incurs losses arising from the assets acquired from Jefferson Bank, then First Bank & Trust in turn will owe correspondingly reduced consideration to the Debtor. This arrangement fully protects MidSouth from losses and expenses apart from the purchase price being paid by MidSouth to Jefferson Bank. This arrangement also partially protects First Bank & Trust from losses and expenses apart from the purchase price being paid to the Debtor, up to the full amount of the contingent consideration that would otherwise be owed to the Debtor. However, it should be noted that First Bank & Trust has no limit on its exposure to MidSouth, whereas the Debtor's exposure to First Bank & Trust is limited to the contingent consideration that would otherwise be owed to the Debtor by First Bank & Trust.

17.     This arrangement matches market expectation for such transactions—the marketplace for potentially troubled financial institutions is defined by the Federal Deposit Insurance Corporation, which routinely provides buyers of leveraged financial institutions with a

---

[9] Acquisition Agreement, §§ 1.03, 1.05(a), & 1.05(g).

[10] Acquisition Agreement, § 2.01. This provision does provide that this amount will be reduced by $500,000 if the Acquisition Agreement goes forward but the MidSouth Agreement does not. *Id.* In this instance, the Debtor will insist on obtaining additional consideration for the estate.

"backstop," under which the FDIC, backed by the credit of the federal government, promises in essence to insure buyers of troubled institutions against losses exceeding a certain amount.

18.    To induce MidSouth to spend the time and money needed to conduct its due diligence regarding this transaction, First Bank & Trust has promised to pay MidSouth $500,000 in the event that the MidSouth Agreement is terminated.[11] Jefferson Bank has in turn promised to reimburse First Bank & Trust in the event the MidSouth Agreement is terminated, which will only happen if a better offer is received for Jefferson Bank or its assets.[12]

19.    To induce First Bank & Trust's parent FBLB to agree to this termination fee and to incur its own due diligence costs, the Debtor has promised to reimburse FBLB for FBLB and First Bank & Trust's own expenses and costs up to $200,000 in the event that the Acquisition Agreement is terminated.[13]

20.    The Debtor believes that it can obtain the requisite regulatory approval for these transactions before August 2011 if the Court were to approve this transaction within approximately sixty days of the Petition Date.

### D.    Auction Process

21.    The Debtor proposes using the FBLB and MidSouth offers as a stalking horse for other potential offers for the Debtor's interests in Jefferson Bank. If the Debtor receives bona fide offers that will provide the estate with greater net consideration than the FBLB/MidSouth offers, the Debtor will hold either hold an auction or continue with a private, negotiated sale process amongst parties making qualified bids. A copy of the proposed Auction Procedures for such an auction is attached hereto as **Exhibit "C"**.

---

[11] MidSouth Agreement, § 9.02
[12] Acquisition Agreement, § 9.03.
[13] *Id.*

22.     The Debtor does not believe that these auction procedures should be restrictive—it is obvious that the FBLB/MidSouth proposal is uniquely tailored to the resources and goals of those investors, and accordingly those entities have incorporated a variety of contingencies and potential adjustments into their offers. Reflecting the potential complexity and variety of these offers, the Debtor believes that a flexible auction process is necessary and appropriate for maximizing the range of offers and thereby maximizing the value received by its bankruptcy estate and creditors. Thus, the Debtor and its advisors will be required to exercise their business judgment numerous times in this auction process to make decisions about issues such as qualifying bids, highest and best offers, and ability to close within the necessary timeframe.

23.     However, some parameters for this auction process can be defined. The Debtor does not want to incur the expenses and delay of an auction process if it has not received bids that are materially better than the FBLB/MidSouth offer in terms of price, genuineness, and feasibility. Qualifying bids must provide greater consideration than the offer on the table, and the Debtor will not hold an auction if it does not receive any qualifying bids.

24.     Qualified bidders must be able to demonstrate to the Debtor's satisfaction that they have the financial wherewithal to close the sale on time. Qualified bidders must also be able to demonstrate to the Debtor's satisfaction that they can obtain the requisite regulatory approvals for the transaction they propose in a timely manner.

25.     Qualified bidders must also submit clear, irrevocable offers. The Debtor requires signed purchase documents, which will be enforceable upon approval by the Bankruptcy Court. If such documents are based on the Acquisition Agreement and the MidSouth Agreement, the bidder must provide a red-line document tracking the changes between those agreements. Bidders must provide the Debtor with a clear, written explanation explaining how their bids are

different and better than the First Bank & Trust/MidSouth offer, as well as how their bids will receive requisite and timely regulatory approval.

26.     If the Debtor receives qualifying bids that can be easily compared and adjusted in the context of a live auction, it will hold an auction. The Debtor will seek approval from the Court for a transaction with the winning bidder (the "Successful Bidder"), or with the second-best bidder (the "Second Best Bidder") if the winning bidder does not close the transaction on time. However, if the Debtor receives qualifying bids that cannot, in the Debtor's reasonable business judgment, be easily compared and adjusted by bidders in the context of a live auction, then the Debtor will conduct further negotiations through a private sale process, and will seek the Court's permission to consummate the best transaction offered through this process.

27.     The Debtor proposes the following timeline for this marketing process, subject of course to the Court's availability:

| | |
|---|---|
| April 25-29: | Hearing to approve break-up fees and auction process. |
| May 6: | Initial bids due. |
| May 11: | Debtor announces Qualified Bidders, if any, and whether Auction will occur. |
| May 11-20: | Debtor conducts private sale and negotiation process, if any. |
| May 16: | Debtor conducts Auction, unless supplanted by private sale and negotiation process. |
| May 16-18: | If Debtor receives no Qualified Bids, then hearing to approve FBLB/MidSouth transaction. |
| May 20: | Debtor files notice with the Court disclosing winner of the auction or private sale process and the terms of the winning offer. |
| May 30-June 3: | Sale hearing to approve sale to winner of auction or private sale process. |

**III.**

## RELIEF REQUESTED & APPLICABLE LAW

28.     By this Motion, the Debtor seeks the entry of two orders. The first is an *Order Approving (i) Initial Bidder Expense Reimbursements, (ii) Auction Procedures, and (iii) Form and Manner of Sale Notice* (the "Auction Procedures Order"), a proposed form of which is attached hereto as **Exhibit "D"**. The second is an *Order Authorizing the Use and Sale of Debtor's Interests in Jefferson Bank Free and Clear of All Liens, Claims, Encumbrances, and Interests* (the "Sale Order"), a proposed form of which is attached hereto as **Exhibit "E"**.

### A.     Approval of Initial Bidder Expense Reimbursements

29.     The Debtor requests that the Auction Procedures Order approve the expense reimbursements contained in § 9.03 of the Acquisition Agreement. The Debtor has promised to reimburse FBLB for FBLB and First Bank & Trust's own expenses and costs in working on this transaction in an amount up to $200,000.[14] The Debtor believes that these expense reimbursements will provide greater returns to the estate, and therefore should be approved.

30.     Expense reimbursements for stalking horse bidders have become a common and necessary aspect of public bankruptcy sales, due to the inherently risky nature of this process for would-be buyers who have provided firm offers prior to a public auction. The use of bidding incentives such as expense reimbursements or break-up fees is commonly recognized as an appropriate, value-adding tool for bankruptcy sales in this district. In *In re Texas Rangers Baseball Partners*, 431 B.R. 706 (Bankr. N.D. Tex. 2010), the Court approved a break-up fee and expense reimbursement for a stalking horse bidder, explaining that "inherent benefits of having a stalking horse," which "provides a floor price" justified the expense by the estate. *Id.* at

---

[14] Acquisition Agreement, § 9.03.

715 & n. 28. Similarly, in *In re Lincolnshire Campus, LLC*, No. 10-34176, 2010 WL 5269706

(Bankr. N.D. Tex. July 23, 2010), the court approved a break-up fee and expense reimbursement:

> [T]he Break-Up Fee and Expense Reimbursement are essential inducements and conditions relating to the Buyer's entry into, and continuing obligations under, the Purchase Agreement. Unless it is assured that the Break-Up Fee and Expense Reimbursement will be available, the Buyer is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Purchase Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bid Procedures). The Break-Up Fee and Expense Reimbursement induced the Buyer to submit a bid that will serve as a minimum or floor bid on which the Debtors, their creditors and other bidders can rely. Accordingly, the Break-Up Fee and Expense Reimbursement are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

*Id.* at *2. These fees are often thought of as incentive payments. *In re Integrated Resources*, 147

B.R. 650, 653 (S.D.N.Y. 1992). They are "meant to compensate the potential acquirer who

serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re Marrose*

*Corp.*, No. 89 B 12171-79 (CB), 1992 WL 33848 (Bankr. S.D.N.Y. Feb. 15, 1992); *see In re*

*Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 889 (Bankr. S.D.N.Y. 1990) (noting that bidding

incentives are "often necessary to bring prospective bidders to the table").

31.     The justification for the expense reimbursements here is clear. The FBLB offer

will provide significant value to the Debtor under any scenario. If the Debtor closes the

transactions with these parties, then the estate will benefit by having liquidated its main asset in a

timely and beneficial manner. If the Debtor closes a transaction with some other party, then the

estate will benefit by having used MidSouth and FBLB as stalking horses that attracted more

favorable offers. However, to entice FBLB to continue to invest time and money in a process

that could ultimately provide it with *nothing* in exchange for the benefit its continued

participation provides to the estate, the Debtor needs to reimburse it for its expenses. Without

these bidding incentives, the Debtor would be faced with the no-win choice of the bird in hand— the FBLB/MidSouth offer—versus two hypothetical birds in the bush (which have yet to be flushed, despite the Debtor's year-long marketing efforts).

32.     The expense reimbursement does not provide FBLB with an opportunity to gain windfall at the expense of the estate. FBLB will only be entitled to its actual out-of-pocket costs and expenses. These costs and expenses will be considerable. The multi-jurisdictional regulatory approval processes involved in this transaction have added considerable additional costs for these parties. The maximum potential expense reimbursement of $200,000 is approximately 1.81% of the maximum consideration of $11,000,000 promised by FBLB. In *In re Texas Rangers Baseball Partners*, the court noted that this percentage is well within the range of reasonableness in bankruptcy sales. 431 B.R. at 706.

33.     Two factors weigh strongly in favor of approving the expense reimbursements for FBLB. First, these are actual expense reimbursements, and not an arbitrary hand-out. These actual expenses have been and will be necessary due to the complicated, heavily regulated nature of this transaction.

34.     Second, Jefferson Bank has been thoroughly marketed for over a year. The Debtor has made every effort to find better offers, without success. The Debtor believes that these circumstances could justify seeking approval of a private sale in this Bankruptcy Case, without further marketing. Indeed, if the estate is unable to pay these expense reimbursements, it will most likely need to forego further marketing and a public sale altogether, to avoid squandering the opportunity provided by the FBLB/MidSouth offer. However, the Debtor has not given up hope of finding other buyers, and believes that it is fair and reasonable for the estate to compensate FBLB for its actual costs and expenses in exchange for the estate buying more

time to find a better offer without losing the good offer in hand. Given these facts, and since the estate will only be paying these expense reimbursements if this auction process does produce a better offer, there is no doubt that the expense reimbursement to FBLB is fair and reasonable, and in the best interests of the estate.

35. The Acquisition Agreement also provides that Jefferson Bank will pay First Bank & Trust $500,000 if the MidSouth Agreement is terminated.[15] This promise is necessary because First Bank & Trust will be obligated to pay MidSouth a $500,000 break-up fee in the event that the MidSouth Agreement is terminated.[16] Since Jefferson Bank is not a debtor, Court approval is not needed for this transaction. Further, this promise is necessary and appropriate—MidSouth cannot terminate the MidSouth agreement unless the Debtor moves forward with a better deal, and the Debtor and Jefferson Bank will not move forward with a better deal unless that deal provides better net returns to the Debtor's bankruptcy estate and creditors.

36. Likewise, in the event a better offer is obtained for the assets of Jefferson Bank, thereby supplanting MidSouth and leading to the termination of the MidSouth Agreement, but the Acquisition Agreement remains in place and closes, then the consideration that FBLB will pay to the Debtor could be reduced by up to $500,000, to compensate FBLB and its wholly owned subsidiary First Bank & Trust, for the $500,000 they will owe to MidSouth.[17] Of course, this reduction, and the ultimate consideration to the estate if a better deal is found, is subject to further negotiation—the Debtor will not move forward with a sale proposal that does not provide better returns for the estate.[18] Thus, if the Debtor does obtain an offer for Jefferson Bank or its

---

[15] Acquisition Agreement, § 9.03(b).
[16] MidSouth Agreement, § 9.02
[17] *Id.* § 9.03(d).
[18] *Id.*

assets that is materially better than MidSouth's offer, the Debtor will demand an increased purchase price from FBLB under the Acquisition Agreement. Conversely, the Debtor will not permit Jefferson Bank to accept an alternative to the MidSouth offer unless that offer would compensate the bankruptcy estate for the reduced purchase price being received from FBLB, or FBLB is willing to increase the consideration it is providing to the bankruptcy estate.

## B.    Approval of Auction Procedures

37.    The Debtor requests that the Auction Procedures Order approve the Auction Procedures proposed in **Exhibit "C"**. In requesting approval of the Auction Procedures, the Debtor does not seek a premature blessing of a sale to the bidder the Debtor designates as the winner of this process. Indeed, the Auction Procedures are designed to give the Debtor flexibility, and repeatedly require the Debtor to use its business judgment if provided with bids that cannot be easily compared (which is not unexpected given the complexity of the First Bank & Trust/MidSouth proposal). Instead, by disclosing the Auction Procedures now and seeking Court approval, the Debtor hopes to elicit any comments or criticisms prior to the final sale hearing, in the hope that these criticisms can be resolved now instead of being used later as excuses to attempt to block the sale.

38.    Further, by seeking Court approval of the Auction Procedures, the Debtor hopes that it can gain approval of a general timeline for this sale process, thereby generating confidence in the integrity of this auction process by preventing any potential bidders from making last-minute, potentially illusory offers that can be used to object to the sale to the winning bidder who participated in the auction in good faith. *See, e.g., In re Bigler, LP*, --- B.R. ----, No. 09-38188, 2010 WL 5173846, *7 (Bankr. S.D. Tex. Dec. 15, 2010) (refusing to reopen bidding in auction that had closed pursuant to court-approved procedures, and explaining that such an attempt

would be improper "merely because a slightly higher offer has been received after the bidding is closed" because "it is important that the bidder receive what he had reason to expect, and that nothing impair public confidence in the regularity of judicial sales") (*quoting In re Gil-Bern Industries, Inc.*, 526 F.2d 627, 628 (1st Cir. 1975)). The Auction Procedures are necessary to force all potential bidders to come forward now, or forever hold their peace.

39.     The timelines proposed in the Auction Procedures are fair and reasonable. Potential buyers can gain access to the data room as soon as they sign a standard, customary confidentiality agreement. Potential buyers will have ample time to review these materials and formulate their bids—initial bids are not due until May 6, 2011, more than a month after the Petition Date, when this Motion was filed. The Debtor will then determine whether those bids qualify by offering the estate more net consideration than the First Bank & Trust/MidSouth offer, and decide whether the qualifying bids could be matched against each other in a live auction process. The Debtor will then disclose the winning bid, giving qualified buyers adequate opportunity to review the best offer and develop their bidding strategies accordingly. This transparency will help ensure that the bidding is vigorous and fruitful.

40.     Finally, the Debtor will fully disclose the winning bid and the terms of that offer more than ten days before the final sale hearing, giving any party-in-interest sufficient opportunity to make an informed objection to the sale to the winning bidder as determined by the Debtor. Accordingly, the Debtor requests that the Court approve the Auction Procedures.

C.     **Approval of Sale Notice**

41.     Federal Rule of Bankruptcy Procedure 6004(a) states notice of a proposed sale or use of the Stock as proposed by this Motion—that is, outside of the ordinary course of business—must be provided pursuant to Rule 2002(a)(2) and (c)(1). In turn, Rule 2002(a)(2)

requires at least 21 days' notice to all creditors by mail of any proposed use or sale of the Stock, and Rule 2002(c)(1) requires the notice to "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Further, Rule 6004(b) requires that an objection to the sale or use of the Stock be filed and served not less than seven days before the date set for the proposed sale or use of the Stock or within the time fixed by the court. The Debtor submits that the proposed Sale Notice, attached hereto as **Exhibit "F"**, provides sufficient notice in accordance with these Rules, and the Debtor will be in compliance with these Rules if it serves the Sale Notice via first-class mail to all creditors at least 21 days prior to the hearing to approve the sale or use of the Stock pursuant to this Motion. The Debtor requests that the Court approve this form and manner of notice in the Auction Procedures Order.

## D. Approval of Transaction

42. The remainder of the Motion shall discuss the proposal to sell and use the Stock under applicable bankruptcy law. The focus of this analysis is the First Bank & Trust transaction contemplated by the Acquisition Agreement.[19] However, obviously, this will not be the ultimate transaction that the Debtor seeks to have approved if the auction process is successful. Nevertheless, since the Acquisition Agreement provides a minimal "floor" for the ultimate sale, the Debtor believes that the ultimate sale will be at least as justifiable as the arrangement proposed by the Acquisition Agreement. Therefore, the discussion of the merits of the Acquisition Agreement and other applicable legal issues below should be germane to whatever transaction the Debtor ultimately seeks to have approved by the Court.

---

[19] The Debtor has disclosed the MidSouth Agreement to the Court, the creditors, and all potential bidders because that agreement is integral to the transaction proposed by First Bank & Trust and therefore is clearly relevant to this Motion. However, the Debtor does not believe that the MidSouth Agreement needs to be approved by the Court because that agreement does not involve the Debtor or any estate assets.

## 1.  Justification for sale and use of Stock

43.     Section 363(b) of the Bankruptcy Code permits the Debtor to sell or use property of the bankruptcy estate outside of the ordinary course of business after notice and hearing. 11 U.S.C. § 363(b).  In order for a proposed sale or use to be proper, the Debtor must "satisfy [his] fiduciary duty to the debtor, creditors and equity holders, by articulating some business justification for using, selling, or leasing the property outside the ordinary course of business." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (*quoting In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)).  "Great judicial deference is given" to this "exercise of business judgment." *Id.* (*citing In re Gulf States Steel*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002) (*citing In re Bakalis*, 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998))).  "'As long as the sale appears to enhance a debtor's estate, court approval of a [debtor's] decision to [sell] should only be withheld if the [debtor's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. . . .'"  *Id.* at 255 (*quoting Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)).

44.     Here, the First Bank & Trust/MidSouth transaction is within the Debtor's sound business judgment.  Some sort of sale, merger, or other transaction must be accomplished within the next few months to preserve the value of Jefferson Bank and the Debtor's stock in that institution.  The terms of the First Bank & Trust/MidSouth transaction are designed to capture as much of that value as possible—the consideration MidSouth is providing for the performing assets of Jefferson Bank will largely flow through First Bank & Trust and FBLB back to the Debtor, subject to reductions if the value of those assets ends up being less than was originally expected by the parties.  However, if the deal closes, the Debtor will be guaranteed to receive at least $2,021,000 from the deal.  Thus, the estate will not be losing value based on those

adjustments—instead those reductions will merely reflect the actual value of the estate's assets. To be sure, a completely firm, "as-is, where-is" offer might be preferable, but since buyers in the market for the assets of regulated financial institutions expect insurance against losses incurred from such sales, the discount that the estate would be forced to grant in exchange for an "as-is, where-is" offer for Jefferson Bank or its assets would be substantial and very unfavorable. The guaranteed consideration, if the deal closes, of $2,021,000, plus additional contingent consideration of up to $8,979,000, is the best offer the estate has obtained thus far.

45.     Further, the extensive marketing efforts of the Debtor both before and after the Petition Date indicate that the First Bank & Trust/MidSouth offer is sound and within the business judgment of the Debtor. The Debtor has spent more than a year trying to generate interest in Jefferson Bank, and will continue with further marketing efforts as the bankruptcy case continues. This process will ensure that the Debtor is receiving fair market value for its interests in Jefferson Bank. Given that this fair market value will decline if the Debtor is unable to sell or dispose of its interests in Jefferson Bank, the Debtor is clearly acting within its business judgment by selling these interests for fair market value after a thorough marketing process.

## 2.     Sale and transfer of Stock free and clear of liens, claims, encumbrances, and interests

46.     If the First Bank & Trust/MidSouth offer is not topped, it will be appropriate for the Stock to be merged with First Bank & Trust free and clear of all liens, claims, encumbrances, and interests any party may have therein, pursuant to § 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, or interests attaching to the net proceeds of the Stock. Here, the Debtor's assets are not encumbered any liens, security interests, or other *in rem* claims held by the Debtor's creditors. Nevertheless, the Debtor and purchasers First Bank & Trust and

FBLB wish to invoke § 363(f) to ensure that none of the claims of the Debtor's creditors can be asserted against First Bank & Trust or FBLB as a result of the merger. The Debtor expects other asset purchasers to seek similar protections.

47.     The Debtor believes that this extinguishment of liability should extend to any claims of the Debtor's creditors for successor liability against First Bank & Trust and FBLB. *See In re Pak-Mor Mfg. Co.*, No. SA-06-CA-658-RF, 2007 WL 2327615, *5 n.47 (W.D. Tex. Aug. 10, 2007) (*citing EEOC v. Knox-Schillinger (In re TWA)*, 322 F.3d 283, 288 (3d Cir.2003) (finding that explicit language in sale order discharged successors of liability); *United Mine Workers of Am.1992 Benefit Plan v. Leckie Smokeless Coal Co, (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 582 (4th Cir. 1996) (finding that interests discharged by a § 363(f) sale are not strictly limited to *in rem* interests)).

48.     Needless to say, the Debtor does not expect § 363(f) to protect First Bank & Trust from the claims against Jefferson Bank itself—§ 363(f) only permits the assets of the Debtor, *i.e.*, the Stock of Jefferson Bank, to be transferred free and clear of claims against the Stock itself. Claims against Jefferson Bank will be assumed by First Bank & Trust. Other bidders should have the same protections—the Debtor's creditors cannot be allowed to assert their claims against the Debtor's property after that property has been sold free and clear of such claims under § 363(f).

### 3.     Good Faith Purchaser

49.     Section 363(m) of the Bankruptcy Code states:

The reversal or modification of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) thus provides that a purchaser of property of the estate is protected from the effects of a reversal on appeal of the authorization to sell such property as long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale.

50. Although the Bankruptcy Code does not define the meaning of "good-faith purchaser," most courts have adopted a traditional equitable definition: "one who purchases the assets for value, in good faith and without notice of adverse claims." *See, e.g., In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997). Courts have stated:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*Id.* (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1197 n. 1 (7th Cir. 1978)).

51. As indicated by this quote, the mere existence of common insiders between a debtor and a buyer does not prevent the buyer from being deemed a good faith purchaser under § 363(m). Indeed, in many bankruptcy cases, the assets of distressed debtor entities are often only attractive to parties already familiar with those assets, such as insiders. Insiders are not presumed to act in bad faith. Instead, there must be evidence of fraud, collusion, or other "grossly unfair" practices to deny an insider buyer the protections of § 363(m). For example, *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the court affirmed that the buyer, despite being an affiliate of the debtor, was entitled to the protections of § 363(m), because there was no evidence of collusion, and because the affiliate had paid fair reasonable value for the Debtor's assets.

52.     Here, even if First Bank & Trust and FBLB are the ultimate purchasers, the terms and conditions of the Acquisition Agreement that will be used for this transaction were negotiated by the Debtor at arm's length and in good faith. Each party was represented by sophisticated counsel, and the Debtor's sale efforts were guided by independent consultant KBW under the direction of a disinterested director. Further, First Bank & Trust and FBLB have agreed to commit to a public sale, showing their willingness to participate in a process that is designed to maximize the value of the Debtor's estate. It is undeniable that these parties are paying fair value to the estate, which also indicates that this is not an insider-driven process motivated by bad faith. Accordingly, the Debtor requests that the Court determine that the Successful Bidders, whether First Bank & Trust and FBLB, or someone else, acted in good faith and are entitled to the protections of a good faith purchaser under § 363(m) of the Bankruptcy Code.

### 4.     Request for Relief Under Bankruptcy Rules 6004(h).

53.     Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). In light of the clear necessity to consummate the transaction in as expeditious a manner as possible, so that closing can happen before August 2011, the order approving the sale and use of the Stock, if granted, should be effective immediately upon entry of such order. Therefore, waiver of the fourteen (14) day stay under Bankruptcy Rule 6004(h) is appropriate and necessary.

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests (i) that the Motion be approved, (ii) that the Successful Bidder or the Second Best Bidder presented to this

Court as the potential purchaser be approved as the same, (iii) that the sale of the Stock to the approved be allowed to close, and (iv) any further relief to which they may be justly entitled.

Dated: April 3, 2011                          Respectfully submitted,

                                              /s/ Jeff P. Prostok
                                              Jeff P. Prostok
                                              State Bar No. 16352500
                                              Lynda L. Lankford
                                              State Bar No. 11935020
                                              Clarke V. Rogers
                                              State Bar No. 24052901
                                              FORSHEY & PROSTOK LLP
                                              777 Main St., Suite 1290
                                              Ft. Worth, TX 76102
                                              Telephone: (817) 877-8855
                                              Facsimile: (817) 877-4151

                                              PROPOSED ATTORNEYS FOR DEBTOR
                                              AND DEBTOR IN POSSESSION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served via ECF Electronic Notice, where available, and via first class mail on the parties listed on the attached service list on this the 3rd day of April, 2011.

                                              /s/ Lynda L. Lankford
                                              Lynda L. Lankford

L:\JPROSTOK\Outsource Holdings #5454\Pleadings\Sale Motion 4.3.11.doc

***Outsource Holdings, Inc.***
***Service List***
***#5454***

Outsource Holdings, Inc.
Doug Boyd
7806 Indiana Avenue
Lubbock, TX 79423

Office of the U.S. Trustee
1100 Commerce St., Room 976
Dallas, TX 75242-1496

Barry Brown
3801 85th St.
Lubbock, TX 79423

Barry Orr
3805 85th St.
Lubbock, TX 79423

BNY Mellon
Attn: Valerie Nuhfer
525 William Penn Place, 7th Floor
Pittsburgh, PA 15259

Bruce Orr
3617 Woodedcreek Cr.
Arlington, TX 76016

Doug Boyd
5124 Arrowhead
Plano, TX 75093

Duncan Burkholder
4515 Marsha Sharp Freeway
Lubbock, TX 79407

Greg Garland
5723 83rd Lane
Lubbock, TX 79424

James Mills
8160 Sundance Dr.
Mansfield, TX 76063

James Young
5010 91st St., #8
Lubbock, TX 79424

Jim Burke
8136 Sundance Dr.
Mansfield, TX 76063

John Walton
4718 S. Loop 289
Lubbock, TX 79414

Larry Rother
3601 Misty Creek Dr.
Austin, TX 78735

Ricky Green
4903 97th St.
Lubbock, TX 79424

Ronnie Malone
5506 Vista Meadow
Dallas, TX 75248

Sami Ebrahim
11551 Forrest Central Dr., Suite 230
Dallas, TX 75243

Terry Grantham
8404 Salem
Lubbock, TX 79424

Terry Grantham
8405 Salem
Lubbock, TX 79425

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

# EXHIBIT "A" TO THE MOTION

# ACQUISITION AGREEMENT

This ACQUISITION AGREEMENT (this "Agreement") is effective as of March __, 2011, by and between First Bank Lubbock Bancshares, Inc., a Texas corporation with its principal offices in Lubbock, Texas ("FBLB"), Outsource Holdings, Inc., a Texas corporation with its principal offices in Lubbock, Texas ("Outsource"), and Jefferson Bank (the "Bank"), a Texas banking association with its principal offices in Dallas, Texas.

## RECITALS

WHEREAS, Outsource is the holder of all of the outstanding capital stock of the Bank (the "Bank Stock");

WHEREAS, Outsource intends to file a voluntary bankruptcy petition under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on or shortly after the date this Agreement is executed;

WHEREAS, FBLB desires to cause its subsidiary bank, First Bank & Trust, Lubbock, Texas (the "Lubbock Bank") to merge with the Bank, with the Lubbock Bank surviving the merger (the "Merger"), which Merger shall be effectuated pursuant to an order of the Bankruptcy Court entered upon a motion by Outsource (the "Sale Motion") under §§ 105 and 363 of the Bankruptcy Code approving such transaction (the "Sale Order");

WHEREAS, FBLB, the Lubbock Bank, Outsource and the Bank believe that the Merger is in the best interests of FBLB, the Lubbock Bank, Outsource and the Bank and their respective creditors and shareholders; and

WHEREAS, Outsource and FBLB desire to enter into this Agreement for the purposes specified herein;

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing and of the mutual representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the conditions set forth below, the parties, intending to be legally bound, undertake, promise, covenant and agree with each other as follows:

## ARTICLE I.
## MERGER

Section 1.01    The Merger.

(a)    Subject to the terms and conditions of this Agreement and the Agreement and Plan of Merger to be entered into between the Bank and the Lubbock Bank (the "Merger Agreement"), the form of which is attached hereto as Exhibit F, FBLB shall cause the Lubbock Bank to be merged with and into the Bank with the Lubbock Bank surviving pursuant to the provisions of Chapter 10, Subchapter A of the Texas Business Organizations Code (the "TBOC") and Section 32.301 et. seq. of the Texas Finance Code and having the effects of a merger.

(b)     The Merger shall have the effects set forth in Chapter 10, Subchapter A of the TBOC and Section 32.301 et. seq. of the Texas Finance Code.  Following the Merger, the Lubbock Bank shall continue as the corporation resulting from the Merger, and the separate corporate existence of the Bank shall cease.  The name of the Resulting Bank shall be "First Bank & Trust."  Subject to the satisfaction of the conditions contained in this Agreement, and as contemplated by Section 363 of the Bankruptcy Code, at the Effective Time (as defined in Section 2.04), and immediately prior to completion of the P&A Transaction: (i) the existing offices and facilities of the Lubbock Bank and the Bank immediately preceding the Merger shall remain as the existing offices and facilities of the Resulting Bank following the Merger, (ii) all rights, title and interests to all real estate and other property owned by the Bank shall be those of the Resulting Bank without reversion or impairment, without further act or deed, and without any transfer or assignment having occurred, but subject to any existing liens or encumbrances thereon, and (iii) all liabilities and obligations of the Bank shall be those of the Resulting Bank, and the Resulting Bank shall be the primary obligor therefor and no other party to the Merger shall be liable therefor.  At the Effective Time, a proceeding pending by or against the Bank may be continued as if the Merger did not occur, or the Resulting Bank may be substituted in the proceedings.

(c)     The Articles of Association and Bylaws, respectively, of the Resulting Bank shall be as set forth in the Merger Agreement.

(d)     The directors and officers, respectively, of the Resulting Bank shall be as set forth in the Merger Agreement.

Section 1.02     Conversion of Shares.  At the Effective Time, all of the shares of common stock of the Bank, par value $5.00 per share (the "Bank Stock"), issued and outstanding as of the Effective Time, shall be converted into the right to receive from FBLB $11,000,000 (subject only to adjustment pursuant to Section 1.03, Section 1.04, and Section 9.03(d)) in the aggregate, payable as follows (the "Purchase Price"):

(a)     cash consideration in the amount of $2,021,000 to be delivered to Outsource at Closing (as defined in Section 2.01) in immediately available funds (the "Closing Cash Consideration"), subject to adjustment as more fully described in Section 9.03(d); plus

(b)     additional cash consideration in the amount of $8,979,000 (the "Additional Consideration"), subject to adjustment as more fully described in Section 1.03 and Section 1.04, to be delivered to Outsource on or before the fourth anniversary ("Additional Consideration Due Date") of the Closing Date (as defined in Section 2.01).  In addition to the Closing Cash Consideration and the Additional Consideration, FBLB will also pay Outsource, annually on each December 31st during the period that the Additional Consideration is outstanding, an additional amount (the "Annual Consideration") equal to 3% of the Adjusted Additional Consideration (as defined in Section 1.04) outstanding on the applicable December 31st.  Further, on the dates that are two (2) and three (3) years from the Closing Date, performance of the Subject Assets will be evaluated and, depending on such performance, up to twenty percent (20%) of the Additional Consideration may be prepaid to Outsource, in FBLB's sole and absolute discretion.

Section 1.03     Adjustment to Purchase Price.  To the extent that the total tangible common book value of the Bank on last day of the month immediately preceding the Closing Date (the "Calculation Date") is less than $4,750,000, the Additional Consideration shall be reduced by the difference between (A) $4,750,000 and (B) the Bank's total tangible common book value as of the Calculation Date.  To the extent that the total tangible common book value of the Bank on the Calculation Date exceeds

$4,750,000, the Additional Consideration shall be increased by the difference between (A) the tangible common book value of the Bank on the Calculation Date, and (B) $4,750,000. For purposes of this Section, the "total tangible common book value" of the Bank shall be calculated in accordance with the methodology used in the Bank's Report of Condition and Income ("Call Report") to calculate the total bank equity capital (Call Report Schedule RC - Balance Sheet, item 27.a) minus intangible assets (Call Report Schedule RC - Balance Sheet, items 10.a and 10.b). Total tangible common book value shall reflect the payment or accrual prior to the Calculation Date of all expenses of the Bank associated with or related to the transactions contemplated by this Agreement, including, without limitation, legal fees, accounting fees, investment banking or brokerage fees, and consulting fees. This calculation shall also be adjusted to reflect the financial impact of the liquidation of the Bank's entire securities portfolio, including Federal Home Loan Bank of Dallas stock (the "Investment Securities"), and the repayment of the Bank's Federal Home Loan Bank advances ("FHLB Advances"), which will be completed prior to the Closing, even if the transactions are completed after the Calculation Date.

Section 1.04    Terms of the Additional Consideration.    Notwithstanding anything to the contrary contained in this Agreement, the Additional Consideration shall be subject to reduction (such amount the "Adjusted Additional Consideration") to the extent Loan Losses (as defined below) on Subject Assets (as defined below) exceed $3,000,000 (the "Loss Threshold"). The sole remedy of FBLB and the Lubbock Bank for Loan Losses on the Subject Assets shall be a reduction in the amount of the Additional Consideration.

(a)    For purposes of this Agreement, "Loan Losses" shall mean (y) the amount of any charge-off or charge down with respect to principal on a Subject Asset that occurs between the Closing Date and the Additional Consideration Due Date at the direction or request of (A) any regulatory examiner, (B) FBLB's independent certified public accounting firm, (C) any external loan reviewer or (D) the management or any internal loan review personnel of the Lubbock Bank using the same standards as are applied at the Lubbock Bank, or (z) the amount of any loss of principal incurred as a result of the sale of any Subject Asset. To the extent that the Lubbock Bank recovers amounts previously included in Loan Losses, the amount of Loan Losses will decrease by the amount of the recovery. For purposes of this Agreement, "Subject Assets" means the assets set forth on *Confidential Schedule 1.04* (including their current carrying values, which shall be net of any specific reserves against such Subject Assets ("Adjusted Book Value")), which will include the loans maintained on the Bank's watch list. The Adjusted Book Value of the Subject Assets shall be subject to reduction to the extent of any excess cash payments applied pursuant to Section 1.04(d), following the payment of the Maintenance Fee (as defined in Section 1.04(d)) and external costs of collections. The Bank must obtain the prior written consent of FBLB in order to remove any loans from the Bank's watch list between the date of this Agreement and the Closing Date.

(b)    Upon consummation of the Merger, the Lubbock Bank will use commercially reasonable efforts to achieve the objective of maximizing collections on the Subject Assets in accordance with normal and prudent banking practices and procedures and in accordance with such specific limitations as may be imposed pursuant to this Section 1.04. The Lubbock Bank may employ agents or independent contractors including, without limitation, any attorney, accountant, consultant or other professional, to perform, or may otherwise subcontract its duties and responsibilities hereunder. The Lubbock Bank shall diligently seek to collect all amounts due with respect to the Subject Assets and will take such other actions (including, without limitation, sales or leases, including a bulk sale, of Subject Assets and enforcement of liabilities of borrowers) as are appropriate in order to attempt to maximize collections on the Subject Assets. In performing its functions hereunder and deciding what actions to take hereunder, the Lubbock Bank may consider the costs of collection (including, without limitation, administrative and legal

- 3 -

expenses), potential liabilities, likelihood of recoveries, and other relevant factors. Subject to the provisions of this Agreement, all decisions of the Lubbock Bank with respect to the servicing of the Subject Assets shall be binding on Outsource. Outsource hereby ratifies and confirms all such actions that may hereafter be taken by the Lubbock Bank (or any subcontractor or agent) in accordance with the provisions of this Section 1.04, except for actions demonstrating fraud, gross negligence or willful misconduct, and agrees that upon request of the Lubbock Bank (or any subcontractor or agent), Outsource will specifically ratify and confirm any such action, except for actions demonstrating gross negligence or willful misconduct, that may hereafter be taken by the Lubbock Bank in accordance with the provisions of this Section 1.04. If Outsource is unsatisfied with the action being taken or proposed to be taken with respect to a Subject Asset, Outsource shall be permitted, upon written notice to the Lubbock Bank, to purchase the Subject Asset from the Lubbock Bank for an amount equal to the then current Adjusted Book Value of the Subject Asset.

(c) The Lubbock Bank will maintain or cause to be maintained such books and records with respect to the Subject Assets as a reasonably prudent lender would maintain under similar circumstances, which books and records shall be made available to Outsource and its agents and representatives at the offices of the Lubbock Bank in Lubbock, Texas (or such other location as the Lubbock Bank and Outsource may from time to time agree upon in writing) during business hours for the purposes of inspection, examination and audit. Outsource may, upon reasonable prior written notice to the Lubbock Bank, review and copy the records maintained or caused to be maintained by the Lubbock Bank with respect to the Subject Assets and the Lubbock Bank shall make available to Outsource for the purpose of cooperating with Outsource in its review and examination of such materials, all without any cost to the Lubbock Bank. Outsource may, at its own expense, engage such outside individuals, including accountants, as it deems necessary or advisable to review or audit the performance of the Lubbock Bank hereunder; provided, however, that Outsource shall not materially interfere in the daily management by or operations of the Lubbock Bank.

(d) Within 45 days after the end of each calendar quarter after the Closing Date, the Lubbock Bank will provide the Outsource Representative(s) (as defined in Section 1.04(i)) with a report (the "Subject Assets Report") setting forth in reasonable detail the Adjusted Book Value of the Subject Assets as of the beginning of such calendar quarter, the net amount of Loan Losses realized with respect to the Subject Assets during the immediately preceding calendar quarter, any reductions in the Adjusted Book Value of the Subject Assets as a result of cash payments, the net amount of Loan Losses realized since the Closing, and the Adjusted Book Value of the Subject Assets as of the end of such calendar quarter. For purposes of determining the amount of Loan Losses with respect to the Subject Assets, (i) all cash payments received by the Lubbock Bank with respect to the Subject Assets (whether upon collection, payment of principal or interest, sale, disposition or otherwise) shall be applied first, to a maintenance fee (the "Maintenance Fee") equal to 3.0% on an annualized basis of the balance of the Subject Assets at the end of such calendar quarter; and second, to the external costs of collection and out of pocket expenses incurred by the Lubbock Bank in connection with the collection of the loan (adjusted to reflect any tax benefit associated with such expenses using an assumed tax rate of 20%), including, but not limited to, legal and accounting expenses, any associated litigation expenses, and costs associated with agents or independent contractors engaged by the Lubbock Bank pursuant to Section 1.04(b); and (ii) any cash payments in excess of the amounts allocated as set forth in clause (i) will reduce the Adjusted Book Value of the Subject Assets. Outsource may dispute the contents of a Subject Assets Report at any time within 30 days from receipt of such report. In the event that Outsource disputes the contents of a Subject Assets Report, the parties shall use good faith efforts to resolve those disputes, but in the event that they are unable to

- 4 -

resolve the disputes within 30 days following written notice of dispute, the parties will agree to submit the dispute for the review of a mutually agreeable certified public accounting firm to make a determination as to the disputed items, and such determination will be final, binding and conclusive on the parties. If the parties are unable to select a mutually agreeable certified public accounting firm, each party will select a certified public accounting firm and those firms together will select a mutually agreeable certified public accounting firm that will make the determination. The parties will split all expenses associated with the engagement of the mutually agreeable certified public accounting firm, and no expenses associated therewith will be considered in the calculation of Loan Losses.

(e)     Upon the earlier of (y) 30 days after the date that the Adjusted Book Value of the Subject Assets held by the Lubbock Bank is zero or (z) the Additional Consideration Due Date, the Lubbock Bank shall provide Outsource with a final report setting forth the information contemplated by this Section 1.04, and, at the direction of Outsource, FBLB shall pay the Additional Consideration. The amount of the Additional Consideration shall be reduced by the amount of any Loan Losses in excess of the Loss Threshold.

(f)     Neither the Lubbock Bank, nor any agent of the Lubbock Bank, including without limitation, attorneys, accountants, consultants or independent contractors employed by the Lubbock Bank, nor any assignee of the Lubbock Bank, nor any of their respective officers, directors, agents or shareholders shall be liable to Outsource or the Bank for any error of judgment or for any action taken or omitted to be taken by any of them, except for actions or omissions exhibiting fraud, gross negligence or willful misconduct.

(g)     The Additional Consideration is also subject to adjustment to the extent that the Lubbock Bank becomes liable to MidSouth Bank, N.A. ("MidSouth") under the terms of that certain Purchase and Assumption Agreement, dated March __, 2011 (the "P&A Agreement"), by and among MidSouth, the Bank, the Lubbock Bank and, for limited purposes, Outsource, for any damages, liabilities and losses as a result of the Bank's breach of any representation, warranty or covenant contained in the P&A Agreement or if the Lubbock Bank incurs indemnification obligations under the terms of the P&A Agreement.

(h)     Without the prior written consent of the Outsource Representative(s), the Lubbock Bank shall not (i) settle or initiate litigation with respect to any Subject Asset or (ii) recognize a Loan Loss on a Subject Asset, through charge off or charge down of any Subject Asset, the sale of any Subject Asset, or otherwise, or modify the terms of any Subject Asset, if (for purposes of clause (ii) only): (A) the transaction would result in a Loan Loss on a Subject Asset of at least $100,000, (B) the resulting Loan Losses would equal 30% or more of the Subject Asset's then-existing carrying value, or (C) in the event that the contemplated transaction involves a sale of a Subject Asset, the proposed purchaser of the Subject Asset is an officer, director or Affiliate (as defined in Section 12.10) of FBLB or the Lubbock Bank or a related interest of any of the foregoing. With respect to any potential Loan Loss subject to this Section 1.04(h), the Lubbock Bank shall provide written request to the Outsource Representative(s) in the manner set forth in this Agreement specifying the Subject Asset, a description of the proposed action(s) to be taken with respect to the Subject Asset, the anticipated Loan Loss, and a statement that the anticipated Loan Loss requires the consent of Outsource pursuant to this Section 1.04(h). The Outsource Representative(s) will meet with representatives of the Lubbock Bank, in person or through telephone or electronic means, within a reasonable time following receipt of such written request to consider the matters discussed therein and to identify, address and seek to resolve any conflicts that may arise from the written request. The parties agree to use commercially reasonable efforts to resolve any disputes that arise from any written request as

- 5 -

soon as practicable following each such meeting. In the event that the parties are unable to resolve the disputes within 30 days following written notice of dispute, the parties will agree to submit the dispute for the review by a mutually agreeable third-party to make a determination as to the disputed matters, and such determination will be final, binding and conclusive on the parties. If the parties are unable to select a mutually agreeable third-party, each party will select a third-party and those third-parties together will select a mutually agreeable third-party that will make the determination. The parties will split all expenses associated with the engagement of the mutually agreeable third-parties, and no expenses associated therewith will be considered in the calculation of Loan Losses. Outsource may designate additional Outsource Representative(s) or replace existing Outsource Representative(s) at any time prior to the Additional Consideration Due Date by written notice to the Lubbock Bank.

(i)     The holders of a majority in interest of the Additional Consideration by dollar amount may from time to time designate one or more representatives of Outsource to act as the "Outsource Representative(s)" for purposes of this Agreement, and any Outsource Representative may be removed by the holders of a majority in interest of the Additional Consideration by dollar amount. The Outsource Representative(s) shall have the power to authorize certain actions as described in this Agreement on behalf of all holders, and the Lubbock Bank shall be entitled to rely on the actions of the Outsource Representative(s) with respect to such matters. The initial Outsource Representative(s) will be Doug Boyd, Sami Ebrahim and Ronnie Malone, and the Lubbock Bank shall be promptly notified of any change in the Outsource Representative(s). The act of a majority in number of the Outsource Representative(s) will constitute the act of the Outsource Representative(s). The Outsource Representative(s) shall have no authority to take action on behalf of any holder entitled to Additional Consideration, except as expressly set forth in this Agreement or as subsequently agreed in writing by such holder. No shareholder will have any right or cause of action against any Outsource Representative in connection with any action taken by the Outsource Representative, except in the case of fraud, willful misconduct or gross negligence, and the Outsource Representative(s) in their capacity as such will be entitled to indemnification from Outsource to the same extent as directors of Outsource are entitled to indemnification from Outsource.

Section 1.05     Outsource's Chapter 11 Bankruptcy Case.

(a)     Subject to the more specific provisions of this Agreement, Outsource's obligations under this Agreement and the transactions contemplated hereby are subject to and contingent upon the approval and authorization of the Bankruptcy Court. Outsource has filed the Sale Motion pursuant to Sections 363 and 365 of the Bankruptcy Code seeking, among other things, (1) entry of the Auction Procedures Order in substantially the same form as Exhibit G as a Final Order, or in such other form and manner as may be acceptable to Outsource and FBLB (A) approving the bidding procedures in substantially the same form as Exhibit H, (B) approving the Expense Reimbursement, (C) scheduling an auction (the "Auction") and a hearing to consider the approval of the sale of the Merger or an Alternative Transaction (the "Sale Hearing"), and (D) approving the form and manner of notice of the Sale Motion and Sale Hearing, and (2) entry of the Sale Order in substantially the same form as Exhibit I as a Final Order, or in such other form and manner as may be acceptable to Outsource and FBLB, (A) finding that notice of Sale Hearing was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, (B) finding that FBLB is a "good faith" purchaser entitled to the protections afforded by § 363(m) of the Bankruptcy Code, (C) finding that FBLB's acquisition of property interests, rights, and powers pursuant to the Agreement shall be free and clear of all liens and claims in or against Outsource and its property, and (D) approving the transaction proposed by this Agreement.

- 6 -

(b)     In the event that the Auction Procedures Order or the Sale Order is appealed, Outsource shall use its commercially reasonable efforts to defend such appeal.

## ARTICLE II.
### THE CLOSING AND THE CLOSING DATE

Section 2.01     Time and Place of the Closing and Closing Date.  On a date mutually acceptable to FBLB and Outsource that is the later of (a) the receipt of all necessary regulatory, corporate, and other approvals and the expiration of any mandatory waiting periods, or (b) within (i) 5 business days of the entry of a Sale Order by the Bankruptcy Court as a Final Order, or in such other form and manner as may be acceptable to FBLB and Outsource, or (ii) within 2 business days of a transaction between Outsource and the Successful Bidder failing to timely close (the "Closing Date"), a meeting (the "Closing") will take place at which the parties to this Agreement will exchange certificates, letters and other documents in order to determine whether all of the conditions set forth in Article VII and Article VIII have been satisfied or waived or whether any condition exists that would permit a party to this Agreement to terminate this Agreement.  If none of the foregoing conditions then exists or if no party elects to exercise any right it may have to terminate this Agreement, then the parties will execute such documents and instruments as may be necessary or appropriate in order to effect the transactions contemplated by this Agreement.  The Closing will take place at the offices of Hunton & Williams LLP, 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202 at 10:00 a.m., or at such other time and place to which the parties may agree.

Section 2.02     Actions to be Taken at the Closing by Outsource.  At the Closing, Outsource will execute and acknowledge, or cause to be executed and acknowledged (as appropriate), and deliver to FBLB such documents and certificates contemplated to be delivered pursuant to this Agreement or reasonably necessary to evidence the transactions contemplated by this Agreement, including the following (all of such actions constituting conditions precedent to FBLB's obligations to close hereunder):

(a)     One or more certificates evidencing and representing the Bank Stock, duly endorsed by Outsource in blank or accompanied by stock powers signed by Outsource in blank;

(b)     True, correct and complete copies of Outsource's Articles of Incorporation and all amendments thereto, duly certified as of a recent date by the Texas Secretary of State;

(c)     True, correct and complete copies of the Bank's Articles of Association and all amendments thereto, duly certified as of a recent date by the Texas Department of Banking (the "TDB");

(d)     Good standing and existence certificates, dated as of a recent date for Outsource, issued by the appropriate state officials, duly certifying as to the existence and good standing of Outsource in Texas;

(e)     Good standing and existence certificates for the Bank, dated as of a recent date, issued by the appropriate state officials, duly certifying as to the existence and good standing of the Bank in Texas;

(f)     A certificate, dated as of a recent date, issued by the Federal Deposit Insurance Corporation (the "FDIC"), duly certifying that the deposits of the Bank are insured by the FDIC pursuant to the Federal Deposit Insurance Act (the "FDIA");

- 7 -

(g)     A certificate, dated as of the Closing Date, signed by the Secretary or an Assistant Secretary of Outsource, pursuant to which Outsource will certify (i) the due adoption by the Board of Directors of Outsource of corporate resolutions attached to such certificate authorizing the Merger and the execution and delivery of this Agreement and the other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby; (ii) the incumbency and true signatures of those officers of Outsource duly authorized to act on its behalf in connection with the Merger and to execute and deliver this Agreement and other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby on behalf of Outsource, and (iii) that the copy of the Bylaws of Outsource attached to such certificate is true and correct and such Bylaws have not been amended except as reflected in such copy;

(h)     A certificate duly signed by the Secretary of the Bank, acting solely in his or her capacity as an officer of the Bank, pursuant to which the Bank will certify that the copy of the Bank's Bylaws attached to such certificate is true and correct and such Bylaws have not been amended except as reflected in such copy;

(i)     A certificate, dated as of the Closing Date, signed by the chief executive officer of Outsource, pursuant to which Outsource will certify that: (i) all of the representations and warranties made in Article III of this Agreement are true and correct on and as of the Closing Date as if made on such date; (ii) Outsource has performed and complied with all of its obligations and agreements required to be performed on or before the Closing Date under this Agreement; and (iii) except as expressly permitted by this Agreement there has been no Material Adverse Change (as defined in Section 12.10) since December 31, 2010;

(j)     A certificate, dated as of the Closing Date, signed by the President of the Bank, pursuant to which the Bank will certify that: (i) all of the representations and warranties made in Article III of this Agreement are true and correct on and as of the Closing Date as if made on such date; (ii) the Bank has performed and complied with all of its obligations and agreements required to be performed on or before the Closing Date under this Agreement; and (iii) except as expressly permitted by this Agreement there has been no Material Adverse Change since December 31, 2010;

(k)     All consents required from third parties to complete the transactions contemplated by this Agreement, including those listed on *Confidential Schedule 3.08*;

(l)     All releases as required under Section 8.06;

(m)     A list of Subject Assets as of the Closing Date; and

(n)     All other documents required to be delivered to FBLB by Outsource under this Agreement, and all other documents, certificates and instruments as are reasonably requested by FBLB or its counsel.

Section 2.03     Actions to be Taken at the Closing by FBLB.  At the Closing, FBLB will execute and acknowledge (where appropriate) and deliver to Outsource such documents and certificates necessary to carry out the terms and provisions of this Agreement, including the following (all of such actions constituting conditions precedent to Outsource's obligations to close hereunder):

(a)     By one or more wire transfers or by one or more certified checks or bank cashier's checks, the Closing Cash Consideration as described in Section 1.02(a);

- 8 -

(b)     A certificate of calculation of the initial amount of the Additional Consideration due under Section 1.02(b).

(c)     A certificate, dated as of the Closing Date, signed by the Secretary of FBLB pursuant to which FBLB will certify (a) the due adoption by the Board of Directors of FBLB of corporate resolutions attached to such certificate authorizing the Merger and the execution and delivery of this Agreement and the other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby; (b) the incumbency and true signatures of those officers of FBLB duly authorized to act on its behalf in connection with the Merger and to execute and deliver this Agreement and other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby on behalf of FBLB; and (c) that the copy of the Bylaws of FBLB attached to such certificate is true and correct and such Bylaws have not been amended except as reflected in such copy;

(d)     A certificate, dated as of the Closing Date, signed by a duly authorized officer of FBLB, pursuant to which FBLB will certify that: (i) all of the representations and warranties made in Article IV of this Agreement are true and correct on and as of the Closing Date as if made on such date; and (ii) FBLB has performed and complied with all of its obligations and agreements required to be performed on or before the Closing Date under this Agreement.

(e)     All consents required from third parties to consummate the transactions contemplated by this Agreement, including, but not limited to, those listed on *Confidential Schedule 4.05*; and

(f)     All other documents required to be delivered to Outsource by FBLB under this Agreement.

Section 2.04     Effective Time.  The "Effective Time" as that term is used in this Agreement means the Effective Time of the Merger under the terms of the Merger Agreement.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF OUTSOURCE AND THE BANK

Outsource and the Bank hereby make the following representations and warranties to FBLB as of the date of this Agreement and of the Closing Date.  Outsource and the Bank also agree to provide to FBLB at the Closing revised supplemental schedules reflecting any material changes to the representations and warranties set forth herein between the date of this Agreement and the Closing Date.

Section 3.01     Organization and Qualification.

(a)     Outsource is a bank holding company registered under the Bank Holding Company Act of 1956, as amended.  Outsource is a corporation, duly organized, validly existing and in good standing under all laws, rules and regulations of the State of Texas.  Outsource has all requisite corporate power and authority to enter into and carry out its obligations under this Agreement.  True and complete copies of the Articles of Incorporation and Bylaws of Outsource as amended to date, certified by the Secretary of Outsource, have been delivered to FBLB.

(b)     The Bank is a Texas banking association, duly organized, validly existing and in good standing under all laws, rules, and regulations of the State of Texas.  The Bank has all requisite corporate power and authority (including all licenses, franchises, permits and other governmental authorizations as are legally required) to carry on its business as now being

- 9 -

conducted, to own, lease and operate its properties and assets as now owned, leased or operated and to enter into and to carry on the business and activities now conducted by it, except where the failure to be so qualified or in good standing, as the case may be, would not be expected to have a Material Adverse Change. True and complete copies of the Articles of Association and Bylaws of the Bank, as amended to date, have been delivered to FBLB. The Bank is an insured bank as defined in the FDIA and is not a member of the Federal Reserve System. Except as set forth on *Confidential Schedule 3.01(b)*, the Bank does not own or control any Affiliate or Subsidiary (as defined in Section 12.10). The nature of the business of the Bank does not require it to be qualified to do business in any jurisdiction other than the State of Texas. Except as set forth on *Confidential Schedule 3.01(b)*, the Bank has no equity interest, direct or indirect, in any other bank or corporation or in any partnership, joint venture or other business enterprise or entity, except as acquired through settlement of indebtedness, foreclosure, the exercise of creditors' remedies or in a fiduciary capacity, and the business carried on by the Bank has not been conducted through any other direct or indirect Subsidiary or Affiliate of the Bank.

Section 3.02    Execution and Delivery. Outsource and the Bank have taken all corporate action necessary to authorize the execution, delivery and (subject to the approval of the Bankruptcy Court and provided the required regulatory approvals are obtained) performance of this Agreement and the other agreements and documents contemplated hereby to which it is a party. This Agreement has been, and the other agreements and documents contemplated hereby, have been or at Closing will be, duly executed by Outsource and the Bank and, subject to the approval of the Bankruptcy Court, each constitutes the legal, valid and binding obligation of Outsource and the Bank, respectively, enforceable in accordance with its respective terms and conditions.

Section 3.03    Capitalization.

(a)    The entire authorized capital stock of Outsource consists solely of 16,000,000 shares of capital stock, designated as follows: (i) 15,000,000 shares of common stock, no par value per share, divided into 12,000,000 shares of voting common stock, of which 3,263,489 are issued and outstanding, and 3,000,000 of non-voting common stock, of which 464,636 shares are issued and outstanding, and (ii) 1,000,000 shares of preferred stock, $0.01 par value per share, none of which are issued and outstanding (collectively referred to as the "Outsource Stock"). Except as set forth on *Confidential Schedule 3.03*, there are no (i) outstanding equity securities of any kind or character, (ii) outstanding subscriptions, options, convertible securities, rights, warrants, calls or other agreements or commitments of any kind issued or granted by, or binding upon, Outsource to purchase or otherwise acquire any security of or equity interest in Outsource, obligating Outsource to issue any shares of, restricting the transfer of or otherwise relating to shares of its capital stock of any class.

(b)    Outsource is, and as of the Closing Date will be, the lawful record and beneficial owner of all of the Bank Stock.

(c)    The entire authorized capital stock of the Bank consists solely of 600,000 shares of Bank Stock, par value $5.00 per share, of which 330,000 are issued and outstanding. All of the issued and outstanding shares of the Bank have been duly authorized, validly issued, and are fully paid and nonassessable, and have not and will not have been issued in violation of the preemptive rights of any person. The securities of the Bank have been issued in compliance with the securities laws of the United States and the State of Texas. Outsource is, and as of the Closing Date will be, the lawful record and beneficial owner of all of the outstanding securities of the Bank, free and clear of any liens, claims, encumbrances, security interests or restrictions of any kind (other than transfer restrictions imposed by applicable federal and state securities laws).

- 10 -

There are no outstanding subscriptions, options, warrants, calls, contracts, demands, commitments, convertible securities or other agreements or arrangements of any character or nature whatever under which Outsource or the Bank is or may become obligated to issue, assign or transfer any securities of the Bank. There are no restrictions applicable to the payment of dividends on the stock of the Bank except pursuant to applicable laws and regulations.

Section 3.04    Compliance with Laws, Permits and Instruments.

(a)    Except as set forth on *Confidential Schedule 3.04*, the Bank has in all material respects performed and abided by all obligations required to be performed by it prior to the date hereof, and has complied with, and is in compliance with, and is not in default (and with the giving of notice or the passage of time will not be in default) under, or in violation of, (i) any provision of the Articles of Association or the Bylaws of the Bank (collectively, the "Constituent Documents"), (ii) any material provision of any mortgage, indenture, lease, contract, agreement or other instrument applicable to the Bank or its assets, operations, properties or businesses or (iii) any permit, concession, grant, franchise, license, authorization, judgment, writ, injunction, order, decree, award, statute, federal, state or local law, ordinance, rule or regulation of any court, arbitrator or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality applicable to the Bank or its assets, operations, properties or businesses.

(b)    Except as set forth on *Confidential Schedule 3.04*, and subject to the approval of the Bankruptcy Court, the execution, delivery and (provided the required regulatory approvals are obtained) performance of this Agreement and the other agreements contemplated hereby, and the completion of the transactions contemplated hereby and thereby will not conflict with, or result, by itself or with the giving of notice or the passage of time, in any violation of or default or loss of a benefit under, (i) the Constituent Documents, (ii) any material mortgage, indenture, lease, contract, agreement or other instrument applicable to Outsource, the Bank or their respective assets, operations, properties or businesses or (iii) any material permit, concession, grant, franchise, license, authorization, judgment, writ, injunction, order, decree, statute, law, ordinance, rule or regulation applicable to Outsource, the Bank or their respective assets, operations, properties or businesses.

Section 3.05    Financial Statements.

(a)    Outsource has furnished to FBLB true and complete copies of (i) the audited consolidated balance sheets of Outsource as of December 31, 2008 and 2009, and the audited consolidated statements of operations and changes in shareholders' equity for the years ended December 31, 2008 and 2009 and statements of cash flows for the years ended December 31, 2008, and 2009, (ii) an unaudited consolidated balance sheet of Outsource as of December 31, 2010, and the related unaudited consolidated statement of operations for the 12 months ended December 31, 2010 (such balance sheets and the related statements of operations, changes in shareholders' equity and cash flows are collectively referred to herein as the "Financial Statements"). The Financial Statements (including the related notes) complied as to form, as of their respective dates, in all material respects with applicable accounting requirements, have been prepared according to generally accepted accounting principles in the United States ("GAAP") applied on a consistent basis during the periods and at the dates involved (except as may be indicated in the notes thereto), fairly present the consolidated financial condition of Outsource and the Bank at the dates thereof and the consolidated results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to notes and normal year-end adjustments that were not material in amount or effect), and the accounting records underlying

the Financial Statements accurately and fairly reflect in all material respects the transactions of Outsource. The Financial Statements do not contain any items of extraordinary or nonrecurring income or any other income not earned in the ordinary course of business except as expressly specified therein.

(b)    Outsource has furnished FBLB with true and complete copies of the Reports of Condition and Income as of December 31, 2008, December 31, 2009 and September 30, 2010 (the "Call Reports"), for the Bank. The Call Reports fairly present, in all material respects, the financial position of the Bank and the results of its operations at the date and for the period indicated in that Call Report in conformity with the instructions to the Call Report Instructions. The Call Reports do not contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business except as expressly specified therein. The Bank has calculated its allowance for loan losses in accordance with regulatory accounting principles ("RAP") as applied to banking institutions and in accordance with all applicable rules and regulations. The allowance for loan losses account for the Bank is, and as of the Closing Date will be, adequate in all material respects to provide for all loan losses, net of recoveries relating to loans previously charged off, on all outstanding loans of the Bank.

Section 3.06    Undisclosed Liabilities. Except as set forth on *Confidential Schedule 3.06*, the Bank has no material liability or obligation, accrued, absolute, contingent or otherwise and whether due or to become due, that are not reflected in or disclosed in the appropriate Call Reports, except those liabilities and expenses incurred in the ordinary course of business and consistent with prudent business practices since the date of the applicable Call Reports.

Section 3.07    Litigation. Except as set forth on *Confidential Schedule 3.07*, and except for matters before the Bankruptcy Court and matters related to the Trust Preferred Securities, there are no actions, claims, suits, investigations, reviews or other legal or administrative proceedings of any kind or nature now pending or, to Outsource's Knowledge, threatened, against the Bank at law or in equity, or by or before any federal, state or municipal court or other governmental or administrative department, commission, board, bureau, agency or instrumentality, that in any manner involve the Bank or any of its properties or capital stock (each, a "Claim"), and Outsource has no Knowledge of any reason to be aware of any basis for the same. Except as set forth on *Confidential Schedule 3.07*, the amounts in controversy in each Claim, and the costs and expenses of the defense thereof (including attorneys' fees) are fully covered by insurance, subject to the deductible set forth on *Confidential Schedule 3.07* with respect to each Claim and subject to the policy limits set forth on *Confidential Schedule 3.07*. Except as set forth on *Confidential Schedule 3.07*, no legal action, suit or proceeding or judicial, administrative or governmental investigation is pending or, to Outsource's Knowledge, threatened against Outsource or the Bank that questions or might question the validity of this Agreement or the agreements contemplated hereby, or any actions taken or to be taken by Outsource or the Bank pursuant hereto or thereto or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby.

Section 3.08    Consents and Approvals. Except as disclosed in *Confidential Schedule 3.08*, and except as required by the Bankruptcy Court, no approval, consent, order or authorization of, or registration, declaration or filing with, any governmental authority or other third party is required on the part of Outsource or the Bank in connection with the execution, delivery or performance of this Agreement or the agreements contemplated hereby, or the completion by Outsource and the Bank of the transactions contemplated hereby or thereby.

Section 3.09    Title to Assets. *Confidential Schedule 3.09* sets forth a list of all existing deeds, leases and title insurance policies for all real property owned or leased by the Bank, including all other real estate, and all mortgages, deeds of trust, security agreements and other documents describing

- 12 -

encumbrances to which such property is subject, true and complete copies of which have been made available to FBLB. The Bank has good and marketable title to all of its assets and properties, including all personal and intangible properties as reflected in the Call Reports or acquired subsequent thereto, subject to no liens, mortgages, security interests, encumbrances or charges of any kind except (a) as described in *Confidential Schedule 3.09*, (b) as noted in the Call Reports, (c) statutory liens not yet delinquent, (d) consensual landlord liens, (e) minor defects and irregularities in title and encumbrances that do not materially impair the use thereof for the purpose for which they are held, (f) pledges of assets in the ordinary course of business to secure public funds deposits, and (g) those assets and properties disposed of for fair value in the ordinary course of business since the applicable dates of the Call Reports.

Section 3.10   Absence of Certain Changes or Events.   Except as disclosed on *Confidential Schedule 3.10*, since December 31, 2010, the Bank has conducted its business only in the ordinary course and has not:

(a)   Incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, except deposits taken and federal funds purchased and current liabilities for trade or business obligations, other than in the ordinary course of business and consistent with past practices and safe and sound banking practices;

(b)   Discharged or satisfied any lien, charge or encumbrance or paid any obligation or liability, whether absolute or contingent, due or to become due, other than in the ordinary course of business and consistent with past practices and safe and sound banking practices;

(c)   Increased the shares of Bank Stock outstanding or its surplus (as calculated in accordance with the Call Report Instructions), or declared or made any payment of dividends or other distribution to its shareholders, or purchased, retired or redeemed, or obligated itself to purchase, retire or redeem, any of its shares of capital stock or other securities;

(d)   Issued, reserved for issuance, granted, sold or authorized the issuance of any shares of its capital stock or other securities or subscriptions, options, warrants, calls, rights or commitments of any kind relating to the issuance thereto;

(e)   Acquired any capital stock or other equity securities or acquired any ownership interest in any bank, corporation, partnership or other entity (except (i) through settlement of indebtedness, foreclosure, or the exercise of creditors' remedies or (ii) in a fiduciary capacity, the ownership of which does not expose it to any liability from the business, operations or liabilities of such person);

(f)   Mortgaged, pledged or subjected to lien, charge, security interest or any other encumbrance or restriction any of its property, business or assets, tangible or intangible except (i) as described in *Confidential Schedule 3.09*, (ii) statutory liens not yet delinquent, (iii) consensual landlord liens, (iv) minor defects and irregularities in title and encumbrances that do not materially impair the use thereof for the purpose for which they are held, (v) pledges of assets to secure public funds deposits, and (vi) those assets and properties disposed of for fair value since the applicable dates of the Financial Statements or the Call Reports;

(g)   Sold, transferred, leased to others or otherwise disposed of any of its assets (except for assets disposed of for fair value) or canceled or compromised any debt or claim, or waived or released any right or claim, other than in the ordinary course of business and consistent with past business practices and prudent banking practices, except as contemplated by the P&A Agreement;

- 13 -

(h)     Terminated, canceled or surrendered, or received any notice of or threat of termination or cancellation of any contract, lease or other agreement or suffered any damage, destruction or loss which, individually or in the aggregate, may reasonably constitute a Material Adverse Change;

(i)     Disposed of, permitted to lapse, transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any license or Proprietary Right (as defined in Section 3.15) or modified any existing rights with respect thereto;

(j)     Made any change in the rate of compensation, commission, bonus, vesting or other direct or indirect remuneration payable, or paid or agreed or orally promised to pay any bonus, extra compensation, pension or severance or vacation pay, to or for the benefit of any of its shareholders, directors, officers, employees or agents, or entered into any employment or consulting contract or other agreement with any director, officer or employee or adopted, amended in any material respect or terminated any pension, employee welfare, retirement, stock purchase, stock option, stock appreciation rights, termination, severance, income protection, golden parachute, savings or profit-sharing plan (including trust agreements and insurance contracts embodying such plans), any deferred compensation, or collective bargaining agreement, any group insurance contract or any other incentive, welfare or employee benefit plan or agreement maintained by it for the benefit of its directors, employees or former employees;

(k)     Except for improvements or betterments relating to Properties (as defined in Section 12.10), made any capital expenditures or capital additions or betterments in excess of an aggregate of $10,000;

(l)     Instituted, had instituted against it, settled or agreed to settle any litigation, action or proceeding before any court or governmental body relating to its property other than routine collection suits instituted by it to collect amounts owed or suits in which the amount in controversy is less than $10,000;

(m)     Suffered any change, event or condition that, in any case or in the aggregate, has caused or may result in a Material Adverse Change;

(n)     Except for the transactions contemplated by this Agreement, the P&A Agreement or as otherwise permitted hereunder, entered into any transaction, or entered into, modified or amended any contract or commitment, other than in the ordinary course of business and consistent with past business practices and prudent banking practices;

(o)     Entered into or given any promise, assurance or guarantee of the payment, discharge or fulfillment of any undertaking or promise made by any person, firm or corporation, other than in the ordinary course of business and consistent with past business practices and prudent banking practices;

(p)     Except as contemplated by the P&A Agreement, sold, or Knowingly disposed of, or otherwise divested itself of the ownership, possession, custody or control, of any corporate books or records of any nature that, in accordance with sound business practice, normally are retained for a period of time after their use, creation or receipt, except at the end of the normal retention period;

(q)     Made any, or acquiesced with any, change in any accounting methods, principles or material practices except as required by GAAP or RAP;

- 14 -

(r)     Sold (provided, however, that payment at maturity is not deemed a sale) or purchased any investment securities in an aggregate amount of $500,000 or more;

(s)     Made, renewed, extended the maturity of, or altered any of the material terms of any loan to any single borrower and his related interests in excess of the principal amount of $500,000; or

(t)     Except as contemplated by the P&A Agreement, entered into any agreement or made any commitment whether in writing or otherwise to take any of the types of action described in subsections (a) through (s) above.

Section 3.11    Leases, Contracts and Agreements.    *Confidential Schedule 3.11* sets forth a complete listing, as of December 31, 2010, of all leases, subleases, licenses, contracts and agreements to which either Outsource or the Bank is a party (the "Contracts"), and which (a) relate to real property used by the Bank in its operations (such Contracts being referred to herein as the "Leases"), or (b) involve payments to or by Outsource or the Bank of $25,000 or more during the term thereof. True and correct copies of all such Contracts, and all amendments thereto, have been made available to FBLB. For the purposes of this Agreement, the term "Contracts" does not include (i) loans made by, (ii) unfunded loan commitments of $50,000 or less made by, (iii) letters of credit issued by, (iv) loan participations of, (v) Federal funds sold or purchased by, (vi) repurchase agreements made by, (vii) spot foreign exchange transactions of, (viii) bankers acceptances of or (ix) deposit liabilities of, the Bank. Except as set forth in *Confidential Schedule 3.11*, no participations or loans have been sold that have buy back, recourse or guaranty provisions that create contingent or direct liability to the Bank. Subject to the approval of the Bankruptcy Court, all of the Contracts are legal, valid and binding obligations of the parties to the Contracts enforceable according to their terms. Except as described in *Confidential Schedule 3.11*, all rent and other payments by Outsource or the Bank under the Contracts are current, there are no existing defaults by Outsource or the Bank under the Contracts and no termination, condition or other event has occurred that (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a material default thereunder. Outsource and the Bank have a good and marketable leasehold interest in each of the properties subject to the Leases, free and clear of all mortgages, pledges, liens, encumbrances and security interests, but subject to all matters of record.

Section 3.12    Taxes.

(a)     Outsource and the Bank have duly and timely filed all Tax Returns (as defined in Section 3.12(q)) that they were required to file under applicable laws and regulations with the appropriate Federal, state, local or foreign governmental agencies. All such Tax Returns were correct and complete in all material respects and have been prepared in substantial compliance with all applicable laws and regulations. All Taxes (as defined in Section 3.12(q)) due and owing by Outsource or the Bank (whether or not shown on any Tax Return) have been paid. Neither Outsource nor the Bank currently is the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where Outsource or the Bank does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of Outsource or the Bank.

(b)     Outsource and the Bank have withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

- 15 -

(c)     There is no material dispute or claim concerning any Tax liability of Outsource or the Bank either (i) claimed or raised by any authority in writing, or (ii) as to which any director or officer (or employee responsible for Tax matters) of Outsource or the Bank has Knowledge based upon personal contact with any agent of such authority. Within the past 3 years, the Internal Revenue Service (the "IRS") has not challenged the interest deduction on any of Outsource's debt on the basis that such debt constitutes equity for federal income tax purposes.

(d)     *Confidential Schedule 3.12(d)* lists all federal, state, local, and foreign Tax Returns filed with respect to Outsource or the Bank for taxable periods ended on or after December 31, 2005, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. True and complete copies of the Federal income Tax Returns of Outsource, as filed with the IRS for the years ended December 31, 2007, 2008, and 2009 have been delivered to FBLB. Neither Outsource nor the Bank has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     Neither Outsource nor the Bank has been a United States real property holding corporation within the meaning of the §897(c)(2) of the Internal Revenue Code of 1986, as amended (the "Code"), during the applicable period specified in Code §897(c)(1)(A)(ii). Neither Outsource nor the Bank is a party to or bound by any tax allocation or sharing agreement, other than those to which only Outsource or the Bank are parties. Each of Outsource and the Bank have disclosed on their Federal income Tax Returns all positions taken therein that could give rise to substantial understatement of federal income Tax within the meaning of Code § 6662.

(f)     Neither Outsource nor the Bank (i) has been a member of a group filing a consolidated federal income tax return (other than a group the common parent of which was Outsource) or (ii) has any liability for the Taxes of any person other than Outsource or the Bank) under Treasury Regulation § 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract or otherwise.

(g)     The unpaid Taxes of Outsource and the Bank (i) did not exceed the provisions for current or deferred Taxes on the Financial Statements (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) and (ii) will not exceed the provisions for current or deferred Taxes on the Financial Statements as of the Closing Date (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income). Each of Outsource and the Bank are in compliance with the requirements of FIN 48, and their Tax accrual work papers explain and support all amounts provided and positions taken by Outsource and the Bank with respect to FIN 48.

(h)     Neither Outsource nor the Bank are required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a taxable period ending on or before the Closing Date; (ii) "closing agreement" as described in Code § 7121 (or any corresponding or similar provision of state, local, or foreign Tax law) executed on or before the Closing Date; (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Code § 1502 (or any corresponding or similar provision of state, local, or foreign Tax law); (iv) installment sale or open transaction disposition made on or before the Closing Date; (v) prepaid amount received on or before the Closing Date; or (vi) election under Code §108(i). Neither Outsource nor the Bank is a party to any agreement, contract, arrangement or plan that has resulted or would result, separately or in the aggregate, in the payment of any amount that will not be fully deductible as a result of Code § 162(m) (or any

- 16 -

corresponding provision of Texas Tax law or Tax laws issued by jurisdictions within the State of Texas).

(i) Neither Outsource nor the Bank has been a party to any "listed transaction" as such term is defined in Code § 6707A(c)(2) and Treasury Regulation § 1.6011-4(b)(2). Each of Outsource and the Bank have properly reported all "reportable transactions" as defined in Code § 6707A(c)(1) and Treasury Regulation § 1.6011-4(b) on its Federal income Tax Returns.

(j) Neither Outsource nor the Bank has distributed stock of another person or has had its stock distributed by another person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or §361.

(k) Effective January 1, 2001 (the "S Election Date"), Outsource made a valid election to be taxed for federal income tax purposes as a Subchapter S corporation (within the meaning of Code §§ 1361 and 1362) (an "S Corporation") and that such election has at all times since the S Election Date remained validly in effect, is currently validly in effect as of the date of this Agreement, and will remain validly in effect for all periods up to and including the Closing Date. Effective on the S Election Date, Outsource made valid elections for the Bank and any other subsidiary distributed by the Bank (a "Bank Subsidiary") to be taxed for federal income tax purposes as a qualified Subchapter S subsidiary (within the meaning of Code § 1361(b)(3)) ("QSSS") and such elections have at all times since the S Election Date remained validly in effect, are currently validly in effect as of the date of this Agreement, and will remain validly in effect for all periods up to and including the Closing Date. Neither Outsource nor any shareholder of Outsource has taken or will take before Closing any action that would cause Outsource to cease being an S Corporation or cause any Bank Subsidiary to cease being a QSSS before the Effective Time. Outsource is not currently and will not any time before the Closing Date be liable for any tax under Code §1374. Except as set forth in *Confidential Schedule 3.12(k)*, none of Outsource or any Bank Subsidiary has, since the S Election Date, (a) acquired assets from another corporation in a transaction in which Outsource's or any Outsource Subsidiary's Tax basis for the acquired assets was determined, in whole or in part, by reference to the Tax basis of the acquired assets (or any other property) in the hands of the transferor or (b) acquired the stock of any corporation that is a QSSS.

(l) For any tax year of Outsource beginning on or after the S Election Date, no audit by the IRS has commenced or been completed pursuant to Code §§6241 through 6245 regarding Subchapter S items, and no agreement, consent or waiver to extend the statute of limitations of Subchapter S items of Outsource has been given. To Outsource's Knowledge, for any tax year of Outsource beginning after the S Election Date, each Outsource shareholder's treatment of Subchapter S items with respect to Outsource is consistent with the manner in which Outsource has filed its tax returns, and no audit by the IRS of any Outsource shareholder has occurred.

(m) Since the S Election Date, Outsource has not been required to include in income any material adjustment pursuant to Code §481 by reason of a voluntary change in accounting method initiated by Outsource, and the IRS has not initiated or proposed any such material adjustment or change in accounting method (including any method for determining reserves for bad debts maintained by Outsource).

(n) Since December 31, 2004, Outsource has not been required to include in income any material adjustment pursuant to Code §481 by reason of a voluntary change in accounting method initiated by Outsource, and the IRS has not initiated or proposed any such material

adjustment or change in accounting method (including any method for determining reserves for bad debts maintained by Outsource).

(o)     Each of Outsource and each Outsource Subsidiary have disclosed on their federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax, within the meaning of Code §6662.

(p)     *Confidential Schedule 3.12(p)* lists and contains an accurate and complete description as to the United States federal net operating and capital loss carryforwards for the Bank (including any limitations of such net operating or capital loss carryforwards under Code Sections 382, 383 or 384 or the Treasury Regulations) as of December 31, 2010, and the expiration dates thereof.

(q)     For purposes of this Agreement, "Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code § 59A), customs, duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not. For purposes of this Agreement, "Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

Section 3.13     Insurance. *Confidential Schedule 3.13* sets forth an accurate and complete list of all policies of insurance, including fidelity and bond insurance, relating to the Bank. All such policies (a) are valid, outstanding and enforceable according to their terms, subject to the Bankruptcy Exception, and (b) are presently in full force and effect, no notice has been received of the cancellation, or threatened or proposed cancellation, of any such policy and there are no unpaid premiums due thereon. Neither Outsource nor the Bank is in default with respect to any such policy and has not failed to give any notice or present any claim thereunder in a due and timely fashion. Except as set forth on *Confidential Schedule 3.13*, the Bank has not been refused any insurance with respect to its assets or operations, nor has its insurance been limited by any insurance carrier to which any the Bank has applied for any such insurance within the last 2 years. Each property of the Bank is insured for in amounts deemed adequate by the Bank's management against risks customarily insured against. There have been no claims under any fidelity bonds of the Bank within the last 3 years, and Outsource has no Knowledge of any facts that would form the basis of a claim under such bonds.

Section 3.14     No Adverse Change. Except as disclosed in the representations and warranties made in this Article III, there has not been any Material Adverse Change since December 31, 2010, nor has any event or condition occurred that has resulted in, or has a reasonable possibility of resulting in the future, in a Material Adverse Change.

Section 3.15     Proprietary Rights. The Bank does not own or require the use of any patent, patent application, patent right, invention, process, trademark (whether registered or unregistered), trademark application, trademark right, trade name, service name, service mark, copyright or any trade secret ("Proprietary Rights") for its business or operations. The Bank is not infringing upon or otherwise acting adversely to, and has not in the past 3 years infringed upon or otherwise acted adversely to, any Proprietary Right owned by any other person or persons. There is no claim or action by any such person pending, or to Outsource's Knowledge, threatened, with respect thereto.

- 18 -

Section 3.16    Transactions with Certain Persons and Entities.   Except as disclosed in *Confidential Schedule 3.16* and excluding deposit liabilities, there are no outstanding amounts payable to or receivable from, or advances by the Bank to, and the Bank is not otherwise a creditor to, any director or executive officer of Outsource or the Bank nor is the Bank a debtor to any such person other than as part of the normal and customary terms of such person's employment or service as a director for the Bank.   Except as set forth on *Confidential Schedule 3.16*, the Bank does not use any asset owned by any shareholder or any present or former director or officer of Outsource or the Bank, or any Affiliate thereof, in the operations (other than personal belongings of such officers and directors located in the Bank's premises, the removal of which would not result in a Material Adverse Change), nor do any of such persons own or have the right to use real property that is adjacent to property on which the Bank's facilities are located.   Except as disclosed in *Confidential Schedule 3.16* or *Confidential Schedule 3.27(a)*, the Bank is not a party to any transaction or agreement with any director or executive officer of Outsource or the Bank.

Section 3.17    Evidences of Indebtedness.   All evidences of indebtedness and leases that are reflected as assets of the Bank are the legal, valid and binding obligations of the respective obligors thereof, enforceable in accordance with their respective terms, subject to the Bankruptcy Exception, and are not subject to any known or threatened defenses, offsets or counterclaims that may be asserted against the Bank or the present holder thereof.   The credit files of the Bank contain all material information (excluding general, local or national industry, economic or similar conditions) known to Outsource or the Bank that is reasonably required to evaluate in accordance with generally prevailing practices in the banking industry the collectability of the loan portfolio of the Bank (including loans that will be outstanding if any of them advances funds they are obligated to advance).   Outsource has disclosed all of the substandard, doubtful, loss, nonperforming or problem loans of the Bank on the internal watch list of the Bank, a copy of which as of December 31, 2010, has been provided to FBLB.   Outsource is not aware of, nor has Outsource received notice of, any past or present conditions, events, activities, practices or incidents that may result in a violation of any Environmental Law (as defined in Section 12.10) with respect to any real property securing any indebtedness reflected as an asset of the Bank.   With respect to any loan or other evidence of indebtedness all or a portion of which has been sold to or guaranteed by any governmental authority, including the Small Business Administration, each of such loans was made in compliance and conformity with all relevant laws, rules, regulations and procedures such that such governmental authority's guaranty of such loan is effective during the term of such loan in all material respects.   No representation or warranty is being made as to the sufficiency of collateral securing or collectability of the loans of the Bank.

Section 3.18    Condition of Assets.   Except as set forth on *Confidential Schedule 3.18,* all tangible assets used by the Bank are in good operating condition, ordinary wear and tear excepted, and conform with all applicable ordinances, regulations, zoning and other laws, whether Federal, state or local.   None of the Bank's premises or equipment are in need of maintenance or repairs other than ordinary routine maintenance and repairs that are not material in nature or cost.

Section 3.19    Environmental Compliance.

(a)    The Bank, its operations and the respective Properties are in material compliance with all Environmental Laws.   Neither Outsource nor the Bank is aware of, nor has Outsource or the Bank received notice of, any past, present, or future conditions, events, activities, practices or incidents that may interfere with or prevent the material compliance of the Bank with all Environmental Laws.

(b)    The Bank has obtained all material permits, licenses and authorizations that are required by it under all Environmental Laws.

- 19 -

(c)     No Hazardous Materials (as defined in Section 12.10) exist on, about or within any of the Properties, nor to the Knowledge of Outsource and the Bank have any Hazardous Materials previously existed on, about or within or been used, generated, stored, transported, disposed of, on or released from any of the Properties. The use that the Bank makes and intends to make of the Properties will not result in the use, generation, storage, transportation, accumulation, disposal or release of any Hazardous Material on, in or from any of the Properties.

(d)     There is no action, suit, proceeding, investigation, or inquiry before any court, administrative agency or other governmental authority pending or to Outsource's Knowledge threatened against the Bank relating in any way to any Environmental Law. The Bank has no liability for remedial action under any Environmental Law. The Bank has not received any request for information by any governmental authority with respect to the condition, use or operation of any of the Properties nor has the Bank received any notice of any kind from any governmental authority or other person with respect to any violation of or claimed or potential liability of any kind under any Environmental Law.

Section 3.20    _Regulatory Compliance._  All reports, records, registrations, statements, notices and other documents or information required to be filed by the Bank with any federal or state regulatory authority, including the TDB and the FDIC, have been duly and timely filed and all information and data contained in such reports, records or other documents are true, accurate, correct and complete in all material respects. Except as set forth on _**Confidential Schedule 3.20,**_ (a) neither Outsource nor the Bank is now nor has it been within the last 5 years subject to any commitment letter, memorandum of understanding, cease and desist order, written agreement or other formal or informal administrative action with any such regulatory bodies, and Outsource and the Bank are in full compliance with the requirements of any such commitment letter, memorandum of understanding, cease and desist order, written agreement or other formal or informal administrative action, and (b) there are no actions or proceedings pending or threatened against the Bank by or before any such regulatory bodies or any other nation, state or subdivision thereof, or any other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

Section 3.21    _Absence of Certain Business Practices._  Neither the Bank nor any officer, employee or agent of the Bank, or any other person acting on their behalf, has, directly or indirectly, within the past 10 years, given or agreed to give any gift or similar benefit to any customer, supplier, governmental employee or other person who is or may be in a position to help or hinder the business of the Bank (or assist the Bank in connection with any actual or proposed transaction) that (a) might subject the Bank to any damage or penalty in any civil, criminal or governmental litigation or proceeding, (b) if not given in the past, might have resulted in a Material Adverse Change or (c) if not continued in the future might result in a Material Adverse Change or might subject the Bank to suit or penalty in any private or governmental litigation or proceeding.

Section 3.22    _Books and Records._  The minute books, stock certificate books and stock transfer ledgers of the Bank (a) have been kept accurately in the ordinary course of business, (b) are complete and correct in all material respects, (c) the transactions entered therein represent bona fide transactions, and (d) do not fail to reflect transactions involving the business of the Bank that properly should have been set forth therein and that have not been accurately so set forth.

Section 3.23    _Forms of Instruments, Etc._  Outsource has made, and will make, available to FBLB copies of all standard forms of notes, mortgages, deeds of trust and other routine documents of a like nature used on a regular and recurring basis by the Bank in the ordinary course of its business.

- 20 -

Section 3.24    Fiduciary Responsibilities.  The Bank has performed in all material respects all of its duties as a trustee, custodian, guardian or as an escrow agent in a manner that complies in all material respects with all applicable laws, regulations, orders, agreements, instruments and common law standards.

Section 3.25    Guaranties.  Except for items in the process of collection in the ordinary course of the Bank's business, none of the obligations or liabilities of the Bank are guaranteed by any other person, firm or corporation, nor, except in the ordinary course of business, according to prudent business practices and in compliance with applicable law, has the Bank guaranteed the obligations or liabilities of any other person, firm or corporation.

Section 3.26    Employee Relationships.  The Bank has complied in all material respects with all applicable laws relating to its relationships with its employees, and Outsource believes that the relationships between the Bank and its employees are good.  Except as set forth on *Confidential Schedule 3.26*, to the Knowledge of Outsource and the Bank, no executive officer or manager of any of the operations operated by the Bank or of any group of employees of the Bank has or have any present plans to terminate their employment with the Bank.  Except as set forth on *Confidential Schedule 3.27(a)*, the Bank is not a party to any oral or written contracts or agreements granting benefits or rights to employees or any collective bargaining agreement or to any conciliation agreement with the Department of Labor, the Equal Employment Opportunity Commission or any federal, state or local agency that requires equal employment opportunities or affirmative action in employment beyond the generally applicable legal requirements.  There are no unfair labor practice complaints pending against the Bank before the National Labor Relations Board and no similar claims pending before any similar state or local or foreign agency.  There is no activity or proceeding of any labor organization (or representative thereof) or employee group to organize any employees of the Bank, nor of any strikes, slowdowns, work stoppages, lockouts or threats thereof, by or with respect to any such employees.  The Bank is in compliance in all material respects with all applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and the Bank is not engaged in any unfair labor practice.

Section 3.27    Employee Benefit Plans.

(a)    Set forth on *Confidential Schedule 3.27(a)* is a complete and correct list of all "employee benefit plans" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), all "multi -employer plans" and "multiple employer" (as defined in ERISA and the Code), all specified fringe benefit plans as defined in Code § 6039D, and all other bonus, incentive, compensation, deferred compensation, profit sharing, stock option, phantom stock, stock appreciation right, stock bonus, stock purchase, employee stock ownership, savings, severance, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit or welfare plan or any other similar plan, agreement, policy or understanding (qualified or nonqualified, currently effective or terminated), and any trust, escrow or other agreement related thereto, which (i) have been sponsored, maintained or contributed to by the Bank, or with respect to which the Bank has or has had any liability during the last 6 years, and (ii) provide benefits, or describe policies or procedures applicable to, or for the welfare of, any officer, director, independent contractor, employee, service provider, former officer or former employee of the Bank, or the dependents, spouses or beneficiaries of any such person, regardless of whether funded (the "Employee Plans").  True, accurate and complete copies of the documents comprising each Employee Plan, including each trust, funding arrangements (including all annuity contracts, insurance contracts, and other funding instruments, summary plan descriptions and summaries of material modifications), the most current determination letter issued by the Internal Revenue Service, Form 5500 Annual Reports for the three most recent plan years, documents, records,

- 21 -

policies, procedures or other materials related thereto, have been delivered to FBLB and are included and specifically identified in *Confidential Schedule 3.27(a)*. No unwritten amendment exists with respect to any Employee Plan.

(b)     No Employee Plan is a defined benefit plan within the meaning of ERISA § 3(35) or is otherwise subject to ERISA Title IV, and neither Outsource nor the Bank has ever sponsored or otherwise maintained such a plan or any plan subject to the minimum funding standards of Section 412 of the Code or Section 302 or ERISA.

(c)     There have been no prohibited transactions (as defined in Code § 4975(c)(1)), breaches of fiduciary duty or any other breaches or violations of any law applicable to the Employee Plans that would subject the Bank or any Employee Plan to any taxes, penalties, or other liabilities (including liability arising through indemnification). Each Employee Plan that is represented to be qualified under Code § 401(a) has a favorable determination letter that covers all existing amendments at least up to and including GUST and has no obligation to adopt any amendments for which the remedial amendment period under Code § 401(b) has expired and Outsource is not aware of any circumstances likely to result in revocation of any such favorable determination letter. To the Knowledge of Outsource, each such Employee Plan is so qualified and has been operated in compliance with applicable law and its terms, any related trust is exempt from federal income tax under Code § 501(a) and no event has occurred that will or reasonably could result in the loss of such tax exemption or to liability for any tax under Code § 511. Except as disclosed on *Confidential Schedule 3.27(c)*, no Employee Plan holds any stock or other securities of the Bank. There are no pending claims, lawsuits or actions relating to any Employee Plan (other than ordinary course claims for benefits) and, to Outsource's Knowledge, none are threatened. The Bank does not provide benefits to any employee or dependent of such employee after the employee terminates employment other than as disclosed in this Agreement or any schedule hereto or as required by law. No written or oral representations have been made to any employee or former employee of the Bank promising or guaranteeing any employer payment or funding for the continuation of medical, dental, life or disability coverage or any other welfare benefit (as defined in ERISA § 3(1)) for any period of time beyond the employee's termination of employment with the Bank (except to the extent of coverage required under Code § 4980B). Compliance with FAS 106 would not create any material change to the Financial Statements. The completion of the transactions contemplated by this Agreement will not cause a termination or partial termination, or otherwise accelerate the time of payment, exercise, or vesting, or increase the amount of compensation due to any employee, officer, former employee or former officer of Outsource or the Bank except (i) as required in connection with qualified plan amendments required by tax law changes, (ii) as contemplated by this Agreement, or (iii) except as identified on *Confidential Schedule 3.27(c)*. There are no surrender charges, penalties, or other costs or fees that would be imposed by any person against the Bank, an Employee Plan, or any other person, including an Employee Plan participant or beneficiary, as a result of the hypothetical liquidation as of the Closing Date of any insurance, annuity, or investment contracts or any other similar investment held by any Employee Plan.

(d)     No participant or beneficiary or non-participating employee has been denied any benefit due or to become due under any Employee Plan, and the Bank has not misled any person as to his or her rights under any Employee Plan or failed to disclose any information or provide any documents required to be disclosed or provided. All obligations required to be performed by the Bank under any Employee Plan have been performed in all material respects and the Bank is not in default under or in violation of any provision of any Employee Plan. To the Knowledge of Outsource, no event has occurred that would constitute grounds for an enforcement action by any party against the Bank under part 5 of Title I of ERISA under any Employee Plan.

- 22 -

(e)     With respect to each "employee benefit plan" (as defined in ERISA) maintained or contributed to or required to be contributed to, currently or in the past, by Outsource or the Bank or any corporation or trade or business required to be treated as a single employer with Outsource or the Bank under any of the rules contained in ERISA or Code § 414 (the "Controlled Group Plans"):

(i)     All Controlled Group Plans that are "group health plans" (as defined in Code § 5000(b)(1) and ERISA § 733(a)) have been operated up to the Closing in a manner so as to not subject the Bank to any material liability under Code § 4980B or § 4980D;

(ii)     There is no Controlled Group Plan that is a defined benefit plan (as defined in ERISA § 3(35)) or a plan subject to the minimum funding requirements of Section 412 of the Code or Section 302 of ERISA, nor has there been in the last 6 years; and

(iii)     There is no Controlled Group Plan that is a "multiple employer plan" or "multi employer plan" (as either such term is defined in ERISA), nor has there been in the last 6 years.

Each such Controlled Group Plan is included in the listing of Employee Plans on *Confidential Schedule 3.27(a)*.

(f)     Except as set forth on *Confidential Schedule 3.27(f)*, all Employee Plan documents, annual reports or returns, audited or unaudited financial statements, actuarial valuations, summary annual reports, and summary plan descriptions issued with respect to the Employee Plans are correct, complete, and current in all material respects, have been timely filed.

(g)     No Employee Plan is invested in or provides the opportunity for the purchase of any employer security (within the meaning of ERISA § 407(d)).

(h)     Except as set forth on *Confidential Schedule 3.27(h)*, neither Outsource nor the Bank maintains any Employee Plan that is a "nonqualified deferred compensation plan" within the meaning of Code §409A(d)(1) of the Code.

(i)     The Bank may withdraw at any time from any Employee Benefit Plan to which it contributes (but does not sponsor or maintain), including any such plan sponsored or maintained by Outsource, without incurring liability except for unpaid premiums or contributions due for the pay period that includes the date of withdrawal or termination.

Section 3.28     Voting Trust or Voting Agreements.  Except as set forth on *Confidential Schedule 3.28*, Outsource is not aware of any agreement or voting trust regarding the voting of shares of Outsource's capital stock.

Section 3.29     Obligations to Employees.  All accrued obligations and liabilities of and all payments by the Bank, and all Employee Plans, whether arising by operation of law, by contract or by past custom, for payments to trusts or other funds, to any government agency or authority or to any present or former director, officer, employee or agent (or his or her heirs, legatees or legal representatives) have been and are being paid to the extent required by applicable law or by the plan, trust, contract or past custom or practice, and adequate actuarial accruals and reserves for such payments have been and are being made by the Bank according to GAAP and applicable law applied on a consistent basis and

- 23 -

actuarial methods with respect to: (a) withholding taxes, unemployment compensation or social security benefits; (b) all pension, profit-sharing, savings, stock purchase, stock bonus, stock ownership, stock option, phantom stock and stock appreciation rights plans and agreements; (c) all employment, deferred compensation (whether funded or unfunded), salary continuation, consulting, retirement, early retirement, severance, reimbursement, bonus or collective bargaining plans and agreements; (d) all executive and other incentive compensation plans, programs, or agreements; (e) all group insurance and health contracts, policies and plans; and (f) all other incentive, welfare (including vacation and sick pay), retirement or employee benefit plans or agreements maintained or sponsored, participated in, or contributed to by the Bank for its current or former directors, officers, employees and agents. All obligations and liabilities of the Bank for all other forms of compensation that are or may be payable to their current or former directors, officers, employees or agents, or pursuant to any Employee Plan, have been and are being paid to the extent required by applicable law or by the plan or contract, and adequate actuarial accruals and reserves for payment therefor have been and are being made by the Bank according to GAAP and generally accepted actuarial principles applied on a consistent basis. All accruals and reserves referred to in this Section are correctly and accurately reflected and accounted for in all material respects in the Financial Statements and the books, statements and records of the Bank.

Section 3.30    Interest Rate Risk Management Instruments. All interest rate swaps, caps, floors and option agreements and other interest rate risk management arrangements, whether entered into for the account of the Bank or for the account of a customer of the Bank, were entered into in the ordinary course of business and, to Outsource's Knowledge, in accordance with prudent banking practice and applicable rules, regulations and policies of any regulatory authority and with counterparties believed to be financially responsible at the time and are legal, valid and binding obligations of the Bank, enforceable according to their terms, subject to the Bankruptcy Exception. The Bank has duly performed in all material respects all of its material obligations thereunder to the extent that such obligations to perform have accrued; and, to Outsource's Knowledge, there are no material breaches, violations or defaults or allegations or assertions of such by any party thereunder.

Section 3.31    Internal Controls. The Bank maintains accurate books and records reflecting its assets and liabilities and maintains proper and adequate internal accounting controls that provide assurance that (a) transactions are executed with management's authorization; (b) transactions are recorded as necessary to permit preparation of the consolidated financial statements of Outsource and to maintain accountability for the Bank's assets; (c) access to the Bank's assets is permitted only in accordance with management's authorization; (d) the reporting of the Bank's assets is compared with existing assets at regular intervals; and (e) extensions of credit and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis. None of the Bank's systems, controls, data or information are recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not under the exclusive ownership and direct control of the Bank or their accountants, except as would not reasonably be expected to have a materially adverse effect on the system of internal accounting controls described in the preceding sentence.

Section 3.32    Community Reinvestment Act. The Bank is in compliance with the Community Reinvestment Act (12 U.S.C. § 2901 *et seq.*) (the "CRA") and all regulations issued thereunder, and the Bank has supplied FBLB with copies of the Bank's current CRA Statement, all support papers therefor, all letters and written comments received by the Bank since January 1, 2004, pertaining thereto and any responses by the Bank to those letters and comments. The Bank has a rating of not less than "satisfactory" as of its most recent CRA compliance examination and Outsource has no Knowledge of any reason why the Bank would not receive a rating of "satisfactory" or better in its next CRA compliance

- 24 -

examination or why the FDIC or any other governmental entity may seek to restrain, delay or prohibit the transactions contemplated hereby as a result of any act or omission of the Bank under the CRA.

Section 3.33    Fair Housing Act, Home Mortgage Disclosure Act and Equal Credit Opportunity Act. Except as set forth in *Confidential Schedule 3.33*, the Bank is in compliance with the Fair Housing Act (42 U.S.C. § 3601 *et seq.*), the Home Mortgage Disclosure Act (12 U.S.C. § 2801 *et seq.*) and the Equal Credit Opportunity Act (15 U.S.C. § 1691 *et seq.*) and all regulations issued thereunder. The Bank has not received any notice of any violation of those acts or any of the regulations issued thereunder, and the Bank has not received any notice of, nor has any Knowledge of, any threatened administrative inquiry, proceeding or investigation with respect to the Bank's non-compliance with such acts.

Section 3.34    Consumer Compliance Laws. Except as set forth in *Confidential Schedule 3.34*, all loans of the Bank have been made in compliance with all applicable statutes and regulatory requirements at the time of such loan or any renewal thereof, including Regulation Z (12 C.F.R. § 226 *et seq.*), the Federal Consumer Credit Protection Act (15 U.S.C. § 1601 *et seq.*), and all statutes governing the operation of Texas banking associations. Each loan on the books of the Bank was made in the ordinary course of its business.

Section 3.35    Bank Secrecy Act, Foreign Corrupt Practices Act and U.S.A. Patriot Act. The Bank is in compliance with the Bank Secrecy Act (12 U.S.C. §§ 1730(d) and 1829(b)), the United States Foreign Corrupt Practices Act and the International Money Laundering Abatement and Anti-Terrorist Financing Act, otherwise known as the U.S.A. Patriot Act, and all regulations issued thereunder, and the Bank has properly certified all foreign deposit accounts and has made all necessary tax withholdings on all of its deposit accounts; furthermore, the Bank has timely and properly filed and maintained all requisite Currency Transaction Reports and other related forms, including any requisite Custom Reports required by any agency of the United States Treasury Department, including the IRS. The Bank has timely filed all Suspicious Activity Reports with the Financial Institutions - Financial Crimes Enforcement Network (U.S. Department of the Treasury) required to be filed by it under the laws and regulations referenced in this Section.

Section 3.36    Loans Secured by Outsource Capital Stock. No borrower of the Bank was required to purchase capital stock of Outsource in order to obtain a loan or other form of credit from the Bank.

Section 3.37    Representations Not Misleading. No representation or warranty by Outsource or the Bank contained in this Agreement, nor any written statement, exhibit or schedule furnished to FBLB by Outsource or the Bank under and pursuant to, or in anticipation of this Agreement, contains or will contain on the Closing Date any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances under which it was or will be made, not misleading and such representations and warranties would continue to be true and correct following disclosure to any governmental authority having jurisdiction over Outsource or the Bank or its properties of the facts and circumstances upon which they were based. Except as disclosed herein, there is no matter that materially adversely affects Outsource or the Bank or Outsource's, or the Bank's ability to perform the transactions contemplated by this Agreement or the other agreements contemplated hereby, or to the Knowledge of Outsource or the Bank, will in the future result in a Material Adverse Change. No information material to the Merger, and that is necessary to make the representations and warranties herein contained not misleading, has been withheld by Outsource or the Bank.

- 25 -

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF FBLB

FBLB hereby makes the following representations and warranties to Outsource and the Bank:

Section 4.01 <u>Organization and Qualification</u>. FBLB is a corporation, duly organized, validly existing and in good standing under all laws, rules, and regulations applicable to corporations located in the State of Texas. FBLB has all requisite corporate power and authority (including all licenses, franchises, permits and other governmental authorizations as are legally required) to carry on its business as now being conducted, to own, lease and operate its properties and assets as now owned, leased or operated and to enter into and carry out its obligations under this Agreement.

Section 4.02 <u>Execution and Delivery</u>. FBLB has taken all corporate action necessary to authorize the execution, delivery and (subject to the approval of the Bankruptcy Court and provided the required regulatory approvals are obtained) performance of this Agreement and the other agreements and documents contemplated hereby to which it is a party. This Agreement has been, and the other agreements and documents contemplated hereby have been or at Closing will be, duly executed by FBLB and, subject to the approval of the Bankruptcy Court, each constitutes the valid and binding obligation of FBLB, enforceable in accordance with its respective terms and conditions.

Section 4.03 <u>Compliance with Laws, Permits and Instruments</u>. The execution, delivery and (subject to the approval of the Bankruptcy Court and provided the required regulatory approvals are obtained) performance of this Agreement and the other agreements contemplated hereby and the completion of the transactions contemplated hereby and thereby will not conflict with, or result, by itself or with the giving of notice or the passage of time, in any violation of or default or loss of a benefit under, (a) any provision of the Certificate of Formation or Bylaws of FBLB, (b) any material provision of any mortgage, indenture, lease, contract, agreement or other instrument applicable to FBLB or its assets, operations, properties or businesses or (c) any statute, law, ordinance, rule or regulation applicable to FBLB.

Section 4.04 <u>Litigation</u>. No legal action, suit or proceeding or judicial, administrative or governmental investigation is pending or, to FBLB's Knowledge, threatened against FBLB that questions or might question the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by FBLB pursuant hereto or thereto or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby.

Section 4.05 <u>Consents and Approvals</u>. Except as disclosed in <u>*Confidential Schedule 4.05*</u>, and except as required by the Bankruptcy Court, no approval, consent, order or authorization of, or registration, declaration or filing with, any governmental authority or other third party is required on the part of FBLB in connection with the execution, delivery or performance of this Agreement or the agreements contemplated hereby or the completion by FBLB of the transactions contemplated hereby or thereby.

Section 4.06 <u>Financial Statements</u>.

(a) FBLB has furnished to Outsource true and complete copies of (i) the audited consolidated balance sheets of FBLB as of December 31, 2008 and 2009, and the audited consolidated statements of operations and changes in shareholders' equity for the years ended December 31, 2008 and 2009 and statements of cash flows for the years ended December 31, 2008, and 2009, (ii) an unaudited consolidated balance sheet of FBLB as of December 31, 2010, and the related unaudited consolidated statement of operations for the 12 months ended

- 26 -

December 31, 2010 (such balance sheets and the related statements of operations, changes in shareholders' equity and cash flows are collectively referred to herein as the "FBLB Financial Statements"). The FBLB Financial Statements (including the related notes) complied as to form, as of their respective dates, in all material respects with applicable accounting requirements, have been prepared according to GAAP applied on a consistent basis during the periods and at the dates involved (except as may be indicated in the notes thereto), fairly present the consolidated financial condition of FBLB at the dates thereof and the consolidated results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to notes and normal year-end adjustments that were not material in amount or effect), and the accounting records underlying the FBLB Financial Statements accurately and fairly reflect in all material respects the transactions of FBLB. The FBLB Financial Statements do not contain any items of extraordinary or nonrecurring income or any other income not earned in the ordinary course of business except as expressly specified therein.

(b)    FBLB has furnished Outsource with true and complete copies of the Reports of Condition and Income as of December 31, 2008, December 31, 2009 and September 30, 2010 (the "Call Reports"), for FBLB's subsidiary financial institution, the Lubbock Bank. The Call Reports fairly present, in all material respects, the financial position of the Lubbock Bank and the results of its operations at the date and for the period indicated in that Call Report in conformity with the instructions to the Call Report Instructions. The Call Reports do not contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business except as expressly specified therein.

Section 4.07    Representations Not Misleading.    No representation or warranty by FBLB contained in this Agreement, nor any written statement, exhibit or schedule furnished to Outsource and the Bank by FBLB under and pursuant to, or in anticipation of this Agreement, contains or will contain on the Closing Date any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances under which it was or will be made, not misleading and such representations and warranties would continue to be true and correct following disclosure to any governmental authority having jurisdiction over FBLB of the facts and circumstances upon which they were based.

## ARTICLE V.
## COVENANTS OF OUTSOURCE

Outsource and the Bank hereby make the covenants set forth in this Article V to FBLB.

Section 5.01    Commercially Reasonable Efforts.    Subject to the approval of the Bankruptcy Court, the Bank will use commercially reasonable efforts to perform and fulfill all conditions and obligations on its part to be performed or fulfilled under this Agreement and to cause the completion of the transactions contemplated hereby in accordance with this Agreement, including, but not limited to the P&A Agreement with MidSouth (or such other third party mutually acceptable to the Bank and FBLB) upon terms and conditions mutually acceptable to the Bank and FBLB.

Section 5.02    Information for Applications and Statements.    Outsource will promptly, but not later than 10 Business Days (as defined in Section 12.10) after receipt of a written request by FBLB, furnish to FBLB all information, data and documents concerning Outsource and the Bank, including financial statements, required to be included in any application or statement to be made by FBLB to, or filed by FBLB with, any governmental body in connection with the transactions contemplated by this Agreement, or in connection with any other transactions while this Agreement is pending, and Outsource represents and warrants that all information so furnished for such statements and applications will be true

- 27 -

and correct in all material respects and will not omit any material fact required to be stated therein or necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Outsource and the Bank will otherwise fully cooperate with FBLB in the filing of any applications or other documents necessary to complete the transactions contemplated by this Agreement.

Section 5.03    Required Acts. Unless otherwise permitted in writing by FBLB, and to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the Office of the United States Trustee (the "US Trustee"), and subject to any Order or direction of the Bankruptcy Court, between the date of this Agreement and the Closing, Outsource will cause the Bank to:

(a)    Operate only in the ordinary course of business and consistent with prudent banking practices;

(b)    Except as required by prudent business practices, use all reasonable efforts to preserve its business organization intact and to retain its present customers, depositors and employees, and to maintain all assets owned, leased or used by it (whether under its control or the control of others), in good operating condition and repair, ordinary wear and tear excepted;

(c)    Perform all of its obligations under contracts, leases and documents relating to or affecting its assets, properties and business, except such obligations as Outsource may in good faith reasonably dispute;

(d)    Maintain in full force and effect all insurance policies now in effect or renewals thereof and give all notices and present all claims under all insurance policies in due and timely fashion;

(e)    Timely file, subject to extensions, all reports required to be filed with governmental authorities and observe and conform, in all material respects, to all applicable laws, except those being contested in good faith by appropriate proceedings;

(f)    Timely file (and Outsource will timely file), subject to extensions, all Tax Returns required to be filed by it and promptly pay all taxes, assessments, governmental charges, duties, penalties, interest and fines that become due and payable, except those being contested in good faith by appropriate proceedings;

(g)    Withhold from each payment made to each of its employees the amount of all Taxes required to be withheld therefrom and pay the same to the proper Tax receiving officers;

(h)    Account for all transactions and prepare all financial statements of Outsource and the Bank in accordance with GAAP (unless otherwise instructed by RAP in which instance account for such transaction in accordance with RAP);

(i)    Promptly classify and charge off loans and make appropriate adjustments to loss reserves in accordance with the Call Report Instructions and the Uniform Retail Credit Classification and Account Management Policy;

(j)    Use good faith best efforts to comply or maintain compliance with any and all regulatory commitment letters, memoranda of understanding, cease and desist orders, written agreements or other formal or information administrative actions to which Outsource or the Bank is subject; and

- 28 -

(k)     Pay (or establish adequate reserves for) all costs, expenses and other charges to be incurred by the Bank in connection with the Merger, including all legal, accounting, consulting, investment banking and brokerage fees, before the Calculation Date.

Section 5.04     Prohibited Acts.     Unless otherwise permitted in writing by FBLB, and to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the US Trustee, and subject to any Order or direction of the Bankruptcy Court, between the date of this Agreement and the Closing, Outsource will not, and will cause the Bank not to:

(a)     Take or fail to take any action that would cause the representations and warranties made in Article III to be inaccurate at the time of the Closing or preclude Outsource or the Bank from making such representations and warranties at the time of the Closing;

(b)     Except as contemplated by the P&A Agreement or this Agreement, merge into, consolidate with or sell its assets to any other person or entity, change the Bank's Constituent Documents, increase the number of shares of Bank Stock outstanding or increase the amount of the Bank's surplus (as calculated in accordance with the Call Report Instructions);

(c)     Except as explicitly permitted hereunder or in accordance with applicable law or pursuant to a Contract existing as of the date of this Agreement, engage in any transaction with any affiliated person or allow such persons to acquire any assets from the Bank, except (i) in the form of wages, salaries, fees for services, reimbursement of expenses and benefits already granted or accrued under the Employee Plans or (ii) any deposit (in any amount) made by an officer, director or employee;

(d)     Discharge or satisfy any lien, charge or encumbrance or pay any obligation or liability, whether absolute or contingent, due or to become due, except in the ordinary course of business consistent with past practices and except for liabilities incurred in connection with the transactions contemplated hereby;

(e)     Except as contemplated by this Agreement or the transactions related to or facilitating the Merger, issue, reserve for issuance, grant, sell or authorize the issuance of any shares of its capital stock or other securities or subscriptions, options, warrants, calls, rights or commitments of any kind relating to the issuance thereto;

(f)     Accelerate the vesting of pension or other benefits in favor of employees of the Bank except according to the Employee Plans or as otherwise contemplated by this Agreement;

(g)     Acquire any capital stock or other equity securities or acquire any equity or ownership interest in any bank, corporation, partnership or other entity (except (i) through settlement of indebtedness, foreclosure, or the exercise of creditors' remedies or (ii) in a fiduciary capacity, the ownership of which does not expose it to any liability from the business, operations or liabilities of such person);

(h)     Mortgage, pledge or subject to lien, charge, security interest or any other encumbrance or restriction any of its property, business or assets, tangible or intangible except (i) statutory liens not yet delinquent, (ii) consensual landlord liens, (iii) minor defects and irregularities in title and encumbrances that do not materially impair the use thereof for the purpose for which they are held, and (iv) pledges of assets to secure public funds deposits;

- 29 -

(i) Except as contemplated by the P&A Agreement, sell, transfer, lease to others or otherwise dispose of any of its assets (except any sales of securities or sales of loans in the ordinary course of business consistent with past practices) or cancel or compromise any debt or claim, or waive or release any right or claim of a value in excess of $10,000;

(j) Make any change in the rate or timing of payment of compensation, commission, bonus or other direct or indirect remuneration payable, or pay or agree or orally promise to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance or vacation pay, to or for the benefit of any of its shareholders, directors, officers, employees or agents, other than periodic increases in compensation consistent with past practices, and bonuses, commissions, and incentives consistent with past and normal Bank practices to Bank employees and officers;

(k) Enter into any employment or consulting contract or other agreement with any director, officer or employee or adopt, amend in any material respect or terminate any pension, employee welfare, retirement, stock purchase, stock option, phantom stock, stock appreciation rights, termination, severance, income protection, golden parachute, savings or profit-sharing plan (including trust agreements and insurance contracts embodying such plans), any deferred compensation, or collective bargaining agreement, any group insurance contract or any other incentive, welfare or employee benefit plan or agreement maintained by it for the benefit of its directors, employees or former employees;

(l) Except for improvements or betterments relating to Properties, make any capital expenditures or capital additions or betterments in excess of an aggregate of $10,000;

(m) Hire or employ any person as a replacement for an existing position with an annual salary equal to or greater than $30,000 or hire or employ any person for any newly created position;

(n) Except as contemplated by the P&A Agreement, sell or dispose of, or otherwise divest itself of the ownership, possession, custody or control, of any corporate books or records of any nature that, in accordance with sound business practice, normally are retained for a period of time after their use, creation or receipt, except at the end of the normal retention period;

(o) Make any, or acquiesce with any, change in any (i) credit underwriting standards or practices, including loan loss reserves, (ii) asset liability management techniques, or (iii) accounting methods, principles or material practices, except as required by changes in GAAP as concurred in by Outsource's independent auditors, or as required by any applicable regulatory authority;

(p) Reduce the amount of the Bank's allowance for loan losses except through charge offs (and subject to the obligations under Section 5.03(i)), and neither Outsource or the shareholders of Outsource will directly or indirectly pay any of the obligations of the borrowers with respect to the Subject Assets;

(q) Sell (but payment at maturity is not a sale) or purchase any investment securities, other than purchases of obligations of the U.S. Treasury (or any agency thereof) with a duration of 4 years or less and an AAA rating by at least one nationally recognized ratings agency;

(r) Make, commit to make, renew, extend the maturity of, or alter any of the material terms of any loan in excess of $50,000, but FBLB will be deemed to have given its consent under this Section 5.04(r) unless FBLB objects to such transaction no later than 48 hours (weekends and

- 30 -

bank holidays excluded) after actual receipt by FBLB of all information relating to the making, renewal or alteration of that loan;

(s)     Enter into any acquisitions or leases of real property, including new leases and lease extensions; or

(t)     Remove any loans from the Bank's watch list.

Section 5.05     Access; Pre-Closing Investigation.    Subject to the provisions of Article X, Outsource will, and will cause the Bank to, afford the officers, directors, employees, attorneys, accountants, investment bankers and authorized representatives of FBLB full access, to the extent legally permissible, to the properties, books, contracts and records of Outsource and the Bank, permit FBLB to make such inspections as they may require and furnish to FBLB, to the extent legally permissible, during such period all such information concerning Outsource and the Bank and its affairs as FBLB may reasonably request, in order that FBLB may have full opportunity to make such reasonable investigation as it desires to make of the affairs of Outsource and the Bank, including access sufficient to verify the value of the assets and the liabilities of Outsource and the Bank and the satisfaction of the conditions precedent to FBLB's obligations described in Article VIII of this Agreement.    FBLB will use its commercially reasonable efforts not to disrupt the normal business operations of the Bank.  Outsource agrees at any time, and from time to time, to furnish to FBLB as soon as practicable, any additional information that FBLB may reasonably request.  All inspections by FBLB under this provision will be at its expense.

Section 5.06     Invitations to and Attendance at Directors' and Committee Meetings.  The Bank shall give notice to 2 designees of FBLB and will invite those persons to attend all regular and special meetings of the Board of Directors of the Bank and all regular and special meetings of any board or senior management committee of the Bank.  However, the Bank reserves the right to exclude those invitees from any portion of any such meeting specifically relating to the transactions contemplated by this Agreement or which, upon the advice of legal counsel, are otherwise privileged.  In addition, the Bank will provide FBLB with copies of the minutes of all regular and special meetings of the Board of Directors of the Bank and minutes of all regular and special meetings of any board or senior management committee of the Bank held on or after the date of this Agreement (except portions of such minutes that are devoted to the discussion of this Agreement or that, upon the advise of legal counsel, are otherwise privileged).  The Bank will provide copies of those minutes to FBLB within fifteen (15) Business Days following the date of that meeting, and FBLB will keep those minutes confidential in accordance with Article X.

Section 5.07     Additional Financial Statements.  Outsource will cause the Bank to promptly furnish FBLB with true and complete copies of each Call Report of the Bank prepared after the date of this Agreement as soon as such reports are made available to the FDIC.

Section 5.08     Untrue Representations.  Outsource will promptly notify FBLB in writing if Outsource becomes aware of any fact or condition that makes untrue, or shows to have been untrue, in any material respect, any schedule or any other information furnished to FBLB or any representation or warranty made in or pursuant to this Agreement or that results in Outsource's failure to comply with any covenant, condition or agreement contained in this Agreement.

Section 5.09     Litigation and Claims.  Outsource will promptly notify FBLB in writing of any litigation, or of any claim, controversy or contingent liability that might be expected to become the subject of litigation, against the Bank or affecting any of its properties if such litigation or potential litigation might, upon an unfavorable outcome, result in a Material Adverse Change, and Outsource will promptly notify FBLB of any legal action, suit or proceeding or judicial, administrative or governmental

- 31 -

investigation, pending or, to the Knowledge of Outsource or the Bank, threatened against Outsource or the Bank that questions or might question the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by Outsource or the Bank pursuant hereto or thereto or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby.

Section 5.10    Adverse Changes.    Outsource will promptly notify FBLB in writing if any change or development has occurred or, to the Knowledge of Outsource, been threatened (or any development has occurred or been threatened involving a prospective change) that (a) is reasonably likely to have, individually or in the aggregate, a Material Adverse Change on the Bank, (b) would adversely affect, prevent or delay the obtaining of any regulatory approval for the completion of the transactions contemplated by this Agreement or (c) would cause the conditions in Section 8.01 or Section 8.02 not to occur.

Section 5.11    Consideration of Alternative Transactions.

(a)    Between the date of this Agreement and the entry of the Auction Procedures Order:

(i)    Except for the P&A Agreement neither Outsource nor the Bank will, directly or indirectly, nor will they permit any of their respective officers, directors, employees, representatives or agents to, directly or indirectly (a) encourage, solicit or initiate discussions or negotiations with, or (b) except upon advice of counsel to the extent required to fulfill the fiduciary duties owed to Outsource, entertain, discuss or negotiate with, or provide any information to, or cooperate with, any corporation, partnership, person or other entity or group (other than FBLB or its Affiliates or associates or officers, partners, employees or other authorized representatives of FBLB or such Affiliates or associates) concerning any merger, tender offer or other takeover offer, sale of substantial assets, sale of shares of capital stock or similar transaction involving the Bank.    Immediately upon receipt of any unsolicited offer, Outsource will communicate to FBLB the terms of any proposal or request for information and the identity of the parties involved.

(ii)    Outsource shall not (i) (A) withdraw (or modify or qualify in any manner adverse to FBLB) or refuse to seek Bankruptcy Court approval of the Merger, or (B) adopt, approve, recommend, endorse or otherwise declare advisable any Alternative Transaction, or (ii) enter or cause the Bank to enter into any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement, option agreement, joint venture agreement, partnership agreement or other agreement constituting or related to, or which is intended to or is reasonably likely to lead to, any Alternative Transaction (other than a confidentiality agreement executed to enable Outsource or the Bank to take action as set forth in Section 5.11).

(iii)    Notwithstanding the foregoing, at any time prior to the entry of the Auction Procedures Order by the Bankruptcy Court, Outsource may, if it determines in good faith (after consultation with outside counsel) that the failure to do so would be reasonably likely to violate its fiduciary duties under applicable law, taking into account all adjustments to the terms of this Agreement that may be offered by FBLB pursuant to this Section, pursue or entertain an Alternative Transaction provided, that Outsource shall not do so, unless (A) Outsource determines in good faith (after consultation with outside counsel and its financial advisor) that an offered Alternative Transaction could be more favorable to Outsource than this Agreement and such offer has been made and has not

- 32 -

been withdrawn and continues to be more favorable after taking into account all adjustments to the terms of this Agreement that may be offered by FBLB pursuant to this Section; (B) such offer has the same or better likelihood of receiving all necessary regulatory and shareholder approvals as the Merger contemplated by this Agreement; (C) Outsource has given FBLB at least ten (10) Business Days' prior written notice of its intention to pursue such offer (which notice shall specify the material terms and conditions of any such offer (including the identity of the party making such offer) and has contemporaneously provided an unredacted copy of the relevant proposed transaction agreements with the party making such offer); and (D) prior to pursuing such Alternative Transaction, Outsource has negotiated, and has caused its representatives to negotiate, in good faith with FBLB during such notice period to the extent FBLB wishes to negotiate, to enable FBLB to revise the terms of this Agreement such that it would cause such offer to no longer constitute a more favorable offer. In the event of any material change to the terms of such offer, Outsource shall, in each case, be required to deliver to FBLB a new written notice, the notice period shall have recommenced and Outsource shall be required to comply with its obligations under this Section with respect to such new written notice, except that the deadline for such new written notice shall be reduced to five (5) Business Days (rather than ten (10) Business Days referenced above).

(b)     From the entry of the Auction Procedures Order to the entry of the Sale Order, Outsource and its Affiliates shall be permitted to market and solicit inquiries, proposals, offers or bids from, any person other than the FBLB regarding an Alternative Transaction, and may take any other affirmative action in connection therewith including (i) entering into any definitive agreement or letter-of-intent with respect thereto, (ii) issuing press releases, placing advertisements or making other releases or disclosures in connection therewith, or (iii) seeking approval of the Bankruptcy Court for any Alternative Transaction, and nothing in this Agreement will, or is intended to, in any way be deemed to restrict such actions or efforts. Neither Outsource nor any of its Affiliates shall have any liability to FBLB or any of its Affiliates, either under or relating to this Agreement or any applicable law, by virtue of entering into or seeking Bankruptcy Court approval of such a definitive agreement for an Alternative Transaction provided that FBLB is paid any Expense Reimbursement Fee that may be required to be paid pursuant to Section 9.03 at the time provided for therein.

(c)     If FBLB is selected as Successful Bidder, from the date of the entry of the Sale Order until the earlier of (i) the Closing Date and (ii) the valid termination of this Agreement pursuant to Section 9.01, Outsource shall not, directly or indirectly, pursue or facilitate any Alternative Transaction or, solicit, accept, facilitate, review, cooperate with, discuss, or provide information in connection with, any offer, inquiry, proposal, bid or indication of interest from any person, or respond to any inquiries from or engage in any negotiations with any person, or share any information regarding FBLB, Outsource or the Bank, with respect to or in possible contemplation of any Alternative Transaction, and Outsource shall not assist, cooperate with or help to facilitate any other person in taking or effecting any such actions; provided, that all of the foregoing is subject to Outsource's ability to finalize and memorialize any back-up bid resulting from the Auction.

Section 5.12     Notice of Sale. Notice of this Agreement and notice of the Sale Motion and Sale Order and the hearings therefor shall be duly and properly given by Outsource by actual notice to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual liens on assets, the lessors on the material leases, the employees of the Outsource, and applicable taxing and governmental authorities

Section 5.13    Consents and Approvals.  Outsource will use their commercially reasonable efforts to obtain at the earliest practicable time all consents and approvals from third parties, including those listed on *Confidential Schedule 3.08*.

Section 5.14    Benefit Plans.  Outsource agrees that any employee welfare benefit plan, as defined in ERISA § 3(1) (each, a "Welfare Plan"), that is sponsored or maintained by the Bank may be terminated, modified or merged into FBLB's Welfare Plans on or after the Closing Date, as determined by FBLB in its sole discretion, subject to compliance with applicable law so long as any such action does not reduce any benefits to which a participant or beneficiary has already become entitled to thereunder. Outsource agrees to terminate any other Employee Plans for which the Bank may have liability so that the Bank will have no liability from and after the Closing Date, and Outsource will cause the Bank to accrue any and all obligations with respect to the termination of such plans before the Calculation Date. The cost of any modification or termination of any Employee Plan resulting from the direction by FBLB will not impact or reduce the Bank's capital. Any costs paid or accrued prior to the Calculation Date resulting from the direction by FBLB will be added back in determining the total tangible common book value of the Bank as of the Calculation Date. FBLB acknowledges that any termination or modification at the direction of FBLB will not (a) be deemed to cause the Financial Statement to have been prepared other than in accordance with GAAP, (b) constitute a breach of any provision of this Agreement by Outsource or the Bank.

Section 5.15    Additional Accruals and Reserves.  At FBLB's request, Outsource will cause the Bank to establish such additional accruals and reserves as may be necessary to conform the Bank's accounting and credit loss reserve practices and methods to those of FBLB and FBLB's plans with respect to the conduct of the Bank's business following the Merger; but no such additional accruals or reserves need be made before the Calculation Date, and no such additional accruals or reserves will impact or reduce the Bank's capital; and FBLB acknowledges that establishing such accruals and reserves and provision for such costs and expenses will not (a) be deemed to cause the Financial Statements to have been prepared other than in accordance with GAAP, (b) constitute or result in a Material Adverse Change with respect to Outsource or the Bank or (c) constitute a breach of any provision of this Agreement by Outsource or the Bank.

Section 5.16    Disclosure Schedules.  At or before the Closing, Outsource will provide FBLB with supplemental Schedules to be delivered by Outsource pursuant to this Agreement, reflecting any material changes thereto between the date of this Agreement and the Closing Date.

Section 5.17    Tail D&O Policy.  On or prior to the Closing Date, Outsource shall use its commercially reasonable efforts to obtain an extended reporting period (otherwise known as "tail coverage") policy covering the directors and officers of the Bank for a period of up to 2 years from the Closing Date, and the total premium for such policy shall be paid or accrued as of the Calculation Date.

Section 5.18    Merger Agreement.  Outsource will, as soon as practicable after the execution of this Agreement and the receipt of all requisite regulatory, corporate, and Bankruptcy Court approvals, cause the Bank to duly authorize and enter into the Merger Agreement, the form of which is attached hereto as <u>Exhibit F</u>, and perform all of its obligations thereunder. Outsource shall vote all of the stock of the Bank in favor of the Merger and the Merger Agreement.

**ARTICLE VI.**
**COVENANTS OF FBLB**

FBLB hereby makes the covenants set forth in this Article VI to Outsource.

Section 6.01    Commercially Reasonable Efforts.   FBLB will use its commercially reasonable efforts to perform and fulfill all conditions and obligations on its part to be performed or fulfilled under this Agreement and to cause the completion of the transactions contemplated hereby in accordance with this Agreement. FBLB shall reasonably cooperate with Outsource in furnishing to the Bankruptcy Court evidence of adequate assurance by FBLB of its future performance under this Agreement and evidence that FBLB has the financial wherewithal to timely close the transactions contemplated by this Agreement. In addition, FBLB shall reasonably cooperate with Outsource in Outsource's efforts to obtain the approval of the Auction Procedures Order and the Sale Order.

Section 6.02    Merger Agreement.   FBLB will cause the Lubbock Bank to, as soon as practicable after the execution of this Agreement, enter into the Merger Agreement, a form of which is attached hereto as Exhibit F, and FBLB shall perform, and shall cause the Lubbock Bank to perform, all of their respective obligations thereunder. FBLB shall vote all of the stock of the Lubbock Bank in favor of the Merger and the Merger Agreement.

Section 6.03    Information for Applications and Statements.   FBLB will promptly furnish to Outsource all information concerning FBLB, including, but not limited to, financial statements, required for inclusion in any application or statement to be made by Outsource or the Bank to or filed by Outsource or the Bank with any governmental body in connection with the transactions contemplated by this Agreement, or in connection with any unrelated transactions during the pendency of this Agreement, and FBLB represents and warrants that all information so furnished for such statements and applications will be true and correct in all material respects and will not omit any material fact required to be stated therein or necessary to make the statements made, in light of the circumstances under which they were made, not misleading. FBLB will otherwise fully cooperate with Outsource in the filing of any applications or other documents necessary to consummate the transactions contemplated by this Agreement.

Section 6.04    Untrue Representations.   FBLB will promptly notify Outsource in writing if FBLB becomes aware of any fact or condition that makes untrue, or shows to have been untrue, in any material respect, any schedule or any other information furnished to Outsource or any representation or warranty made in or pursuant to this Agreement or that results in FBLB's failure to comply with any covenant, condition or agreement contained in this Agreement.

Section 6.05    Litigation and Claims.   FBLB will promptly notify Outsource of any legal action, suit or proceeding or judicial, administrative or governmental investigation, pending or, to the Knowledge of FBLB, threatened against FBLB that questions or might question the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by FBLB pursuant hereto or thereto or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby.

Section 6.06    Regulatory and Other Approvals.   FBLB, at its own expense, will promptly, but in no event later than 30 days after the date Outsource provides FBLB with the information requested for the regulatory applications pursuant to Section 5.02, file or cause to be filed applications for all regulatory approvals required to be obtained by FBLB in connection with this Agreement and the other agreements contemplated hereby. FBLB will promptly furnish Outsource with copies of all such regulatory filings and all correspondence for which confidential treatment has not been requested. FBLB will use its

commercially reasonable efforts to obtain all such regulatory approvals and any other approvals from third parties, including those listed on *Confidential Schedule 4.05*, at the earliest practicable time.

## ARTICLE VII.
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF OUTSOURCE

As set forth below, the obligations of Outsource under this Agreement are subject to the satisfaction of each of the following conditions, which may be waived in whole or in part by Outsource:

Section 7.01    Representations and Warranties.    All representations and warranties made by FBLB in this Agreement or in any document or schedule delivered to Outsource in connection with this Agreement being true and correct in all material respects when made and being true and correct in all material respects as of the Closing with the same force and effect as if such representations and warranties were made at and as of the Closing, except with respect to those representations and warranties specifically made as of an earlier date (in which case such representations and warranties must have been true as of such earlier date).

Section 7.02    Performance of Obligations.    FBLB having, or having caused to be, performed or observed in all material respects all agreements, terms, covenants and conditions required by this Agreement to be performed or observed by FBLB at or before the Closing

Section 7.03    Bankruptcy Court Approvals.    The Bankruptcy Court having entered (1) the Auction Procedures Order in substantially the same form as Exhibit G as a Final Order, or in such other form and manner as may be acceptable to FBLB, (A) approving the bidding procedures in substantially the same form as Exhibit H, (B) approving the Expense Reimbursement, (C) scheduling an auction (the "Auction") and a hearing to consider the approval of the sale of the Merger or an Alternative Transaction (the "Sale Hearing"), and (D) approving the form and manner of notice of the Sale Motion and Sale Hearing, and (2) the Sale Order in substantially the same form as Exhibit I as a Final Order, or in such other form and manner as may be acceptable to FBLB, (A) finding that notice of Sale Hearing was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, (B) finding that FBLB is a "good faith" purchaser entitled to the protections afforded by § 363(m) of the Bankruptcy Code, (C) finding that FBLB's acquisition of property interests, rights, and powers pursuant to the Agreement shall be free and clear of all liens and claims in or against Outsource and its property, and (D) approving the transaction proposed by this Agreement, *provided, however*, that the entry of the Sale Order is not a condition precedent to Outsource's obligation to pay the Expense Reimbursement and is not a condition precedent to any obligations under Section 9.03.

Section 7.04    Shareholder Approvals.    The Merger Agreement and Merger having been approved by FBLB, as sole shareholder of the Lubbock Bank.

Section 7.05    Government and Other Approvals.    FBLB having received approvals, acquiescences or consents of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities and other third parties, including all consents described on *Confidential Schedules 3.08 and 4.05*, and all applicable waiting periods having expired. Further, the approvals and the transactions contemplated hereby not having been contested or threatened to be contested by any Federal or state governmental authority or by any other third party by formal proceedings.

Section 7.06    No Litigation.    No action having been taken, and no statute, rule, regulation or order being promulgated, enacted, entered, enforced or deemed applicable to the Merger by any Federal, state or foreign government or governmental authority or by any court, including the entry of a

- 36 -

preliminary or permanent injunction, that would (a) make the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby illegal, invalid or unenforceable, (b) impose material limits on the ability of any party to this Agreement to complete the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby, or (c) if the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby are completed, subject the Bank or any officer, director, shareholder or employee of the Bank to criminal or civil liability. Further, no action or proceeding before any court or governmental authority, by any government or governmental authority or by any other person is threatened, instituted or pending that would reasonably be expected to result in any of the consequences referred to in clauses (a) through (c) above.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF FBLB

All obligations of FBLB under this Agreement are subject to the satisfaction, before or at the Closing, of each of the following conditions, which may be waived in whole or in part by FBLB:

Section 8.01    Representations and Warranties.    All representations and warranties made by Outsource and the Bank in this Agreement or in any document or schedule delivered to FBLB in connection with this Agreement being true and correct in all material respects when made and being true and correct in all material respects as of the Closing with the same force and effect as if such representations and warranties were made at and as of the Closing, except with respect to those representations and warranties specifically made as of an earlier date (in which case such representations and warranties must have been true as of such earlier date).

Section 8.02    Performance of Obligations.    Outsource and the Bank having, or having caused to be, performed or observed in all material respects all agreements, terms, covenants and conditions required by this Agreement to be performed or observed by Outsource and the Bank at or before the Closing.

Section 8.03    Bankruptcy Court Approvals.    The Bankruptcy Court having entered (1) the Auction Procedures Order in substantially the same form as Exhibit G as a Final Order, or in such other form and manner as may be acceptable to FBLB, (A) approving the bidding procedures in substantially the same form as Exhibit H, (B) approving the Expense Reimbursement, (C) scheduling the Auction and the Sale Hearing, and (D) approving the form and manner of notice of the Sale Motion and Sale Hearing, and (2) entry of the Sale Order in substantially the same form as Exhibit I as a Final Order that is not subject to a timely notice of appeal, or in such other form and manner as may be acceptable to FBLB, (A) finding that notice of Sale Hearing was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, (B) finding that FBLB is a "good faith" purchaser entitled to the protections afforded by § 363(m) of the Bankruptcy Code, (C) finding that FBLB's acquisition of property interests, rights, and powers pursuant to the Agreement shall be free and clear of all liens and claims in or against Outsource and its property, and (D) approving the transaction proposed by this Agreement.

Section 8.04    Government and Other Approvals.    FBLB having received approvals, acquiescences or consents that may be required in order to complete the transactions contemplated by this Agreement (including any approvals, acquiescence or consents that may be required in order to fulfill the transactions contemplated by Section 6.06), all on terms and conditions acceptable to FBLB, from all necessary governmental agencies and authorities, including all consents described on *Confidential Schedules 3.08 and 4.05*, and all applicable waiting periods having expired. Further, the approvals and

- 37 -

the transactions contemplated hereby not having been contested or threatened to be contested by any Federal or state governmental authority or by any other third party by formal proceedings.

Section 8.05   No Litigation. No action having been taken, and no statute, rule, regulation or order having been promulgated, enacted, entered, enforced or deemed applicable to this Agreement, or the transactions contemplated hereby by any Federal, state or foreign government or governmental authority or by any court, including the entry of a preliminary or permanent injunction, that would (a) make this Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby illegal, invalid or unenforceable, (b) require the divestiture of a material portion of the assets of FBLB, its subsidiaries or the Bank, (c) impose material limits on the ability of any party to this Agreement to complete the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby, (d) otherwise result in a Material Adverse Change or (e) if this Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby are completed, subject FBLB or subject any officer, director, shareholder or employee of FBLB to criminal or civil liability. Further, no action or proceeding before any court or governmental authority, by any government or governmental authority or by any other person, being threatened, instituted or pending that would reasonably be expected to result in any of the consequences referred to in clauses (a) through (e) above.

Section 8.06   Releases. FBLB having received from Outsource an instrument dated as of the Closing Date releasing Outsource's Subsidiaries from any and all claims of Outsource (except to certain matters described therein), the form of which is attached as Exhibit A. FBLB having received from each of the directors of Outsource and the Bank an instrument dated as of the Closing Date releasing Outsource and its Subsidiaries from any and all claims of such directors (except to certain matters described therein), the form of which is attached as Exhibit B. Further, FBLB having received from each of the officers of Outsource and the Bank with titles of vice president and above an instrument dated as of the Closing Date releasing Outsource and its Subsidiaries from any and all claims of such officers (except as to certain matters described therein), the form of which is attached as Exhibit C.

Section 8.07   Support Agreements. Simultaneously with the execution of this Agreement, FBLB having received each of the directors of the Bank listed on *Confidential Schedule 8.07* a Support Agreement, the form of which is attached as Exhibit E.

Section 8.08   FBLB Capital Offering. FBLB having successfully raised a minimum of $3,000,000 through a sale of shares of FBLB common stock, or such lesser amount as FBLB may, in its sole discretion, determine.

Section 8.09   P&A Agreement. The Bank having entered into the P&A Agreement with MidSouth or such other third-party mutually acceptable to Outsource, the Bank and FBLB and the P&A Agreement having received approval from applicable regulatory agencies, and all conditions and requirements to the consummation of the P&A Agreement having been fully satisfied.

Section 8.10   FBLB Fairness Opinion. The receipt by FBLB of a fairness opinion from a third-party valuation firm selected by FBLB that the Purchase Price is fair, from a financial point of view, to the shareholders of FBLB.

Section 8.11   Sale of Investment Securities and Repayment of FHLB Advances. The Bank shall have (i) sold or otherwise disposed of all of the Bank's Investment Securities, and (ii) repaid all FHLB Advances made to the Bank.

- 38 -

Section 8.12    No Material Adverse Change. There will have been no Material Adverse Change since December 31, 2010.

## ARTICLE IX.
## TERMINATION

Section 9.01    Right of Termination. This Agreement and the transactions contemplated hereby may be terminated at any time, before or at the Closing as follows, and in no other manner:

(a)    By the mutual consent of FBLB and Outsource, duly authorized by the board of directors of each of FBLB and Outsource.

(b)    By either Outsource or FBLB (as long as the terminating party is not in material breach of any representation, warranty, covenant or other agreement contained herein) if the conditions precedent to such parties' obligations to close specified in Articles VII and VIII, respectively, hereof have not been met or waived by July 31, 2011, or such later date as has been approved by FBLB and Outsource.

(c)    By either FBLB or Outsource if any of the transactions contemplated by this Agreement are disapproved by any regulatory authority whose approval is required to complete such transactions or if any court of competent jurisdiction in the United States or other federal or state governmental body has issued an order, decree or ruling or taken any other action restraining, enjoining, invalidating or otherwise prohibiting the Agreement or the transactions contemplated hereby and such order, decree, ruling or other action is final and nonappealable.

(d)    By FBLB if it reasonably determines, in good faith and after consulting with counsel, there is substantial likelihood that any necessary regulatory approval will not be obtained or will be obtained only upon a condition or conditions that make it inadvisable to proceed with the transactions contemplated by this Agreement.

(e)    By FBLB if there has been any Material Adverse Change.

(f)    By FBLB, if prior to the entry of the Auction Procedures Order, Outsource or the Bank accepts an offer for an Alternative Transaction, or if Outsource or the Bank fails to comply with Section 5.11(a) of this Agreement.

(g)    By FBLB if Outsource fails to comply in any material respect with any of their respective covenants or agreements contained in this Agreement or in any other agreement contemplated hereby and such failure has not been cured within a 30 day period after notice from FBLB, or if any of the representations or warranties of Outsource contained herein or therein are inaccurate in any material respect.

(h)    By Outsource if FBLB fails to comply in any material respect with any of its covenants or agreements contained in this Agreement or in any other agreement contemplated hereby and such failure has not been cured within a 30 day period after notice from Outsource, or if any of the representations or warranties of FBLB contained herein or therein are inaccurate in any material respect.

(i)    By FBLB, on or after May 6, 2011, if the Bankruptcy Court has not entered the Auction Procedures Order in substantially the same form as Exhibit G as a Final Order, or in such other form and manner as may be acceptable to FBLB (i) approving the bidding procedures in

substantially the same form as Exhibit H, (ii) approving the Expense Reimbursement, as defined below, (iii) scheduling the Auction and a hearing to consider the approval of the sale of the Merger or an Alternative Transaction (the "Sale Hearing"), (iv) approving the form and manner of notice of the Sale Motion and Sale Hearing, and (v) providing that such order is immediately effective.

(j)     By FBLB, on or after July 31, 2011, if the Bankruptcy Court has not entered the Sale Order in substantially the same form as Exhibit I as a Final Order, or in such other form and manner as may be acceptable to FBLB (i) finding that notice of Sale Hearing was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, (ii) finding that FBLB is a "good faith" purchaser entitled to the protections afforded by § 363(m) of the Bankruptcy Code, and (iii) approving the transaction proposed by this Agreement, with FBLB as either the Successful Bidder or the Second Best Bidder.

(k)     By FBLB, on or after July 31, 2011, if the Closing of this Agreement and the transactions contemplated herein has not occurred by such date.

Section 9.02     Notice of Termination.  The power of termination provided for by Section 9.01 hereof may be exercised only by a notice given in writing, as provided in Section 12.07 of this Agreement.

Section 9.03     Effect of Termination.

(a)     Subject to Sections 9.03(b), 9.03(c) and 9.03(d), and without limiting any other relief to which either party hereto may be entitled for breach of this Agreement, if this Agreement is terminated pursuant to the provisions of Section 9.01 hereof, no party to this Agreement will have any further liability or obligation under this Agreement, except for (i) liability of a party for expenses pursuant to Sections 9.03(b), 9.03(c), 9.03(d), and 11.02 hereof, and (ii) the provisions of Article X hereof will remain applicable.

(b)     If the Lubbock Bank becomes obligated to pay a termination fee to MidSouth under Section 9.2(B) of the P&A Agreement, and the transactions contemplated by this Agreement are not consummated, then the Bank shall pay to the Lubbock Bank, within four days of the later of the termination of the P&A Agreement or this Agreement, by wire transfer of immediately available funds, the aggregate amount of $500,000.

(c)     If, after the entry of the Auction Procedures Order, Outsource or the Bank pursues and closes an Alternative Transaction, then Outsource shall, within three days following closing of the Alternative Transaction, pay FBLB an Expense Reimbursement in an amount not to exceed $200,000 in reimbursement of FBLB's and the Lubbock Bank's expenses and costs incurred in connection with the Acquisition, including, but not limited to, legal, accounting, and consulting expenses and costs, but excluding any expense reimbursements due to MidSouth under the P&A Agreement.

(d)     If the Lubbock Bank becomes obligated to pay a termination fee to MidSouth under Section 9.2(B) of the P&A Agreement, then the Closing Cash Consideration to be paid as set forth in Section 1.02(a) shall be reduced  to $1,521,000, or such other amount agreed to by FBLB and Outsource.

- 40 -

## ARTICLE X.
## CONFIDENTIAL INFORMATION

Section 10.01 <u>Definition of "Recipient," "Disclosing Party" and "Representative"</u>. For purposes of this Article X, the term "Recipient" means the party receiving the Subject Information (as defined in Section 10.02) and the term "Disclosing Party" means the party furnishing the Subject Information. The terms "Recipient" or "Disclosing Party", as used herein, include: (a) all persons and entities related to or affiliated in any way with the Recipient or the Disclosing Party, as the case may be, and (b) any person or entity controlling, controlled by or under common control with the Recipient or the Disclosing Party, as the case may be. The term "Representative" as used herein, includes all directors, officers, shareholders, employees, representatives, advisors, attorneys, accountants and agents of any of the foregoing. The term "person" as used in this Article X is to be broadly interpreted to include any corporation, company, group, partnership, governmental agency or individual.

Section 10.02 <u>Definition of "Subject Information"</u>. For purposes of this Article X, the term "Subject Information" means all information furnished to the Recipient or its Representatives (whether prepared by the Disclosing Party, its Representatives or otherwise and whether or not identified as being nonpublic, confidential or proprietary) by or on behalf of the Disclosing Party or its Representatives relating to or involving the business, operations or affairs of the Disclosing Party or otherwise in possession of the Disclosing Party, including the Purchase Price; provided, however, that the Purchase Price may be disclosed in the Proxy Statement distributed to the shareholders of Outsource in connection with the Meeting. The term "Subject Information" does not include information that (a) was already in the Recipient's possession at the time it was first furnished to Recipient by or on behalf of Disclosing Party, provided that such information is not known by the Recipient to be subject to another confidentiality agreement with or other obligation of secrecy to the Disclosing Party, its Subsidiaries or another party, or (b) becomes generally available to the public other than as a result of a disclosure by the Recipient or its Representatives, or (c) becomes available to the Recipient on a non-confidential basis from a source other than the Disclosing Party, its Representative or otherwise, provided that such source is not known by the Recipient to be bound by a confidentiality agreement with or other obligation of secrecy to the Disclosing Party, its Representative or another party.

Section 10.03 <u>Confidentiality</u>. Each Recipient hereby agrees that the Subject Information will be used solely for the purpose of reviewing and evaluating the transactions contemplated by this Agreement and the other agreements contemplated hereby and that the Subject Information will be kept confidential by the Recipient and the Recipient's Representatives; provided, however, that (a) any of such Subject Information may be disclosed to the Recipient's Representatives (including, but not limited to, the Recipient's accountants and attorneys) who need to know such information for the purpose of evaluating any such possible transaction between the Disclosing Party and the Recipient (it being understood that such Representatives will be informed by the Recipient of the confidential nature of such information and that the Recipient will direct and cause such persons to treat such information confidentially); and (b) any disclosure of such Subject Information may be made to which the Disclosing Party consents in writing before any such disclosure by Recipient.

Section 10.04 <u>Securities Law Concerns</u>. Each Recipient hereby acknowledges that the Recipient is aware, and the Recipient will advise the Recipient's Representatives who are informed as to the matters that are the subject of this Agreement, that the United States securities laws prohibit any person who has received material, non-public information from an issuer of securities from purchasing or selling securities of such issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

- 41 -

Section 10.05  Return of Subject Information.  In the event of termination of this Agreement for any reason, the Recipient will promptly return to the Disclosing Party all written material containing or reflecting any of the Subject Information other than information contained in any application, notice or other document filed with any governmental agency and not returned to the Recipient by such governmental agency.  In making any such filing, the Recipient will request confidential treatment of such Subject Information included in any application, notice or other document filed with any governmental agency.

Section 10.06  Specific Performance/Injunctive Relief.  Each Recipient acknowledges that the Subject Information constitutes valuable, special and unique property of the Disclosing Party critical to its business and that any breach of Article X of this Agreement by it will give rise to irreparable injury to the Disclosing Party that is not compensable in damages.  Accordingly, each Recipient agrees that the Disclosing Party will be entitled to obtain specific performance or injunctive relief against the breach or threatened breach of Article X of this Agreement by the Recipient or its Representatives.  Each Recipient further agrees to waive, and use its reasonable efforts to cause its Representatives to waive, any requirement for the securing or posting of any bond in connection with such remedies.  Such remedies are not the exclusive remedies for a breach of Article X of this Agreement, but are in addition to all other remedies available at law or in equity to the Disclosing Party.

## ARTICLE XI.
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ADDITIONAL REMEDIES

Section 11.01  Survival of Representations, Warranties and Covenants.  All of the representations and warranties made by Outsource contained in this Agreement will survive for 48 months following the Closing Date, at which time such representations and warranties will terminate.  If Outsource or the Bank breaches any representation, warranty or covenant contained in this Agreement, FBLB's sole remedy shall be the right to offset the Additional Consideration by the amount of the losses to compensate FBLB for such breach; provided that no such offset shall occur until the aggregate dollar amount of all losses incurred as a result of breaches of any representation, warranty or covenant contained in this Agreement by Outsource or the Bank totals $25,000, at which point FBLB may be able to offset the Additional Consideration by the full amount of such losses.  All covenants made by the parties in Articles X and XII will survive the Closing Date.  All other covenants terminate at the Closing Date.

Section 11.02  Tax Matters.

(a)  FBLB and Outsource agree to treat the Merger as an asset sale and asset purchase for federal, state, and local income Tax purposes.  FBLB and Outsource agree that the Purchase Price (and all other capitalizable costs) shall be allocated among the assets of the Bank for federal, state and local income Tax purposes in the manner required by Code § 1060 and the applicable Treasury Regulations issued thereunder.  FBLB and Outsource further agree to timely file Internal Revenue Service Form 8594 (including any applicable supporting schedules) and any other applicable federal, state or local income tax forms based on the allocations set forth in *Confidential Schedule 11.03(a)* attached hereto, with any such changes as may be mutually agreed upon by the parties.  FBLB and Outsource also agree that if the amount of the Purchase Price is subsequently adjusted pursuant to this Agreement, then FBLB and Outsource shall file amended Internal Revenue Service Form 8594s consistent with the adjustments made to the Purchase Price.

(b)  Outsource will prepare or cause to be prepared and file or cause to be filed all Tax Returns for Outsource and each of the Outsource Subsidiaries for all periods ending on or before the Closing Date that are filed after the Closing Date, including the S corporation Tax

- 42 -

Return for Outsource for the taxable year that includes the Merger pursuant to this Agreement (the "Outsource S Corporation Tax Return"). Outsource will permit a representative of FBLB to review and comment on each such Tax Return that includes the operations of the Bank for a taxable period (or portion thereof) beginning before the Closing Date. Outsource shall make such changes to such Tax Returns as are reasonably requested by FBLB. The Outsource S Corporation Tax Return will allocate all gains and losses incurred by Outsource as a result of the Merger pursuant to this Agreement to the Outsource shareholders and will list such gains and losses on the Schedule K-1s issued to such Outsource shareholders. The Outsource shareholders will also be liable for any Taxes imposed on Outsource as a result of the Merger pursuant to this Agreement, if any, that are not paid prior to or on the Closing Date.

(c)    FBLB, Outsource and each of the Outsource Subsidiaries will cooperate fully, as and to the extent reasonably requested by the other party and by a representative of the Outsource shareholders, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Such cooperation will include the retention and (upon the other party's request) the provision of records and information reasonably relevant to any such audit, litigation, or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(d)    All tax-sharing agreements or similar agreements with respect to or involving the Bank and Outsource or the Bank and any Subsidiary or Affiliate of Outsource will be terminated as of the Closing Date and, after the Closing Date, neither the Bank nor any Bank Subsidiary will be bound thereby or have any liability thereunder.

(e)    The payment of any transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement will be the responsibility of the Shareholders, as will the filing of all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and if required by applicable law, FBLB will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

(f)    Neither Outsource nor any Subsidiary or Affiliate of Outsource shall take any action after the Closing Date to revoke or cause to be revoked Outsource's election to be taxed as an S corporation within the meaning of Code §§ 1361 and 1362 that would be effective for any period prior to and including the Closing Date. Neither Outsource nor any Subsidiary or Affiliate of Outsource shall take or allow any action to be taken after the Closing Date that would result in the termination of Outsource's status as a validly electing S corporation within the meaning of Code §§ 1361 and 1362 that would be effective for any period prior to and including the Closing Date.

(g)    Neither Outsource nor any Subsidiary or Affiliate of Outsource shall take any actions after the Closing Date to revoke or cause to be revoked any Subsidiary of the Bank's election to be treated as a "qualified subchapter S subsidiary" within the meaning of Code § 1361(b)(3)(B). Neither Outsource nor any Subsidiary or Affiliate of Outsource shall take or allow any action to be taken after the Closing Date that would result in the termination of any Bank Subsidiary's status as a validly electing "qualified subchapter S subsidiary" within the meaning of Code §1361(b)(3)(B) as of the Closing Date.]

- 43 -

# ARTICLE XII.
## MISCELLANEOUS

Section 12.01   Expenses.  Each of the parties to this Agreement is obligated to pay all of its expenses and costs (including all counsel fees and expenses) incurred in connection with this Agreement and the consummation of the transactions contemplated hereby.

Section 12.02   Brokerage Fees and Commissions.  FBLB hereby represents to Outsource that except as disclosed on *Confidential Schedule 12.02*, no agent, representative or broker has represented FBLB in connection with the transactions described in this Agreement.  Outsource will not have any responsibility or liability for any fees, expenses or commissions payable to any agent, representative or broker of FBLB, and FBLB hereby agrees to indemnify and hold Outsource harmless for any amounts owed to any agent, representative or broker of FBLB.  FBLB will have no responsibility or liability for any fees, expenses or commissions payable to any agent, representative or broker of Outsource, the Bank or any shareholder of Outsource, and Outsource hereby agrees to indemnify and hold FBLB harmless for any amounts owed to any agent, representative or broker of Outsource, the Bank or any shareholder of Outsource.

Section 12.03   Entire Agreement.  This Agreement and the other agreements, documents, schedules and instruments signed and delivered by the parties to each other at the Closing are the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement relating to the subject matter hereof and supersede any and all prior agreements, whether written or oral, that may exist between the parties with respect thereto.  Except as otherwise specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement is binding unless hereafter made in writing and signed by the party to be bound, and no modification will be effected by the acknowledgment or acceptance of documents containing terms or conditions at variance with or in addition to those set forth in this Agreement.

Section 12.04   Binding Effect; Assignment.  All of the terms, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors, representatives and permitted assigns.  Nothing expressed or referred to herein is intended or is to be construed to give any person other than the parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement, it being the intent of the parties that this Agreement, and the terms hereof are for the sole benefit of the parties to this Agreement and not for the benefit of any other person.  No party to this Agreement will assign this Agreement, by operation of law or otherwise, in whole or in part, without the prior written consent of the other parties, and any assignment made or attempted in violation of this Section is void and of no effect.

Section 12.05   Further Cooperation.  The parties agree that they will, at any time and from time to time after the Closing, upon request by the other and without further consideration, do, perform, execute, acknowledge and deliver all such further acts, deeds, assignments, assumptions, transfers, conveyances, powers of attorney, certificates and assurances as may be reasonably required in order to complete the transactions contemplated by this Agreement or to carry out and perform any undertaking made by the parties hereunder.

Section 12.06   Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, then (a) this Agreement is to be construed and enforced as if such illegal, invalid or unenforceable provision were not a part hereof; (b) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such illegal, invalid or

- 44 -

unenforceable provision or by its severance from this Agreement; and (c) there will be added automatically as a part of this Agreement a provision mutually agreed to which is similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and enforceable.

Section 12.07  Notices.  Any and all payments (other than payments at the Closing), notices, requests, instructions and other communications required or permitted to be given under this Agreement after the date of this Agreement by any party hereto to any other party may be delivered personally or by nationally recognized overnight courier service or sent by mail or (except in the case of payments) by facsimile transmission or electronic mail, at the respective addresses or transmission numbers set forth below and is deemed delivered (a) in the case of personal delivery, facsimile transmission or electronic mail, when received; (b) in the case of mail, upon the earlier of actual receipt or 5 Business Days after deposit in the United States Postal Service, first class certified or registered mail, postage prepaid, return receipt requested; and (c) in the case of an overnight courier service, 1 Business Day after delivery to such courier service with and instructions for overnight delivery. The parties may change their respective addresses and transmission numbers by written notice to all other parties, sent as provided in this Section. All communications must be in writing and addressed as follows:

IF TO OUTSOURCE:

    Board of Directors
    Outsource Holdings, Inc.
    c/o Douglas Boyd
    ESI (Estech Systems, Inc.)
    3701 E. Plano Parkway
    Plano, TX 75074
    Telecopy: (972) 422-9705
    Electronic mail: dboyd@esi-estech.com

WITH A COPY TO:

    Mr. Geoffrey S. Kay
    Fenimore, Kay, Harrison & Ford, LLP
    111 Congress Avenue
    Suite 820
    Austin, Texas 78701
    Telecopy: (512) 583-5940
    Electronic mail: gkay@fkhpartners.com

IF TO THE BANK:

    Mr. Ralph Kerr
    President
    Jefferson Bank
    18333 Preston Road
    Suite 100
    Dallas, Texas 75252
    Telecopy: (972) 818-3877
    Electronic mail: rkerr@jeffersonbanktexas.com

WITH A COPY TO:

        Mr. Geoffrey S. Kay
        Fenimore, Kay, Harrison & Ford, LLP
        111 Congress Avenue
        Suite 820
        Austin, Texas 78701
        Telecopy: (512) 583-5940
        Electronic mail: gkay@fkhpartners.com

IF TO THE OUTSOURCE REPRESENTATIVE(S):

        Outsource Representative
        Attn: Douglas Boyd
        ESI (Estech Systems, Inc.)
        3701 E. Plano Parkway
        Plano, TX 75074
        Telecopy: (972) 422-9705
        Electronic mail: dboyd@esi-estech.com

IF TO FBLB:

        Mr. Barry Orr
        Chairman
        First Bank Lubbock Bancshares, Inc.
        9816 Slide Road
        Lubbock, Texas 79424
        Telecopy: (806) 788-0699
        Electronic mail: borr@firstbanklubbock.com

WITH A COPY TO:

        Mr. Charles E. Greef
        Hunton & Williams LLP
        1445 Ross Avenue, Suite 3700
        Dallas, Texas 75202-2799
        Telecopy: (214) 468-3331
        Electronic mail: cgreef@hunton.com

    Section 12.08  <u>GOVERNING LAW</u>.  THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW.  VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN LUBBOCK, TEXAS.

    Section 12.09  <u>Multiple Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be signed in multiple counterparts, each of which will be deemed an original, and all counterparts hereof so signed by the parties hereto, whether or not such counterpart will bear the execution of each of the parties hereto, will be deemed to be, and is to be construed as, one and the same Agreement.  A telecopy or facsimile transmission of a signed counterpart of this Agreement will be sufficient to bind the party or parties whose signature(s) appear thereon.

70885.000001 EMF_US 34758791v10

Section 12.10    Certain Definitions.

(a)    "Affiliate" means, with respect to any person or entity, any person or entity that, directly or indirectly, controls, is controlled by, or is under common control with, such person or entity in question.  For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any person or entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting securities or by contract or otherwise.

(b)    "Alternative Agreement" shall mean one or more definitive agreements with respect to one or more Alternative Transactions.

(c)    "Alternative Transaction" shall mean any agreement or arrangement, other than this Agreement or the P&A Agreement, or agreement to support or propose to the Bankruptcy Court any agreement or arrangement, other than this Agreement or the P&A Agreement, the effect and results of which are substantially similar to the transactions contemplated by this Agreement.

(d)    "Auction" has the meaning set forth in Section 1.05.

(e)    "Auction Procedures" shall mean the Auction Procedures in substance in the form of Exhibit H hereto (unless otherwise agreed to by FBLB in its reasonable discretion) approved by the Bankruptcy Court in the Auction Procedures Order.

(f)    "Auction Procedures Order" shall mean an order of the Bankruptcy Court in substance in the form of Exhibit G hereto (unless otherwise agreed to by FBLB in its reasonable discretion) that approves, inter alia, bidding and Auction Procedures to be followed by Outsource and all potential bidders of an Alternative Transaction.

(g)    "Bankruptcy Case" has the meaning set forth in the recitals of this Agreement.

(h)    "Bankruptcy Code" has the meaning set forth in the recitals of this Agreement.

(i)    "Bankruptcy Court" has the meaning set forth in the recitals of this Agreement.

(j)    "Bankruptcy Exception" means, in respect of any agreement, contract, commitment or obligation, any limitation thereon imposed by any bankruptcy, insolvency, fraudulent conveyance, reorganization, receivership, moratorium or similar law affecting creditors' rights and remedies generally and, with respect to the enforceability of any agreement, contract, commitment or obligation, by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether enforcement is sought in a proceeding at law or in equity.

(k)    "Business Day" means a day that the Bank is open to the public for the conduct of banking business.

(l)    "Claim" means a claim against Outsource or their respective property, as such term is defined in section 101(5) of the Bankruptcy Code.

(m)    "Estate" means Outsource's estate created pursuant to Section 541 of the Bankruptcy Code.

(n)    "Environmental Laws" means the common law and all federal, state, local and foreign laws or regulations, codes, orders, decrees, judgments or injunctions issued, promulgated, approved or entered thereunder, now or hereafter in effect, relating to pollution or protection of public or employee health or safety or the environment, including laws relating to (i) emissions, discharges, releases or threatened releases of Hazardous Materials, into the environment (including ambient air, indoor air, surface water, ground water, land surface or subsurface strata), (ii) the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport or handling of Hazardous Materials, and (iii) underground and above ground storage tanks, and related piping, and emissions, discharges, releases or threatened releases therefrom.

(o)    "Expense Reimbursement Fee" has the meaning set forth in Section 9.03.

(p)    "Final Order" shall mean any order or judgment of the Bankruptcy Court or other court having jurisdiction over any matter, provided that such order is effective, is not subject to a timely and has not been reversed, stayed, or vacated pursuant to applicable law or by an order of the Bankruptcy Court or other court of competent jurisdiction.

(q)    "Hazardous Material" means any pollutant, contaminant, chemical, or toxic or hazardous substance, constituent, material or waste, or any other chemical, substances, constituent or waste including petroleum, crude oil or any fraction thereof or any petroleum product, but does not include normal quantities of any chemical used in the ordinary course of business as office or cleaning supplies.

(r)    A person has "Knowledge" of, or acts "Knowingly" with respect to, a particular fact or other matter if any individual who is presently serving as a director or officer or employee of that person, after reasonable inquiry, is actually aware of such fact or other matter.

(s)    "Material Adverse Change" means any material adverse change in the business, results of operations, condition (financial or otherwise), prospects, assets, properties, employees, liabilities (absolute, accrued, contingent or otherwise) or reserves of the Bank has occurred, excluding any change with respect to, or effect on, the Bank resulting from (i) changes in laws, rules, regulations, GAAP or RAP, as such would apply to banks, (ii) changes after the date of this Agreement in national or regional political conditions or general economic or market conditions (including changes in prevailing interest rates, credit availability and liquidity) generally affecting banks and bank holding companies, except to the extent that such change has a disproportionately adverse effect on the Bank as compared to similarly situated banks, and (iii) any actions expressly required by this Agreement or that are taken with the prior informed written consent of FBLB in contemplation of the transactions contemplated by this Agreement. For purposes of determining whether a Material Adverse Change has occurred based on an increase in the Bank's classified loans or other real estate owned, such determination shall be made from the date of this Agreement. The conditions resulting in the filing of the Bankruptcy Case will not be deemed to be a Material Adverse Change.

(t)    "Petition Date" shall mean April 3, 2011.

(u)    "Professional Fees" shall mean a Claim by any person employed or to be compensated pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for compensation and/or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b)

or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Bankruptcy Case.

(v)     The term "Property" or "Properties" includes all real property currently owned or leased by the Bank, including properties that the Bank has foreclosed on as well as the Bank's premises and all improvements and fixtures thereon.

(w)     "Qualified Bids" has the meaning set forth in Exhibit H.

(x)     "Sale Hearing" has the meaning set forth in Section 9.01.

(y)     "Sale Motion" shall mean the motion filed by the Seller with the Bankruptcy Court seeking, among other things, entry of the Auction Procedures Order and the Sale Order (with such changes as agreed to by FBLB in its reasonable discretion).

(z)     "Sale Order" shall mean an order of the Bankruptcy Court in substance in the form of Exhibit I hereto (unless otherwise agreed to by FBLB in its reasonable discretion).

(aa)     "Second Best Bidder" has the meaning set forth in Exhibit H.

(bb)     "Subsidiary" means, when used with reference to an entity, any corporation, a majority of the outstanding voting securities of which are owned directly or indirectly by such entity or any partnership, joint venture or other enterprise in which any entity has, directly or indirectly, a majority equity interest.

(cc)     "Successful Bidder" has the meaning set forth in Exhibit H.

(dd)     "Trust Preferred Securities" means the $5,155,000 in trust preferred securities issued September 22, 2004 by Outsource.

Section 12.11     Specific Performance.  Each of the parties hereto acknowledges that the other parties would be irreparably damaged and would not have an adequate remedy at law for money damages if any of the covenants contained in this Agreement were not performed in accordance with its terms or otherwise were materially breached.  Each of the parties hereto therefore agrees that, without the necessity of proving actual damages or posting bond or other security, the other party may be entitled to temporary and/or permanent injunction or injunctions which a court of competent jurisdiction concludes is justified to prevent breaches of such performance and to specific enforcement of such covenants in addition to any other remedy to which they may be entitled, at law or in equity.

Section 12.12     Attorneys' Fees and Costs.  If attorneys' fees or other costs are incurred to secure performance of any of the obligations herein provided for, or to establish damages for the breach thereof, or to obtain any other appropriate relief, the prevailing party is entitled to recover reasonable attorneys' fees and costs incurred therein and determined by the court to be justified.

Section 12.13     Rules of Construction.  The descriptive headings in this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.  Each use herein of the masculine, neuter or feminine gender is deemed to include the other genders.  Each use herein of the plural will include the singular and vice versa, in each case as the context requires or as it is otherwise appropriate.  The word "or" is used in the inclusive sense.  No party shall be required to take any action under this Agreement to the extent that such action would require the party to violate any applicable law, regulation or policy.

Section 12.14   Articles, Sections, Exhibits and Schedules.   All articles and sections referred to herein are articles and sections, respectively, of this Agreement and all exhibits and schedules referred to herein are exhibits and schedules, respectively, attached to this Agreement. Descriptive headings as to the contents of particular sections are for convenience only and do not control or affect the meaning, construction or interpretation of this Agreement. Any and all schedules, exhibits, certificates or other documents or instruments referred to herein or attached hereto are and will be incorporated herein by reference hereto as though fully set forth herein.

Section 12.15   Public Disclosure.   None of FBLB, Outsource, or the Bank will make any announcement, statement, press release, acknowledgment or other public disclosure of the existence of, or reveal the terms, conditions or the status of, this Agreement or the transactions contemplated hereby without the prior written consent of the other parties to this Agreement; but FBLB, Outsource, and the Bank are permitted to make any public disclosures or governmental filings as legal counsel may deem necessary to maintain compliance with or to prevent violations of applicable federal or state laws or regulations or that may be necessary to obtain regulatory approval for the transactions contemplated hereby.

Section 12.16   Extension; Waiver.   At any time before the Closing Date, the parties may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document, certificate or writing delivered pursuant hereto, or (c) waive compliance with any of the agreements or conditions contained herein. Such action will be evidenced by a signed written notice given in the manner provided in Section 12.07. No party to this Agreement will by any act (except by a written instrument given pursuant to Section 12.07) be deemed to have waived any right or remedy hereunder or to have acquiesced in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising any right, power or privilege hereunder by any party hereto will operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver of any party of any right or remedy on any one occasion will not be construed as a bar to any right or remedy that such party would otherwise have on any future occasion or to any right or remedy that any other party may have hereunder. Any party may unilaterally waive a right which is solely applicable to it.

Section 12.17   Amendments.   To the extent permitted by applicable law, this Agreement may be amended by action taken by or on behalf of the Board of Directors of FBLB, Outsource, and the Bank at any time before or after adoption of this Agreement by the shareholders of Outsource but, after any submission of this Agreement to such shareholders for approval, no amendment will be made that reduces the Purchase Price or that materially and adversely affects the rights of Outsource's shareholders hereunder without the requisite approval of such shareholders. This Agreement may be amended, modified or supplemented only by an instrument in writing signed by the party against which enforcement of the amendment, modification or supplement is sought.

*[SIGNATURE PAGE FOLLOWS.]*

IN WITNESS WHEREOF, FBLB, Outsource, and the Bank have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

FIRST BANK LUBBOCK BANCSHARES, INC.

By: _____

Barry Orr, Chairman and CEO

OUTSOURCE HOLDINGS, INC.

By: _____

Doug Boyd, Director and Authorized Signatory

JEFFERSON BANK

By: _____

Doug Boyd, Director and Authorized Signatory

- 51 -

IN WITNESS WHEREOF, FBLB, Outsource, and the Bank have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

FIRST BANK LUBBOCK BANCSHARES, INC.

By: _____
Barry Orr, Chairman and CEO

OUTSOURCE HOLDINGS, INC.

By: _____
Doug Boyd, Director and Authorized Signatory

JEFFERSON BANK

By: _____
Doug Boyd, Director and Authorized Signatory

- 51 -

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Outsource Release |
| Exhibit B | - | Form of Director Release |
| Exhibit C | - | Form of Officer Release |
| Exhibit D | - | Not used |
| Exhibit E | - | Form of Support Agreement |
| Exhibit F | - | Form of Agreement and Plan of Merger |
| Exhibit G | - | Form of Auction Procedures Order |
| Exhibit H | - | Form of Auction Procedures |
| Exhibit I | - | Form of Sale Order |

# EXHIBIT "A"
## To
## Acquisition Agreement

## RELEASE
### (Outsource)

This **RELEASE** (the "Release"), effective as of _____, is made by Outsource Holdings, Inc. ("Outsource") in favor of each of the Outsource Subsidiaries, as defined herein.

### RECITALS

WHEREAS, pursuant to that certain Acquisition Agreement (the "Acquisition Agreement"), dated as of April 3, 2011, by and between First Bank Lubbock Bancshares, Inc. ("FBLB"), Outsource, and Jefferson Bank, Dallas, Texas (the "Bank"), it is a condition to the consummation of the transactions contemplated by the Acquisition Agreement that Outsource has executed and delivered to FBLB an instrument releasing each of the Outsource Subsidiaries (Outsource Holdings Statutory Trust I and the Bank are collectively referred to as the "Outsource Subsidiaries," and each, a "Outsource Subsidiary"), from any and all claims of Outsource;

WHEREAS, the purpose of this Release is to serve as the instrument referred to in Section 8.06 of the Acquisition Agreement as discussed above; and

WHEREAS, Outsource desires to enter into this Release in consideration of the matters set forth herein.

### AGREEMENT

NOW, THEREFORE, for and in consideration of $1.00 and other good and valuable consideration, including, without limitation, that this Release is a condition to the Acquisition Agreement, the receipt and sufficiency of which is hereby expressly acknowledged, Outsource agrees as follows:

1.      Attached as <u>Schedule 1</u> hereto is a list of all claims by Outsource against the Outsource Subsidiaries. Outsource acknowledges that, to the best of its knowledge, there are no existing claims or defenses, personal or otherwise, or rights of set off whatsoever against any Outsource Subsidiary, except as a result of Outsource's capacity as a depositor with the Bank or other written contractual obligations of any Outsource Subsidiary to Outsource. Outsource and its successors and assigns (the "Outsource Releasing Parties") hereby releases, acquits and forever discharges the Outsource Subsidiaries and their respective predecessors, successors, assigns, and their respective officers, employees, agents and servants, and all persons, natural or corporate, in privity with them or any of them (but only as to their actions or omissions in their capacity as officers, directors, employees, agents or servants of the Outsource Subsidiaries) from any and all claims or causes of action of any kind whatsoever, at common law, statutory or otherwise, which the Outsource Releasing Parties, or any of them, has, known or unknown, now existing or that may hereafter arise in respect of any and all agreements and obligations incurred on or prior to the date hereof, or in respect of any event occurring or circumstances existing on or prior to the date hereof; but the Outsource Subsidiaries are not released from any obligations or liabilities to Outsource in connection with any deposits or accounts of Outsource or other written contractual obligations of the Outsource Subsidiaries to Outsource existing on the date of this Release (the "Specified Claims").

2.      It is expressly understood and agreed that the terms hereof are contractual and not merely recitals, and that the agreements herein contained and the consideration herein transferred is to compromise doubtful and disputed claims, and that no releases made or other consideration given hereby or in connection herewith are to be construed as an admission of liability, all liability being expressly denied by the Outsource Subsidiaries. Outsource hereby represents and warrants that the consideration

hereby acknowledged for entering into this Release and the transactions contemplated hereby is greater than the value of all claims, demands, actions and causes of action herein relinquished, released, renounced, abandoned, acquitted, waived or discharged, and that this Release is in full settlement, satisfaction and discharge of any and all such claims, demands, actions, and causes of action that Outsource may have or be entitled to against the Outsource Subsidiaries, and their respective predecessors, assigns, legal representatives, officers, directors, employees, attorneys and agents other than the Specified Claims.

3.      Outsource hereby represents and warrants that it has full power and authority to enter into, execute and deliver this Release, all proceedings required to be taken to authorize the execution, delivery and performance of this Release and the agreements and undertakings relating hereto and the transactions contemplated hereby have been validly and properly taken and this Release constitutes a valid and binding obligation of Outsource in the capacity in which executed. Outsource further represents and warrants that it has entered into this Release freely of its own accord and without reliance on any representations of any kind of character not set forth herein. Outsource enters into this Release after the opportunity to consult with its own legal counsel.

4.      THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLYING TO CONTRACTS ENTERED INTO AND TO BE PERFORMED WITHIN THE STATE OF TEXAS, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN LUBBOCK COUNTY, TEXAS. If any provision of this Release or the application thereof to any person or circumstance is determined to be invalid or unenforceable to any extent, such provision is deemed severable, the remainder of this Release and the application of all other provisions are not to be affected thereby and are to be enforced to the greatest extent permitted by law. This Release is executed as of the date first above written. As used herein, the singular includes the plural, the masculine includes the feminine and neuter, and vice versa.

*[signature page to follow]*

2

Executed this ___ day of _____, 20__.

OUTSOURCE HOLDINGS, INC.

By: _____

Print Name:_____

Title: _____

## SCHEDULE 1

## CLAIMS

70885.000001 EMF_US 33763849v1

# EXHIBIT "B"
# To
# Acquisition Agreement

# RELEASE
(Director)

This **RELEASE** (the "Release"), effective as of _____, is made by _____ (the "Director"), in favor of Outsource Holdings, Inc. ("Outsource"), and each of the Outsource Subsidiaries, as defined herein.

## RECITALS

WHEREAS, pursuant to that certain Acquisition Agreement (the "Acquisition Agreement"), dated as of April 3, 2011, by and between First Bank Lubbock Bancshares, Inc. ("FBLB"), Outsource, and Jefferson Bank, Dallas, Texas (the "Bank"), it is a condition to the consummation of the transactions contemplated by the Acquisition Agreement that the Director has executed and delivered to FBLB an instrument releasing Outsource and each of the Outsource Subsidiaries (Outsource Holdings Statutory Trust 1, the Bank and Suite 100 Holdings, Inc. are collectively referred to as the "Outsource Subsidiaries," and each, a "Outsource Subsidiary"), from any and all claims of such Director;

WHEREAS, the purpose of this Release is to serve as the instrument referred to in Section 8.06 of the Acquisition Agreement as discussed above; and

WHEREAS, the Director desires to enter into this Release in consideration of the matters set forth herein.

## AGREEMENT

NOW, THEREFORE, for and in consideration of $1.00 and other good and valuable consideration, including, without limitation, that this Release is a condition to the Acquisition Agreement, the receipt and sufficiency of which is hereby expressly acknowledged, the Director agrees as follows:

1.     Attached as Schedule 1 hereto is a list of all loans outstanding from the Bank to the Director. The Director acknowledges that, to the best of his or her knowledge, there are no existing claims or defenses, personal or otherwise, or rights of set off whatsoever against Outsource or any Outsource Subsidiary, except as a result of the Director's capacity as a depositor with the Bank or other written contractual obligations of Outsource or any Outsource Subsidiary to the Director. The Director for himself or herself and on behalf of his or her heirs and assigns (the "Director Releasing Parties") hereby releases, acquits and forever discharges Outsource and the Outsource Subsidiaries and their respective predecessors, successors, assigns, and their respective officers, directors, employees, agents and servants, and all persons, natural or corporate, in privity with them or any of them (but only as to their actions or omissions in their capacity as officers, directors, employees, agents or servants of Outsource or the Outsource Subsidiaries) from any and all claims or causes of action of any kind whatsoever, at common law, statutory or otherwise, which the Director Releasing Parties, or any of them, has, known or unknown, now existing or that may hereafter arise in respect of any and all agreements and obligations incurred on or prior to the date hereof, or in respect of any event occurring or circumstances existing on or prior to the date hereof; but Outsource and the Outsource Subsidiaries are not released from any obligations or liabilities to the Director (a) pursuant to the articles or certificate of incorporation or association or bylaws of Outsource or the Outsource Subsidiaries regarding the indemnification of officers or directors; and (b) in connection with any deposits or accounts of the Director or other written contractual obligations of Outsource or the Outsource Subsidiaries to the Director existing on the date of this Release (items (a) and (b) are collectively referred to herein as the "Specified Claims").

2.     It is expressly understood and agreed that the terms hereof are contractual and not merely recitals, and that the agreements herein contained and the consideration herein transferred is to compromise doubtful and disputed claims, and that no releases made or other consideration given hereby or in connection herewith are to be construed as an admission of liability, all liability being expressly denied by Outsource and the Outsource Subsidiaries. The Director hereby represents and warrants that the consideration hereby acknowledged for entering into this Release and the transactions contemplated hereby is greater than the value of all claims, demands, actions and causes of action herein relinquished, released, renounced, abandoned, acquitted, waived or discharged, and that this Release is in full settlement, satisfaction and discharge of any and all such claims, demands, actions, and causes of action that the Director may have or be entitled to against Outsource or the Outsource Subsidiaries, and their respective predecessors, assigns, legal representatives, officers, directors, employees, attorneys and agents other than the Specified Claims.

3.     The Director hereby represents and warrants that he or she has full power and authority to enter into, execute and deliver this Release, all proceedings required to be taken to authorize the execution, delivery and performance of this Release and the agreements and undertakings relating hereto and the transactions contemplated hereby have been validly and properly taken and this Release constitutes a valid and binding obligation of the Director in the capacity in which executed. The Director further represents and warrants that he or she has entered into this Release freely of his or her own accord and without reliance on any representations of any kind of character not set forth herein. The Director enters into this Release after the opportunity to consult with his or her own legal counsel.

4.     THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLYING TO CONTRACTS ENTERED INTO AND TO BE PERFORMED WITHIN THE STATE OF TEXAS, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN LUBBOCK COUNTY, TEXAS. If any provision of this Release or the application thereof to any person or circumstance is determined to be invalid or unenforceable to any extent, such provision is deemed severable, the remainder of this Release and the application of all other provisions are not to be affected thereby and are to be enforced to the greatest extent permitted by law. This Release is executed as of the date first above written. As used herein, the singular includes the plural, the masculine includes the feminine and neuter, and vice versa.

*[signature page to follow]*

70885.000001 EMF_US 33763715v1

THE DIRECTOR:

_____

Print Name:_____

STATE OF TEXAS          §
                        §
COUNTY OF _____     §

    This instrument was acknowledged before me on _____, by _____, individually.

_____

Notary Public in and for the State of Texas

Printed Name:_____

My Commission Expires: _____

## SCHEDULE 1

### LOANS OUTSTANDING

# EXHIBIT "C"
## To
## Acquisition Agreement

**RELEASE**
(Officer)

This **RELEASE** (the "Release"), effective as of _____, is made by _____ (the "Officer"), in favor of Outsource Holdings, Inc. ("Outsource"), and each of the Outsource Subsidiaries, as defined herein.

RECITALS

WHEREAS, pursuant to that certain Acquisition Agreement (the "Acquisition Agreement"), dated as of April 3, 2011, by and between First Bank Lubbock Bancshares, Inc. ("FBLB"), Outsource, and Jefferson Bank, Dallas, Texas (the "Bank"), it is a condition to the consummation of the transactions contemplated by the Acquisition Agreement that the Officer has executed and delivered to FBLB an instrument releasing Outsource and each of the Outsource Subsidiaries (Outsource Holdings Statutory Trust I and the Bank are collectively referred to as the "Outsource Subsidiaries," and each, a "Outsource Subsidiary"), from any and all claims of such Officer;

WHEREAS, the purpose of this Release is to serve as the instrument referred to in Section 8.06 of the Acquisition Agreement as discussed above; and

WHEREAS, the Officer desires to enter into this Release in consideration of the matters set forth herein.

AGREEMENT

NOW, THEREFORE, for and in consideration of $1.00 and other good and valuable consideration, including, without limitation, that this Release is a condition to the Acquisition Agreement, the receipt and sufficiency of which is hereby expressly acknowledged, the Officer agrees as follows:

1.	Attached as Schedule 1 hereto is a list of all loans outstanding from the Bank to the Officer. The Officer acknowledges that, to the best of his or her knowledge, there are no existing claims or defenses, personal or otherwise, or rights of set off whatsoever against Outsource or any Outsource Subsidiary, except (i) as a result of the Officer's capacity as a depositor with the Bank or other written contractual obligations of Outsource or any Outsource Subsidiary to the Officer; (ii) for salary, bonus or other compensation or benefits specifically described on Schedule 2 hereto due to such Officer in the ordinary course of business; or (iii) in connection with medical claims not yet filed. The Officer for himself or herself and on behalf of his or her heirs and assigns (the "Officer Releasing Parties") hereby releases, acquits and forever discharges Outsource and the Outsource Subsidiaries and their respective predecessors, successors, assigns, and their respective officers, directors, employees, agents and servants, and all persons, natural or corporate, in privity with them or any of them (but only as to their actions or omissions in their capacity as officers, directors, employees, agents or servants of Outsource or the Outsource Subsidiaries) from any and all claims or causes of action of any kind whatsoever, at common law, statutory or otherwise, which the Officer Releasing Parties, or any of them, has, known or unknown, now existing or that may hereafter arise in respect of any and all agreements and obligations incurred on or prior to the date hereof, or in respect of any event occurring or circumstances existing on or prior to the date hereof; but Outsource and the Outsource Subsidiaries are not released from any obligations or liabilities to the Officer (a) pursuant to the articles or certificate of incorporation or association or bylaws of Outsource or the Outsource Subsidiaries regarding the indemnification of officers or directors; (b) in connection with any deposits or accounts of the Officer or other written contractual obligations of Outsource or the Outsource Subsidiaries to the Officer existing on the date of this Release; (c) accrued compensation and benefits; (d) pursuant to the provisions of any written employment agreement to which

the Officer is a party and as set forth on Schedule 2; and (e) in connection with medical claims not yet filed (items (a), (b), (c), (d) and (e) are collectively referred to herein as the "Specified Claims").

2.     It is expressly understood and agreed that the terms hereof are contractual and not merely recitals, and that the agreements herein contained and the consideration herein transferred is to compromise doubtful and disputed claims, and that no releases made or other consideration given hereby or in connection herewith are to be construed as an admission of liability, all liability being expressly denied by Outsource and the Outsource Subsidiaries. The Officer hereby represents and warrants that the consideration hereby acknowledged for entering into this Release and the transactions contemplated hereby is greater than the value of all claims, demands, actions and causes of action herein relinquished, released, renounced, abandoned, acquitted, waived or discharged, and that this Release is in full settlement, satisfaction and discharge of any and all such claims, demands, actions, and causes of action that the Officer may have or be entitled to against Outsource or the Outsource Subsidiaries, and their respective predecessors, assigns, legal representatives, officers, directors, employees, attorneys and agents other than the Specified Claims.

3.     The Officer hereby represents and warrants that he or she has full power and authority to enter into, execute and deliver this Release, all proceedings required to be taken to authorize the execution, delivery and performance of this Release and the agreements and undertakings relating hereto and the transactions contemplated hereby have been validly and properly taken and this Release constitutes a valid and binding obligation of the Officer in the capacity in which executed. The Officer further represents and warrants that he or she has entered into this Release freely of his or her own accord and without reliance on any representations of any kind of character not set forth herein. The Officer enters into this Release after the opportunity to consult with his or her own legal counsel.

4.     THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLYING TO CONTRACTS ENTERED INTO AND TO BE PERFORMED WITHIN THE STATE OF TEXAS, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN LUBBOCK COUNTY, TEXAS. If any provision of this Release or the application thereof to any person or circumstance is determined to be invalid or unenforceable to any extent, such provision is deemed severable, the remainder of this Release and the application of all other provisions are not to be affected thereby and are to be enforced to the greatest extent permitted by law. This Release is executed as of the date first above written. As used herein, the singular includes the plural, the masculine includes the feminine and neuter, and vice versa.

*[signature page to follow]*

2

THE OFFICER:

_____

Print Name: _____

STATE OF TEXAS          §
                        §
COUNTY OF _____    §

    This instrument was acknowledged before me on _____, by _____, individually.

_____
Notary Public in and for the State of Texas

Printed Name:_____

My Commission Expires:_____

70885.000001 EMF_US 33763314v2

## SCHEDULE 1

## LOANS OUTSTANDING

## SCHEDULE 2

### SALARY, BONUS OR OTHER COMPENSATION OR BENEFITS

# EXHIBIT "D"
## To
## Acquisition Agreement

## NOT USED

# EXHIBIT "E"
## To
# Acquisition Agreement

## SUPPORT AGREEMENT

This **SUPPORT AGREEMENT** (the "Agreement") is made and entered into as of _____, 2011, by and between First Bank Lubbock Bancshares, Inc., a Texas corporation ("FBLB"), and _____, an individual resident of the State of Texas ("Director").

## RECITALS

WHEREAS, FBLB, Outsource Holdings, Inc., a Texas corporation, and Jefferson Bank, Dallas, Texas (the "Bank"), a Texas state banking association, have entered into an Acquisition Agreement, dated as of April 3, 2011 (the "Acquisition Agreement"). Terms used herein with their initial letters capitalized and not otherwise defined herein have the meanings given them in the Acquisition Agreement; and

WHEREAS, in connection with consummation of the transactions contemplated by the Acquisition Agreement, and as a condition precedent to the obligations of FBLB under the Acquisition Agreement, FBLB and Director have agreed to enter into this Agreement.

NOW, THEREFORE, in consideration for receipt of such confidential information and trade secrets and in consideration of the premises and mutual covenants contained herein and intending to be legally bound hereby, FBLB and Director agree as follows:

## AGREEMENT

1.    <u>Director Support</u>.  Director agrees to use his or her best efforts to refrain from harming the goodwill of the Bank, any subsidiary of the Bank, or FBLB or its subsidiary, First Bank & Trust, Lubbock, Texas (the "Lubbock Bank"), and their respective customer and client relationships.

2.    <u>Director Covenants</u>.

(a)    Director acknowledges that he has received or may have received substantial, valuable consideration, including confidential trade secret and proprietary information relating to the identity and special needs of the Bank's current and prospective customers, the Bank's current and prospective services, the Bank's and the Lubbock Bank's business projections and market studies, the Bank's and the Lubbock Bank's business plans and strategies, and the Bank's studies and information concerning special services unique to the Bank. Director further acknowledges and agrees that this consideration constitutes fair and adequate consideration for the execution of the non-solicitation restriction set forth below. Accordingly, other than in any capacity for or on behalf of FBLB or any subsidiary of FBLB, including the Lubbock Bank, Director agrees that Director will not, without the prior written consent of FBLB, directly or indirectly, individually or as an employee, partner, officer, director or shareholder or in any other capacity whatsoever:

(i)    solicit the business of any person or entity who is a customer of the Lubbock Bank as of the date of this Agreement or as of the Closing Date on behalf of any other insured depository institution;

(ii)    (A)    acquire any interest in (directly or indirectly), charter, operate or enter into any franchise or other management agreement with, any insured depository institution that has a location within a 60 mile radius of any location of the Lubbock Bank (the "Noncompete Area") (but Director may (1) retain any existing ownership interest in any insured depository institution as disclosed on <u>Schedule 1</u> attached hereto, (2) acquire an ownership interest in any publicly-traded depository institution, so long as that

ownership interest does not exceed 3% of the total number of shares outstanding of that depository institution, and (3) invest in an existing mutual fund that invests, directly or indirectly, in such insured depository institutions),

> (B)  serve as an officer, director, employee, agent or consultant to any insured depository institution that has a location within the Noncompete Area, or

> (C)  establish or operate a branch or other office of an insured depository institution within the Noncompete Area, or

> (iii)  recruit, hire, assist others in recruiting or hiring, discuss employment with, or refer others concerning employment of, any person who is, or within the 12 months preceding the Closing Date was, an employee of the Lubbock Bank; but nothing in this Section 2(a)(iii) applies to employment other than in the financial services business.

Director may not avoid the purpose and intent of this Section 2(a) by engaging in conduct within the geographically limited area from a remote location through means such as telecommunications, written correspondence, computer generated or assisted communications, or other similar methods.

(b)  If any court of competent jurisdiction should determine that the terms of this Section 2 are too broad in terms of time, geographic area, lines of commerce or otherwise, that court is to modify and revise any such terms so that they comply with applicable law.

(c)  Director agrees that (i) this Agreement is entered into in connection with the sale to FBLB of the goodwill of the business of the Bank, (ii) Director is receiving valuable consideration for this Agreement, (iii) the restrictions imposed upon Director by this Agreement are essential and necessary to ensure FBLB acquires the goodwill of the Bank and (iv) all the restrictions (including particularly the time and geographical limitations) set forth in this Agreement are fair and reasonable.

3.  Early Resolution Conference. This Agreement is understood to be clear and enforceable as written and is executed by both parties on that basis. However, should Director later challenge any provision as unclear, unenforceable, or inapplicable to any competitive activity that Director intends to engage in, Director will first notify FBLB in writing and meet with a FBLB representative and a neutral mediator (if FBLB elects to retain one at its expense) to discuss resolution of any disputes between the parties. Director will provide this notification at least 14 days before Director engages in any activity on behalf of a competing business or engages in other activity that could foreseeably fall within a questioned restriction. If Director fails to comply with this requirement, Director waives his right to challenge the reasonable scope, clarity, applicability or enforceability of this Agreement and its restrictions at a later time.

4.  Termination. This Agreement and all obligations hereunder will terminate on the earlier of (a) the date the Acquisition Agreement is terminated pursuant to Section 9.01 of the Acquisition Agreement or (b) the date that is 24 months after the Closing Date.

5.  Injunctive Relief. FBLB and Director hereby acknowledge and agree that FBLB and the Bank will be irreparably damaged if this Agreement is not specifically enforced. Accordingly, FBLB and the Bank are entitled to injunctive relief restraining any violation of this Agreement by Director (without any bond or other security being required), or any other appropriate decree of specific performance. Such

remedies are not to be exclusive and are in addition to any other remedy that FBLB or the Bank may have at law or in equity.

6.    Assignability.  Director may not assign its obligations under this Agreement without the prior written consent of FBLB.

7.    Parties Bound.  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective legal representatives, successors and assigns, except as otherwise expressly provided herein.

8.    Applicable Law.  This Agreement is to be construed under and according to the laws of the State of Texas.  Venue for any cause of action arising from this agreement will lie in Lubbock County, Texas.

9.    Legal Construction.  If any of the provisions contained in this Agreement are for any reason held to be invalid, illegal or unenforceable in any respect, that provision is to be fully severable, such invalidity, illegality or unenforceability is not to affect any other provision hereof, and this Agreement is to be construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein, and the remaining provisions of this Agreement are to remain in full force and effect.  Furthermore, in lieu of that illegal, invalid or unenforceable provision, there is to be added automatically as a part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be valid and enforceable.

10.   Notice.  Any and all notices, requests, instructions and other communications to be given under this Agreement may be delivered personally or by nationally recognized overnight courier service or sent by mail or (except in the case of payments) by electronic mail or facsimile transmission, at the respective addresses or transmission numbers set forth below and will be effective (a) in the case of personal delivery, electronic mail or facsimile transmission, when received; (b) in the case of mail, upon the earlier of actual receipt or 5 business days after deposit in the United States Postal Service, first class certified or registered mail, postage prepaid, return receipt requested; and (c) in the case of nationally-recognized overnight courier service, 1 business day after delivery to such courier service together with all appropriate fees or charges and instructions for such overnight delivery.  The parties may change their respective addresses and transmission numbers by written notice to the other, sent as provided in this Section.  All communications must be in writing and addressed as follows:

IF TO DIRECTOR:

_____

_____

_____

_____

IF TO FBLB:

Mr. Barry Orr
Chairman
First Bank Lubbock Bancshares, Inc.
9816 Slide Road
Lubbock, Texas 79424
Telecopy: (806) 788-0800
Electronic mail: borr@firstbanklubbock.com

3

11.     <u>No Delay, Waiver, Etc</u>.  No delay on the part of the parties hereto in exercising any power or right hereunder is to operate as a waiver thereof; nor is any single or partial exercise of any power or right hereunder to preclude other or further exercise thereof or the exercise of any other power or right.

12.     <u>Modification</u>. No amendment of this Agreement is effective unless contained in a written instrument signed by the parties hereto.

13.     <u>Headings</u>. The descriptive headings of the sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**DIRECTOR:**


_____

Print Name: _____


**FIRST BANK LUBBOCK BANCSHARES, INC.**


By:_____
       Barry Orr, Chairman

# SCHEDULE 1

## EXISTING OWNERSHIP INTEREST

# EXHIBIT "F"
## To
# Acquisition Agreement

# AGREEMENT AND PLAN OF MERGER

This **AGREEMENT AND PLAN OF MERGER** (this "Merger Agreement"), is made as of _____, 2011, by and among First Bank & Trust Company, a Texas banking association ("First Bank"), and Jefferson Bank, a Texas banking association ("Jefferson").

## RECITALS

WHEREAS, First Bank is a wholly-owned subsidiary of First Bank Lubbock Bancshares, Inc., a Texas corporation and registered bank holding company ("FBLB");

WHEREAS, Jefferson is a wholly-owned subsidiary of Outsource Holdings, Inc., a Texas corporation and registered bank holding company ("OHI");

WHEREAS, Jefferson, OHI and FBLB, are parties to an Acquisition Agreement dated April 3, 2011 (the "Acquisition Agreement"), pursuant to which OHI desires to merge Jefferson with and into First Bank (the "Merger") pursuant to the provisions of Section 32.301 of the Texas Finance Code, Chapters 10 and 21, Subchapter J of the Texas Business Organizations Code (the "TBOC"), the Acquisition Agreement and this Merger Agreement;

WHEREAS, Jefferson is a banking association duly organized and existing under the laws of the State of Texas, with authorized capital stock consisting of 600,000 shares of common stock, par value $5.00 ("Jefferson Stock"), 330,000 of which are issued and outstanding; and

WHEREAS, the Boards of Directors of Jefferson and First Bank, pursuant to the authority given by and in accordance with the provisions of the TBOC have approved this Merger Agreement and have authorized the execution hereof.

NOW, THEREFORE, Jefferson and First Bank, hereby agree that Jefferson is to be merged with and into First Bank on the following terms and conditions:

## AGREEMENT

1.     <u>Merger of Jefferson and First Bank</u>. At the Effective Time (as defined in Section 11), Jefferson will be merged with and into First Bank in accordance with Section 32.301 of the Texas Finance Code and Chapters 10 and 21 of the TBOC. First Bank will be the surviving entity in the Merger (the "Surviving Entity") and will continue its existence under the TBOC. At the Effective Time, the separate existence of Jefferson will cease.

2.     <u>Effects of the Merger</u>. The Merger will have the effects set forth in § 10.008 of the TBOC. The name of the Surviving Entity will be "First Bank & Trust Company."

3.     <u>Articles of Association and Bylaws</u>. The Articles of Association and Bylaws of First Bank, as in effect immediately before the Effective Time, will be the Articles of Association and Bylaws of the Surviving Entity until thereafter changed or amended as provided by applicable law

4.     <u>Directors and Officers</u>. The directors and officers of First Bank at the Effective Time will remain the directors and officers of the Surviving Entity from the Effective Time until their respective successors are duly elected or appointed and qualified in the manner provided in the Articles of Association and Bylaws of the Surviving Entity or as otherwise provided by law.

5. Conversion of Securities. At the Effective Time, the shares of Jefferson Stock outstanding at the Effective Time will be converted as described in Section 1.02 of the Acquisition Agreement.

6. Conditions to Completion of the Merger. Completion of the Merger as provided herein is conditioned upon the satisfaction of the conditions set forth in the Acquisition Agreement, any or all of which may be waived in accordance with the terms and provisions of the Acquisition Agreement.

7. Termination. This Merger Agreement may be terminated and abandoned at any time before the Effective Time, whether before or after action thereon pursuant to the terms of the Acquisition Agreement.

8. Effect of Termination. If this Merger Agreement is terminated, liability by reason of this Merger Agreement or the termination thereof on the part of any of Jefferson, First Bank or the directors, officers, employees or agents of either of them is to be determined pursuant to the TBOC.

9. Representations and Warranties of Jefferson. Jefferson is a banking association, duly organized, validly existing and in good standing under the laws of the State of Texas. Jefferson has all requisite corporate power and authority (including all licenses, franchises, permits and other governmental authorizations as are legally required) to carry on its business as now being conducted, to own, lease and operate its properties and assets as now owned, leased or operated and to enter into and carry out its obligations under this Merger Agreement.

10. Waiver; Amendment. Any of the terms or conditions of this Merger Agreement may be waived at any time, whether before or after action thereon by the party that is entitled to the benefits thereof. This Merger Agreement may be amended at any time before the Effective Time, whether before or after action thereon by the shareholders of Jefferson and First Bank. Any waiver or amendment must be in writing.

11. Effective Time. The Merger is to be effective on the date and at the time specified in the Certificate of Merger to be issued by the Secretary of State of Texas under the seal of his office, such time being referred to herein as the "Effective Time."

12. Multiple Counterparts. For the convenience of the parties hereto, this Merger Agreement may be executed in multiple counterparts, each of which will be deemed an original, and all counterparts hereof so executed by the parties hereto, whether or not such counterpart will bear the execution of each of the parties hereto, will be deemed to be, and is to be construed as, one and the same Agreement. A telecopy or facsimile transmission of a signed counterpart of this Merger Agreement is sufficient to bind the party or parties whose signature(s) appear thereon.

13. Governing Law. **THIS MERGER AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLYING TO CONTRACTS ENTERED INTO AND TO BE PERFORMED WITHIN THE STATE OF TEXAS, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS MERGER AGREEMENT WILL LIE IN LUBBOCK COUNTY, TEXAS.**

14. Further Assurances. The parties agree that they will, at any time and from time to time after the Effective Time, upon request by the other and without further consideration, do, perform, execute, acknowledge and deliver all such further acts, deeds, assignments, assumptions, transfers, conveyances, powers of attorney, certificates and assurances as may be reasonably required in order to

fully complete the transactions contemplated hereby in accordance with this Merger Agreement or to carry out and perform any undertaking made by the parties hereunder.

15. <u>Severability</u>. If any provision of this Merger Agreement is held to be illegal, invalid or unenforceable under present or future laws, then (a) this Merger Agreement is to be construed and enforced as if such illegal, invalid or unenforceable provision were not a part hereof; (b) the remaining provisions of this Merger Agreement will remain in full force and effect and will not be affected by such illegal, invalid or unenforceable provision or by its severance from this Merger Agreement; and (c) there will be added automatically as a part of this Merger Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and enforceable.

16. <u>Specific Performance</u>. Each of the parties hereto acknowledges that the other parties would be irreparably damaged and would not have an adequate remedy at law for money damages if any of the covenants contained in this Merger Agreement were not performed according to its terms or otherwise were materially breached. Each of the parties agrees that, without the necessity of proving actual damages or posting bond or other security, the other party is entitled to injunctive relief to prevent breach of performance and to specific enforcement of such covenants in addition to any other remedy to which they may be entitled.

17. <u>Rules of Construction</u>. Descriptive headings as to the contents of particular sections are for convenience only and do not control or affect the meaning, construction or interpretation of this Merger Agreement. All articles and sections referred to herein are articles and sections, respectively, of this Merger Agreement. Each use herein of the masculine, neuter or feminine gender is deemed to include the other genders. Each use herein of the plural includes the singular and vice versa, in each case as the context requires or as it is otherwise appropriate. The word "or" is used in the inclusive sense. Any and all documents or instruments referred to herein are incorporated herein by reference hereto as though fully set forth herein verbatim. If there is any conflict between the terms of this Merger Agreement and the terms of the Acquisition Agreement, the terms of the Acquisition Agreement shall control.

18. <u>Binding Effect; Assignment</u>. All of the terms, covenants, representations, warranties and conditions of this Merger Agreement are binding upon, and inure to the benefit of and be enforceable by, the parties hereto and their respective successors, representatives and permitted assigns. Nothing expressed or referred to herein is intended or is to be construed to give any person other than the parties hereto any legal or equitable right, remedy or claim under or in respect of this Merger Agreement, or any provision herein contained, it being the intent of the parties hereto that this Merger Agreement, the assumption of obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole benefit of the parties to this Merger Agreement and for the benefit of no other person, except as expressly provided for herein. Nothing in this Merger Agreement will act to relieve or discharge the obligation or liability of any third party to any party to this Merger Agreement, nor will any provision give any third party any right of subrogation or action over or against any party to this Merger Agreement, except as expressly provided for herein. No party to this Merger Agreement will assign this Merger Agreement, by operation of law or otherwise, in whole or in part, without the prior written consent of the other parties. Except as provided for in the preceding sentence, any assignment made or attempted in violation of this Section is void and of no effect.

*[SIGNATURE BLOCK ON FOLLOWING PAGE]*

3

IN WITNESS WHEREOF, Jefferson and First Bank have caused this Merger Agreement to be signed in their respective corporate names as of the date and year first above written.

**JEFFERSON BANK**
**(a Texas banking association)**


By:_____
    Ralph Kerr, President



**FIRST BANK & TRUST COMPANY**
**(a Texas banking association)**


By:_____
    Greg Garland, President

4

# EXHIBIT "G"
# To
# Acquisition Agreement

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11 Case** |
| | § | |
| **OUTSOURCE HOLDINGS, INC.,** | § | **Case No.: 11-** |
| | § | |
| Debtor. | § | |

**ORDER APPROVING (I) INITIAL BIDDER EXPENSE REIMBURSEMENTS, (II)
AUCTION PROCEDURES, AND (III) FORM AND MANNER OF SALE NOTICE**

Upon the motion, dated April 3, 2011 (the "Motion"), of the debtor and debtor-in-possession in the above-captioned case (the "Debtor") for an order (the "Auction Procedures Order") (a) approving procedures for the sale and use of stock owned by the Debtor (the "Stock"), (b) scheduling a hearing to approve such sale and approving the form of notice thereof, and (c) authorizing the payment of certain expense reimbursements; and the Court having reviewed and considered the Motion, and having heard statements of counsel and the evidence presented in support of the relief requested by the Debtor in the Motion at a hearing before the Court on April \_\_\_, 2011 (the "Procedures Hearing"); and it appearing that (i) the relief

1

requested in the Motion, as it relates to the Auction Procedures, is in the best interests of the Debtor, its bankruptcy estate, its stakeholders, and all other parties-in-interest; (ii) the Court has jurisdiction over this matter; (iii) the legal and factual bases set forth in the Motion and at the Procedures Hearing establish just cause for the relief granted herein; and (iv) the Debtor has provided sufficient notice of the Motion and the Procedures Hearing to all creditors and parties in interest; and after due deliberation thereon, it is hereby

ORDERED that the Auction Procedures[1] as set forth in **Exhibit "1"** annexed hereto are hereby approved in all respects; and it is further

ORDERED that the Sale Notice as set forth in **Exhibit "2"** annexed hereto is hereby approved in all respects; and it is further

ORDERED that, if the Debtor receives no Qualified Bids, as defined in the Auction Procedures, the Sale Hearing shall be held during the hearing scheduled before this Court for May __, 2011 _____ __.m. (prevailing Fort Worth, Texas time), or as soon thereafter as counsel may be heard; and it is further

ORDERED that, if the Debtor receives Qualified Bids, as defined in the Auction Procedures, the Sale Hearing shall be held during the hearing scheduled before this Court for May __, 2011 _____ __.m. (prevailing Fort Worth, Texas time), or as soon thereafter as counsel may be heard; and it is further

ORDERED that the Debtor shall, within three business days after entry of this Procedures Order, serve the Sale Notice and this Procedures Order, including exhibits thereto, upon (a) the United States Trustee for the Northern District of Texas, (b) all parties who have filed a request

---

[1] Undefined capitalized terms herein shall be ascribed the same definitions as in the Motion.

for service of notices in these cases, (c) all creditors of the Debtor, and (d) all parties who have expressed an interest in the Debtor's assets; and it is further

ORDERED that such notice as set forth in the preceding decretal paragraphs shall constitute good and sufficient notice of the Motion as it relates to the Debtor's request for entry of the Sale Order (as defined in the Motion), the Auction, and the Sale Hearing, and no other or further notice of the Motion, the Auction, and/or Sale Hearing shall be necessary or required; and it is further

ORDERED that responses or objections, if any, to the entry of the Sale Order (as defined in the Motion), shall be filed with this Court and served, so as to be actually received no later than May __, 2011 _____ __.m. (prevailing Fort Worth, Texas time), on (a) counsel to the Debtor, Jeff P. Prostok, Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102; and (b) Office of the U.S. Trustee for the Northern District of Texas; and it is further

ORDERED that the Debtor shall pay the Expense Reimbursement of up to $200,000, which amount the Court finds is reasonable and necessary for the sale or use of the Stock with the presence of a firm initial offer, per the terms and conditions described in the Acquisition Agreement; and it is further

ORDERED that the Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Auction Procedures Order.

### END OF ORDER ###

# EXHIBIT "1"

## **Auction Procedures**

# EXHIBIT "2"

## **<u>Sale Notice</u>**

# EXHIBIT "H"
# To
# Acquisition Agreement

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11 Case** |
| | § | |
| **OUTSOURCE HOLDINGS, INC.,** | § | **Case No.: 11-** |
| | § | |
| Debtor. | § | |

## AUCTION PROCEDURES

These auction procedures (the "Auction Procedures") set forth the process by which Outsource Holdings, Inc., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 proceeding pending before the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), will conduct an auction (the "Auction") for the sale, merger, or other use (the "Transaction") of the Debtor's ownership of 100% of the outstanding capital stock of Jefferson Bank (the "Stock").

These Auction Procedures have been approved by the Bankruptcy Court pursuant to an order dated April ___, 2011 (the "Procedures Order"). The Auction Procedures are binding upon all bidders, and the bidders will have no right to alter these Auction Procedures. Bids not submitted pursuant to the Auction Procedures will not be considered.

1.     Assets to be Sold

As of April 3, 2011 the Debtor owned 100% of the outstanding capital stock of Jefferson Bank. The Debtor plans to auction this Stock for transfer or other use through a merger, sale, or other transaction.

2.     Bidding and Stalking Horse Bidder

The Debtor provides these Auction Procedures, whereby prospective bidders may compete to submit the highest bid for the purchase or use of the Stock. These offers may be substantially similar to the terms of the Acquisition Agreement (the "Acquisition Agreement") by and between the Debtor and First Bank Lubbock Bancshares, Inc. (the "Stalking Horse Bidder"). Under the Acquisition Agreement, the Debtor will use the Stock to cause Jefferson Bank to be merged with the Stalking Horse Bidder's wholly owned subsidiary First Bank & Trust, Lubbock, Texas, in exchange for up to $11,000,000 to the Debtor. The Stalking Horse Bidder's offer is not revocable.

Further, offers may be combined with offers for some or all of Jefferson Bank's assets, such as the arrangement embodied in the Purchase and Assumption Agreement (the "Purchase and Assumption Agreement") between the Stalking Horse Bidder, its subsidiary bank, Jefferson Bank, and MidSouth Bank, N.A. Interested potential investors may obtain the Acquisition Agreement and the Purchase and Assumption Agreement from the Debtor by request or from the electronic docket maintained by the Bankruptcy Court.

1

All bidders shall be required to submit irrevocable bids for the use or sale of the Stock. There is no set format for such bids. Bids need not be based upon the Acquisition Agreement or the Purchase and Assumption Agreement. However, these bids must be provided in the form of completed and signed agreements that will be enforceable if approved by the Bankruptcy Court. If a bid is derived from the Acquisition Agreement or the Purchase and Assumption Agreement, the bidder shall also submit a redlined version showing the changes between such agreements and the agreements provided by the bidder.

In the event the Stalking Horse Bidder is not the Successful Bidder as set forth in these Auction Procedures, and does not close on the Acquisition Agreement, it will be entitled to an expense reimbursement fee in the amount of up to $200,000 (the "Expense Reimbursement Fee").

3.    Access to Information

Information relevant to the Debtor, the Stock and Jefferson Bank shall be made available to potential bidders within twenty-four (24) hours following the execution by potential bidders of a valid confidentiality agreement acceptable to the Debtor. Such information includes certain books and records, material contracts, and other financial information for due diligence investigation. To obtain a copy of a confidentiality agreement, contact the Debtor's investment banker, Keefe, Bruyette, & Woods, Inc. ("KBW") [KBW CONTACT INFO]. Specific instructions for accessing the information will be provided after execution of such confidentiality agreements. Interested bidders requesting information about the qualification process, and information in connection with their due diligence, should contact KBW at the contact information listed above. If, in the Debtor's reasonable judgment, providing information to a potential bidder would not be in the best interests of the bankruptcy estate, then the Debtor may refuse to provide such bidder with access to information.

The diligence period will conclude on May 6, 2011. The Debtor will coordinate all reasonable requests for additional information and due diligence access from potential bidders.

4.    Bid Deadlines

The Debtor will consider only formal, binding, unconditional, and irrevocable bids (each, a "Bid"). All Bids must be submitted via electronic mail or such other means so that they are actually received no later than 5:00 p.m. local Fort Worth, Texas time on May 6, 2011 (the "Bid Deadline"). Each bidder must deliver its Bid by the Bid Deadline to all of the parties listed below:

(i) the Debtor, [CONTACT INFO];

(ii) advisors to the Debtor, KBW [CONTACT INFO];

(iii) counsel to the Debtor, Forshey & Prostok, LLP, Attn: Jeff P. Prostok (jprostok@forsheyprostok.com), 777 Main Street, Suite 1290, Fort Worth, Texas 76102, phone: (817) 877-8855, fax: (817) 877-4151;

(v) the Stalking Horse Bidder, [CONTACT INFO]; and

(vi) counsel to the Stalking Horse Bidder, Hunton & Williams, LLP, Attn: Andrew E. Jillson (ajillson@hunton.com), 1445 Ross Ave,. Ste. 3700, Dallas, TX 75202, phone: (214) 979-3000, fax: (214) 880-0011.

5.   Qualified Bid Requirements

Bids must contain:

(a) an executed version of the applicable transactional documents necessary to complete the transaction proposed by the Bid;

(b) if applicable, a marked or blacklined version of such transactional documents showing any changes to the corresponding form Acquisition Agreement or Purchase and Assumption Agreement;

(c) a letter setting forth the identity of the bidder (including an authorized representative thereof), such bidder's counsel, and contact information for such bidder, its authorized representative, and its counsel, explaining the change, if any, from the bid of the Stalking Horse Bidder, explaining why the bid is superior to the Stalking Horse Bid, and setting forth a written description explaining the regulatory steps needed to gain approval of such Transaction and a timeline for obtaining such approval;

(d) a certified or bank check or wire transfer in an amount equal to $_____ as a minimum good faith deposit (the "Minimum Deposit"). The Minimum Deposit shall be used to fund a portion of the purchase price provided for in the Bid if the bidder ultimately closes on the transaction. Bidders should contact KBW at the contact information listed above for wiring instructions. The Minimum Deposit of all bidders other than the Successful Bidder and the Second Best Bidder, as defined below, will be returned within 48 hours of the conclusion of the Sale Hearing. The Minimum Deposit of the Second Best Bidder will be returned within 48 hours of the closing of the Sale with the Successful Bidder;

(e) written evidence of the bidder's financial ability to pay cash to consummate the Transaction in a form satisfactory to the Debtor on or before June ___, 2011;

(f) written acknowledgement that such Bid is unconditional and not contingent upon any event, including, without limitation, any due diligence investigation, the receipt of financing, or any further bidding approval;

(g) written confirmation that such Bid shall remain open and irrevocable until the closing of a Sale to the Successful Bidder or Second Best Bidder;

(h) written evidence that the bidder has the requisite corporate or similar authority to consummate the Transaction;

(i) written evidence or a summary satisfactory to the Debtor that the bidder has consulted with applicable banking regulatory agencies concerning the bidder's ability and likelihood of receiving the regulatory approval(s) required to consummate the Transaction; and

(j) such other information as the Debtor may request.

Further, Bids must be materially better than the net consideration that would be provided by the Acquisition Agreement and Purchase and Assumption Agreement, as evaluated by the Debtor within its reasonable business judgment. A materially better offer must consist of net consideration greater than (a) the $200,000 termination fee that the Debtor will owe to the Stalking Horse Bidder if that transaction is terminated, plus (b) after taking into account the $500,000 that Jefferson Bank will owe MidSouth Bank, N.A. if the Purchase and Assumption Agreement is terminated because Jefferson Bank pursues an alternative transaction, the value of the Stalking Horse Bidder's offer of a firm $2,021,000 in cash at closing for the use of the Stock, and up to $8,979,000 in cash within three years of closing contingent on certain events, plus (c) a $200,000 bid increment to justify the additional expense and delay of holding the Auction.

Bids that comply with the foregoing shall be "Qualified Bids." Persons that comply with the foregoing shall be "Qualified Bidders." Qualified Bidders shall comply with all reasonable requests for additional information by the Debtor and its advisors regarding the Bids and the foregoing information. Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtor to determine that a Bid made by such Qualified Bidder is not a Qualified Bid. The Stalking Horse Bidder shall be deemed a Qualified Bidder for purposes of these Auction Procedures.

6.    Selection of the Successful Bidder if Only One Qualified Bid Submitted

If the only Qualified Bid submitted by the Bid Deadline is the Stalking Horse Bid, the Debtor shall not hold an Auction and instead shall seek an order from the Bankruptcy Court approving the Stalking Horse Bid at a hearing to be held on May __, 2011.

7.    Auction or Negotiated Private Sale Process if Two or More Qualified Bids Are Submitted

If two or more timely Qualified Bids are received by the Bid Deadline, the Debtor either will conduct a public auction (the "Auction") or further private negotiations amongst Qualified Bidders. The Debtor will use its reasonable business judgment to determine whether an Auction is appropriate. Such determination will be based in large part on whether the Qualified Bids are capable of being objectively compared and adjusted in the context of a public auction. The Auction, if any, will take place on May 16, 2011 between the hours of 9:00 a.m. and 5:00 p.m., local Fort Worth time ("Business Hours") at the offices of the Debtor's counsel, or such later time or other place as the Debtor may provide, so long as such change is communicated reasonably in advance by the Debtor to all Qualified Bidders.

If the Debtor opts to forego the Auction and instead continue negotiations regarding a private sale with Qualified Bidders, then it will file a notice with the Bankruptcy Court stating so on or before May 11, 1011. The Debtor intends to conclude such negotiated sale process on or before May 20, 2011, and to request the Bankruptcy Court approve a Transaction or sale pursuant to the best offer obtained through such process at a hearing to be held on May ___,

2011. The Debtor will file with the Bankruptcy Court the documents governing such proposed Transaction or Sale on or before May 20, 2011.

8.    Auction Procedures and Transaction Issues

If an auction is conducted, only the parties who have submitted a Qualified Bid will be eligible to participate in the Auction. Only the authorized representatives of each of the Qualified Bidders, the Committee, and the Debtor (the "Auction Participants") shall be permitted to participate in the Auction. Any Qualified Bidder shall be permitted to attend the Auction in person or by telephone.

On May 11, 2011, the Debtor will announce the highest Qualified Bid submitted and the Qualified Bidder that submitted such highest Qualified Bid. The Debtor will not announce the Qualified Bids submitted by any other Qualified Bidder. The bidding at the Auction shall start at the highest Qualified Bid. At the Auction, the Qualified Bidders will bid in amounts greater than the then highest Qualified Bid by at least a minimum overbid increment equal to $100,000. Each Qualified Bidder will be permitted a fair, but limited, amount of time (no more than 15 minutes, unless otherwise agreed by the Debtor) to respond to the previous bid at the Auction.

Upon the failure of the Debtor to receive an overbid, or such other time as the Debtor may determine in its reasonable business judgment prior to the conclusion of the Auction, the Debtor may determine the "highest and best" Qualified Bid (the "Successful Bid" and the bidder making such Qualified Bid, the "Successful Bidder") and the next "highest and best" Qualified Bid (the "Second Best Bid" and the bidder making such Qualified Bid, the "Second Best Bidder"), and the price shall be identified.

The Debtor intends to close the Auction on or before 6:00 p.m., local Fort Worth, Texas time, on May 16, 2011, but reserves the right to continue the Auction beyond such time if bidding continues. The Auction Procedures set forth in this paragraph 8 are subject to amendment by Debtor, within its reasonable business judgment, upon notice to the Qualified Bidders.

The Debtor will present the Successful Bidder and the Successful Bid and the Second Best Bidder and the Second Best Bid to the Bankruptcy Court at the Final Hearing, at which certain findings will be sought from the Bankruptcy Court regarding the sale process, including, among other things, that (i) the process leading to the selection of the Successful Bid and the Second Best Bid was conducted and the Successful Bidder and the Second Best Bidder for the Loans were selected in accordance with these Auction Procedures, (ii) the sale process was fair in substance and procedure, (iii) the Successful Bidder and the Second Best Bidder are entitled to the protections of 11 U.S.C. § 363(m); and (iv) consummation of the Transaction contemplated by the Successful Bid, or if necessary the Second Best Bid, will provide the highest or otherwise best value for the Stock and is in the best interests of the Debtor and its estate.

The Qualified Bid will be binding upon the Debtor only when (i) the Qualified Bid is declared the Successful Bid at the Sale Hearing, (ii) the Bankruptcy Court has approved the Successful Bid and a final order approving such Successful Bid has been docketed, and (iii) definitive documentation has been executed in respect thereof.

9.  Final Hearing and Closing of the Transaction

The Debtor shall seek an order of the Bankruptcy Court approving the Successful Bid at a hearing to be held on May __, 2011 at ___ __.m. local Fort Worth, Texas time (the "Final Hearing"). The closing of the Transaction with the Successful Bidder shall occur on or before five business days after an order approving the Transaction becomes final and the receipt of all necessary regulatory approvals. In the event that the Successful Bidder does not close on or before such time, the Debtor shall be authorized to close with the Second Best Bidder, and the Second Best Bidder will be required to close, on or before seven business days after an order approving the Transaction becomes final.

10. Reservation of Rights

The Debtor reserves the right, upon notice to all parties that have demonstrated an interest in bidding, to (i) waive terms and conditions set forth herein with respect to any or all potential bidders; (ii) impose additional terms and conditions with respect to any or all potential bidders; (iii) extend the deadlines set forth herein; (iv) cancel the Transaction without further notice; and (v) amend the Auction Procedures as they may determine to be in the best interests of the estate or to withdraw the motion to approve the Transaction at any time with or without prejudice; provided however, that the forgoing reservation of rights shall not amend or alter the Stalking Horse Bidder's right to the Expense Reimbursement Fee.

# EXHIBIT "I"
## To
## Acquisition Agreement

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11 Case** |
| | § | |
| **OUTSOURCE HOLDINGS, INC.,** | § | **Case No.: 11-** |
| | § | |
| **Debtor.** | § | |

**ORDER APPROVING THE USE AND SALE OF DEBTOR'S INTERESTS IN
JEFFERSON BANK FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS**

Upon the motion, dated April 3, 2011 (the "Motion"), of the debtor and debtor-in-possession in the above-captioned case (the "Debtor") for an order (the "Sale Order") authorizing the Debtor to transfer and use its stock in Jefferson Bank (the "Stock") to cause the merger of Jefferson Bank with First Bank & Trust, Lubbock, Texas ("First Bank & Trust") pursuant to the Acquisition Agreement with First Bank & Trust and its parent First Bank Lubbock Bancshares, Inc. (the "Purchaser") dated ____, 2011 (the "Acquisition Agreement," attached hereto as **Exhibit "A"**) free and clear of all Liens, Claims, Encumbrances and other Interests. The Court, heard statements of counsel and the evidence presented in support of the relief requested by the Debtor in the Motion at a hearing before the Court on [_____], 2011 (the

"Sale Hearing"). Based on the evidence presented at the Sale Hearing, the arguments of counsel, the applicable pleadings in this Case, and the applicable law, and after due deliberation thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:

## I.    Jurisdiction, Final Order, and Statutory Predicates

A.    The transactions contemplated by the Acquisition Agreement (the "Sale") is a "sale" of the Stock for the purposes of title 11 of the United States Code (the "Bankruptcy Code") including but not limited to 11 U.S.C. § 363.

B.    The Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    This order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this order, and expressly directs entry of judgment as set forth herein.

D.    The statutory predicates for the relief requested in the Sale Motion are §§ 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014.

E.    The Court entered the Sale Procedures Order on April __, 2011 (Docket No. ___).

F.    Pursuant to the Sale Procedures Order ... [DISCUSS FACTUAL CIRCUMSTANCES OF AUCTION (the "Auction").]

G.  The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

H.  To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such.  Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.

I.  In the absence of a stay pending appeal, the Purchaser will be acting in good faith pursuant to § 363(m) of the Bankruptcy Code in closing the transaction contemplated by the Acquisition Agreement at any time on or after entry of this Sale Order, and cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rule 6004(h).

II.  **Notice of the Sale, Auction and the Cure Amounts**

A.  Pursuant to the Sale Procedures Order, the Sale Notice, which includes actual written notice of the Sale Hearing, the Auction, and the Motion, has been provided to all known interested persons and entities, including, but not limited to the following parties (the "Notice Parties"), thereby providing them with a reasonable opportunity to object or be heard with respect to such matters:

1.  the United States Trustee;

2.  all parties that have requested special notice pursuant to Bankruptcy Rule 2002;

3.  all creditors of the Debtor; and

4.  all potential bidders previously identified or otherwise known to the Debtor.

B. The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the Sale process, including, without limitation, approval and authorization to serve Sale Procedures Order.

C. The Sale Procedures Order provided all interested parties with timely and proper notice of the Sale, Sale Hearing, and Auction.

D. As evidenced by the affidavits of service previously filed with the Court and the orders of the Court [CITE], proper, timely, adequate, and sufficient notice of the Motion, Auction, Sale Hearing, and Sale has been provided in accordance with §§ 102 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014. The Debtor also has complied with all obligations to provide notice of the Auction, Sale Hearing, and Sale required by the Auction Procedures Order. The notices described in paragraphs A to C above were good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Auction, Sale Hearing, or the Sale is required.

E. The disclosures made by the Debtor concerning the Motion, Acquisition Agreement, Auction, Sale, and Sale Hearing, including but not limited to the facts alleged in the Sale Motion and other pleadings filed with the Court, and the evidence and arguments presented and proffered at the Sale Hearing and other hearings before the Court, were good, complete and adequate.

III. **Good Faith of Purchaser**

A. Purchaser is not an "insider" of the Debtor, as that term is defined in § 101(31) of the Bankruptcy Code.

B. Purchaser is purchasing the Stock in good faith and is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code, and are therefore entitled to the full protection of that provision, and otherwise have proceeded in good faith in all respects in

connection with this proceeding in that, inter alia: (a) Purchaser recognized that the Debtor was free to deal with any other party interested in acquiring the Stock; (b) Purchaser complied with the provisions in the Auction Procedures Order; (c) Purchaser agreed to subject itself to the competitive bidding procedures set forth in the Auction Procedures Order; (d) Purchaser in no way induced or caused the chapter 11 filing by the Debtor; (e) all payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale have been disclosed; (f) Purchaser has not violated § 363(n) of the Bankruptcy Code by any action or inaction; (g) the common directors, controlling stockholders, and officers that exist between Purchaser and the Debtor have been excluded from receiving knowledge about and making decisions about the Sale and marketing process; and (h) the negotiation and execution of the Acquisition Agreement and any other agreements or instruments related thereto were at arms' length and in good faith.

## IV.     Highest or Best Offer

A.     Prior to selecting Purchaser as the stalking horse bidder, the Debtor solicited offers to acquire or use the Stock from a wide variety of parties. In addition to such solicitations, evidence of which was presented at the Sale Hearing, the Debtor scheduled the Auction in accordance with the provisions of the Auction Procedures Order. This Auction, which [DISCUSS AUCTION] in compliance with the process set forth in the Auction Procedures Order, afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase or use the Stock. The Auction was duly noticed and provided opportunity for a noncollusive, fair, and good faith sale process and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Stock.

B. The Acquisition Agreement constitutes the highest or best offer for the Stock, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the Acquisition Agreement constitutes the highest or best offer for the Stock constitutes a valid and sound exercise of the Debtor's business judgment.

C. The Acquisition Agreement represents a fair and reasonable offer to purchase the Stock under the circumstances of these chapter 11 cases. No other person or entity or group of entities has offered to purchase the Stock for greater economic value to the Debtor's estate than Purchaser.

D. Approval of the Sale Motion and the Acquisition Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate, and other parties in interest.

E. The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

## V. No Fraudulent Transfer

A. The consideration provided by Purchaser pursuant to the Acquisition Agreement is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, and the District of Columbia.

## VI. Validity of Transfer

A. The Debtor has full corporate power and authority to execute and deliver the Acquisition Agreement and all other documents contemplated thereby, and no further

consents or approvals are required for the Debtor to consummate the transactions contemplated by the Acquisition Agreement, except as otherwise set forth in the Acquisition Agreement.

B.     The transfer of the Stock to Purchaser will be as of the Closing Date a legal, valid, and effective transfer of the Stock, and vests or will vest Purchaser with all right, title, and interest of the Debtor to the Stock free and clear of all liens and Claims (as defined below) (collectively, "Liens") accruing, arising, or relating thereto any time prior to the Closing Date.

## VII.   Section 363(f) Is Satisfied

A.     Purchaser would not have entered into the Acquisition Agreement and would not consummate the transactions contemplated thereby (by paying the Purchase Price and assuming the Assumed Liabilities set forth in the Acquisition Agreement) if the sale and transfer of the Stock to Purchaser was not free and clear of all liens of any kind or nature whatsoever ("Liens") or Claims (as defined below), or if Purchaser would be liable, or in the future could be liable, for any of such Liens or Claims, including, but not limited to, Liens or Claims in respect of the following: (1) any labor agreements; (2) all mortgages, deeds of trust, and security interests; (3) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (4) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, Claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the

Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (1) any other state or federal benefits or claims relating to any employment with the Debtor or any of its respective predecessors; (5) any bulk sales or similar law; (6) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (7) any environmental law(s); and (8) any theories of successor liability.

        B.      The Debtor may sell the Stock free and clear of all Liens and Claims against the Debtor, its estate, and any of the Stock because, in each instance, one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens or Claims against the Debtor, its estate, or any of the Stock who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.  Those holders of such Liens or Claims who did object fall within one or more of the other subsections of § 363(f) and are adequately protected by having their Liens and/or Claims, if any, in each instance against the Debtor, its estate, or any of the Stock, attach to the cash proceeds of the Sale ultimately attributable to the Stock in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

## VIII.  Compelling Circumstances for an Immediate Sale

        A.      To enhance the Debtor's level of liquidity, and to avoid loss of value to the estate, it is essential that the Sale or transfer of the Stock occur within the time constraints set forth in the Acquisition Agreement.  Time is of the essence in consummating the Sale.

        B.      Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the purchase price under the Acquisition Agreement, the proposed Sale of the

Stock to Purchaser constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

        C.      The consummation of the transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, §§ 105(a), 363(b), 363(f), and 363(m), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

## IX.    Use of Sale Proceeds

        A.      The Debtor shall apply the Sale Proceeds in accordance with the applicable orders of this Court in this Bankruptcy Case and provisions of the Bankruptcy Code; provided, however, that any and all Liens and Claims encumbering the Stock shall be released at Closing.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

## General Provisions

1.    The relief requested in the Motion is granted and approved, and the Sale contemplated thereby is approved as set forth in this Order.

2.    This Court's findings of fact and conclusions of law, set forth in the Auction Procedures Order, are incorporated herein by reference.

3.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

**Approval of the Acquisition Agreement**

4.     The Acquisition Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

5.     Pursuant to § 363(b) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of each of the Stock to Purchaser pursuant to and in accordance with the terms and conditions of the Acquisition Agreement, (ii) close the Sale as contemplated in the Acquisition Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement, and close fully the Acquisition Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Acquisition Agreement and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Acquisition Agreement and such other ancillary documents.

6.     This Order shall be binding in all respects upon the Debtor, including the Debtor, its estate, all holders of equity interests in the Debtor, all holders of any Claim(s) (whether known or unknown) against the Debtor, any holders of Liens or Claims against or on all or any portion of the Stock, Purchaser and all successors and assigns of Purchaser, and any trustees subsequently appointed in the Bankruptcy Case or upon a conversion to chapter 7 under the Bankruptcy Code of the Bankruptcy Case. This Order and the Acquisition Agreement shall inure to the benefit of the Debtor, its estate and creditors, Purchaser, and their respective successors and assigns.

**Transfer of the Stock**

7.     Pursuant to §§ 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Stock on the Closing Date. Such Stock shall be transferred to

Purchaser upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding, and effective transfer of such Stock and, upon the Debtor's receipt of the Purchase Price, shall be free and clear of all Liens and Claims, including, without limitation, all "claims" within the meaning of § 101(5) of the Bankruptcy Code, and all interests, encumbrances, rights of setoff, recoupment, netting and deductions ("Claims"). Upon the Closing, Purchaser shall take title to and possession of the Stock. Pursuant to § 363(f) of the Bankruptcy Code, the Sale of the Stock shall be free and clear of (a) any and all Liens; (b) any and all liabilities; and (c) any and all Claims including, without limitation, any and all claims pursuant to any successor or successor-in-interest liability theory. All Liens and/or Claims shall attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Stock, subject to any claims and defenses the Debtor and its estate may possess with respect thereto. The Debtor shall apply the Sale Proceeds in accordance with applicable orders of this Court in this Bankruptcy Case and provisions of the Bankruptcy Code; provided, however, that any and all Liens and Claims encumbering the Stock shall be released at Closing.

8. All persons and entities holding Liens, Claims or interests in all or any portion of the Stock arising under or out of, in connection with, or in any way relating to Claims against the Debtor, the Stock, or the transfer of the Stock to Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against Purchaser or its successors or assigns, their property, or the Stock, such persons' or entities' Liens or Claims against the Debtor or in and to the Stock. On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by Purchaser to be necessary or desirable to release Liens or Claims on the Stock, if any, as provided for herein, as such Liens or Claims may have been recorded or may otherwise exist. The transactions authorized herein shall be of

full force and effect, regardless of the Debtor's lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business or other circumstances. Upon consummation of the transactions set forth in the Acquisition Agreement, Purchaser shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any Lien, Claim, or encumbrance that is extinguished or otherwise released pursuant to this Order under § 363 and the related provisions of the Bankruptcy Code.

9. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Stock to Purchaser in accordance with the terms of the Acquisition Agreement and this Order.

10. All persons and entities that are in possession of some or all of the Stock on the Closing Date are directed to surrender possession of such Stock to Purchaser or its assignee at the Closing.

11. A certified copy of this Order may be filed with the appropriate clerk or other official or similar person or institution and/or recorded with the recorder or other official or similar person or institution to act to cancel any of the Liens, Claims, and other encumbrances of record.

12. If any person or entity which has filed statements or other documents or agreements evidencing Liens on, Claims against, or interests in, all or any portion of the Stock shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to Purchaser for the purpose of

documenting the release of all Liens or Claims, which the person or entity has asserted or may assert with respect to all or any portion of the Stock, the Debtor is hereby authorized and directed, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Stock.

13.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Acquisition Agreement.

**Other Provisions**

14.     Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Purchaser, its successors and assigns, or the Stock, with respect to any (a) Lien or Claim arising under, out of, in connection with or in any way relating to the Debtor, Purchaser, the Stock, or the operation of the Stock prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors or

assigns, assets, or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Purchaser, its successors, assets, or properties; (iii) creating, perfecting, or enforcing any Lien or Claim against Purchaser, its successors or assigns, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Purchaser or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate Jefferson Bank or conduct any of the businesses operated by Jefferson Bank.

15.     Except as provided in the Acquisition Agreement, Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Stock. Without limiting the generality of the foregoing, Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the Debtor's use and ownership of the Stock prior to the Closing. Purchaser has given substantial consideration under the Acquisition Agreement for the benefit of the holders of any Liens or Claims. The consideration given by Purchaser shall constitute valid and valuable consideration for the

releases of any potential claims of successor liability of Purchaser, which releases shall be deemed to have been given in favor of Purchaser by all holders of Liens or Claims against or interests in the Debtor or any of the Stock.

16.     The transactions contemplated by the Acquisition Agreement are undertaken by Purchaser without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale unless such authorization and such Sale are duly stayed pending such appeal. Purchaser is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of § 363(m) of the Bankruptcy Code.

17.     The consideration to be provided by the Purchaser pursuant to the Acquisition Agreement is fair and reasonable, and the Sale may not be avoided under § 363(n) of the Bankruptcy Code.

18.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) this Bankruptcy Case, (ii) any subsequent chapter 7 case into which the Bankruptcy Case may be converted, or (iii) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Acquisition Agreement or the terms of this Order.

19.     Pursuant to Bankruptcy Rules 7062, 9014, and 6004(h), this Order shall be effective immediately upon entry, and the Debtor and Purchaser is authorized to close the Sale immediately upon entry of this Order.

20.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

21.    There are no brokers involved in consummating the Sale and no brokers' commissions are due.

22.    The failure specifically to include any particular provision of the Acquisition Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Acquisition Agreement be authorized and approved in its entirety.

23.    The Acquisition Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

24.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Acquisition Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Debtor are a party or which have been assigned by the Debtor to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

25.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26.    To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in the Bankruptcy Case, the terms of this Order shall govern.

### ###

## EXHIBIT A

### Acquisition Agreement

# EXHIBIT "B"
# TO THE
# MOTION

PURCHASE AND ASSUMPTION AGREEMENT

AMONG

MIDSOUTH BANK, N.A.,

FIRST BANK & TRUST COMPANY AND

JEFFERSON BANK

April 3, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I    PURCHASE AND SALE OF ASSETS AND  ASSIGNMENT AND ASSUMPTION OF LIABILITIES .................................................................. 2

1.1    Purchase and Sale of Assets.................................................................. 2

1.2    Assignment and Assumptions of Liabilities ....................................... 3

1.3    Purchase Price ..................................................................................... 4

1.4    Transfer of Funds ................................................................................ 4

1.5    Adjustment Payment Date ................................................................... 5

1.6    Prorations ............................................................................................ 6

1.7    Closing Date: Closing; Real Estate Transfer ..................................... 6

1.8    Limitations On Assumption of Liabilities .......................................... 7

ARTICLE II    REPRESENTATIONS AND WARRANTIES OF SELLERS ...................... 7

2.1    Corporate Organization........................................................................ 7

2.2    Corporate Authority and Action ......................................................... 8

2.3    No Default Effected ............................................................................ 8

2.4    Brokers................................................................................................. 8

2.5    Litigation.............................................................................................. 8

2.6    Deposits................................................................................................ 9

2.7    Title to Assets ..................................................................................... 9

2.8    Loans.................................................................................................... 9

2.9    Condition of Branches and Real Property ......................................... 10

2.10    Contracts, Safe Deposit Leases, Property Leases and Dallas Sublease .............. 10

2.11    Compliance with Laws ....................................................................... 11

2.12    Governmental Reporting...................................................................... 11

2.13    Environmental Matters........................................................................ 11

2.14    Taxes.................................................................................................... 11

2.15    Real Property ....................................................................................... 12

2.16    Employees............................................................................................ 12

2.17    Appointment of IRA Trustee or Custodian......................................... 12

2.18    Books, Records, Documentation, Etc ................................................. 12

2.19    Employee Benefits .............................................................................. 12

| | | |
|---|---|---|
| 2.20 | Regulatory Conditions | 13 |
| ARTICLE III | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 14 |
| 3.1 | Corporate Organization | 14 |
| 3.2 | Corporate Authority and Action | 14 |
| 3.3 | No Default Effected | 14 |
| 3.4 | Brokers | 14 |
| 3.5 | Litigation | 15 |
| 3.6 | Regulatory Conditions | 15 |
| 3.7 | Compliance with Law | 15 |
| ARTICLE IV | AGREEMENTS PENDING CLOSING | 15 |
| 4.1 | Regulatory Approval and Standards | 15 |
| 4.2 | Notification of Customers | 15 |
| 4.3 | Employment of Existing Employees | 16 |
| 4.4 | Operations | 17 |
| 4.5 | Real Property | 17 |
| 4.6 | Sales and Transfer Taxes | 17 |
| 4.7 | Bulk Sales Act Indemnity | 18 |
| 4.8 | Negative Operating Covenants | 18 |
| 4.9 | Affirmative Operating Covenants | 18 |
| 4.10 | Damage or Destruction of Personal Property, Real Property or Leased Branches | 18 |
| 4.11 | Assistance in Obtaining Regulatory Approvals | 19 |
| 4.12 | Other Relationships | 19 |
| 4.13 | No Breach | 19 |
| 4.14 | Safe Deposit Business | 19 |
| 4.15 | Landlord Estoppel and Consent | 20 |
| 4.16 | Letters of Credit | 20 |
| ARTICLE V | ITEMS TO BE DELIVERED TO SELLERS | 20 |
| ARTICLE VI | ITEMS TO BE DELIVERED TO PURCHASER | 21 |
| ARTICLE VII | POST-CLOSING MATTERS | 22 |

| | | |
|---|---|---|
| 7.1 | Information In Usable Form | 22 |
| 7.2 | Covenants Not to Compete | 22 |
| 7.3 | Conveyancing Charges; Recording Charges, Sales and Transfer Taxes, Etc | 23 |
| 7.4 | Employees | 23 |
| 7.5 | Transactions After Closing Date | 24 |
| 7.6 | Maintenance of Records | 27 |
| 7.7 | Further Assurances | 27 |
| 7.8 | Signage | 28 |
| 7.9 | Indemnification by Purchaser | 28 |
| 7.10 | Indemnification by First Bank & Trust | 28 |
| 7.11 | Defense of Actions - Purchaser Indemnifications | 28 |
| 7.12 | Defense of Actions - Sellers Indemnifications | 29 |
| 7.13 | Participation Loans | 29 |
| ARTICLE VIII | CLOSING CONDITIONS | 29 |
| 8.1 | Conditions Precedent to Sellers' Obligation to Close | 29 |
| 8.2 | Conditions Precedent to Purchaser's Obligation to Close | 30 |
| ARTICLE IX | MISCELLANEOUS | 32 |
| 9.1 | Expenses | 32 |
| 9.2 | Termination; Extension of Closing Date | 32 |
| 9.3 | Modification and Waiver | 33 |
| 9.4 | Binding Effect, Assignment | 33 |
| 9.5 | Entire Agreement; Governing Law | 33 |
| 9.6 | Headings | 33 |
| 9.7 | Severability | 33 |
| 9.8 | Counterparts | 34 |
| 9.9 | Notices | 34 |
| 9.10 | Survival | 35 |
| 9.11 | Remedies | 35 |
| 9.12 | Parties' Knowledge | 35 |
| 9.13 | Public Announcements and Communications | 35 |

# TABLE OF CONTENTS
## (continued)

Page

Exhibits

Exhibit 1 – Provisional Closing Statement for Transfer Payment

Exhibit 2 – Final Closing Statement for Adjustment Payment

Exhibit 3 – Instrument of Transfer, Assignment and Assumption

Exhibit 4 – Successor Trustee Appointment and Consent Agreement

Exhibit 5 – Limited Power of Attorney

## PURCHASE AND ASSUMPTION AGREEMENT

This Purchase and Assumption Agreement (this "Agreement") is made and entered into this 3rd day of April, 2011, by and among MidSouth Bank, N.A., a national banking association ("Purchaser") and Jefferson Bank, a Texas-chartered bank ("Jefferson Bank" or "Seller") and joined in for certain purposes by First Bank & Trust Company, a Texas-chartered bank ("First Bank & Trust").

**WHEREAS,** as of the date of this Agreement, Jefferson Bank owns and operates a branch facility located at 2828 North Galloway Avenue, Mesquite, Texas 75150 (the "Owned Branch") and leases and operates branch facilities located at 2435 Ridge Road, Suite 117, Rockwall, Texas 75087 (the "Rockwall Branch"); 9069 Garland Road, Dallas, Texas 75218 (the "White Rock Branch"); 18333 Preston Road, Suite 100, Dallas, Texas 75252 (the "North Dallas Branch"); and 100 E. 15th Street, Suite 120, Fort Worth, Texas 76102 (the "Fort Worth Branch" and together with the Rockwall Branch, the White Rock Branch and the North Dallas Branch, the "Leased Branches") (the Leased Branches, together with the Owned Branch are referred to as, the "Branches"); and

**WHEREAS,** Outsource Holdings, Inc., the sole shareholder of Jefferson Bank ("Outsource Holdings") intends to file a voluntary bankruptcy petition under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on or shortly after the date this Agreement is executed.

**WHEREAS,** it is anticipated that immediately prior to the Closing Date (as defined in Section 1.7), Jefferson Bank will be merged with and into First Bank & Trust with First Bank & Trust being the surviving bank (the "Merger"), pursuant to that certain Acquisition Agreement by and between Jefferson Bank, First Bank Lubbock Bancshares, Inc., and Outsource Holdings dated April 3, 2011 (the "Acquisition Agreement") to be effectuated pursuant to an order of the Bankruptcy Court under Sections 105 and 363 of the Bankruptcy Code approving such transaction.

**WHEREAS,** Jefferson Bank and First Bank & Trust (collectively as the "Sellers," except where specifically identified or designated separately throughout this Agreement) desire to sell and Purchaser agrees to acquire the Branches and, in that regard, Sellers desire to sell and Purchaser desires to acquire certain assets relating to the Branches, all as set forth in this Agreement; and

**WHEREAS,** Sellers desire to assign to Purchaser and Purchaser desires to assume from Sellers certain liabilities relating to the Branches, all as set forth in this Agreement.

**NOW THEREFORE,** in consideration of the premises and the mutual promises, Sellers and Purchaser agree as follows:

# ARTICLE I
## PURCHASE AND SALE OF ASSETS AND
## ASSIGNMENT AND ASSUMPTION OF LIABILITIES

**1.1** *Purchase and Sale of Assets.* Upon the terms and subject to the conditions set forth in this Agreement, Sellers shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, the following assets relating to the Branches (the "Assets"):

    A. *Personal Property.* The personal property, including furniture, fixtures, equipment and fixed assets contained in and used primarily for the operation of each of the Branches as described in Schedule 1.1A hereto (the "Personal Property").

    B. *Loans.*

        1.    Certain of the loans carried on the books and records of the Branches as of the close of business on March 18, 2011, relating to customer relationships at the Branches, as listed on Schedule 1.1B.1(a) (the "Existing Loans") to be prepared and delivered by Sellers together with this Agreement, including all related escrow accounts and other obligations and which shall not include any: (i) loans that are restructured, changed or modified after March 18, 2011, without Purchaser's written consent; (ii) loans that are in foreclosure or are 30 days or more delinquent as of the third business day prior to the Closing Date; and (iii) loans listed on Schedule 1.1B.1(b) (the "Excluded Loans") to be prepared and delivered by Purchaser within 15 business days after the date of this Agreement. Schedule 1.1B.1(a) shall provide the following information for each loan: loan number and type, the borrower, collateral and outstanding principal balance on March 18, 2011. Schedule 1.1B.1(b) shall identify the Excluded Loans by loan number and borrower. Within five business days after receiving Schedule 1.1B.1(b), Sellers shall prepare and provide to Purchaser a revised list of Existing Loans on Schedule 1.1B.1(a) that excludes the Excluded Loans.

        2.    All additional loans originated and entered on the books and records of the Branches relating to customer relationships at the Branches from March 18, 2011, to the close of business on the day immediately before the Closing Date, but excluding loans that are 30 days or more delinquent as of the third business day prior to the Closing Date (the "Interim Loans").

        3.    For purposes of this Agreement, the Existing Loans and Interim Loans are collectively referred to as the "Purchased Loans." The Purchased Loans, together with interest accrued thereon but unpaid as of the close of business on the day immediately before the Closing Date (the "Accrued Loan Interest"), shall be purchased by Purchaser, subject to the put-back option described in Section 7.5(N). Sellers will prepare for Closing Schedule 1.1B.3, to be delivered by Sellers after the close of business the day immediately before the Closing Date, which will provide the following information for the Purchased Loans: loan number and type, the borrower, outstanding principal balance,

collateral and Accrued Loan Interest as of the close of business the day immediately before the Closing Date, which Schedule 1.1B.3 shall be current and made a part hereof as of the Closing Date.

C. **Real Property.** The real property, and all improvements thereon, owned by Sellers on which the Owned Branch is located (the "Real Property"), which shall be sold and purchased pursuant to the terms detailed in Section 7.3 and Schedule 1.1C.

D. **Cash on Hand.** The cash on hand maintained at the Branches at the close of business on the day immediately preceding the Closing Date (the "Cash on Hand").

E. **Records, Etc.** All records, files, books of accounts, notes, collateral and other original documents and instruments pertaining to the Assets being transferred and the Assumed Liabilities being assumed, as defined below.

F. **Safe Deposit Boxes.** All the rights, title and interest of Sellers under any safe deposit box rental agreements relating to safe deposit boxes located at the Branches (the "Safe Deposit Leases");

G. **Property Leases.** All the rights, title and interest of Sellers as the "tenant" under those certain lease agreements upon which the Leased Branches operate identified as follows (each, a "Property Lease" and collectively, the "Property Leases"):

1. Lease Agreement between Magnolia WG, L.P. and Jefferson Bank, dated November 7, 2007, respecting the Fort Worth Branch;

2. Lease Agreement between White Rock Shopping Center, L.P. and Jefferson Bank dated November 8, 2007, respecting the White Rock Branch;

3. Shopping Center Lease between Ridge Road Town Centre Partners, L.P. and Jefferson Bank dated August 8, 2006, respecting the Rockwall Branch; and

4. Amended and Restated Office Lease between Acron Preston North, L.P., and Jefferson Bank f/k/a First Bank & Trust Company of Dallas, dated December 5, 2006, respecting the North Dallas Branch.

H. **Contracts.** In addition to the Safe Deposit Leases and Property Leases, all the rights, title and interest of Sellers under the Contracts (as defined in Section 1.2(D)); and

I. **Rights Relating to Assets.** Any statutory or common law right, title and interest in and related to the Assets that Sellers may have and assign, including, without limitation, claims, causes of action, rights of recovery or set-offs, and credit of any kind or nature relating to the Assets (the "Rights").

**1.2** *Assignment and Assumptions of Liabilities.* Upon the terms and subject to the conditions set forth in this Agreement, Sellers shall assign to Purchaser, and Purchaser shall

accept and assume from Sellers, the following liabilities relating to the Branches, which liabilities Purchaser agrees to perform and discharge (the "Assumed Liabilities"), as follows:

A. **_Deposit Liabilities._** All liabilities for payment of deposits given an account number maintained at the Branches or assigned to the Branches in the ordinary course pursuant to Sellers' accounting system (excluding brokered deposits and deposits associated with the Excluded Loans), in each case as of the close of business on March 18, 2011 (the "Cut-Off Date Deposits"), all of which shall be listed in full on Schedule 1.2A.1 hereto (the "Deposit Balance"), together with any changes in the Cut-Off Date Deposits and all new non-certificate accounts from March 18, 2011, through the close of business on the day immediately before the Closing Date (the "Interim Deposits") (the Cut-Off Date Deposits and Interim Deposits, in each case as of the close of business on the day immediately before the Closing Date are hereinafter collectively referred to as the "Deposits" or the "Deposit Liabilities"), in accordance with the terms of the agreements pertaining to such Deposits, together with interest accrued thereon but unpaid as of the close of business on the day immediately before the Closing Date (the "Accrued Deposit Interest"). Said Deposit Liabilities and Accrued Deposit Interest shall be specified in Schedule 1.2A.2 to be prepared by Sellers and be attached hereto and made a part hereof as of the Closing Date.

B. **_Contracts._** All obligations of Sellers relating to the period on and after the Closing Date under the contracts relating to the operation of the Branches that are assignable by Sellers to Purchaser listed on Schedule 1.2B to this Agreement (the "Contracts").

C. **_Property Leases._** All obligations of Sellers (i) as "tenant" under the Property Leases and (ii) as "sublandlord" under that certain Sublease Agreement between Sellers and eBank Systems, Inc. "Subtenant"), as "subtenant" dated October 25, 2007, as amended in January 2010 (the "Dallas Sublease"), accruing on and after the Closing Date.

**1.3** **_Purchase Price._** The purchase price to be paid by Purchaser to Sellers for the Assets acquired under this Agreement (the "Purchase Price") shall be equal to the sum of (i) the Book Value of the Personal Property, the Agreed Value of the Real Property, (ii) 99% of the unpaid principal owed on the Purchased Loans, the Accrued Loan Interest on the Purchased Loans and (iii) the amount of Cash on Hand. Purchaser also shall assume the Deposit Liabilities, Accrued Deposit Interest, the Property Leases, the Safe Deposit Leases and the Contracts and shall pay a premium equal to 5.0% of the Deposit Liabilities, all of which are set forth on Schedule 1.3 (the "Deposit Premium"). For purposes of this Agreement, "Book Value" means the net book value on the books and records of Sellers in accordance with GAAP as of the month-end prior to the Closing Date and the "Agreed Value" of the Real Property is $2.5 million.

**1.4** **_Transfer of Funds._** In connection with the acquisition by Purchaser of the Assets and the assumption by Purchaser of the Assumed Liabilities, Sellers shall transfer to Purchaser by wire transfer of immediately available funds on the Closing Date (or the business day immediately before the Closing Date, if the Closing Date occurs on a day when the funds cannot

be wired for same day reinvestment) in accordance with Section 1.7 (the "Transfer Payment") an amount equal to:

A.　the estimated amount of the Deposit Liabilities; <u>plus</u>

B.　the estimated amount of the Accrued Deposit Interest; <u>minus</u>

C.　the Book Value of the Personal Property; <u>minus</u>

D.　the Agreed Value of the Real Property; <u>minus</u>

E.　99% of the estimated unpaid principal amount of the Purchased Loans; <u>minus</u>

F.　the estimated amount of the Accrued Loan Interest; <u>minus</u>

G.　the amount of Cash on Hand; <u>minus</u>

H.　the Deposit Premium; and <u>plus or minus</u>

I.　the estimated amount of prorations, as provided for in Section 1.6 hereof.

The parties agree that if the sum of subsections A through I is less than zero, Purchaser will transfer to Sellers, in accordance with Section 1.7, by wire transfer on the Closing Date (or the business day immediately before the Closing Date, if the Closing Date occurs on a day when funds cannot be wired for same day reinvestment), immediately available funds in the amount by which such sum is less than zero.

Sellers shall prepare and deliver to Purchaser on and as of the third business day before the Closing Date a provisional closing statement to be executed by the parties for the calculation for the Transfer Payment in substantially the form attached hereto as <u>Exhibit 1</u>.

**1.5** *Adjustment Payment Date.*

A.　On the 30th day after the Closing Date or such earlier date as may be agreed to by the parties (the "Adjustment Payment Date"), Sellers shall deliver the following documents to Purchaser in order to determine the amount of any necessary adjustment to the Transfer Payment ("Adjusted Payment"):

1.　A statement setting forth (a) the aggregate amount of Deposit Liabilities and the Accrued Deposit Interest thereon transferred to and assumed by Purchaser, calculated as of the close of business on the day immediately before the Closing Date; and (b) any corrections to the information contained in <u>Schedule 1.2A.2</u> delivered to Purchaser on the Closing Date;

2.　A statement of the Purchased Loans as of the close of business on the day immediately before the Closing Date, setting forth (a) the aggregate unpaid principal amount of such Purchased Loans and the Accrued Loan Interest

and listing, for each such Purchased Loans, the name and address of the borrower, the unpaid principal amount thereof, interest rate thereon and the amount of the Accrued Loan Interest; and (b) any corrections to the information contained in the Schedule 1.1B.3 delivered to Purchaser on the Closing Date;

3.    A statement of the actual proration amounts to be paid in accordance with Section 1.6 hereof as of the start of business on the Closing Date; and

4.    A final closing statement of any other required adjustments to determine the Adjusted Payment for execution by the parties in substantially the form attached hereto as Exhibit 2.

B.    If the final closing statement requires an Adjusted Payment, Sellers or Purchaser, as the case may be, shall make the Adjusted Payment to the other party to correct any discrepancy between the amount of the Transfer Payment paid under Section 1.4 and the amount of the Adjusted Payment determined under this Section 1.5. Sellers shall provide Purchaser with the worksheets it used to calculate the Adjustment Payment. Any Adjustment Payment due to either party on the Adjustment Payment Date pursuant to this provision shall be paid to such party on the Adjustment Payment Date by the other party by wire transfer on the first business day immediately following the execution of the final closing statement by Purchaser and Sellers and shall bear interest from and including the Closing Date to the date of payment at the effective federal funds rate as published daily by the Federal Reserve Bank of Atlanta for the dates involved.

**1.6    *Prorations.*** It is the intention of the parties hereto that Sellers shall operate for its own account the business being transferred pursuant to this Agreement until the close of business on the day immediately before the Closing Date, and that Purchaser shall operate for its own account the business being transferred pursuant to this Agreement from and after the Closing Date. Thus, except as otherwise specifically provided in this Agreement, items of income and expense allocable to the Assets and Assumed Liabilities shall be prorated as of the close of business on the day immediately before the Closing Date determined in accordance with GAAP, whether or not such adjustment would normally be made as of such time. For purposes of this Agreement, items of proration and other adjustments shall include, but not be limited to; (i) personal property and real estate taxes; (ii) rent, utilities and other obligations under the Property Leases and the Dallas Sublease; (iii) FDIC deposit insurance and FICO assessments (prorated in accordance with the number of days elapsed during the quarter in which the Closing Date occurs and taking into account applicable FDIC assessment rates for Purchaser); (iv) any prepaid revenues received by Sellers in connection with the Safe Deposit Leases; and (v) other accrued expenses (including but not limited to those under the Contracts) and prepaid expenses (but only including prepaids that will inure directly to the benefit of Purchaser and excluding all others, such as by way of example, prepaid advertising) for the Branches. Sellers shall deliver to Purchaser a preliminary proration schedule as of the end of the month preceding the Closing Date to enable the parties to agree on the types of prorations to apply at Closing.

**1.7    *Closing Date: Closing; Real Estate Transfer.*** The consummation of the purchase and assumption transactions provided for in this Agreement (the "Closing"), shall occur

(i) no later than 15 calendar days after receipt by the parties of all required regulatory approvals and all other approvals required by law or contract for consummation of the transactions provided for herein and lapse of all required waiting periods associated therewith (such date referred to hereinafter as the "Closing Date"), with a target date of May 31, 2011, or (ii) such other date as is mutually agreed upon by the parties hereto. In any event, the Closing Date may be extended to July 31, 2011, if regulatory approvals and waiting periods necessitate. Delivery of the documents and instruments to be delivered by Sellers and Purchaser, payment of the Transfer Payment by Sellers or Purchaser, closing of the sale of the Real Property, and other transactions herein contemplated to take place concurrently with such deliveries, assumptions and payments, shall take place on the Closing Date at 8:00 a.m. (local time) at the offices of First Bank & Trust in the State of Texas (or at such other time and place as are agreed to by both parties), and all such transactions shall be deemed effective as of the close of business on the day immediately before the Closing Date; provided, however, that any payment to be made by either party to the other by wire transfer of immediately available funds on the Closing Date shall be made by wire transfer initiated prior to 10:00 a.m. (local time) on the Closing Date (or on the business day immediately before the Closing Date, if the Closing Date occurs on a day when funds cannot be wired for same day reinvestment). Any deliveries, conveyances, assignments or transfers required under this Agreement, other than the foregoing, shall be made at the time and date specified in this Agreement (and where no time is specified, on or before the start of business on the date specified) and in the manner and place specified in this Agreement (where not specified, in the manner and place as reasonably requested in writing by the party that is to receive such delivery, conveyances, assignment or transfer).

**1.8** *Limitations On Assumption of Liabilities.* The parties agree that Purchaser shall assume only the Assumed Liabilities. Purchaser assumes no other liabilities of either Seller or either Seller's banking operations.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby, jointly and severally, make the following representations and warranties to Purchaser:

**2.1** *Corporate Organization.* Jefferson Bank is a Texas-chartered non-member commercial bank duly organized and existing under the laws of the State of Texas. First Bank & Trust is a Texas-chartered non-member commercial bank duly organized and existing under the laws of the State of Texas. Sellers possess full corporate power and all necessary approvals to own and operate the Branches and to carry on their respective business as presently owned, operated, and conducted by them. Sellers' deposit liabilities are insured by the Federal Deposit Insurance Corporation (the "FDIC") to the fullest extent permitted under federal law. No proceedings for the termination or revocation of such insurance are pending or to Sellers' knowledge threatened. Except as disclosed to Purchaser in Schedule 2.1A, neither Seller is currently under any cease and desist order by or written agreement with any regulatory agency, nor to Sellers' knowledge is any such action threatened that would preclude Sellers from entering into or consummating this Agreement.

**2.2** *Corporate Authority and Action.* Sellers have full right, power and authority to sell, convey, assign, transfer and deliver the Assets and the Assumed Liabilities to Purchaser and to otherwise fully perform Sellers' obligations under this Agreement, subject however to (i) Sellers' receipt of and compliance with all required regulatory approvals (ii) in the case of First Bank & Trust, the consummation of the Merger, and (iii) compliance by Purchaser with all of its obligations under this Agreement. Sellers have full right, power and authority to execute and deliver this Agreement and each of the documents and instruments contemplated hereby. This Agreement, and each such other document and instrument, constitutes a valid and binding obligation of Sellers enforceable against Sellers in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, or other laws relating to or affecting the enforcement of creditors' rights including, without limitation, the avoidance powers of the FDIC pursuant to the Federal Deposit Insurance Act and except as courts of equity may limit certain remedies such as specific performance. This Agreement and the transactions contemplated hereby have been approved by the Boards of Directors of Sellers and, except as set forth herein, no other corporate or member action is required on the part of Sellers relating to this Agreement and the transactions contemplated hereby.

**2.3** *No Default Effected.* The execution and delivery of this Agreement by Sellers and the consummation by Sellers of the transactions contemplated hereby, subject to the fulfillment of the terms and compliance with the provisions hereof and all regulatory approvals, will not conflict with, or result in the breach of, or a default (or an occurrence which, with the lapse of time or action by a third party, could result in a breach or default) with respect to (i) any of the terms, conditions, or provisions of any laws applicable to either Seller, or of the charter or bylaws of either Seller; (ii) any agreement or other instrument to which either Seller is a party or is subject, or by which either Seller or any of its properties or assets are bound; or (iii) any order, judgment, injunction, decree, directive, or award of any court, arbitrator, government agency, or public official by which either Seller is bound.

**2.4** *Brokers.* Except as disclosed to Purchaser in <u>Schedule 2.4</u>, all negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Jefferson Bank without the assistance of any other person acting on behalf of Jefferson Bank, in such manner as to give rise to any valid claim by any person against Jefferson Bank, First Bank & Trust or Purchaser for reimbursement of expenses or a finder's fee, brokerage commission, or other similar payment, and Jefferson Bank shall pay all commissions, fees, costs and expenses, directly or indirectly, due any such person and indemnify Purchaser against all commissions, fees, costs, expenses, or other similar payments in connection therewith.

**2.5** *Litigation.* There are no actions, causes of action, claims, suits or proceedings, pending or, to Sellers' knowledge, threatened, against either Seller affecting the Branches, the Assets or the Assumed Liabilities whether at law, in equity or before or by a governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, and to Sellers' knowledge, there are no unresolved disputes under any written or oral agreement, whether express or implied, to which either Seller is a party or by which it is bound that would adversely affect the Branches, the Assets, the Assumed Liabilities or the transactions contemplated hereby, and neither Seller has any knowledge of any state of facts or the occurrence of any event which would form the basis for any claim that would adversely affect the Branches, the Assets, the Assumed Liabilities or the transactions contemplated hereby.

**2.6** *Deposits.* The Deposits are insured by the FDIC to the fullest extent permitted under federal law. The Deposits (i) are in all respects genuine and enforceable obligations of Sellers and have been acquired and maintained in full compliance with all applicable laws, including (but not limited to) the Truth in Savings Act and regulations promulgated thereunder; (ii) were acquired in the ordinary course of Sellers' business; and (iii) are not subject to any claims that are superior to the rights of persons shown on the records delivered to Purchaser indicating the owners of the Deposits, other than claims against such Deposit owners, such as state and federal tax liens, garnishments, and other judgment claims, which have matured or may mature into claims against the respective Deposits.

**2.7** *Title to Assets.* Sellers have good and marketable title to the Assets (except the Property Leases), and complete and unrestrictive power to sell, transfer and assign the Assets to Purchaser subject to the receipt of all required regulatory approvals and free and clear of any and all claims, liens, encumbrances or rights of third parties, other than the Permitted Exceptions (as defined in Schedule1.1C). Sellers have no knowledge of any defects in, or damage to, any of the Real Property, a valid leasehold interest in each of the Property Leases, free and clear of any and all claims, liens, encumbrances or rights of third parties, other than statutory liens of landlords.

**2.8** *Loans.*

A.     Sellers have full power and authority to hold the Purchased Loans and good and marketable title to the Purchased Loans free and clear of all liens and encumbrances. Sellers are authorized to sell and assign the Purchased Loans to Purchaser and, upon assignment, Purchaser shall have the rights of Sellers with respect to the Purchased Loans in accordance with the terms and conditions thereof.

B.     All notes and other evidences of indebtedness in favor of Jefferson Bank in connection with the Purchased Loans, including, without limitation, any and all security agreements, guarantees, mortgages and other collateral documents accompanying the same, are correct in amount, genuine as to signatures of the makers, endorsers or signatories thereof or thereto, were given for a valid consideration and, to the knowledge of Jefferson Bank, represent binding claims against such makers, endorsers or signatories for the full amount shown on the books and records of Sellers. To the knowledge of Jefferson Bank, all of the Purchased Loans have been made by Jefferson Bank in accordance with Board of Director-approved loan policies. Jefferson Bank holds, subject to consummation of the Merger, First Bank & Trust will hold the Purchased Loans for their own benefit and no other person has any rights in the Purchased Loans. To the knowledge of Jefferson Bank, the secured Purchased Loans include perfected liens having the priority indicated by their terms, subject, as of the date of recordation or filing of applicable security instruments, only to such exceptions as are discussed in attorneys' opinions regarding title or in title insurance policies in the loan files relating to Purchased Loans secured by real property or are not material as to the collectability of such loans. All of the Purchased Loans are with full recourse to the borrowers and guarantors, if any, and Sellers have not taken any action that would result in a waiver or negation of any rights or remedies available by it against any borrower or guarantor, if any, on any Purchased Loan. All applicable remedies against all borrowers and guarantors are enforceable, except as such enforcement may be limited by general

principles of equity whether applied in a court of law or a court in equity and by bankruptcy, insolvency, fraudulent conveyance, and similar laws affecting creditors' rights and remedies generally. Jefferson Bank has fulfilled in all respects its contractual responsibilities and duties as servicer of the Purchased Loans and has complied in all respects with its duties as required under applicable regulatory requirements. Jefferson Bank has, and, subject to and to the extent required in connection with the consummation of the Merger, First Bank & Trust will have properly perfected or caused to be properly perfected all liens or other interests in any collateral securing any secured Purchased Loan. To the knowledge of Jefferson Bank, the loan file for each Purchased Loan (i) complies with the recordkeeping requirements of Sellers' primary bank regulator; (ii) is maintained in accordance with industry standard and practices; and (iii) contains all documents, instruments and other information necessary or appropriate to (x) comply with the underwriting requirements applicable thereto and/or (y) enforce the rights of Sellers under the notes, other evidences of indebtedness, security agreements, guaranties, mortgages and other collateral documents in favor of Sellers in connection with such Loan.

**2.9** *Condition of Branches and Real Property.* The improvements and fixtures on the Real Property and at the Branches are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, are adequate and suitable for the purposes for which they are presently being used. No proceedings to take all or any part of the premises of the Branches or the Real Property by condemnation or right of eminent domain are pending or, to Jefferson Bank's knowledge, threatened. Jefferson Bank's use of the Branches and Real Property are not, and no complaints have been received by Jefferson Bank that Jefferson Bank is in, a violation of applicable building, zoning, platting, subdivision, use, safety, building, energy and environmental or similar laws, ordinances, regulations and restrictions. The Branches and Real Property are adequately serviced by all utilities necessary for effective operation as presently used for a financial institution branch office. There are presently in effect permanent certificates of occupancy as may be required for the Branches and, to Jefferson Bank's knowledge, the present use and occupation of the Branches is in compliance and conformity with the certificates of occupancy. There have been no written notices or requests of any municipal department insurance company or board of fire underwriters (or organization exercising functions similar thereto), or mortgagee directed to Jefferson Bank and requesting the performance of any work or alteration in respect to the Branches which has not been complied with. No portion of the Branches or any of the buildings and improvements located thereon, violates any law, rule, regulation, ordinance or statute, including those relating to zoning, building, land use, environmental, health and safety, fire, air sanitation and noise control.

**2.10** *Contracts, Safe Deposit Leases, Property Leases and Dallas Sublease.*

A.    True and complete copies of each Contract, Safe Deposit Lease, Property Lease and Dallas Sublease have been delivered to Purchaser. Each Contract, Safe Deposit Lease, Property Lease and Dallas Sublease is in full force and effect, is valid and enforceable according to its terms, Sellers are not in default under any Contract, Safe Deposit Lease, Property Lease and Dallas Sublease, and there has been no event which, with notice or the lapse of time, or both, would constitute a default under any Contract, Safe Deposit Lease, Property Lease and Dallas Sublease by Sellers including, but not

limited to, the consummation of the transactions contemplated by this Agreement. Sellers have not sent or received written notice of any default under any Contract, Safe Deposit Lease, Property Lease or Dallas Sublease. Jefferson Bank has not breached any covenant, agreement or condition contained in any Contract, Safe Deposit Lease, Property Lease or Dallas Sublease, and there has not occurred any event which with the giving of notice or passage of time or both that would constitute such breach by Jefferson Bank under any Contract, Safe Deposit Lease, Property Lease and Dallas Sublease.

B.     All sums due and owing Sellers under the Dallas Sublease have been paid in full through the date of this Agreement. Subtenant is not in arrears on any rent or other charges payable by Subtenant under the Dallas Sublease and Sellers have no existing liens, claims or past due rentals under the Dallas Sublease or in the enforcement of the Dallas Sublease against Subtenant. To the best of Sellers' knowledge, (i) Subtenant has performed all of Subtenant's obligations under the Dallas Sublease to be performed by Subtenant as of the date hereof, (ii) Subtenant is not in default under the Dallas Sublease, (iii) no event has occurred which, with the giving of notice or passage of time, or both, could result in a default by Subtenant; and (iv) Subtenant has no outstanding performance obligations with respect to the premises demised under the Dallas Sublease or Sellers. All improvement allowances, relocation allowances or any other allowances or payments due Subtenant by Sellers under the terms of the Dallas Sublease have been paid in full to Subtenant.

**2.11**     *Compliance with Laws.* Insofar as it may affect the transactions contemplated by this Agreement, to Sellers' knowledge, Sellers are in compliance with all laws applicable to the operation of its business as presently conducted at the Branches, specifically including, without limitation, compliance with all regulations concerning truth-in-savings, consumer protection, occupational safety, civil rights, and labor and/or employment laws.

**2.12**     *Governmental Reporting.* Sellers have timely filed all applicable reports, returns and filing information data required to be filed with any and all federal and state banking authorities and any and all other governmental authorities and regulatory agencies. For all completed calendar years, Sellers have duly and timely sent to each owner of a Deposit all required Form 1099s.

**2.13**     *Environmental Matters.* There is no legal, administrative, arbitral or other proceeding, claim, action, cause of action or governmental investigation pending nor, to Sellers' knowledge, is threatened which seeks to impose on Sellers in connection with the Real Property any liability arising under any environmental laws, nor to Sellers' knowledge is there any basis for any of the foregoing. Sellers are not subject to any agreement, order, judgment, decree or memorandum by or with any court, regulatory agency or third party imposing any such liability with respect to the Real Property. To Sellers' knowledge, there are no environmental conditions such as use of the Real Property as a landfill or for storage of above ground or under ground storage tanks, discharges or emissions or releases of hazardous materials present at, on, under, or above the Real Property, which constitute a violation of any environmental laws.

**2.14**     *Taxes.* Sellers have paid or reserved for or shall have paid or reserved for prior to the Closing Date all federal, state and local taxes required to be paid with respect to the

Branches, the non-payment of which would result in a lien upon any of the Assets or would result in Purchaser becoming liable or responsible therefor. Sellers have filed all real property and personal property tax returns currently due relating to the Assets and have paid all taxes shown as due thereon.

**2.15** *Real Property.* There are no leases, subleases, licenses or similar agreements permitting any party other than Sellers to lease, use or occupy space in or on the Real Property other than the Dallas Sublease. There are no outstanding options to purchase or similar agreements with respect to the Real Property. There are no taxes, assessments, water charges or sewer charges relating to the Real Property which are delinquent, and there are no special tax assessments or charges for unpaid taxes pending or threatened against the Real Property.

**2.16** *Employees.* Schedule 2.16 lists the names of all employees at the Branches ("Employees"), their full-time or part-time status (including approximate hours per week), their job description and/or title, their compensation (by wages or base salary, bonus and other amounts) and benefits, any written or oral agreements with them, and their hire dates.

**2.17** *Appointment of IRA Trustee or Custodian.* Subject to not receiving contrary instructions from the customers, Sellers have sole authority to appoint a successor trustee or custodian for all IRA Deposits and (including SEP IRA, SIMPLE IRA and other retirement accounts over which Sellers serves as trustee or custodian) included in the Deposit Liabilities.

**2.18** *Books, Records, Documentation, Etc.* The books and records being transferred to Purchaser hereunder are complete, correct and accurate in all material respects, and are in material compliance with all applicable federal and state laws and regulations. The deposit and lending-related forms, notices, statements, and related documentation with respect to the Deposits and Purchased Loans, as well as Sellers' policies, procedures, and practices with respect thereto, used in connection with its banking operations comply in all material respects with applicable federal and state laws and regulations.

**2.19** *Employee Benefits.*

A. Neither Sellers nor any ERISA Affiliate of Sellers has ever sponsored or contributed to or had any liability with respect to (i) any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA which is or was subject to Title IV of ERISA or Sections 412 or 430 of the Code or Section 302 of ERISA, (ii) any multiemployer plan as defined in Section 414(f) of the Code or Sections 3(37) or 4001(a)(3) of ERISA, (iii) any multiple employer plan within the meaning of Section 413(c) of the Code or Sections 4063, 4064 or 4068 of ERISA, or (iv) any multiple employer welfare arrangement within the meaning of Section 3(40) of ERISA. None of the Assets are subject to any lien under Section 302(f) of ERISA or Section 430(k) of the Code. For purposes of this Agreement, the term "ERISA Affiliate" means any person (whether incorporated or unincorporated), that together with any Seller would be deemed a "single employer" within the meaning of Section 414 of the Code or Section 4001(a)(14) of ERISA.

B. Sellers do not sponsor, maintain, contribute to or have any liability under any Benefit Plan (as defined below) which provides benefits to any Employees, except for (i) any Benefit Plans sponsored and maintained by First Bank & Trust (from and after the Merger) or Outsource Holdings (prior to the Merger) and (ii) a nonqualified deferred compensation plan sponsored and maintained by Jefferson Bank (referred to herein as "Seller Benefit Plans"). For purposes of this Agreement, the term "Seller Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and any other stock bonus, stock option, restricted stock, stock appreciation right, stock purchase, bonus, incentive, deferred compensation, severance or vacation plan, employment or consulting agreement or other employee benefit plan, program, policy or other arrangement covering employees (or former employees).

C. Each Seller Benefit Plan to which any Seller contributes that is intended to be qualified under Section 401(a) of the Code is so qualified and its related trust is exempt from taxation under Section 501(a) of the Code, and no fact or event has occurred, and no condition exists, that would cause any such plan to lose its tax-qualified status or to cause any related trust that holds the assets of any such Benefit Plan to lose its exemption from taxation under Section 501(a) of the Code. For purposes of this Agreement, the term "Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and any other stock bonus, stock option, restricted stock, stock appreciation right, stock purchase, bonus, incentive, deferred compensation, severance or vacation plan, employment or consulting agreement or other employee benefit plan, program, policy or other arrangement covering employees (or former employees).

D. Jefferson Bank and its ERISA Affiliates, and any employee benefit plan sponsored or maintained by them and the Seller Benefit Plans, are in compliance in all material respects with the applicable provisions of the ERISA, the Code and other applicable laws.

E. Notwithstanding any other provision of this Agreement, Purchaser shall not have any liability with respect to any Benefit Plan maintained or contributed to by Sellers or any of their ERISA Affiliates or to which Sellers or any of their ERISA Affiliates contributes or is obligated to make payments thereunder or otherwise may have any liability, and no event has occurred, and there exists no condition or set of circumstances in connection with which Purchaser could, directly or indirectly, be subject to any liability under ERISA, the Code or any other applicable law with respect to any such plan.

**2.20** *Regulatory Conditions.* The only regulatory applications that Sellers or any of their affiliates are required to file and have approved to permit them to consummate the Merger are set forth on Schedule 2.20. Sellers are not aware of any facts that would delay or prevent Sellers from obtaining regulatory approval with respect to the Merger.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties to Sellers:

**3.1** *Corporate Organization.* Purchaser is a national banking association duly organized and existing under the laws of the United States and possesses full corporate power and all necessary approvals to own and operate its properties and to carry on its business as presently owned, operated and conducted by it. Purchaser's deposit accounts are insured by the FDIC to the fullest extent permitted under federal law. No proceedings for the termination or revocation of such insurance are pending or to Purchaser's knowledge threatened, and Purchaser is not currently under any cease and desist order by any regulatory agency nor to Purchaser's knowledge is any such action threatened which would preclude Purchaser from entering into or consummating this Agreement.

**3.2** *Corporate Authority and Action.* Purchaser has full right, power and authority to acquire the Assets and assume the Assumed Liabilities from Sellers and to otherwise fully perform Purchaser's obligations under this Agreement, subject however, to (i) Purchaser's receipt of and compliance with all required regulatory approvals and (ii) compliance by Sellers with all of its obligations under this Agreement. Purchaser has full right, power and authority to execute and deliver this Agreement and each of the documents and instruments contemplated hereby. This Agreement, and each such other document and instrument, constitutes a valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, or other laws relating to or affecting the enforcement of creditors' rights including, without limitation, the avoidance powers of the FDIC pursuant to the Federal Deposit Insurance Act and except as courts of equity may limit certain remedies such as specific performance. This Agreement and the transactions contemplated hereby have been approved by the Board of Directors of Purchaser and, except as set forth herein, no other corporate or shareholder action is required on the part of Purchaser relating to this Agreement and the transactions contemplated hereby.

**3.3** *No Default Effected.* The execution and delivery of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby, subject to the fulfillment of the terms and compliance with the provisions hereof and all regulatory approvals, will not conflict with, or result in the material breach of, or a material default (or an occurrence which, with the lapse of time or action by a third party, could result in a breach or default) with respect to (i) any of the terms, conditions or provisions of any laws applicable to Purchaser, or of the charter or bylaws of Purchaser; (ii) any agreement or other instrument to which Purchaser is a party or is subject or by which Purchaser or any of its properties or assets are bound; or (iii) any order, judgment, injunction, decree, directive, or award of any court, arbitrator, government agency or public official by which Purchaser is bound.

**3.4** *Brokers.* Except as provided on Schedule 3.4, negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Purchaser without the assistance of any other person acting as Purchaser's broker. Purchaser shall pay all commissions, fees, costs and expenses, directly or indirectly, due any such person acting as

Purchaser's broker and indemnify Sellers against all commissions, fees, costs, expenses, or other similar payments in connection therewith.

**3.5** *Litigation.* There are no actions, causes of action, claims, suits, or proceedings, pending or, to Purchaser's knowledge, threatened, against Purchaser which would adversely affect the transactions contemplated by this Agreement, whether at law, in equity or before or by a governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign, and to Purchaser's knowledge, there are no unresolved disputes under any written or oral agreement, whether express or implied, to which Purchaser is a party or by which it is bound that would adversely affect the transactions contemplated hereby, and Purchaser has no knowledge of any state of facts or the occurrence of any event which could form the basis for any claim which would adversely affect the transactions contemplated hereby.

**3.6** *Regulatory Conditions.* The only regulatory application that Purchaser is required to file and have approved to permit it to consummate the transactions contemplated hereby is the approval of the Office of the Comptroller of the Currency ("OCC"). Purchaser has a CRA rating of satisfactory or better. Purchaser is an "eligible bank" and "eligible depository institution," as defined in 12 C.F.R. § 5.3(g) and (h), respectively. Purchaser is not aware of any facts that would delay or prevent Purchaser from obtaining regulatory approval with respect to the transactions contemplated hereby.

**3.7** *Compliance with Law.* Insofar as it may affect the transactions contemplated by this Agreement, Purchaser is in material compliance with all laws applicable to the operation of its business.

## ARTICLE IV
## AGREEMENTS PENDING CLOSING

**4.1** *Regulatory Approval and Standards.* Purchaser shall file an application with the OCC within 30 days after the date hereof, seeking requisite approval of or authority to effect the transactions contemplated hereby. Purchaser shall provide Sellers with a copy of the draft application at least two business days before the anticipated filing date. Purchaser's obligation to file the applications is extended to within three business days after receiving Sellers' clearance to file an executed signature page for the OCC application. Purchaser shall furnish Sellers with copies of the final applications (except for the confidential portions thereof) and any amendments, as well as each material notice, order, opinion or other item of correspondence received by Purchaser from such regulatory agency with respect to such application which do not contain confidential information. Sellers shall file any required applications or notices with the FDIC and the Texas Department of Banking respecting the sale of the Branches within 30 days after the date hereof. Sellers shall provide Purchaser with a copy of its draft filings at least two business days before the anticipated filing date. Sellers' obligation to file the applications or notices is extended to within three business days of receiving Purchaser's clearance to file.

**4.2** *Notification of Customers.* Purchaser and Sellers shall take such actions required by law or regulation to notify customers, creditors or depositors of the Branches of the transfers and assumptions to be effected pursuant to this Agreement. Purchaser and Sellers shall work together to develop the contents of any such notifications and shall issue any such notifications,

at Sellers' expense, after all regulatory approvals have been obtained (or as otherwise mutually agreed to by the parties or required by applicable laws and regulations) but prior to the Closing. The following specific notifications shall be provided:

      A.    Sellers shall provide Purchaser with copies of all of its IRA Deposit forms (including SEP IRA Deposits, SIMPLE IRA accounts and any other type of retirement account for which Sellers serve as custodian or trustee) currently in place within five business days of the date of this Agreement. Within such period prior to the Closing Date as is required by applicable law or regulation or the account forms, Sellers will, at its sole cost and expense, notify the depositors who maintain IRA Deposits at the Branches of Sellers' intent to resign as custodian or trustee for all IRA Deposits as of Closing and to appoint Purchaser as successor custodian or trustee and the discharge and release of Sellers from all liabilities as custodian or trustee from and after the effective time of its resignation. Purchaser will accept such appointment as successor custodian or trustee, unless the customer objects in writing to such appointment or to Purchaser's master IRA agreement. It is agreed that Sellers are required to notify each such depositor only once, which notification will be by means of a letter approved by Purchaser, which approval shall not be unreasonably withheld, and accompanied by all appropriate forms and documents necessary to effect such replacement and release and to adopt Purchaser's master agreement. The IRA Deposit of any customer not accepting the appointment of Purchaser and Purchaser's master plan will not be included in the Deposit Liabilities.

      B.    Purchaser also shall be permitted to send or publish welcome letters and other marketing and instructional materials to all customers of the Branches relating to the transactions contemplated by this Agreement, provided that Purchaser shall notify and cooperate with Sellers as to the timing of the delivery of such notices. Sellers shall assist Purchaser in such endeavor by providing customer contact information and shall have the right to approve such materials in advance, which approval shall not be unreasonably withheld.

    **4.3**    *Employment of Existing Employees.* Sellers shall terminate the Employees to be effective as of the close of business on the business day before the Closing Date. Purchaser agrees to extend offers of at-will employment to a majority of the Employees to be effective at the start of business on the Closing Date. Purchaser's employment offers shall provide the Employees with the similar benefits as Purchaser offers to Purchaser's other employees who are similarly situated in terms of their position and longevity, including service at Sellers as provided in Section 7.4. Sellers shall be responsible for payment of all salaries, benefits, accrued leave and vacation of the Employees prior to the Closing Date. Purchaser shall have no liability or obligation to the Employees relating to their employment by Sellers or the leasing organization including, without limitation, any liability or obligation relating to any employee benefits to which the Employees may be entitled in connection with their employment with Sellers or the leasing organization. First Bank & Trust shall indemnify Purchaser for any damages, losses and expenses (including reasonable attorney fees) incurred by Purchaser resulting from employment claims, including without limitation claims for benefits, by the Employees against Purchaser relating to Sellers' or the leasing organization's actions with respect to such Employees prior to, or in connection with, the termination of their employment, as required by this Section 4.3. Purchaser shall indemnify Sellers for any damages, losses and expenses (including reasonable

attorney fees) incurred by Sellers resulting from employment claims by the Employees against Sellers relating to Purchaser's actions with respect to such Employees after the Closing Date.

### 4.4 *Operations.*

A.    No later than 30 days prior to the Closing Date, Sellers shall supply such information as is reasonably necessary for Purchaser to conduct the data conversion needed for the Assets and Assumed Liabilities from Sellers' data processing system to Purchaser's data processing system. In addition, Sellers shall supply the services of certain of Sellers' personnel for a reasonable period of time not to exceed 100 hours in the aggregate during Sellers' normal business hours to assist Purchaser in such conversion.

B.    Purchaser shall use its best efforts at its expense to convert operations to its own data processing system as soon as administratively practicable after the Closing Date, and in any event no later than September 15, 2011 (the "Conversion Period"). Purchaser shall be solely responsible for the cost of such conversion. Prior to the earlier of the date such conversion actually occurs and the end of the Conversion Period, Sellers agree to continue conducting the data processing services on behalf of Purchaser with respect to the Branches pursuant to the agreements listed on Schedule 4.4(A) (the "Data Processing Agreements") which Data Processing Agreements will be assumed by operation of law by First Bank & Trust in connection with the Merger. Purchaser will promptly reimburse First Bank & Trust for all reasonable expenses incurred by it in connection with providing such services under the Data Processing Agreements. For purposes of clarification, such costs will include the costs of conversion under the Data Processing Agreements but shall not include any termination fees payable by Sellers upon the termination of the Data Processing Agreements. Until the earlier of the date of the conversion and the end of the Conversion Period, Sellers agree not to terminate or amend any provision of the Data Processing Agreements without the consent of Purchaser.

C.    All of Sellers' Branch ATM/Debit/POS Cards and on-line account relationships with customers of the Branches shall be terminated upon Purchaser's instruction to Sellers to do so which shall be given as soon as administratively practicable after the Closing Date, and in any event no later than September 15, 2011.

**4.5    *Real Property.*** The parties shall comply with the covenants and conditions respecting the sale of the Real Property included in Section 7.3 and Schedule 1.1C. Additionally, from and after the date of this Agreement to the date and time of Closing, Sellers shall, at their expense, continue to maintain insurance policies providing coverages in at least the amounts and against the risks covered by the insurance policies maintained by Sellers as of the date of this Agreement. Upon termination of such policies, any premium refund received by Purchaser shall be remitted to Seller within 15 business days after receipt of the refund.

**4.6    *Sales and Transfer Taxes.*** Except for such taxes and assessments relating to the transfer of the Real Property, Purchaser and Sellers agree that no sales or transfer tax is due on this transaction because it is not in the ordinary course of business of either Purchaser or Sellers;

however, in the event that a sales or transfer tax is imposed by a governmental authority having jurisdiction to impose such a tax, Sellers shall be responsible for the full and timely payment of same and shall indemnify and hold harmless Purchaser for the amount of any such taxes due, and from any expenses, fines, penalties, fees, costs, or other damages resulting from the imposition of such tax or for any failure to make timely payment thereof. First Bank & Trust shall indemnify Purchaser and hold Purchaser harmless for the amount of any taxes attributable to Sellers' operations prior to the Closing Date, and from any expenses, fines, penalties, fees, costs or other damages resulting from the imposition of such tax or for any failure to make timely payment thereof provided that Purchaser promptly notifies Sellers of same.

**4.7    *Bulk Sales Act Indemnity.*** Sellers shall promptly pay when due all its creditors in order to avoid any claim by any such creditor against Purchaser or any of the Assets by virtue of the transactions contemplated by this Agreement or any bulk transfer provisions under applicable law. First Bank & Trust will indemnify and hold Purchaser harmless from any liability, loss or damage arising from failure of any applicable bulk transfer law to be satisfied or from Sellers' failure to perform this covenant.

**4.8    *Negative Operating Covenants.*** Except as may be required by regulatory authorities, and except for deposit liabilities associated with Excluded Loans, Sellers shall not, without the prior written consent of Purchaser: (i) transfer to Sellers' other banking facilities any of the deposit liabilities maintained at the Branches, except upon the unsolicited request of a depositor in the ordinary course of business; (ii) transfer to the Branches any of the deposits domiciled at its other banking facilities except upon the unsolicited request of a depositor in the ordinary course of business; (iii) transfer, assign, encumber or otherwise dispose of or enter into any contract, agreement or understanding to transfer, assign, encumber or otherwise dispose of any of the Assets; (iv) enter into any contract, commitment, or other transaction relating to the Branches, except for deposit-taking and lending activities in the ordinary course of business consistent with past practices; (v) offer interest rates on any deposit liabilities at the Branches in excess of those interest rates paid on similar deposits at Sellers' other banking facilities; or (vi) alter its current advertising or marketing programs at the Branches in any material respect, other than as part of a general advertising or marketing campaign implemented by Sellers company-wide.

**4.9    *Affirmative Operating Covenants.*** Sellers shall exercise their respective best efforts to (i) cause the Deposits to be equal to or greater than the Deposit Balance, (ii) preserve the goodwill of customers and others doing business with the Branches and (iii) cause the Employees to continue their employment with Purchaser on and after the Closing Date.

**4.10    *Damage or Destruction of Personal Property, Real Property or Leased Branches.*** If prior to Closing there is any damage to or destruction or theft of the Personal Property, Real Property or Leased Branches, or either Purchaser or Sellers receives or obtains written notice of any proceeding that affects the Personal Property or Real Property, then Purchaser shall be entitled to receive and will be assigned (i) all insurance proceeds payable with respect to the damage, destruction or theft of the Personal Property, Real Property or Leased Branches with Sellers paying over to Purchaser any deductible under the applicable insurance policies; and (ii) any award or payment received in connection with any proceeding concerning the Personal Property, Real Property or Leased Branches, including any condemnation or

eminent domain proceedings; and (iii) any additional amount necessary to repair, restore or replace the Personal Property, Real Property or Leased Branches in excess of the payments in (i) and (ii). In the event insurance proceeds are not received by Seller within 120 days after the Closing Date, then Sellers shall pay to Purchaser at such time the full amount spent by Purchaser to repair, restore or replace such Personal Property, Real Property or Leased Branches, and in such case, Seller shall retain the insurance proceeds.

**4.11** *Assistance in Obtaining Regulatory Approvals.* Purchaser and Sellers shall exercise their best efforts to obtain any required regulatory approvals. Sellers agree to use all reasonable efforts to assist Purchaser in obtaining all regulatory approvals necessary to complete the transactions contemplated hereby. Sellers will provide to Purchaser and to the appropriate regulatory authorities all information reasonably required of Sellers to be submitted by Purchaser in connection with such approvals. Purchaser will provide to Sellers and to the appropriate regulatory authorities all information reasonably required of Purchaser to be submitted by Sellers in connection with such approvals.

**4.12** *Other Relationships.* Except for the deposit relationships being transferred by Sellers to Purchaser, as of the Closing Date neither Sellers nor any of its affiliates will have any other business relationship with any holders of Deposits or borrowers of Purchased Loans, except for outstanding deposit or loan relationships at other banking offices of Sellers or deposit relationships associated with Excluded Loans and the relationships set forth on Schedule 4.12.

**4.13** *No Breach.* Neither Sellers nor Purchaser shall take or fail to take any action, that taking or failure would cause or constitute a breach or would, if it had been taken or failed to be taken prior to the date hereof, have caused or constituted a breach, of any of the applicable representations and warranties set forth in the Agreement or the covenants of each of Seller and Purchaser set forth in this Agreement. Sellers and Purchaser will each, in the event of, or promptly after becoming aware of the occurrence of, or the impending or threatened occurrence of, any event that would cause or constitute a breach or would, if it had occurred prior to the date hereof, have caused or constituted a breach of any of the applicable representations and warranties set forth in the Agreement or the covenants of Sellers or Purchaser set forth in this Agreement, or which may result in the non-satisfaction of any condition set forth in Section 8.1 or 8.2 hereof, promptly give detailed notice thereof to the other party. Sellers or Purchaser, as the case may be, will use its respective commercially reasonable efforts to prevent or promptly to remedy such breach or failure, to perform such covenant or to satisfy such condition.

**4.14** *Safe Deposit Business.*

A. As of the Closing Date, Purchaser shall assume and discharge Sellers' obligations with respect to the safe deposit box business at the Branches in accordance with the terms and conditions of the Safe Deposit Leases, and Purchaser shall maintain all facilities necessary for the use of such safe deposit boxes by persons entitled to use them.

B. As of the Closing Date, Sellers shall transfer the records related to such safe deposit box business to Purchaser, and Purchaser shall maintain and safeguard all

such records and be responsible for granting access to and protecting the contents of the safe deposit boxes at the Branches.

C. Safe deposit box rental payments (not including late payment fees) collected by Sellers before the Closing Date shall be prorated as of the Closing Date as provided in Section 1.6.

**4.15** *Landlord Estoppel and Consent.* Sellers shall use best efforts to obtain all consents, approvals or waivers sufficient to enable Sellers to assign to Purchaser the Property Leases (the "Required Consents"), prior to the Closing and, once obtained, provide Purchaser with copies thereof. Each such consent shall be in a form and substance satisfactory to Purchaser and (i) shall confirm the material terms of the Property Lease and the absence of any defaults or breaches thereunder, (ii) shall confirm that no payments shall be required as a result of the transfer other than reasonable and customary consent fees (e.g., a $1,000 consent fee) or administrative expense reimbursements, which expenses shall be borne by Sellers, (iii) shall waive any recapture or similar rights of termination with respect to the assignment of the Property Lease, (iv) shall consent to Purchaser's use of the trade name "MidSouth Bank" on all signage and otherwise, (v) shall not condition such consent upon a modification in any material respect of the Property Lease and (vi) shall not result in any loss of options to extend the term thereof or any rights or first refusal or similar rights.

**4.16** *Letters of Credit.* Sellers and Purchasers shall cooperate and use all commercially reasonable efforts to effect the termination of the Letters of Credit identified on Schedule 4.16 (the "Letters of Credit") and the substitution of Purchaser in the place of Sellers with respect to the Letters of Credit. In addition to the provisions of Section 1.1, Purchaser shall assume only those Letters of Credit identified on Schedule 4.16, which shall be updated by Sellers in connection with Sellers' preparation of the Closing Statement as set forth in Section 1.5.

## ARTICLE V
## ITEMS TO BE DELIVERED TO SELLERS

At or prior to the Closing, Purchaser shall deliver the following documents to Sellers:

**5.1** Certified copies of resolutions of the Board of Directors of Purchaser approving and authorizing the execution, delivery and performance of this Agreement and any other documents required to be executed and delivered by Purchaser hereunder;

**5.2** Evidence of requisite regulatory approval for Purchaser to consummate the transactions contemplated hereby;

**5.3** An Instrument of Transfer, Assignment and Assumption, in substantially the form set forth in Exhibit 3, whereby Sellers transfer and assign and Purchaser assumes and agrees to pay or perform the Assumed Liabilities, including without limitation the Property Leases, Safe Deposit Leases and the Contracts;

**5.4** All documents and other instruments as may be required to be delivered by Purchaser pursuant to the terms of the sale of the Real Property in Schedule 1.1C;

**5.5** All documents and other instruments as may be required to be delivered by Purchaser pursuant to Article VIII of this Agreement.

## ARTICLE VI
## ITEMS TO BE DELIVERED TO PURCHASER

At or prior to the Closing, Sellers shall deliver to Purchaser, in addition to any and all keys, security codes, combinations or other access control devices the following (with such documents set forth below in form and substance reasonably satisfactory to Purchaser):

**6.1** A statement setting forth the aggregate amount of Deposit Liabilities and Accrued Deposit Interest thereon to be transferred to and assumed by Purchaser, as of the opening of business five business days prior to the Closing Date;

**6.2** A listing of the Purchased Loans, as of the opening of business five business days prior to the Closing Date, setting forth the aggregate unpaid principal amount of such Purchased Loans and Accrued Loan Interest thereon and listing, for each Purchased Loan, the name and address of the borrower, the unpaid principal amount thereof, interest rate thereon and the amount of accrued but unpaid interest owing in regard thereto, the amount of escrows held by Sellers with respect thereto, if any, and such other information as may be necessary for Purchaser to establish accounts therefore;

**6.3** A statement of the Cash on Hand as of the close of business on the business day prior to the Closing Date and of the estimated proration amounts determined in accordance with Section 1.6 hereof;

**6.4** All records, files and documents of the Branches relating to the Deposit Liabilities and Purchased Loans to be assumed or purchased by Purchaser, including, but not limited to, signature cards, applications, certificates, notes, security agreements, pledge agreements, and properly executed assignments and endorsements with respect thereto, and actual physical possession of the Branches;

**6.5** The Required Consents for each of the Property Leases and all material consents reasonably necessary to authorize the transfer and assignment to Purchaser of, or the substitution of Purchaser for, Sellers under all Contracts and Safe Deposit Leases (without any material alterations required by any third party and preserving for Purchaser all material rights and privileges thereunder);

**6.6** A provisional closing statement in substantially the form set forth in Exhibit 1 for execution by the parties;

**6.7** A listing of the Deposits as of the close of business five business days prior to the Closing Date (the "Deposit Listing") on hard copy or utilizing such other method of information transfer as the parties shall have agreed, which Deposit Listing shall include, for each Deposit, the name and address of the owner thereof, the account number, the principal balance, the accrued interest, the maturity date, if any, the interest rate, the tax identification number, and such other information as may be necessary for Purchaser to establish accounts therefore;

**6.8** An Instrument of Transfer, Assignment and Assumption in the form in <u>Exhibit 3</u>, and such other instruments of transfer reasonably requested by Purchaser as necessary to transfer good and marketable title to the Assets (other than the Real Property) free and clear of all claims, encumbrances and rights of third parties;

**6.9** All documents and other instruments as may be required to be delivered by Sellers pursuant to the terms of the sale of Real Property in <u>Schedule 1.1C</u>;

**6.10** Two executed instruments of transfer with respect to the transfer of the trusteeship or custodianship of IRA Deposits included in the Deposit Liabilities in substantially the form of <u>Exhibit 4</u>;

**6.11** Certified copies of resolutions of the Board of Directors of each Seller approving and authorizing the execution, delivery and performance of this Agreement and any other documents required to be executed and delivered by Sellers hereunder;

**6.12** Sellers' keys to the safe deposit boxes and all other contents and records as exist and are in Sellers' possession or control related to the safe deposit box business at the Branches;

**6.13** Such other Assets as shall be capable of physical delivery; and

**6.14** All documents and other instruments as may be required to be delivered by Sellers pursuant to Article VIII of this Agreement.

### ARTICLE VII
### POST-CLOSING MATTERS

**7.1** *Information In Usable Form.* Promptly following the Closing, Purchaser and Sellers will use reasonable efforts to cause all information concerning the Purchased Loans and the Deposits to be transferred into a form usable by Purchaser.

**7.2** *Covenants Not to Compete.* Except with respect to the existing operations of PrimeWest Mortgage, a wholly-owned subsidiary of First Bank & Trust, conducted within the Restricted Area (as defined in this Section 7.2), and with respect to borrowers associated with Excluded Loans, from the Closing Date and for a period of three years thereafter (the "Restrictive Period"), Sellers (and their affiliates, successors and assigns) shall not open any branch office, deposit-taking facility (including ATM), loan office or, except as otherwise provided in this Section 7.2, solicit any business in Dallas, Collin, Rockwall and Tarrant Counties, Texas (the "Restricted Area"). Sellers agree that said time and geographic restrictions are reasonable and necessary to protect Purchaser's legitimate business concerns, that said covenants do not violate public policy, and do not place any unreasonable restraints upon Sellers' other ongoing business operations. During the Restrictive Period, Sellers (and its affiliates, successors, and assigns) shall not directly or indirectly (i) solicit any business from any of the holders of Deposits or any of the borrowers or guarantors of the Purchased Loans; (ii) undertake any targeted marketing or advertising in the Restricted Area (the use of mass media shall not constitute a breach of this provision); or (iii) encourage any Employee or employee of Purchaser to cease employment with Purchaser or change such person's employment; provided, however, that First Bank & Trust shall be permitted to establish a Texas-domiciled loan

production office ("LPO") solely for the purposes of servicing Excluded Loans retained by First Bank & Trust, including renewals, modifications and extensions of Excluded Loans and originations of new loans to borrowers associated with Excluded Loans, but in no event will the LPO accept deposits.

Notwithstanding the preceding, if First Bank & Trust or First Bank Lubbock Bancshares, Inc. engages in a merger or similar transaction to which it is not the successor, the agreements and covenants contained in this Section 7.2 shall not apply to the operations of such successor in the Restricted Area in which such successor has had a continuing presence for at least 12 months prior to consummation of such successor's acquisition of First Bank & Trust or First Bank Lubbock Bancshares, Inc. (a "Preexisting Presence"). Nothing in the preceding sentence will release such a successor from the agreements and covenants contained in this Section 7.2 in any Noncompete Area in which such successor did not have a Preexisting Presence. In the event such successor subsequently acquires a bank or bank holding company that has a Preexisting Presence in the Restricted Area, such successor may continue the operations of such bank or bank holding company in any Restricted Area in which a Preexisting Presence exists without regard to the noncompete provisions of this Section 7.2.

**7.3** *Conveyancing Charges; Recording Charges, Sales and Transfer Taxes, Etc.* All taxes, conveyance charges, recording charges and similar costs and expenses relating to the transfer of the Real Property to Purchaser shall be borne and paid by Sellers. All title examination charges and the cost of obtaining title insurance commitments with customary printed exceptions and exclusions relating to the transfer of the Real Property to Purchaser shall be borne and paid by Sellers. All real estate taxes and assessments, excluding special assessments, if applicable, shall be apportioned or adjusted between Sellers and Purchaser. All special assessments shall be paid or prepaid in full by Sellers. All charges relating to the recordation of the assignment of the Purchased Loans by Purchaser shall be borne and paid by Purchaser. If any sales, transfer or similar tax is imposed by a governmental authority relating to the transfer of any of the Assets or any of the Assumed Liabilities, Sellers shall be responsible for the full and timely payment of same and shall hold Purchaser harmless from the amount of any such taxes due, and from any expenses, fines, penalties, fees, costs, or other damages resulting from the imposition of such tax or for any failure to make timely payment thereof.

**7.4** *Employees.* Each Employee who commences employment with Purchaser pursuant to Section 4.3 shall receive credit for his or her past service with Sellers for purposes of eligibility, vesting and accrual of benefits under all of the employee benefit plans of Purchaser in which such Employee is eligible to participate, except (i) there shall be no accrual of benefits under any defined benefit plan of Purchaser; and (ii) there shall be no credit during calendar year 2011 for vacation time or sick days prior to the date of employment by Purchaser; provided, however, that, such Employees shall be entitled to receive vacation time from Purchaser on a pro rata basis based on the number of days remaining in the year as of the date employment commences with Purchaser (e.g., for clarification only, if there are six months remaining in the year at the time employment commences with Purchaser, he or she will be entitled to 50% of the vacation time and sick days he or she would have received if he or she had been employed by Purchaser for the full year). Sellers shall cause health and welfare benefits to remain in place for Employees until the first day of the month following the day of Closing on the same basis as they were covered prior to the Closing Date (which may include health care continuation coverage

under COBRA). Employees who commence employment with Purchaser may be subject to a waiting period under the health and welfare plans of Purchaser pursuant to the terms of such plans, which waiting period would extend until the first day of the calendar month following 60 days from the date of employment with Purchaser (e.g. if employment commenced on June 15, the waiting period would extend until September 1). In such event, Seller shall provide such employees with health care continuation coverage under COBRA during any such waiting period and Purchaser will reimburse Seller for the premiums paid by Seller in connection with providing health care continuation coverage under COBRA during any such waiting period. In addition, Purchaser shall use commercially reasonable efforts to cause its health insurance carrier to cover any pre-existing condition of any such Employee that was covered under a health insurance plan covering such Employee while proving services to Sellers no less favorably than such Employee was covered for such pre-existing condition under such plan (subject to such Employee providing a certificate of creditable coverage as required by Purchaser's health and welfare plans).

7.5     *Transactions After Closing Date.* Sellers and Purchaser shall execute and file such documents as necessary to transfer Jefferson Bank's ACH clearing/routing number to Purchaser effective on the Closing date and, except as provided below or otherwise agreed in writing by the parties, for a period ending September 15, 2011:

A.     Subject to Section 7.5(I), Sellers shall transfer, convey, and assign to Purchaser on the date of its receipt all deposits received by Sellers after the Closing Date for credit to any of the accounts for the Deposits, and all payments received by Sellers after the Closing Date for application to or on account of any of the Assets.

B.     Sellers shall notify Purchaser on the date of its receipt of the return to it of any items deposited in, or cashed at, the Branches prior to the Closing Date and shall expeditiously forward any such items to Purchaser. If Purchaser cannot recover on such returned items after making a good faith effort to do so, Sellers shall reimburse Purchaser for such return items upon assignment of such items by Purchaser to Sellers. Purchaser's good faith effort shall not include institution of any legal action with respect to such recovery.

C.     To the extent permitted by law and the applicable contracts for the Deposits, Purchaser will honor all properly payable checks, drafts, withdrawal orders and similar items drawn on Sellers' forms against the Deposits, which are presented to Purchaser by mail, over its counters, or through clearing houses.

D.     Provided that such items have been timely delivered to Purchaser by Sellers, Purchaser shall pay the items referred to in Section 7.5(C) to the extent of the balance of funds in the accounts. Sellers shall deliver such checks and drafts to Purchaser at Purchaser's address set forth in Section 9.9, no later than 4:00 p.m. Central Time one business day following the day they were received by Sellers. Purchaser shall promptly reimburse Sellers on a daily basis for the amount of all such checks and drafts paid by Sellers. The parties shall share equally the cost of delivery of any items under this Section 7.5(D).

E.     As of the Closing Date, Purchaser will notify all Automated Clearing House ("ACH") originators of the transfers and assumptions made pursuant to the Agreement; provided, however, that Sellers may, at their option, notify all such originators itself (on behalf of Purchaser). For a period ending September 15, 2011, Sellers will honor all ACH items related to accounts for Deposits assumed under this Agreement, which are routed or presented to Sellers. Sellers will make no charge to Purchaser for honoring such items, and will transmit such ACH data to Purchaser on a daily basis. If Purchaser cannot receive an electronic transmission, Sellers will make available daily to Purchaser at Sellers' operations center receiving items from the ACH tapes containing such ACH data. Sellers and Purchaser shall make arrangements to provide for the daily settlement with immediately available funds by Purchaser of any ACH items honored by Sellers, and Sellers shall be held harmless and indemnified by Purchaser for acting in accordance with this arrangement to accept ACH items other than ACH items initiated by Sellers. Sellers shall settle any and all ATM transactions effected on or before the Closing Date, but processed after the Closing Date, as soon as practicable. Purchaser and Sellers shall remit the total net balance of such transactions to Sellers or Purchaser, as the case may be, on the same date the transactions are settled. In instances in which an owner of a Deposit made an assertion of error regarding an account pursuant to the Electronic Funds Transfer Act and Federal Reserve Board Regulation E, and Sellers, prior to the Closing Date, recredited the disputed amount to the relevant account during the conduct of the error investigation, Purchaser shall comply with a written request from Sellers to debit such account in a stated amount and remit such amount to Sellers, to the extent of the balance of funds available in the accounts.

F.     Sellers shall provide Purchaser with a listing of each stop payment order in effect as to a Deposit or Purchased Loan on the Closing Date. Purchaser shall honor all stop payment orders relating to the Deposits or the Purchased Loans initiated prior to the Closing and reflected in the magnetic tape made available by Sellers to Purchaser on the Closing Date. In the event that Purchaser makes any payment in violation of a stop payment order initiated prior to the Closing but not reflected in stop payment documents and the magnetic tape made available by Sellers to Purchaser prior to such payment, then First Bank & Trust shall indemnify, hold harmless and defend Purchaser from and against all claims, losses and liabilities, including reasonable attorneys' fees and expenses, arising out of any such payment. In the event that Purchaser makes any payment in violation of a stop payment order initiated prior to the Closing that is reflected in stop payment documents and the magnetic tape made available by Sellers to Purchaser prior to such payment, then Purchaser shall indemnify, hold harmless and defend Sellers from and against all claims, losses and liabilities, including reasonable attorneys' fees and expenses, arising out of any such payment.

G.     After the Closing Date, Purchaser shall process any and all "charge-back items" received subsequent to the Closing Date but arising prior thereto against any amount for Deposits, as covered under applicable charge-back regulations. "Charge-back items" shall include, but not be limited to, disputed items, purchases over limit, fraudulent use of a debit card, late presentations of sales slips, unpresented credit on sales returns and other adjustments as specified under the rules and regulations of MasterCard or Visa. If Purchaser cannot recover on any such charge-back items after making a good

faith effort to do so, Sellers shall reimburse Purchaser for such items upon assignment of such items by Purchaser to Sellers. Purchaser's good faith effort to recover on any such items shall not require that Purchaser take any legal action against any person.

H.     Following the date of this Agreement, Sellers will not, without the consent of Purchaser, alter or change any business practice at the Branch related to overdrawn deposit accounts, except in connection with a change applicable to Sellers generally and which is no more permissive than the current policy.

I.     The parties agree that all amounts required to be remitted by either such party to the other party hereto pursuant to this Section 7.5 shall be settled on a daily basis. Any amounts to be paid by Sellers to Purchaser shall be netted daily against any amounts to be paid by Purchaser to Sellers, such that only one amount, representing the net amount due, shall be transferred on a daily basis by the party with the higher amount of remittances for such day in immediately available funds. Purchaser shall provide Sellers with a daily net settlement figure for all such transactions from the immediately preceding business day by 12:00 noon Central Time on each business day and the party obligated to remit any funds thereunder shall do so in immediately available funds by wire transfer by 2:00 p.m. Eastern Time on such day or by any other method of payment agreed upon by the parties; any such settlement shall be provisional pending receipt or review by the parties of the physical items relating to such settlement.

J.     If any uncollected item credited to a Deposit at the time of the transfer of such Deposit to Purchaser is subsequently returned resulting in an overdraft to the Deposit account, Sellers shall pay to Purchaser, not later than two business days after demand, the amount of such uncollected item; provided, however, that Purchaser shall, upon Sellers' making payment for such uncollected item, deliver such uncollected item to Sellers and shall assign to Sellers any and all rights which Purchaser may have or obtain in connection with such returned item.

K.     If the balance due on any Purchased Loan transferred and assigned to Purchaser pursuant to the terms of the Agreement has been reduced as a result of the receipt of an item or items prior to the Closing Date, which are returned after the Closing Date as uncollected, the asset value represented by the Purchased Loan transferred shall be correspondingly increased, and an amount in cash equal to such increase shall be paid by Purchaser to Sellers within two business days after receipt of such returned item.

L.     If Sellers receive payments, notices or correspondence with respect to any Purchased Loan after the Closing Date, Sellers shall remit such payments, notices or correspondence to Purchaser in the same form received by Sellers.

M.     For a period of 30 days after the Closing Date, upon demand of Purchaser, Sellers shall pay promptly to Purchaser the overdraft amount (negative balance) of any of the Deposits.

N.     For a period from the Closing Date until the next calendar quarter-end, First Bank & Trust agrees that Purchaser may return to First Bank & Trust for repurchase

within three business days after Purchaser's submission any of the Purchased Loans at a price equal to 99% of the amount of the unpaid principal of the Purchased Loan and Accrued Loan Interest at Closing, as adjusted for interim payments on the returned loans since the Closing Date, if such Purchased loan is (i) on nonaccrual status (including loans for which the collateral securing the same has been repossessed or in which collection efforts have been instituted or claim and delivery or foreclosure proceedings have been filed); (ii) payable in installments that are 61 days or more past due; (iii) payable in a single payment that are 31 days or more past due; (iv) classified as "substandard," "doubtful" or "loss" as of the date of the most recent regulatory examination of Seller or placed on Seller's watch list as a result of the most recent internal or external loan review of Seller performed prior to the date of this Agreement; (v) upon which insurance has been force placed; or (vi) in connection with which the borrower has filed a petition for relief under the United States Bankruptcy Code, or such proceeding has been filed involuntarily against borrower, prior to the Closing Date.

O.     Purchaser shall file Form 1099s for the Deposits covering the year in which the Closing; provided that First Bank & Trust shall provide Purchaser with complete and accurate information concerning data to be reported on Form 1099s with respect to transactions occurring through the Closing Date.

**7.6     *Maintenance of Records.*** For a period of five years after the Closing, (i) Purchaser will preserve and safe keep the Records transferred to Purchaser that relate to the Assets and Assumed Liabilities as required by reasonable business practices for the joint benefit of Sellers and Purchaser; and (ii) Sellers shall preserve and safe keep all tax records which are not transferred to Purchaser as required by reasonable business practices for the joint benefit of Sellers and Purchaser. Each of Sellers and Purchaser shall cooperate from and after the Closing Date to provide to the other upon request such information and records in the possession of the non-requesting party which is reasonably necessary for the operation of business by the requesting party or the requesting party is required to produce to a third party in connection with legal, administrative or governmental proceedings. The requesting party agrees to give the non-requesting party prompt notice of all requests for disclosure of such information or records that arise during legal, administrative or governmental proceedings involving the requesting party, so that the non-requesting party may seek a protective order with respect to the threatened disclosure. If the requesting party is required to disclose such information or records, the requesting party agrees to give written notice to the non-requesting party as soon as possible of the information and records required to be disclosed and, at the non-requesting party's request and expense, to use reasonable efforts to obtain assurances that such information and records required to be disclosed will be maintained on a confidential basis and will not be disclosed to a greater degree than required by law. In addition to the foregoing, Sellers will permit Purchaser and its tax or accounting representatives access to Sellers' journals and general ledgers relating to the Branch for financial and tax purposes during such five-year period.

**7.7     *Further Assurances.*** On and after the Closing Date, Sellers shall (i) give such further assurances to Purchaser and shall execute, acknowledge and deliver all such bills of sale, deeds, acknowledgments and other instruments, and take such further action as may be necessary and appropriate to effectively vest in Purchaser the full legal and equitable title to the Assets and to the security interests, if any, relating to the Assets; and (ii) use reasonable efforts to assist

Purchaser in the orderly transition of the Branch operations being acquired by Purchaser. In order to comply with its obligations set forth in subsection (i) above, Sellers will grant to specified employees of Purchaser, if necessary, a power of attorney (the "Power of Attorney") for the limited purpose of signing and filing all such bills of sale, acknowledgments, assignments and other instruments in the form of Exhibit 5.

**7.8**     *Signage.* All interior and exterior signs identifying Sellers will be covered or removed by Purchaser, at Purchaser's expense, by the opening of business on the first business day after the Closing Date and all signs will be removed within 10 calendar days following the Closing Date. From and after the Closing Date, Purchaser will at its expense as soon as reasonably practicable change the name on all documents and facilities relating to the Branch to Purchaser's name.

**7.9**     *Indemnification by Purchaser.* For a period of two years after the Closing Date, Purchaser shall indemnify and hold First Bank & Trust harmless from and against any and all damages, liabilities and losses which may be sustained by First Bank & Trust by reason of Purchaser's breach of any representation, warranty or covenant to First Bank & Trust under this Agreement. Purchaser shall indemnify and hold First Bank & Trust harmless from and against any and all damages, liabilities and losses which may be sustained by First Bank & Trust by reason of Purchaser's actions on and after the Closing Date with respect to the Assets or Assumed Liabilities transferred hereunder. Purchaser's covenants shall not be deemed to be violated by discharge of Assumed Liabilities in accordance with normal trade practices or by forbearing to discharge any such obligation which Purchaser is disputing in good faith and for which Purchaser has provided adequate reserves, provided Purchaser indemnifies and holds First Bank & Trust harmless in connection with the same as set forth above.

**7.10**     *Indemnification by First Bank & Trust.* For a period of two years after the Closing Date, First Bank & Trust shall indemnify and hold Purchaser harmless from and against any and all damages, liabilities and losses which may be sustained by Purchaser by reason of Sellers' breach of any representation, warranty or covenant to Purchaser under this Agreement. First Bank & Trust shall indemnify and hold Purchaser harmless from and against any and all damages, liabilities and losses which may be sustained by Purchaser with respect to the Branches, the Assets or the Assumed Liabilities arising from acts, omissions or events occurring prior to the Closing Date.

**7.11**     *Defense of Actions - Purchaser Indemnifications.* Sellers shall notify Purchaser promptly of any lawsuit or claim against Sellers which it has reasonable cause to believe would entitle it to indemnification hereunder. Purchaser shall be entitled to assume at its expense the defense of, and to determine the terms of settlement of, any such suit or claim, except that no term awarding relief other than money damages against Sellers may be agreed to without the consent of Sellers, and no award of money damages against Sellers shall be agreed to without satisfactory prior arrangements between Purchaser and Sellers to assure Sellers that Purchaser will have sufficient funds available to respond to the award. If Purchaser promptly so elects to assume, and promptly so notifies Sellers, and does assume, the defense of any such suit or claim, it shall not be liable for any legal expense or other expenses incurred by Sellers with respect to such suit or claim and Sellers shall be solely responsible for those expenses (whether incurred by Sellers before or after Purchaser assumes the defense of any such suit or claim). If Purchaser

does not assume the defense of any such suit or claim, it shall thereafter be barred from disputing the nature and amount of the monetary damages ultimately incurred or determined to have been incurred by Sellers in settling or litigating the suit or claim.

**7.12** *Defense of Actions - Sellers Indemnifications.* Purchaser shall notify Sellers promptly of any lawsuit or claim against Purchaser which it has reasonable cause to believe would entitle it to indemnification hereunder. Sellers shall be entitled to assume at its expense the defense of and to determine the terms of settlement of, any such suit or claim, except that no term awarding relief other than money damages against Purchaser may be agreed to without the consent of Purchaser, and no award of money damages against Purchaser shall be agreed to without satisfactory prior arrangements between Sellers and Purchaser to assure Purchaser that Sellers will have sufficient funds available to respond to the award. If Sellers promptly so elects to assume, and promptly so notifies Purchaser, and does assume, the defense of any such suit or claim, it shall not be liable for any legal expense or other expenses incurred by Purchaser with respect to such suit or claim and Purchaser shall be solely responsible for those expenses (whether incurred by Purchaser before or after Sellers assumes the defense of any such suit or claim). If Sellers does not assume the defense of any such suit or claim, it shall thereafter be barred from disputing the nature and amount of the monetary damages ultimately incurred or determined to have been incurred by Purchaser in settling or litigating the suit or claim.

**7.13** *Participation Loans.* For a period of two years following the Closing Date, First Bank & Trust shall not reduce by any means Purchaser's interest in the participation loans for which First Bank & Trust is the lead bank or otherwise has the contractual right to reduce, all of which are listed on either Schedule 7.13 or result from the Make Whole Participations as set forth in Section 8.2(J) herein, or both, prior to their scheduled maturity unless requested to take such action by Purchaser in each instance, provided that such requested action will not result in a legal lending limit violation by First Bank & Trust.

## ARTICLE VIII
## CLOSING CONDITIONS

**8.1** *Conditions Precedent to Sellers' Obligation to Close.* The obligation of Sellers to close the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in advance in writing by Sellers) of each of the following conditions at or prior to Closing:

    A.    The representations and warranties of Purchaser shall be true and correct in all material respects as of the date hereof and as of the time of Closing as if made anew at such time provided, however, to the extent that any representation or warranty of Purchaser contains a materiality qualification, the representation or warranty as qualified shall remain as stated and such qualification shall not be deemed to be lessened or otherwise modified by the use of "material respects" in this Section 8.1(A);

    B.    Purchaser shall have performed in all material respects all of its covenants and agreements contained in this Agreement that require performance at or prior to Closing; provided, however, to the extent that any covenant or agreement of Purchaser contains a materiality qualification, the covenant or agreement as qualified shall remain

as stated and such qualification shall not be deemed to be lessened or otherwise modified by the use of "material respects" in this Section 8.1(B);

C.   No adverse action or proceeding shall have been instituted pertaining to the transactions contemplated by this Agreement;

D.   All required regulatory approvals and notices, regardless of whether Sellers or Purchaser was required to apply for the same, shall have been received without the imposition of any burdensome condition upon Sellers and all applicable waiting periods shall have expired and all pre-closing conditions to be performed by Purchaser in such approvals have been met;

E.   Purchaser shall have executed and delivered any documents required by this Agreement or reasonably requested by Sellers;

F.   Purchaser shall have acknowledged receipt of the Transfer Payment made under Section 1.4;

G.   The chief executive or financial officer of each of Purchaser and Sellers shall have executed the provisional closing statement in substantially the form of Exhibit 1 hereto and an Instrument of Transfer, Assignment and Assumption in substantially the form of Exhibit 3 hereto;

H.   Jefferson Bank and First Bank & Trust shall have consummated the Merger after having obtained a final order of approval from the Bankruptcy Court permitting the Merger;

I.   Purchaser shall have delivered to Seller all of the items provided in Article V hereof; and

J.   Purchaser shall have delivered to Sellers a certificate of its chief executive officer certifying that the conditions in (A), (B), (C), (D) and (I) have been satisfied.

**8.2   *Conditions Precedent to Purchaser's Obligation to Close.*** The obligation of Purchaser to close the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in advance in writing by Purchaser) of each of the following conditions at or prior to Closing:

A.   The representations and warranties of Sellers shall be true and correct in all material respects as of the date hereof and as of the time of Closing as if made anew at such time; provided, however, to the extent that any representation or warranty of Sellers contains a materiality qualification, the representation or warranty as qualified shall remain as stated and such qualification shall not be deemed to be lessened or otherwise modified by the use of "material respects" in this Section 8.2(A);

B.   Sellers shall have performed in all material respects all of its covenants and agreements contained this Agreement that require performance at or prior to Closing; provided, however, to the extent that any covenant or agreement of Sellers contains a

materiality qualification, the covenant or agreement as qualified shall remain as stated and such qualification shall not be deemed to be lessened or otherwise modified by the use of "material respects" in this Section 8.2(B);

      C.     No adverse action or proceeding shall have been instituted pertaining to the transactions contemplated by this Agreement;

      D.     All required regulatory approvals and notices, regardless of whether Sellers or Purchaser was required to apply for the same, shall have been received without the imposition of any burdensome condition upon Purchaser and all applicable waiting periods shall have expired and all pre-closing conditions to be performed by Sellers in such approvals have been met;

      E.     Sellers shall have executed and delivered any documents required by this Agreement or reasonably requested by Purchaser;

      F.     Sellers shall have delivered to Purchaser a deed conveying title to the Real Property in accordance with Schedule 1.1C;

      G.     Purchaser shall have executed two instruments of transfer delivered by Sellers under Section 6.7 and delivered one of the executed instruments to Sellers;

      H.     The chief executive or financial officer of each of Purchaser and Sellers shall have executed the provisional closing statement in substantially the form of Exhibit 1 hereto and an Instrument of Transfer, Assignment and Assumption in the form of Exhibit 3 hereto;

      I.     Jefferson Bank and First Bank & Trust shall have consummated the Merger and Sellers shall have provided Purchaser with a certified copy of the Certificate of Merger and such other documentation as Purchaser may request regarding such transaction;

      J.     The aggregate outstanding principal balance of the Purchased Loans as of the Closing Date shall be equal to or greater than $70 million, provided, however, that to the extent that the aggregate outstanding principal balance of the Purchased Loans as of the Closing Date is less than $70 million, in order to increase the aggregate outstanding principal balance of the Purchased Loans as of the Closing Date to $70 million, then Purchaser shall take the following actions, as selected by Purchaser, so that the outstanding principal balance of Purchaser's portion of (1), (2) and (3), below, plus the aggregate outstanding principal balance of the Purchased Loans as of the Closing Date, shall be equal to or greater than $70 million:

      1.     re-purchase from First Bank & Trust minority participations in Purchased Loans for which Jefferson Bank was the lead lender and First Bank & Trust was the minority participation;

2.      re-purchase from other financial institutions minority participations in Purchased Loans for which Jefferson Bank was the lead lender and the other financial institutions were the minority participation; or

3.      enter into with First Bank & Trust one or more loan participation agreements in form and substance reasonably agreeable to Purchaser (the "Make Whole Participations"), in loans of First Bank & Trust that are not (a) on nonaccrual status (including loans for which the collateral securing the same has been repossessed or in which collection efforts have been instituted or claim and delivery or foreclosure proceedings have been filed); (b) payable in installments that are 61 days or more past due; (c) payable in a single payment that are 31 days or more past due; (d) classified as "substandard," "doubtful" or "loss" as of the date of the most recent regulatory examination of First Bank & Trust or placed on First Bank & Trust's watch list as a result of the most recent internal or external loan review of First Bank & Trust performed prior to the date of this Agreement; (e) upon which insurance has been force placed; or (f) in connection with which the borrower has filed a petition for relief under the United States Bankruptcy Code, or such proceeding has been filed involuntarily against borrower, prior to the Closing Date.

If, however, Purchaser determines not to enter into Make-Whole Participations with First Bank & Trust, and such determination results in the aggregate outstanding principal balance of the Purchased Loans as of the Closing Date being less than $70 million, Purchaser shall be deemed to have waived the condition contained in this Section;

K.      Sellers shall have delivered to Purchaser all of the items provided in Article VI hereof; and

L.      Each Seller shall have delivered to Purchaser a certificate of its chief executive officer certifying that the conditions in (A), (B), (C), (D) and (I) have been met.

## ARTICLE IX
## MISCELLANEOUS

**9.1     *Expenses*.** Except as provided in Schedule 1.1C and Section 7.3, Sellers and Purchaser each shall pay all of their own out-of-pocket expenses in connection with this Agreement, including accounting and legal fees and taxes, if any, whether or not the transactions contemplated by this Agreement are consummated. Purchaser shall be responsible for payment of all costs associated with the filing and recording of bills of sale, deeds, and other instruments necessary or desirable to be filed by Purchaser after the Closing.

**9.2     *Termination; Extension of Closing Date*.** This Agreement is terminated if:

A.      the other party hereto shall fail to perform or comply in a timely manner with its obligations under this Agreement, and such failure remains uncured on the tenth business day following receipt of written notice of termination from the non-defaulting party of its intent to terminate this Agreement pursuant to this Section 9.2A;

B.    if either of the Sellers or First Bank & Trust's parent, First Bank Lubbock Bancshares, Inc, or all of them are not authorized by the Bankruptcy Court (or any successor court thereto), as applicable, to consummate the transaction contemplated by this Agreement and the transaction contemplated by the Acquisition Agreement on substantially the terms and conditions provided herein and therein;

C.    the parties mutually consent to terminate this Agreement; or

D.    if the Closing has not occurred as of July 31, 2011, unless the parties agree in writing to further extend the Closing; provided a defaulting party may not exercise a right of termination or extension under this paragraph if its material breach remains uncured.

In the event that this Agreement is terminated by Purchaser or either Seller pursuant to Section 9.2(A) for the other party's failure to perform or comply in a timely manner with its obligations under this Agreement, then the nonperforming party shall, within five days after the date of such termination, pay to the terminating party, by wire transfer of immediately available funds, the aggregate amount of $500,000.

In the event that this Agreement is terminated pursuant to Section 9.2(B), then First Bank & Trust shall, within five days after the date of such termination, pay to Purchaser, by wire transfer of immediately available funds, the aggregate amount of $500,000.

**9.3    *Modification and Waiver.*** No modifications of any provision of the Agreement shall be binding unless in writing and executed by the party sought to be bound thereby. Performance of or compliance with any covenant given herein or satisfaction of any condition to the obligations of either party hereunder may be waived by the party to whom such covenant is given or by whom such condition is intended to benefit, except to the extent any such condition is required by law, so long as any such waiver is in writing.

**9.4    *Binding Effect, Assignment.*** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that neither this Agreement nor any rights, privileges, duties or obligations of the parties hereto, and provided further that in the case of any such assignment the assigning party shall also remain responsible as a party hereto.

**9.5    *Entire Agreement; Governing Law.*** This Agreement, together with the Schedules and Exhibits attached hereto and made a part hereof, contains the entire agreement between the parties hereto with respect to the transactions covered and contemplated hereunder, and supersedes all prior agreements or understandings between the parties hereto relating to the subject matter thereof. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas and the federal banking laws of the United States, as appropriate.

**9.6    *Headings.*** The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

**9.7    *Severability.*** In the event that any provision of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, illegality and enforceability of the

remaining provisions contained in this Agreement shall not in any way be affected or impaired thereby, and this Agreement shall otherwise remain in full force and effect.

**9.8** *Counterparts.* This Agreement may be executed in original or facsimile signatures in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto.

**9.9** *Notices.* All notices, consents, requests, instruction, approvals, waivers, stipulations and other communications provided herein to be given by one party hereto to the other party shall be deemed validly given, made or served, if in writing and delivered personally or sent by certified mail, return receipt requested, if to:

| | |
|---|---|
| Purchaser: | MidSouth Bank, N.A.<br>102 Versailles Boulevard<br>Versailles Centre<br>Lafayette, Louisiana 70501<br>Attention:     C.R. "Rusty" Cloutier<br>            President and Chief Executive Officer<br>Electronic mail: cloutier@midsouthbank.com |
| With a copy to: | Mr. Thomas O. Powell<br>Troutman Sanders LLP<br>600 Peachtree Street NE<br>Suite 5200<br>Atlanta, Georgia 30308<br>Telecopy: (404) 962-6658<br>Electronic mail: thomas.powell@troutmansanders.com |
| Jefferson Bank: | Mr. Ralph Kerr<br>President<br>Jefferson Bank<br>18333 Preston Road<br>Suite 100<br>Dallas, Texas 75252<br>Telecopy: (972) 818-3877<br>Electronic mail: rkerr@jeffersonbanktexas.com |
| First Bank & Trust: | Mr. Barry Orr<br>Chairman<br>First Bank Lubbock Bancshares, Inc.<br>9816 Slide Road<br>Lubbock, Texas 79424<br>Telecopy: (806) 788-0699<br>Electronic mail: borr@firstbanklubbock.com |

<table>
<tr><td>With a copy to:</td><td>Mr. Charles E. Greef<br>Hunton & Williams LLP<br>1445 Ross Avenue, Suite 3700<br>Dallas, Texas 75202-2799<br>Telecopy: (214) 468-3331<br>Electronic mail: cgreef@hunton.com</td></tr>
</table>

Notice by certified mail shall be deemed to be received three business days after mailing of the same. Either party may change the persons or addresses to whom or to which notices may be sent by written notice to the other.

**9.10** *Survival.* All of the representations, warranties, covenants and agreements of the parties contained in this Agreement, except as otherwise stated, shall survive until the third anniversary of the Closing Date.

**9.11** *Remedies.* In the event the transactions contemplated by this Agreement are not consummated due to the willful breach by a party hereto, then the non-breaching party shall be entitled to all remedies and relief, at law or in equity, including injunctive relief, against the breaching party with all remedies being deemed cumulative and no remedy being deemed exclusive. Neither party shall be liable to the other party for such other party's consequential or special damages, including without limitation, lost profits.

**9.12** *Parties' Knowledge.* For purposes of this Agreement and any document delivered pursuant to this Agreement, whenever the phrases "to the best of" Seller's or Purchaser's knowledge, "to the knowledge of" Seller or Purchaser or the "knowledge" of Seller or Purchaser or words of similar import are used, they shall be deemed to refer to the actual knowledge only, and not any implied, imputed or constructive knowledge, without any independent inquiry or investigation having been made or any implied duty to inquire or investigate, of the current Chairman, Chief Executive Officer, Chief Lending Officer, and Chief Accounting Officer of a Seller or Purchaser, as the case may be, and shall not be construed to refer to the knowledge of any agent of such person or any affiliate thereof.

**9.13** *Public Announcements and Communications.* Each party shall consult with the other before making any announcement or other public communication with respect to the transactions contemplated by this Agreement and, prior to such announcement or other public communication, shall mutually agree upon the substance and timing thereof, unless the form and content of such release or notice are mandated by law, regulations or regulatory authority or required under the terms of this Agreement.

The parties hereto have caused this Agreement to be executed, by their duly authorized representatives, as of the day and year first above written.

**PURCHASER:**

MIDSOUTH BANK, N.A

Name: C.R. Cloutier

Title: President and Chief Executive Officer

**SELLERS:**

JEFFERSON BANK

Name: _____

Title: _____

FIRST BANK & TRUST COMPANY

Name: _____

Title: _____

The parties hereto have caused this Agreement to be executed, by their duly authorized representatives, as of the day and year first above written.

**PURCHASER:**

MIDSOUTH BANK, N.A

_____

Name: _____

Title: _____

**SELLERS:**

JEFFERSON BANK

_____

Name: Ralph Kerr

Title: President/CEO

FIRST BANK & TRUST COMPANY

_____

Name: _____

Title: _____

The parties hereto have caused this Agreement to be executed, by their duly authorized representatives, as of the day and year first above written.

**PURCHASER:**                                    **SELLERS:**

MIDSOUTH BANK, N.A                          JEFFERSON BANK

_____          _____

Name: _____          Name: _____

Title: _____          Title: _____

FIRST BANK & TRUST COMPANY

_Berry Orr_

Name: _BERRY ORR_

Title: _CEO_

# EXHIBIT 1

## PROVISIONAL CLOSING STATEMENT FOR TRANSFER PAYMENT

(As of Close of Business on _____, 2011)

A. the estimated amount of the Deposit Liabilities;                              $_____.__

                                                          plus
B. the estimated amount of the Accrued Deposit Interest;                         $_____.__

                                                          minus
C. the Book Value of the Personal Property;                                      $_____.__

                                                          minus
D. the Agreed Value of the Real Property;                                        $_____.__

                                                          minus
E. 99% of the estimated unpaid principal amount of the                           $_____.__
   Purchased Loans;

                                                          minus
F. the estimated amount of the Accrued Loan Interest;                            $_____.__

                                                          minus
G. the amount of Cash on Hand at the close of business                           $_____.__
   on _____;

                                                          minus
H. the Deposit Premium (5.0% of the Deposit Liabilities);                        $_____.__

                                                          plus or
                                                          minus
I. the estimated amount of prorations under Section 1.6,                         $_____.__
   as detailed on the attached sheet;

   Transfer Payment Amount (if positive paid by Sellers to      $_____.__
   Purchaser; if negative paid by Purchaser to Sellers)

SELLERS                                    PURCHASER


By: _____     By: _____

Its:                                Its:

Estimated Amount of Prorations:

[Insert an itemized list of the estimated prorations based on the language in Section 1.6 of the Agreement.]

# EXHIBIT 2

## FINAL CLOSING STATEMENT FOR ADJUSTED PAYMENT

Dated: _____, 2011

A.  Original Transfer Payment (if positive was paid by Sellers to Purchaser;     $_____.___
    if negative was paid by Purchaser to Sellers)

B.  Adjustment in Deposit Liabilities (estimated amount was     _____.__
    $_____ and actual amount was $_____);

C.  Adjustment in the Accrued Deposit Interest (estimated amount was     _____.__
    $_____ and actual amount was $_____);

D.  Adjustment in 99% of the unpaid principal amount of the Purchased     _____.__
    Loans (estimated amount was $_____ and actual amount was
    $_____);

E.  Adjustment in the Accrued Loan Interest (estimated amount was     _____.__
    $_____ and actual amount was $_____);

F.  Adjustment in Cash on Hand ($_____ at close of business on     _____.__
    _____ and $_____ at the close of business on _____);

G.  Adjustment in Deposit Premium (estimated amount was $_____ and     _____.__
    actual amount is $_____ based on _____);

H.  Adjustment in prorations under Section 1.6, as detailed on the attached     _____.__
    sheet (estimated amount was $_____ and actual amount was
    $_____);

I.  Preliminary Adjustment Payment     _____.__

J.  Interest on Preliminary Adjustment Payment from and including the     _____.__
    Closing Date to the date of payment at the effective federal funds rate as
    published daily by the Federal Reserve Bank of Atlanta during the
    period(s) involved.

Adjustment Payment to be paid by [Purchaser/Sellers] to [Purchaser/Sellers]     $_____.__
(note correct party)

SELLERS                                    PURCHASER


By: _____          By: _____

Its: _____          Its: _____

Adjustments in Prorations:

[Insert an itemized list of the adjustments in the prorations based on the language in Section 1.6 of the Agreement.)

# EXHIBIT 3

## INSTRUMENT OF TRANSFER, ASSIGNMENT AND ASSUMPTION

First Bank & Trust Company, a Texas-chartered commercial bank ("Assignor"), for itself and as successor by merger to Jefferson Bank, a Texas-chartered commercial bank ("Jefferson Bank"), for valuable consideration paid to it by MidSouth Bank, N.A., a national banking association ("Assignee"), the receipt whereof is hereby acknowledged by Assignor, in accordance with the provisions of the Purchase and Assumption Agreement dated as of _____ __, 2011, among Assignor, Jefferson Bank and Assignee, as amended to date (the "Agreement") hereby conveys, grants, bargains, sells, transfers, sets over, assigns, delivers and confirms unto Assignee, its successors and assigns, forever good and marketable title to the Assets (as defined in the Agreement), free and clear of any claims, liens, security interests, other encumbrances or rights of others, including the following: (a) the Personal Property; (b) the Purchased Loans and Accrued Loan Interest; (c) the Cash on Hand; (d) all records, files, books of account and other original documents pertaining to the Assets and Assumed Liabilities being transferred and assumed; (e) the Safe Deposit Leases; (f) the Property Leases, including the Dallas Sublease; (g) the Contracts; and (h) the Rights.

Assignee, in consideration of the assignment hereunder, hereby assumes all of the Assumed Liabilities (as defined in the Agreement). This Instrument shall be effective at the beginning of business on the date hereof, and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This instrument is made in accordance with the terms of the Agreement. Capitalized terms used herein shall have the same meaning as set forth in the Agreement.

Assignor and Assignee acknowledge that Real Property is being transferred by deed in connection with this transfer, assignment and assumption.

Assignor will grant to specified employees of Assignee a limited power of attorney for the purpose of signing and filing all other instruments necessary to effect the assignment of the Assets and the assumption of the Assumed Liabilities and to enable the Assignee to transfer or assign the Assets and Assumed Liabilities after the date hereof.

Assignor and Assignee have caused this Instrument of Transfer, Assignment and Assumption to be executed in their name and behalf by their duly authorized officer to be effective the _____ day of _____, 2011.

ASSIGNOR:

By: _____
Its: _____

ASSIGNEE:

By: _____
Its: _____

EXHIBIT 4

## SUCCESSOR TRUSTEE APPOINTMENT AND CONSENT AGREEMENT

This Appointment is made by and between First Bank & Trust Company ("Seller") for itself and as successor by merger to Jefferson Bank, a Texas-chartered commercial bank ("Jefferson Bank"), and MidSouth Bank, N.A. ("Purchaser"), as of _____, 2011 (the "Appointment").

WHEREAS, Purchaser, Seller and Jefferson Bank have entered into that Purchase and Assumption Agreement, dated as of _____, 2011 ("Agreement"), whereby Seller and Jefferson Bank shall sell and Purchaser shall assume certain assets and liabilities of Seller, including the Deposit Liabilities (as such term is defined in the Agreement), as set forth in the Agreement; and

WHEREAS, Jefferson Bank has merged with and into Seller, with Seller being the surviving bank and Jefferson Bank has ceased to exist;

WHEREAS, some of the Deposit Liabilities being assumed by Purchaser under the Agreement are held by individual retirement accounts and certain qualified retirement plans of which Seller is the custodian or trustee, as applicable (the "Retirement Plans"); and

WHEREAS, under the Agreement, Purchaser shall succeed Seller as trustee or custodian, as applicable, of each Retirement Plan.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and in accordance with the provisions of the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

1. Seller hereby resigns as trustee or custodian of each Retirement Plan maintained in and through the Branches (as such term is defined in the Agreement), effective as of the date hereof, and hereby appoints Purchaser as successor trustee or successor custodian, as applicable. Purchaser hereby accepts its appointment as successor trustee or successor custodian, as the case may be, with respect to each Retirement Plan transferred under the Agreement. Seller has delivered or will deliver to Purchaser as successor trustee or successor custodian, as applicable, certain records and documents as set forth in the Agreement. Unless notified by an individual that another trustee or custodian has been appointed for its Retirement Plan, Purchaser shall commence serving as successor trustee or successor custodian, as applicable, of each Retirement Plan from which Seller resigns effective as of the date hereof.

2. After the date hereof, Seller shall have no further responsibility for the administration of those Retirement Plans under which Purchaser is the successor trustee or successor custodian, as applicable, or for the investments of any accounts maintained under those Retirement Plans. Seller shall indemnify and hold Purchaser harmless from all liability, including reasonable attorneys fees, which may have resulted from, arisen out of or been based upon matters occurring or omissions made during periods in which Seller managed or administered those Retirement Plans. After the date hereof, Purchaser shall have all

responsibility and liability for management, administration and investments, including continuing tax qualification, of those Retirement Plans under which it is successor trustee or successor custodian, as applicable. Purchaser shall indemnify and hold Seller harmless from all liability, including reasonable attorneys' fees, which may result from, arise out of or be based upon matters occurring or omissions made during periods in which Purchaser manages or administers those Retirement Plans. Nothing in this paragraph shall relieve Seller from liability for its management, administration or investments of the Retirement Plans that occurred before this Appointment becomes effective.

       3.     This Appointment is subject to the terms and conditions of the Agreement. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

       IN WITNESS WHEREOF, the parties hereto have duly executed this Appointment as of the date first written above.

SELLER:

**FIRST BANK & TRUST COMPANY**

By: _____

Name: _____

Title: _____


PURCHASER:

**MIDSOUTH BANK, N.A.**

By: _____

Name: _____

Title: _____

EXHIBIT 5

## LIMITED POWER OF ATTORNEY

This Limited Power of Attorney is given this _____ day of _____, 2011, by First Bank & Trust Company, a Texas-chartered commercial bank headquartered in Dallas, Texas ("Seller") for itself and as successor by merger to Jefferson Bank, a Texas-chartered commercial bank ("Jefferson Bank"), to MidSouth Bank, N.A., a national banking association headquartered in Lafayette, Louisiana ("Purchaser") to be effective immediately in accordance with the following recitals and for the purposes set forth below:

### RECITALS

A.  Seller, Jefferson Bank and Purchaser entered into a Purchase and Assumption Agreement dated _____, 2011 (the "Agreement") pursuant to which Seller, Jefferson Bank and Purchaser agreed Purchaser would acquire the banking facilities and substantially all of the banking operations of Seller and Jefferson Bank at the Branches.

B.  Jefferson Bank has merged with and into Seller, with Seller being the surviving bank and Jefferson Bank has ceased to exist;

C.  At the closing of the acquisition of the Branches, Seller and Purchaser executed an Instrument of Transfer, Assignment and Assumption effective _____, 2011 (the "Assignment").

D.  In accordance with the Agreement and the Assignment, Purchaser acquired from Seller certain loans, personal and real property and other assets defined in the Agreement as the "Assets," and Purchaser agreed to assume certain deposits and other liabilities of Seller defined in the Agreement as the "Assumed Liabilities."

E.  The Agreement provides that Seller shall grant to Purchaser a limited power of attorney for purposes of executing and delivering bills of sale, acknowledgements and other instruments necessary to vest effectively in Purchaser full and equitable title to the Assets and any related security interests and to otherwise consummate the transfer of the Assets and Assumed Liabilities ("Other Instruments").

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Seller hereby appoints and authorizes Purchaser, through any of its authorized officers holding the status of assistant vice president or greater, as the true and lawful attorney-in-fact of Seller to do those things hereinafter set forth in relation to the Assets and Assumed Liabilities, including, without limitation, the loans sold, assigned and transferred to Purchaser by Seller pursuant to the Agreement and Assignment (the "Purchased Loans"), in all cases in the name, place and stead of Seller, but for the benefit and on behalf of Purchaser:

1.  To demand, sue for, endorse, receive and collect all of the Purchased Loans and make any necessary repossessions in connection therewith, and to give effectual receipts, discharges or terminations for the same;

2.  To endorse and assign any promissory notes or other evidences of obligation relating to the Purchased Loans, other Assets or any of them upon which Seller appears as a payee or is otherwise the holder or assignee and has actual or apparent beneficial interest;

3. To modify, continue, amend, assign, or terminate any UCC financing statements relating to the Purchased Loans, other Assets or any of them consistent with the terms of the related underlying security agreements;

4. To prepare any documents of assignment or transfer necessary to satisfy the request of any person, organization, entity or governmental body requesting written evidence of the right of Purchaser to possess and own the Assets and security therefor;

5. To issue notice to any insurer, guarantor or debtor (as defined in applicable state law) of the transfer of legal and beneficial interest of Seller in the Assets and related collateral to Purchaser;

6. To endorse to the benefit of Purchaser any instruments or other documents of payment relating to any of the Purchased Loans or other Assets upon which Seller appears to have any interest;

7. To give notice, advertise, sell, or otherwise dispose of any collateral held in the name of Seller relating to the Purchased Loans or any of them;

8. To record any evidence of assignment, transfer, modification, or release of any interest in real estate held by Seller relating to the Purchased Loans, other Assets or any of them;

9. To assign mortgages and real estate collateral including assignments of rents and leases related to the Purchased Loans;

10. To assign any security agreements, financing statements, certificate of title liens, deposit account assignments and other collateral assignments related to the Purchased Loans;

11. To assign any guarantees or other credit enhancement instruments related to the Purchased Loans;

12. To take any and all additional acts reasonably considered by Purchaser to be necessary or advisable to vest good and marketable title to the Assets in Purchaser as provided in the Agreement and Assignment.

In addition, Seller hereby appoints Purchaser as its agent and attorney-in-fact to negotiate, endorse and/or deposit for its own account all checks, drafts and other instruments representing payments on the Assets.

Seller shall, upon request of Purchaser, execute and deliver to Purchaser such recordable documents as may be reasonably necessary or advisable to facilitate Purchaser's designation as attorney-in-fact for the foregoing purposes.

Third parties may rely upon the representation of Purchaser as to all matters regarding the powers granted to Purchaser herein. No person who acts in reliance on Purchaser's representation or the authority granted under this Limited Power of Attorney shall incur any liability to Seller or its successors and assigns, for permitting Purchaser to exercise any power granted herein, unless that person has actual knowledge that this Limited Power of Attorney has been terminated by operation of law or otherwise.

This Limited Power of Attorney is for the purpose of carrying into effect the transfer of Assets and Assumed Liabilities contemplated by the Agreement and Assignment and is deemed a power coupled with an interest.

This Limited Power of Attorney is deemed an irrevocable and durable power of attorney that is binding on Seller and its successors and assigns and inures to the benefit of Purchaser and its successors and assigns.

Capitalized terms shall have the same meaning provided to them herein or in the Agreement or Assignment. Photocopies of the Limited Power of Attorney may be treated as counterparts for all purposes.

This Limited Power of Attorney is governed by the laws of the State of Texas without regard for conflicts of law principles. It was executed in the State of Texas and is intended to be valid in all jurisdictions in the United States.

Seller has caused this Limited Power of Attorney to be duly executed and witnessed by its duly authorized officers as of the date and year first above written.

SELLER: FIRST BANK & TRUST COMPANY

By: _____

Name:

Title:

Signed, sealed and delivered in the presence of the undersigned witness:

_____

_____, Secretary of Seller

STATE OF TEXAS )

) SS:

COUNTY OF _____ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of _____, 2011, personally appeared _____, the _____ of First Bank & Trust Company and acknowledged that he, with full authority, executed the foregoing Limited Power of Attorney, in my presence.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

(SEAL)                    _____

NOTARY PUBLIC

My Commission Expires _____

# EXHIBIT "C" TO THE MOTION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11 Case** |
| | § | |
| **OUTSOURCE HOLDINGS, INC.,** | § | **Case No.: 11-** |
| | § | |
| **Debtor.** | § | |

## AUCTION PROCEDURES

These auction procedures (the "Auction Procedures") set forth the process by which Outsource Holdings, Inc., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 proceeding pending before the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), will conduct an auction (the "Auction") for the sale, merger, or other use (the "Transaction") of the Debtor's ownership of 100% of the outstanding capital stock of Jefferson Bank (the "Stock").

These Auction Procedures have been approved by the Bankruptcy Court pursuant to an order dated April ___, 2011 (the "Procedures Order"). The Auction Procedures are binding upon all bidders, and the bidders will have no right to alter these Auction Procedures. Bids not submitted pursuant to the Auction Procedures will not be considered.

1.     Assets to be Sold

As of April 3, 2011 the Debtor owned 100% of the outstanding capital stock of Jefferson Bank. The Debtor plans to auction this Stock for transfer or other use through a merger, sale, or other transaction.

2.     Bidding and Stalking Horse Bidder

The Debtor provides these Auction Procedures, whereby prospective bidders may compete to submit the highest bid for the purchase or use of the Stock. These offers may be substantially similar to the terms of the Acquisition Agreement (the "Acquisition Agreement") by and between the Debtor and First Bank Lubbock Bancshares, Inc. (the "Stalking Horse Bidder"). Under the Acquisition Agreement, the Debtor will use the Stock to cause Jefferson Bank to be merged with the Stalking Horse Bidder's wholly owned subsidiary First Bank & Trust, Lubbock, Texas, in exchange for up to $11,000,000 to the Debtor. The Stalking Horse Bidder's offer is not revocable.

Further, offers may be combined with offers for some or all of Jefferson Bank's assets, such as the arrangement embodied in the Purchase and Assumption Agreement (the "Purchase and Assumption Agreement") between the Stalking Horse Bidder, its subsidiary bank, Jefferson Bank, and MidSouth Bank, N.A. Interested potential investors may obtain the Acquisition Agreement and the Purchase and Assumption Agreement from the Debtor by request or from the electronic docket maintained by the Bankruptcy Court.

All bidders shall be required to submit irrevocable bids for the use or sale of the Stock. There is no set format for such bids. Bids need not be based upon the Acquisition Agreement or the Purchase and Assumption Agreement. However, these bids must be provided in the form of completed and signed agreements that will be enforceable if approved by the Bankruptcy Court. If a bid is derived from the Acquisition Agreement or the Purchase and Assumption Agreement, the bidder shall also submit a redlined version showing the changes between such agreements and the agreements provided by the bidder.

In the event the Stalking Horse Bidder is not the Successful Bidder as set forth in these Auction Procedures, and does not close on the Acquisition Agreement, it will be entitled to an expense reimbursement fee in the amount of up to $200,000 (the "Expense Reimbursement Fee").

3.    Access to Information

Information relevant to the Debtor, the Stock and Jefferson Bank shall be made available to potential bidders within twenty-four (24) hours following the execution by potential bidders of a valid confidentiality agreement acceptable to the Debtor. Such information includes certain books and records, material contracts, and other financial information for due diligence investigation. To obtain a copy of a confidentiality agreement, contact the Debtor's investment banker, Keefe, Bruyette, & Woods, Inc. ("KBW") [KBW CONTACT INFO]. Specific instructions for accessing the information will be provided after execution of such confidentiality agreements. Interested bidders requesting information about the qualification process, and information in connection with their due diligence, should contact KBW at the contact information listed above. If, in the Debtor's reasonable judgment, providing information to a potential bidder would not be in the best interests of the bankruptcy estate, then the Debtor may refuse to provide such bidder with access to information.

The diligence period will conclude on May 6, 2011. The Debtor will coordinate all reasonable requests for additional information and due diligence access from potential bidders.

4.    Bid Deadlines

The Debtor will consider only formal, binding, unconditional, and irrevocable bids (each, a "Bid"). All Bids must be submitted via electronic mail or such other means so that they are actually received no later than 5:00 p.m. local Fort Worth, Texas time on May 6, 2011 (the "Bid Deadline"). Each bidder must deliver its Bid by the Bid Deadline to all of the parties listed below:

(i) the Debtor, [CONTACT INFO];

(ii) advisors to the Debtor, KBW [CONTACT INFO];

(iii) counsel to the Debtor, Forshey & Prostok, LLP, Attn:  Jeff P. Prostok (jprostok@forsheyprostok.com), 777 Main Street, Suite 1290, Fort Worth, Texas 76102, phone:  (817) 877-8855, fax:  (817) 877-4151;

(v) the Stalking Horse Bidder, [CONTACT INFO]; and

(vi) counsel to the Stalking Horse Bidder, Hunton & Williams, LLP, Attn: Andrew E. Jillson (ajillson@hunton.com), 1445 Ross Ave,. Ste. 3700, Dallas, TX 75202, phone: (214) 979-3000, fax: (214) 880-0011.

5.  Qualified Bid Requirements

Bids must contain:

(a) an executed version of the applicable transactional documents necessary to complete the transaction proposed by the Bid;

(b) if applicable, a marked or blacklined version of such transactional documents showing any changes to the corresponding form Acquisition Agreement or Purchase and Assumption Agreement;

(c) a letter setting forth the identity of the bidder (including an authorized representative thereof), such bidder's counsel, and contact information for such bidder, its authorized representative, and its counsel, explaining the change, if any, from the bid of the Stalking Horse Bidder, explaining why the bid is superior to the Stalking Horse Bid, and setting forth a written description explaining the regulatory steps needed to gain approval of such Transaction and a timeline for obtaining such approval;

(d) a certified or bank check or wire transfer in an amount equal to $_____ as a minimum good faith deposit (the "Minimum Deposit"). The Minimum Deposit shall be used to fund a portion of the purchase price provided for in the Bid if the bidder ultimately closes on the transaction. Bidders should contact KBW at the contact information listed above for wiring instructions. The Minimum Deposit of all bidders other than the Successful Bidder and the Second Best Bidder, as defined below, will be returned within 48 hours of the conclusion of the Sale Hearing. The Minimum Deposit of the Second Best Bidder will be returned within 48 hours of the closing of the Sale with the Successful Bidder;

(e) written evidence of the bidder's financial ability to pay cash to consummate the Transaction in a form satisfactory to the Debtor on or before June ___, 2011;

(f) written acknowledgement that such Bid is unconditional and not contingent upon any event, including, without limitation, any due diligence investigation, the receipt of financing, or any further bidding approval;

(g) written confirmation that such Bid shall remain open and irrevocable until the closing of a Sale to the Successful Bidder or Second Best Bidder;

(h) written evidence that the bidder has the requisite corporate or similar authority to consummate the Transaction;

(i) written evidence or a summary satisfactory to the Debtor that the bidder has consulted with applicable banking regulatory agencies concerning the bidder's ability and likelihood of receiving the regulatory approval(s) required to consummate the Transaction; and

(j) such other information as the Debtor may request.

Further, Bids must be materially better than the net consideration that would be provided by the Acquisition Agreement and Purchase and Assumption Agreement, as evaluated by the Debtor within its reasonable business judgment. A materially better offer must consist of net consideration greater than (a) the $200,000 termination fee that the Debtor will owe to the Stalking Horse Bidder if that transaction is terminated, plus (b) after taking into account the $500,000 that Jefferson Bank will owe MidSouth Bank, N.A. if the Purchase and Assumption Agreement is terminated because Jefferson Bank pursues an alternative transaction, the value of the Stalking Horse Bidder's offer of a firm $2,021,000 in cash at closing for the use of the Stock, and up to $8,979,000 in cash within three years of closing contingent on certain events, plus (c) a $200,000 bid increment to justify the additional expense and delay of holding the Auction.

Bids that comply with the foregoing shall be "Qualified Bids." Persons that comply with the foregoing shall be "Qualified Bidders." Qualified Bidders shall comply with all reasonable requests for additional information by the Debtor and its advisors regarding the Bids and the foregoing information. Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtor to determine that a Bid made by such Qualified Bidder is not a Qualified Bid. The Stalking Horse Bidder shall be deemed a Qualified Bidder for purposes of these Auction Procedures.

6.    Selection of the Successful Bidder if Only One Qualified Bid Submitted

If the only Qualified Bid submitted by the Bid Deadline is the Stalking Horse Bid, the Debtor shall not hold an Auction and instead shall seek an order from the Bankruptcy Court approving the Stalking Horse Bid at a hearing to be held on May __, 2011.

7.    Auction or Negotiated Private Sale Process if Two or More Qualified Bids Are Submitted

If two or more timely Qualified Bids are received by the Bid Deadline, the Debtor either will conduct a public auction (the "Auction") or further private negotiations amongst Qualified Bidders. The Debtor will use its reasonable business judgment to determine whether an Auction is appropriate. Such determination will be based in large part on whether the Qualified Bids are capable of being objectively compared and adjusted in the context of a public auction. The Auction, if any, will take place on May 16, 2011 between the hours of 9:00 a.m. and 5:00 p.m., local Fort Worth time ("Business Hours") at the offices of the Debtor's counsel, or such later time or other place as the Debtor may provide, so long as such change is communicated reasonably in advance by the Debtor to all Qualified Bidders.

If the Debtor opts to forego the Auction and instead continue negotiations regarding a private sale with Qualified Bidders, then it will file a notice with the Bankruptcy Court stating so on or before May 11, 1011. The Debtor intends to conclude such negotiated sale process on or before May 20, 2011, and to request the Bankruptcy Court approve a Transaction or sale pursuant to the best offer obtained through such process at a hearing to be held on May ___,

2011. The Debtor will file with the Bankruptcy Court the documents governing such proposed Transaction or Sale on or before May 20, 2011.

8. Auction Procedures and Transaction Issues

If an auction is conducted, only the parties who have submitted a Qualified Bid will be eligible to participate in the Auction. Only the authorized representatives of each of the Qualified Bidders, the Committee, and the Debtor (the "Auction Participants") shall be permitted to participate in the Auction. Any Qualified Bidder shall be permitted to attend the Auction in person or by telephone.

On May 11, 2011, the Debtor will announce the highest Qualified Bid submitted and the Qualified Bidder that submitted such highest Qualified Bid. The Debtor will not announce the Qualified Bids submitted by any other Qualified Bidder. The bidding at the Auction shall start at the highest Qualified Bid. At the Auction, the Qualified Bidders will bid in amounts greater than the then highest Qualified Bid by at least a minimum overbid increment equal to $100,000. Each Qualified Bidder will be permitted a fair, but limited, amount of time (no more than 15 minutes, unless otherwise agreed by the Debtor) to respond to the previous bid at the Auction.

Upon the failure of the Debtor to receive an overbid, or such other time as the Debtor may determine in its reasonable business judgment prior to the conclusion of the Auction, the Debtor may determine the "highest and best" Qualified Bid (the "Successful Bid" and the bidder making such Qualified Bid, the "Successful Bidder") and the next "highest and best" Qualified Bid (the "Second Best Bid" and the bidder making such Qualified Bid, the "Second Best Bidder"), and the price shall be identified.

The Debtor intends to close the Auction on or before 6:00 p.m., local Fort Worth, Texas time, on May 16, 2011, but reserves the right to continue the Auction beyond such time if bidding continues. The Auction Procedures set forth in this paragraph 8 are subject to amendment by Debtor, within its reasonable business judgment, upon notice to the Qualified Bidders.

The Debtor will present the Successful Bidder and the Successful Bid and the Second Best Bidder and the Second Best Bid to the Bankruptcy Court at the Final Hearing, at which certain findings will be sought from the Bankruptcy Court regarding the sale process, including, among other things, that (i) the process leading to the selection of the Successful Bid and the Second Best Bid was conducted and the Successful Bidder and the Second Best Bidder for the Loans were selected in accordance with these Auction Procedures, (ii) the sale process was fair in substance and procedure, (iii) the Successful Bidder and the Second Best Bidder are entitled to the protections of 11 U.S.C. § 363(m); and (iv) consummation of the Transaction contemplated by the Successful Bid, or if necessary the Second Best Bid, will provide the highest or otherwise best value for the Stock and is in the best interests of the Debtor and its estate.

The Qualified Bid will be binding upon the Debtor only when (i) the Qualified Bid is declared the Successful Bid at the Sale Hearing, (ii) the Bankruptcy Court has approved the Successful Bid and a final order approving such Successful Bid has been docketed, and (iii) definitive documentation has been executed in respect thereof.

9.     Final Hearing and Closing of the Transaction

The Debtor shall seek an order of the Bankruptcy Court approving the Successful Bid at a hearing to be held on May __, 2011 at ___ _.m. local Fort Worth, Texas time (the "Final Hearing"). The closing of the Transaction with the Successful Bidder shall occur on or before five business days after an order approving the Transaction becomes final and the receipt of all necessary regulatory approvals. In the event that the Successful Bidder does not close on or before such time, the Debtor shall be authorized to close with the Second Best Bidder, and the Second Best Bidder will be required to close, on or before seven business days after an order approving the Transaction becomes final.

10.    Reservation of Rights

The Debtor reserves the right, upon notice to all parties that have demonstrated an interest in bidding, to (i) waive terms and conditions set forth herein with respect to any or all potential bidders; (ii) impose additional terms and conditions with respect to any or all potential bidders; (iii) extend the deadlines set forth herein; (iv) cancel the Transaction without further notice; and (v) amend the Auction Procedures as they may determine to be in the best interests of the estate or to withdraw the motion to approve the Transaction at any time with or without prejudice; provided however, that the forgoing reservation of rights shall not amend or alter the Stalking Horse Bidder's right to the Expense Reimbursement Fee.

L:\JPROSTOK\Outsource Holdings #5454\Pleadings\Auction Procedures 4.3.11.DOC

# EXHIBIT "D"
# TO THE
# MOTION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11 Case** |
| | § | |
| **OUTSOURCE HOLDINGS, INC.,** | § | **Case No.: 11-** |
| | § | |
| **Debtor.** | § | |

**ORDER APPROVING (I) INITIAL BIDDER EXPENSE REIMBURSEMENTS, (II)
AUCTION PROCEDURES, AND (III) FORM AND MANNER OF SALE NOTICE**

Upon the motion, dated April 3, 2011 (the "Motion"), of the debtor and debtor-in-possession in the above-captioned case (the "Debtor") for an order (the "Auction Procedures Order") (a) approving procedures for the sale and use of stock owned by the Debtor (the "Stock"), (b) scheduling a hearing to approve such sale and approving the form of notice thereof, and (c) authorizing the payment of certain expense reimbursements; and the Court having reviewed and considered the Motion, and having heard statements of counsel and the evidence presented in support of the relief requested by the Debtor in the Motion at a hearing before the Court on April ___, 2011 (the "Procedures Hearing"); and it appearing that (i) the relief

1

requested in the Motion, as it relates to the Auction Procedures, is in the best interests of the Debtor, its bankruptcy estate, its stakeholders, and all other parties-in-interest; (ii) the Court has jurisdiction over this matter; (iii) the legal and factual bases set forth in the Motion and at the Procedures Hearing establish just cause for the relief granted herein; and (iv) the Debtor has provided sufficient notice of the Motion and the Procedures Hearing to all creditors and parties in interest; and after due deliberation thereon, it is hereby

ORDERED that the Auction Procedures[1] as set forth in **Exhibit "1"** annexed hereto are hereby approved in all respects; and it is further

ORDERED that the Sale Notice as set forth in **Exhibit "2"** annexed hereto is hereby approved in all respects; and it is further

ORDERED that, if the Debtor receives no Qualified Bids, as defined in the Auction Procedures, the Sale Hearing shall be held during the hearing scheduled before this Court for May __, 2011 _____ __.m. (prevailing Fort Worth, Texas time), or as soon thereafter as counsel may be heard; and it is further

ORDERED that, if the Debtor receives Qualified Bids, as defined in the Auction Procedures, the Sale Hearing shall be held during the hearing scheduled before this Court for May __, 2011 _____ __.m. (prevailing Fort Worth, Texas time), or as soon thereafter as counsel may be heard; and it is further

ORDERED that the Debtor shall, within three business days after entry of this Procedures Order, serve the Sale Notice and this Procedures Order, including exhibits thereto, upon (a) the United States Trustee for the Northern District of Texas, (b) all parties who have filed a request

---

[1] Undefined capitalized terms herein shall be ascribed the same definitions as in the Motion.

for service of notices in these cases, (c) all creditors of the Debtor, and (d) all parties who have expressed an interest in the Debtor's assets; and it is further

ORDERED that such notice as set forth in the preceding decretal paragraphs shall constitute good and sufficient notice of the Motion as it relates to the Debtor's request for entry of the Sale Order (as defined in the Motion), the Auction, and the Sale Hearing, and no other or further notice of the Motion, the Auction, and/or Sale Hearing shall be necessary or required; and it is further

ORDERED that responses or objections, if any, to the entry of the Sale Order (as defined in the Motion), shall be filed with this Court and served, so as to be actually received no later than May __, 2011 _____ __.m. (prevailing Fort Worth, Texas time), on (a) counsel to the Debtor, Jeff P. Prostok, Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102; and (b) Office of the U.S. Trustee for the Northern District of Texas; and it is further

ORDERED that the Debtor shall pay the Expense Reimbursement of up to $200,000, which amount the Court finds is reasonable and necessary for the sale or use of the Stock with the presence of a firm initial offer, per the terms and conditions described in the Acquisition Agreement; and it is further

ORDERED that the Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Auction Procedures Order.

### END OF ORDER ###

# EXHIBIT "1"

## **Auction Procedures**

# EXHIBIT "2"

## <u>Sale Notice</u>

# EXHIBIT "E"
# TO THE
# MOTION

| In re: | § | **Chapter 11 Case** |
| | § | |
| **OUTSOURCE HOLDINGS, INC.,** | § | **Case No.: 11-** |
| | § | |
| Debtor. | § | |

### ORDER APPROVING THE USE AND SALE OF DEBTOR'S INTERESTS IN JEFFERSON BANK FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

Upon the motion, dated April 3, 2011 (the "Motion"), of the debtor and debtor-in-possession in the above-captioned case (the "Debtor") for an order (the "Sale Order") authorizing the Debtor to transfer and use its stock in Jefferson Bank (the "Stock") to cause the merger of Jefferson Bank with First Bank & Trust, Lubbock, Texas ("First Bank & Trust") pursuant to the Acquisition Agreement with First Bank & Trust and its parent First Bank Lubbock Bancshares, Inc. (the "Purchaser") dated ____, 2011 (the "Acquisition Agreement," attached hereto as **Exhibit "A"**) free and clear of all Liens, Claims, Encumbrances and other Interests. The Court, heard statements of counsel and the evidence presented in support of the relief requested by the Debtor in the Motion at a hearing before the Court on [_____], 2011 (the

"Sale Hearing"). Based on the evidence presented at the Sale Hearing, the arguments of counsel, the applicable pleadings in this Case, and the applicable law, and after due deliberation thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:

## I. Jurisdiction, Final Order, and Statutory Predicates

A.    The transactions contemplated by the Acquisition Agreement (the "Sale") is a "sale" of the Stock for the purposes of title 11 of the United States Code (the "Bankruptcy Code") including but not limited to 11 U.S.C. § 363.

B.    The Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    This order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this order, and expressly directs entry of judgment as set forth herein.

D.    The statutory predicates for the relief requested in the Sale Motion are §§ 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014.

E.    The Court entered the Sale Procedures Order on April __, 2011 (Docket No. ___).

F.    Pursuant to the Sale Procedures Order ... [DISCUSS FACTUAL CIRCUMSTANCES OF AUCTION (the "Auction").]

G.     The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

H.     To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.

I.     In the absence of a stay pending appeal, the Purchaser will be acting in good faith pursuant to § 363(m) of the Bankruptcy Code in closing the transaction contemplated by the Acquisition Agreement at any time on or after entry of this Sale Order, and cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rule 6004(h).

II.    **Notice of the Sale, Auction and the Cure Amounts**

A.     Pursuant to the Sale Procedures Order, the Sale Notice, which includes actual written notice of the Sale Hearing, the Auction, and the Motion, has been provided to all known interested persons and entities, including, but not limited to the following parties (the "Notice Parties"), thereby providing them with a reasonable opportunity to object or be heard with respect to such matters:

1.     the United States Trustee;

2.     all parties that have requested special notice pursuant to Bankruptcy Rule 2002;

3.     all creditors of the Debtor; and

4.     all potential bidders previously identified or otherwise known to the Debtor.

B.     The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the Sale process, including, without limitation, approval and authorization to serve Sale Procedures Order.

C.     The Sale Procedures Order provided all interested parties with timely and proper notice of the Sale, Sale Hearing, and Auction.

D.     As evidenced by the affidavits of service previously filed with the Court and the orders of the Court [CITE], proper, timely, adequate, and sufficient notice of the Motion, Auction, Sale Hearing, and Sale has been provided in accordance with §§ 102 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014. The Debtor also has complied with all obligations to provide notice of the Auction, Sale Hearing, and Sale required by the Auction Procedures Order. The notices described in paragraphs A to C above were good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Auction, Sale Hearing, or the Sale is required.

E.     The disclosures made by the Debtor concerning the Motion, Acquisition Agreement, Auction, Sale, and Sale Hearing, including but not limited to the facts alleged in the Sale Motion and other pleadings filed with the Court, and the evidence and arguments presented and proffered at the Sale Hearing and other hearings before the Court, were good, complete and adequate.

## III.     Good Faith of Purchaser

A.     Purchaser is not an "insider" of the Debtor, as that term is defined in § 101(31) of the Bankruptcy Code.

B.     Purchaser is purchasing the Stock in good faith and is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code, and are therefore entitled to the full protection of that provision, and otherwise have proceeded in good faith in all respects in

connection with this proceeding in that, inter alia: (a) Purchaser recognized that the Debtor was free to deal with any other party interested in acquiring the Stock; (b) Purchaser complied with the provisions in the Auction Procedures Order; (c) Purchaser agreed to subject itself to the competitive bidding procedures set forth in the Auction Procedures Order; (d) Purchaser in no way induced or caused the chapter 11 filing by the Debtor; (e) all payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale have been disclosed; (f) Purchaser has not violated § 363(n) of the Bankruptcy Code by any action or inaction; (g) the common directors, controlling stockholders, and officers that exist between Purchaser and the Debtor have been excluded from receiving knowledge about and making decisions about the Sale and marketing process; and (h) the negotiation and execution of the Acquisition Agreement and any other agreements or instruments related thereto were at arms' length and in good faith.

## IV.    Highest or Best Offer

A.    Prior to selecting Purchaser as the stalking horse bidder, the Debtor solicited offers to acquire or use the Stock from a wide variety of parties.  In addition to such solicitations, evidence of which was presented at the Sale Hearing, the Debtor scheduled the Auction in accordance with the provisions of the Auction Procedures Order.  This Auction, which [DISCUSS AUCTION] in compliance with the process set forth in the Auction Procedures Order, afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase or use the Stock.  The Auction was duly noticed and provided opportunity for a noncollusive, fair, and good faith sale process and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Stock.

B.     The Acquisition Agreement constitutes the highest or best offer for the Stock, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.     The Debtor's determination that the Acquisition Agreement constitutes the highest or best offer for the Stock constitutes a valid and sound exercise of the Debtor's business judgment.

C.     The Acquisition Agreement represents a fair and reasonable offer to purchase the Stock under the circumstances of these chapter 11 cases.  No other person or entity or group of entities has offered to purchase the Stock for greater economic value to the Debtor's estate than Purchaser.

D.     Approval of the Sale Motion and the Acquisition Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate, and other parties in interest.

E.     The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

## V.     No Fraudulent Transfer

A.     The consideration provided by Purchaser pursuant to the Acquisition Agreement is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, and the District of Columbia.

## VI.     Validity of Transfer

A.     The Debtor has full corporate power and authority to execute and deliver the Acquisition Agreement and all other documents contemplated thereby, and no further

consents or approvals are required for the Debtor to consummate the transactions contemplated by the Acquisition Agreement, except as otherwise set forth in the Acquisition Agreement.

B.      The transfer of the Stock to Purchaser will be as of the Closing Date a legal, valid, and effective transfer of the Stock, and vests or will vest Purchaser with all right, title, and interest of the Debtor to the Stock free and clear of all liens and Claims (as defined below) (collectively, "Liens") accruing, arising, or relating thereto any time prior to the Closing Date.

## VII.    Section 363(f) Is Satisfied

A.      Purchaser would not have entered into the Acquisition Agreement and would not consummate the transactions contemplated thereby (by paying the Purchase Price and assuming the Assumed Liabilities set forth in the Acquisition Agreement) if the sale and transfer of the Stock to Purchaser was not free and clear of all liens of any kind or nature whatsoever ("Liens") or Claims (as defined below), or if Purchaser would be liable, or in the future could be liable, for any of such Liens or Claims, including, but not limited to, Liens or Claims in respect of the following: (1) any labor agreements; (2) all mortgages, deeds of trust, and security interests; (3) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (4) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, Claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the

Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtor or any of its respective predecessors; (5) any bulk sales or similar law; (6) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (7) any environmental law(s); and (8) any theories of successor liability.

B.    The Debtor may sell the Stock free and clear of all Liens and Claims against the Debtor, its estate, and any of the Stock because, in each instance, one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens or Claims against the Debtor, its estate, or any of the Stock who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code. Those holders of such Liens or Claims who did object fall within one or more of the other subsections of § 363(f) and are adequately protected by having their Liens and/or Claims, if any, in each instance against the Debtor, its estate, or any of the Stock, attach to the cash proceeds of the Sale ultimately attributable to the Stock in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

## VIII.   Compelling Circumstances for an Immediate Sale

A.    To enhance the Debtor's level of liquidity, and to avoid loss of value to the estate, it is essential that the Sale or transfer of the Stock occur within the time constraints set forth in the Acquisition Agreement. Time is of the essence in consummating the Sale.

B.    Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the purchase price under the Acquisition Agreement, the proposed Sale of the

Stock to Purchaser constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

        C.      The consummation of the transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, §§ 105(a), 363(b), 363(f), and 363(m), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

## IX.    Use of Sale Proceeds

        A.      The Debtor shall apply the Sale Proceeds in accordance with the applicable orders of this Court in this Bankruptcy Case and provisions of the Bankruptcy Code; provided, however, that any and all Liens and Claims encumbering the Stock shall be released at Closing.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

## General Provisions

1.      The relief requested in the Motion is granted and approved, and the Sale contemplated thereby is approved as set forth in this Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Auction Procedures Order, are incorporated herein by reference.

3.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

**Approval of the Acquisition Agreement**

4.      The Acquisition Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

5.      Pursuant to § 363(b) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of each of the Stock to Purchaser pursuant to and in accordance with the terms and conditions of the Acquisition Agreement, (ii) close the Sale as contemplated in the Acquisition Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement, and close fully the Acquisition Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Acquisition Agreement and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Acquisition Agreement and such other ancillary documents.

6.      This Order shall be binding in all respects upon the Debtor, including the Debtor, its estate, all holders of equity interests in the Debtor, all holders of any Claim(s) (whether known or unknown) against the Debtor, any holders of Liens or Claims against or on all or any portion of the Stock, Purchaser and all successors and assigns of Purchaser, and any trustees subsequently appointed in the Bankruptcy Case or upon a conversion to chapter 7 under the Bankruptcy Code of the Bankruptcy Case. This Order and the Acquisition Agreement shall inure to the benefit of the Debtor, its estate and creditors, Purchaser, and their respective successors and assigns.

**Transfer of the Stock**

7.      Pursuant to §§ 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Stock on the Closing Date. Such Stock shall be transferred to

Purchaser upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding, and effective transfer of such Stock and, upon the Debtor's receipt of the Purchase Price, shall be free and clear of all Liens and Claims, including, without limitation, all "claims" within the meaning of § 101(5) of the Bankruptcy Code, and all interests, encumbrances, rights of setoff, recoupment, netting and deductions ("Claims"). Upon the Closing, Purchaser shall take title to and possession of the Stock. Pursuant to § 363(f) of the Bankruptcy Code, the Sale of the Stock shall be free and clear of (a) any and all Liens; (b) any and all liabilities; and (c) any and all Claims including, without limitation, any and all claims pursuant to any successor or successor-in-interest liability theory. All Liens and/or Claims shall attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Stock, subject to any claims and defenses the Debtor and its estate may possess with respect thereto. The Debtor shall apply the Sale Proceeds in accordance with applicable orders of this Court in this Bankruptcy Case and provisions of the Bankruptcy Code; provided, however, that any and all Liens and Claims encumbering the Stock shall be released at Closing.

8.     All persons and entities holding Liens, Claims or interests in all or any portion of the Stock arising under or out of, in connection with, or in any way relating to Claims against the Debtor, the Stock, or the transfer of the Stock to Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against Purchaser or its successors or assigns, their property, or the Stock, such persons' or entities' Liens or Claims against the Debtor or in and to the Stock. On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by Purchaser to be necessary or desirable to release Liens or Claims on the Stock, if any, as provided for herein, as such Liens or Claims may have been recorded or may otherwise exist. The transactions authorized herein shall be of

11

full force and effect, regardless of the Debtor's lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business or other circumstances. Upon consummation of the transactions set forth in the Acquisition Agreement, Purchaser shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any Lien, Claim, or encumbrance that is extinguished or otherwise released pursuant to this Order under § 363 and the related provisions of the Bankruptcy Code.

9.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Stock to Purchaser in accordance with the terms of the Acquisition Agreement and this Order.

10.     All persons and entities that are in possession of some or all of the Stock on the Closing Date are directed to surrender possession of such Stock to Purchaser or its assignee at the Closing.

11.     A certified copy of this Order may be filed with the appropriate clerk or other official or similar person or institution and/or recorded with the recorder or other official or similar person or institution to act to cancel any of the Liens, Claims, and other encumbrances of record.

12.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, Claims against, or interests in, all or any portion of the Stock shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to Purchaser for the purpose of

documenting the release of all Liens or Claims, which the person or entity has asserted or may assert with respect to all or any portion of the Stock, the Debtor is hereby authorized and directed, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Stock.

13. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Acquisition Agreement.

**Other Provisions**

14. Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Purchaser, its successors and assigns, or the Stock, with respect to any (a) Lien or Claim arising under, out of, in connection with or in any way relating to the Debtor, Purchaser, the Stock, or the operation of the Stock prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors or

assigns, assets, or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Purchaser, its successors, assets, or properties; (iii) creating, perfecting, or enforcing any Lien or Claim against Purchaser, its successors or assigns, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Purchaser or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate Jefferson Bank or conduct any of the businesses operated by Jefferson Bank.

  15. Except as provided in the Acquisition Agreement, Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Stock. Without limiting the generality of the foregoing, Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the Debtor's use and ownership of the Stock prior to the Closing. Purchaser has given substantial consideration under the Acquisition Agreement for the benefit of the holders of any Liens or Claims. The consideration given by Purchaser shall constitute valid and valuable consideration for the

releases of any potential claims of successor liability of Purchaser, which releases shall be deemed to have been given in favor of Purchaser by all holders of Liens or Claims against or interests in the Debtor or any of the Stock.

16.     The transactions contemplated by the Acquisition Agreement are undertaken by Purchaser without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale unless such authorization and such Sale are duly stayed pending such appeal. Purchaser is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of § 363(m) of the Bankruptcy Code.

17.     The consideration to be provided by the Purchaser pursuant to the Acquisition Agreement is fair and reasonable, and the Sale may not be avoided under § 363(n) of the Bankruptcy Code.

18.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) this Bankruptcy Case, (ii) any subsequent chapter 7 case into which the Bankruptcy Case may be converted, or (iii) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Acquisition Agreement or the terms of this Order.

19.     Pursuant to Bankruptcy Rules 7062, 9014, and 6004(h), this Order shall be effective immediately upon entry, and the Debtor and Purchaser is authorized to close the Sale immediately upon entry of this Order.

20.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

21. There are no brokers involved in consummating the Sale and no brokers' commissions are due.

22. The failure specifically to include any particular provision of the Acquisition Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Acquisition Agreement be authorized and approved in its entirety.

23. The Acquisition Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

24. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Acquisition Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Debtor are a party or which have been assigned by the Debtor to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

25. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in the Bankruptcy Case, the terms of this Order shall govern.

### 

L:\JPROSTOK\Outsource Holdings #5454\Pleadings\Sale Order 4.3.11.DOC

# EXHIBIT A

**Acquisition Agreement**

# EXHIBIT "F"
# TO THE
# MOTION

| In re: | § | Chapter 11 Case |
|--------|---|-----------------|
| | § | |
| **OUTSOURCE HOLDINGS, INC.,** | § | Case No.: 11- |
| | § | |
| Debtor. | § | |

## SALE NOTICE

TO ALL INTERESTED PARTIES:

PLEASE TAKE NOTICE that on April 3, 2011, Outsource Holdings, Inc., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 proceeding pending before the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), filed a Motion with the Bankruptcy Court requesting entry of orders authorizing the Debtor to use its ownership of 100% of the outstanding capital stock of Jefferson Bank (the "Stock") to effectuate a merger, sale of the Stock, or other transaction.

PLEASE TAKE FURTHER NOTICE that unless the Debtor receives qualified, timely other offers, the transaction contemplated by the Motion will be accomplished through a private sale/merger transaction between the Debtor and First Bank Lubbock Bancshares, Inc. and its wholly owned subsidiary First Bank & Trust, Lubbock, Texas (the "Stalking Horse Bidders"). Under the proposed transaction, the Debtor will use the Stock to cause Jefferson Bank to be merged with First Bank Lubbock Bancshares, Inc's wholly owned subsidiary, First Bank & Trust, Lubbock, Texas, in exchange for up to $11,000,000 to the Debtor. The Stalking Horse Bidder's offer is not revocable.

PLEASE TAKE FURTHER NOTICE THAT pursuant to an order, dated April __, 2011 (the "Procedures Order"), and the Auction Procedures approved therein (the "Auction Procedures," attached hereto as **Exhibit "A"**), the Debtor will be soliciting competing offers through May 6, 2011. In order to participate in this sale process, interested parties must submit irrevocable "Qualified Bids" no later than 5:00 p.m. local Fort Worth, Texas time on May 6, 2011. The Auction Procedures explain the requirements for submitting a "Qualified Bid." Any entity that wishes to submit a bid must comply in all respects with the terms and conditions established by the Auction Procedures and the Procedures Order. If the Debtor receives qualified offers that are conducive to an auction process, it will conduct an auction among the bidders who submit qualified offers on May 16, 2011 at the offices of Debtor's counsel at Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102. The auction will be governed pursuant to the Auction Procedures approved by the Procedures Order. If the Debtor receives qualified offers that are not conducive to an auction process, then the Debtor will conduct a private negotiated sale process among the Qualified Bidders between May 11 and May 20, 2011.

PLEASE TAKE FURTHER NOTICE THAT, if no Qualified Bids are received, a hearing (the "Final Hearing") on the sale and use of the Stock in the sale/merger transaction between the Debtor and First Bank Lubbock Bancshares, Inc. and its wholly owned subsidiary First Bank & Trust, Lubbock, Texas will be held in the Bankruptcy Court on _____, 2011 at ___ _.m. local Fort Worth, Texas time.  Objections, if any, to approval of this Transaction must be made in writing, filed with the Bankruptcy Court, and served in accordance with the terms and conditions established by the Procedures Order so as to be actually received by the parties specified in the Procedures Order by ___ __.m. local Fort Worth, Texas time on _____, 2011.

PLEASE TAKE FURTHER NOTICE THAT, if Qualified Bids are received, a Final Hearing on the sale and use of the Stock to the winning bidder at the ensuing auction or private sale process will be conducted on May ___, 2011 at ___ _.m. local Fort Worth, Texas time. Objections, if any, to approval of this Transaction must be made in writing, filed with the Bankruptcy Court, and served in accordance with the terms and conditions established by the Procedures Order so as to be actually received by the parties specified in the Procedures Order by ___ __.m. local Fort Worth, Texas time on _____, 2011.

PLEASE TAKE FURTHER NOTICE that in the absence of any timely objection, the Debtor will submit to the Court a form of order setting forth, among other things, that (i) the notice procedures of the Motion have been satisfied, (ii) no objection to the Motion was timely made or such objection has been resolved, and (iii) the Debtor may proceed with the relief requested in the Motion.

**IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE TO YOU OR THE OPPORTUNITY TO OBJECT.**

PLEASE TAKE FURTHER NOTICE that any entity wishing to receive a copy of the Motion or the underlying agreements should contact Debtor's counsel at Forshey & Prostok, LLP, Attn:  Jeff Prostok (jprostok@forsheyprostok.com), 777 Main Street, Suite 1290, Fort Worth, Texas 76102, phone:  (817) 877-8855, fax:  (817) 877-4151.

L:\JPROSTOK\Outsource Holdings #5454\Pleadings\Sale Notice 4.3.11.DOC

# EXHIBIT "A"

## Auction Procedures