Stephen A. Goodwin
  TX Bar No. 08186500
Lisa M. Lucas
  TX Bar No. 24067734
**Carrington Coleman Sloman**
**& Blumenthal, LLP**
901 Main Street, Suite 5500
Dallas, TX 75202
Telephone: 214.855.3000
Facsimile: 214.855.1333

Gerard S. Catalanello
  *Pro Hac Vice Pending*
William C. Heuer
**Duane Morris LLP**
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1000
Facsimile: 212.692.1020

**ATTORNEYS FOR TRICADIA CDO MANAGEMENT, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| OUTSOURCE HOLDINGS, INC., | § | Case No. 11-41938-DML |
| | § | |
| Debtor. | § | |

### OBJECTION OF TRICADIA CDO MANAGEMENT, LLC
### TO DEBTOR'S MOTION FOR ORDERS RELATED TO THE
### SALE OF DEBTOR'S INTERESTS IN JEFFERSON BANK
[Re: Docket No. 2]

Tricadia CDO Management, LLC ("Tricadia"),[1] on behalf of creditors and as a party in

interest in the above captioned case, by and through its undersigned attorneys, hereby objects

(the "Objection") to the motion of Outsource Holdings, Inc. ("Outsource" or the "Debtor"), for

Orders Approving (I) Initial Bidder Expense Reimbursements, (II) Auction Procedures,

(III) Form and Manner of Sale Notice, and (IV) the Use and Sale of Debtor's Interests in

---

[1] Tricadia CDO Management, LLC ("Tricadia") is the sub-manager of 100% of the assets (notes) held in the "statutory trusts" described in the Debtor's Motion, acting on behalf of (i) Alesco Preferred Funding V, Ltd., as issuer and Alesco Preferred Funding V, Inc., as co-issuer (together, the "Issuer") under an indenture dated as of September 14, 2004, and the (ii) indenture trustee thereunder, as authorized by the collateral manager, Cohen & Company Financial Management, LLC ("Cohen")(authorized to act as collateral manager by a Collateral Management Agreement among Cohen and the Issuer dated as of September 14, 2004 and pursuant to the terms of a Sub-Management Agreement with Tricadia dated as of April 20, 2011).

Jefferson Bank Free and Clear of All Liens, Claims, Encumbrances, and Interests (the "Motion").[2] In support of the Objection, Tricadia represents as follows:

## PRELMINARY STATEMENT

1.      The Debtor's Motion seeks approval of the sale (the "Sale") of substantially all of the Debtor's assets (its ownership of all of the outstanding capital stock of Jefferson Bank (the "Assets")), to First Bank Lubbock Bancshares, Inc. ("FBLB") (and its wholly-owned subsidiary, First Bank and Trust, Lubbock, Texas ("FB&T")) pursuant to the terms of an Acquisition Agreement, which further involves a related sale of, among other things, the assets of Jefferson Bank to MidSouth Bank, N.A. ("MidSouth," and together with FBLB, the "Purchasers") pursuant to the terms of a Purchase and Assumption Agreement. At the same time, the Debtor's Motion seeks approval of procedures for bidding and possibly an auction if qualified bids are received (the "Proposed Procedures"). All of this is to be done on an expedited basis. Indeed, while the Debtor claims to have been marketing the Assets for more than a year, it now seeks to proceed on an expedited basis in its newly-filed chapter 11 case out of some sense of urgency which, as of yet, remains unexplained.

2.      The truly expedited nature of the proposed Sale is evident from a review of basic case information. The Motion was filed on the very same day that the Debtor's petition was filed. The hearing date for consideration of the Motion – on the Proposed Procedures and Sale – is scheduled to take place even before the section 341 meeting of creditors will take place. Indeed, under the Debtor's Proposed Procedures, the auction itself will take place just ten (10) days after the section 341 meeting of creditors is held.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

3. Although (i) there are a number of deficiencies in the information provided through the Motion, and (ii) certain provisions in the proposed Sale and Proposed Procedures are inconsistent with the stated purpose of the Motion – to achieve the best return for the estate and the benefit of *creditors* – the most troubling aspect of the Motion and what the Debtor seeks to achieve is the apparently pervasive involvement and self-serving conduct of insiders, to the likely, if not certain, detriment of creditors. This involvement and self-serving conduct appears to be present not only on the Debtor side of the proposed Sale, but also on the purchaser side of the Sale.

4. Tricadia respectfully submits – and will demonstrate below – that in a case such as this, where it appears from the outset that insider influence is present on both sides of the transaction, a more deliberate and rational sale process should be put in place. Because even at this early stage of this chapter 11 case it appears that insider influence and potential self-dealing are at issue, and because the Debtor admits in its schedules that its debts (even non-insider debts) exceed the $5,000,000 threshold set out in 11 U.S.C. § 1104(c)(2), Tricadia respectfully submits that a trustee or examiner should be appointed under § 1104 to oversee and conduct the sale process and/or to investigate the proposed Sale and the web of insider involvement, to determine whether this process should proceed on a different track.

## BACKGROUND

### A.  Nature and Type of Debt and Insider Involvement

5. The Debtor's only significant asset is the outstanding capital stock of Jefferson Bank. The Debtor has no business operations.

6. On April 3, 2011 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code, along with other documents in support of the petition.

7.     The supporting documents include the Debtor's Statement of Financial Affairs ("SOFAs") and the Debtor's schedules ("Schedules").

8.     At section 21(b), the SOFAs identifies the Debtor's officers, directors and stockholders holding more than five percent (5%) of voting or equity interests in the Debtor. This list identifies eleven (11) individuals.

9.     Cross-referencing section 21(b) of the SOFAs with Schedule F reveals that with just two (2) exceptions, the Debtor's officers, directors and stockholders have also been listed by the Debtor as unsecured creditors based on unsecured note obligations.

10.     The Debtor also filed (i) its List of Creditors Holding 20 Largest Unsecured Claims (the "Top 20 List") and (ii) its List of Equity Security Holders.

11.     With just two (2) exceptions, each and every one of the unsecured creditors listed on the Top 20 List is also an equity security holder. The two exceptions are Keefe, Bruyette & Woods (noted in the Motion as being the Debtor's investment bankers) and the Texas State Comptroller. All eleven (11) of the individuals noted in section 21(b) of the Debtor's SOFAs are listed in the Top 20 List as holding unsecured note claims.

12.     The Debtor's case filings indicate that all of the "note" claims held by individuals whom the Debtor concedes are equity security holders (some, equity security holders *and* officers and/or directors), were incurred in the relatively recent past; during 2009 or 2010.

13.     That the nature and extent of insider debt is important in the context of the Motion and proposed Sale is made evident in the opening paragraphs of the Debtor's Motion. The Debtor emphasizes that it has three (3) basic "baskets" of debt: (i) 2010 noteholders with debt of $200,000; (ii) 2009 noteholders with debt of $7,000,000; and (iii) statutory trusts holding $5,000,000 in notes.

**OBJECTION OF TRICADIA CDO MANAGEMENT, LLC, TO DEBTOR'S MOTION FOR ORDERS RELATED TO THE SALE OF DEBTOR'S INTERESTS IN JEFFERSON BANK**
i_1583851v.1

Page 4 of 22

14.     In tacit recognition of the fact that legitimate unsecured creditors (noteholders in bucket 3, the statutory trust) are disadvantaged through the insider-crafted Sale *vis-a-vis* the insider officers and directors / equity holders / noteholders (in buckets 1 and 2), the Debtor emphasizes in the Motion that "bucket 3" noteholders hold subordinated debt. Building on this theme, the Debtor asks the Court to permit the Sale to proceed with haste in order to "[avoid] a situation in which a few deeply subordinated creditors could hold the Debtor's assets and other creditors hostage[.]" Seen alongside the Debtor's SOFAs, Top 20 List, and List of Equity Security Holders, the Debtor's plea that "creditors" need help and protection, rings hollow.

15.     The vehicle through which the Debtor asks the Court to help it avoid this injustice is the Sale. The Sale contemplates a transaction whereby FBLB's wholly-owned subsidiary FB&T will merge with Jefferson Bank.

16.     FBLB's board of directors has substantial overlap with the Debtor's board of directors – who also happen to be the equity holders, unsecured creditors and noteholders under "debt" instruments issued in the recent past that hope to benefit from the Sale. The full extent of overlap is unclear. The Debtor admits that "*2 of the 5* seats on the Debtor's board of directors" are held by individuals who also hold seats on FBLB's board of directors, *see* Motion at ¶ 10 (emphasis added), but the Motion also states that "*[a]ll but one* of the Debtor's directors are on the board of directors of FBLB", *see* Motion at n.2 (emphasis added). The Debtor's SOFAs confirms that there are five (5) members of the Debtor's board of directors. *See* SOFAs § 21(b).

17.     Regardless of whether there is complete overlap, or overlap with respect to forty percent (40%) of the boards of directors on both sides of the proposed Sale, the plain fact is that the Debtor concedes overlap substantial enough to raise eyebrows; especially in a case where the insiders / equity holders running both sides of the transaction seek a recovery as "privileged"

unsecured noteholders based upon recently implemented "debt" instruments, and do so on an expedited timeframe.

18.     If the degree of overlap on both sides of the transaction were not enough standing alone to raise questions about the substance of the proposed Sale and for whose benefit it was conceived, the Debtor's filings contain additional information from which it is fair and reasonable to infer that insider dominance and disregard is present.

19.     On the very first page of the Debtor's SOFAs, the Debtor notes that in the ninety (90) days preceding its chapter 11 filing, the Debtor made three payments totalling $20,083.00 to the law firm Hunton & Williams. *See* SOFAs § 3(b). The SOFAs indicates that the $20,083 paid to Hunton & Williams were payments "related to debt counselling or bankruptcy" and further notes that they were for "[f]ees incurred primarily in connection with proposed transactions." *See* SOFAs § 9.

20.     Yet, in the Acquisition Agreement for which the Debtor seeks approval from the Court, Hunton & Williams is listed as counsel for FBLB – the *purchaser*, which is controlled at least in part by members of the Debtor's board of directors – *not* the Debtor. *See* Acquisition Agreement § 12.07. If that were not a clear enough indication that Hunton & Williams does not represent the Debtor, any remaining question was resolved on April 6, 2011, when the firm filed an appearance in the Debtor's chapter 11 case on behalf of FBLB and FB&T. Docket No. 6. This raises obvious and serious questions about for whose benefit the Debtor made prepetition payments, as well as questions regarding who (officers and directors / equity holders / "privileged" noteholders under recent "debt" instruments) directed that the payments be made.

21.     To date, there is no committee of unsecured creditors appointed in this case to investigate the Sale of the Debtor's Assets or the finances, books and records and other

transactions of the Debtor and its wholly owned subsidiary Jefferson Bank. Nor is it even possible for such a committee to be in place until just ten (10) days before the proposed hearing to approve the Sale.

**B.    The Proposed Sale**

22.    The proposed Sale contemplates that under the Acquisition Agreement, FBLB, through its wholly-owned subsidiary, FB&T, will acquire the Debtor's ownership of the outstanding capital stock of Jefferson Bank. This will be implemented through a merger between Jefferson Bank and FB&T pursuant to the Purchase and Assignment Agreement (the "Merger").

23.    The precise amount that FBLB and FB&T will pay is unclear. The ceiling or highest amount is $11,000,000. However, only $2,021,000 is certain to be paid to the Debtor. The remaining potential $8,979,000 is contingent. This contingent amount is subject to a number of post-closing adjustments that are tied to the assets of Jefferson Bank (as such adjustments are determined in conjunction with the sale of those assets to MidSouth) and is payable over a period of four (4) years. The proposed Sale thus requires that non-insider creditors of this failed enterprise take a credit risk on the success of the same enterprise, run by the same insider individuals, but under a different name.

24.    Upon the Merger, MidSouth will then buy the assets of the merged Jefferson Bank / FB&T entity, which include Jefferson Bank's: (i) owned and leased real estate, (ii) various loans, and (iii) personal property (collectively, the "Jefferson Bank Assets"). MidSouth will also assume certain liabilities from Jefferson Bank, including Jefferson Bank's liabilities to its depositors.

25.     The purchase price MidSouth will pay to the newly formed and merged Jefferson Bank / FB&T entity is estimated to be $11,600,000.  That price, however, is also subject to a number of post-closing adjustments.  One thing is clear: the amount paid by MidSouth will be paid to the merged entity, not the Debtor or the Debtor's estate.

26.     To the extent the proposed Sale does not close, the Proposed Procedures provide that FBLB is entitled to a cost and expense reimbursement from the Debtor in an amount up to $200,000.  In addition, MidSouth would be entitled to a break-up fee in the amount of $500,000, for which Jefferson Bank is ultimately liable to FB&T.

27.     Pursuant to the Proposed Procedures, the Debtor proposes to give notice of the Sale to all parties who have filed a request for service, all creditors, and all parties who have expressed an interest in the Debtor's assets.  The Proposed Procedures do not require or propose that the Debtor publish notice of the Sale.

28.     All bids must be submitted by May 6, 2011 (the same day that the initial section 341 meeting in this case is scheduled to be heard); and the Auction (if necessary) is to take place on May 11, 2011.  The Debtor has requested that a sale hearing be scheduled for some time between May 16th through 18th if there is no auction, or between May 30th and June 3rd if there is an auction.

## OBJECTION

### A.     A Trustee Or Examiner Should Be Appointed To Oversee A Sale And Plan Process

29.     In the case *In re Gem Tire & Service Co.*, 117 B.R. 874 (Bankr. S.D. Tex. 1990), the court recognized the overriding principle of bankruptcy law that:

> The conduct of bankruptcy proceedings not only should *be right* but must *seem right*.  This high standard of conduct necessarily extends to the bankruptcy trustee.

117 B.R. at 877 (emphasis supplied) (citing *Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164 (2d Cir. 1966) (Friendly, J.)).

30.     The principle embodied in that remarkably straightforward proposition is that in bankruptcy cases, the mere appearance of impropriety – even if any claimed impropriety can be explained away – is sufficient to require bankruptcy courts to take action because there is heightened sensitivity to claims of self-dealing and abuse, and a need for vigilance in patrolling cases to remove even the possibility of taint infecting the bankruptcy process.

31.     Although reported decisions reiterating the principles and quote above from *In re Ira Haupt & Co.* generally address questions relating to the retention of counsel or the payment of the fees of counsel or other professionals, there is no reason to limit its application.  Indeed, as the court noted in *In re Gem Tire & Service Co.*, those principles apply to trustees themselves, not just their counsel.  117 B.R. at 877.

32.     Here, a trustee has not been put in place, so the principles set out in *In re Ira Haupt & Co.* and *In re Gen Tire & Service Co.*, *supra*, apply to the Debtor and its officers and directors.  *See* 11 U.S.C. § 1107(a).

33.     Section 1104 provides a vehicle for addressing problems, such as those that appear to be present here, in a chapter 11 case.  The statute provides:

> § 1104 Appointment of trustee or examiner
>
> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; [or]

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor[.] . . .

\* \* \*

(c) If the court does not order the appointment of a trustee under this section, then at any time before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if –

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000. . . .

11 U.S.C. § 1104.

34. Although this case was just recently commenced, the requirements of the statute are nevertheless met.

35. First, although the statute notes that relief can only be granted on request of a party in interest and after notice and a hearing, courts have held that bankruptcy courts have authority to raise the issue of whether a trustee or examiner should be appointed on a *sua sponte* basis. S*ee United States Mineral Prods. Co. v. Official Committee of Asbestos Claimants (In re United States Mineral Prods. Co.)*, 105 Fed. App'x 428, 430-31 (3d Cir. 2004) (unpublished) (rejecting argument that bankruptcy code requires a motion by a party in interest, and that a trustee cannot be appointed on a *sua sponte* basis); *In re Wings Digital Corp.*, Case No. 05-12117, 2005 WL 3789334 at *4 (Bankr. S.D.N.Y. May 16, 2005) ("Bankruptcy courts have broad discretion to appoint a trustee, and may do so *sua sponte*.") (quoting 2 L. King, *et al.*,

COLLIER ON BANKRUPTCY ¶ 1104.02 (15th ed. 1979)); *In re Kingston Square Assocs.*, 214 B.R. 713, 738 (Bankr. S.D.N.Y. 1997) (discussing *sua sponte* appointment and stating: "[e]ven if the Movants had not sought such relief, I had considered taking matters into my own hand as the statute allows me."); *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 855 (Bankr. S.D.N.Y. 1994) ("the Court has the authority to appoint an examiner *sua sponte*.").

36.     Here, Tricadia affirmatively seeks the appointment of a trustee or examiner. Because of the speed with which the Debtor has sought approval of a sale of substantially all of its assets to insider-controlled entities, Tricadia's request, too, must proceed on an expedited basis. To the extent the Debtor or any other party objects to proceeding in that manner, Tricadia respectfully requests that the Court exercise its authority to proceed with such an appointment on a *sua sponte* basis.

37.     On the merits, the statutory requirements have been met. Cause exists for the appointment of a trustee under 11 U.S.C. § 1104(a)(1). Although the statute starts by identifying fraud, dishonesty and other indicators that require the appointment of a trustee, it continues on to note that "similar cause" is sufficient. Here, the evidence of insider pervasiveness on both sides of the proposed Sale is evident from the Debtor's own filings. The Debtor's insiders have invoked the bankruptcy process for their own benefit in an attempt to avoid payment obligations to legitimate unsecured creditors. There are questions about whether the Debtor has been paying the legal fees of the proposed acquirer, and it is reasonable to infer that if this has indeed happened, those payments were made at the direction of the very insiders that are on both sides of the transaction.

38.     In addition to being pregnant with questions and concerns about insider self-dealing, the Motion seeks to push the Sale through on a highly expedited basis. The Motion was

filed at the same time as the petition. It is a sale of all assets outside the context of a plan, but the Debtor has no business operations and there is no need to proceed on such an expedited basis (other than, perhaps, an arbitrary deadline set by the very same insiders that are on both sides of the transaction and seek to benefit through these proceedings to the detriment of other creditors). The Debtor has provided no explanation or justification for the need to proceed with such reckless haste other than the *ipse dixit* of counsel.

39. Not a single affidavit from an officer, director, or even an employee, was submitted in support of the Motion. Not one. There is no valuation evidence, despite the fact that the Debtor hired an investment banking firm in the prepetition period. Indeed, the Debtor has not even sought to retain that investment banking firm in its chapter 11 case. Yet, the Debtor does appear eager to pay that investment banking firm $400,000 – *approximately twenty percent (20%)* – of the "guaranteed" Sale proceeds. *See* Top 20 List, noting $400,000 claims of Keefe, Bruyette & Woods.

40. Further compounding the problems that are present due to a lack of disclosure and information, as well as the expedited timeframe on which the Debtor seeks to proceed and the insider-driven economics of the proposed Sale, is the fact that the Motion, in and of itself, was served *almost exclusively* on the Debtor's equity holders. Indeed, other than the regulatory agencies listed on Exhibit A to the affidavit of service relating to the Motion, the only other parties that appear to have been formally served are listed on Exhibit B. *See* Aff. of Service, Docket No. 7. Exhibit B, cross-referenced against the Debtor's List of Equity Security Holders, reveals that each and every single party identified in Exhibit B as having been served with the Motion – each and every one – is an equity holder insider. *Compare* Docket Nos. 7 and 10.

41.     Tricadia respectfully submits that, on the facts present, "cause" is present to require the appointment of a trustee to manage the liquidation of the Debtor's assets and plan process under 11 U.S.C. § 1104(a)(1).   Alternatively, Tricadia respectfully submits that the requirements of 11 U.S.C. §§ 1104(a)(2), (c)(1) and (c)(2) have been met, and respectfully requests the appointment of either a trustee or an examiner pursuant to those subsections.

**B.      The Sale Should Not Proceed On An Expedited, Pre-Plan Timeline**

42.     Prior to confirmation of a plan of reorganization, the bankruptcy code does permit a debtor-in-possession to sell assets of its estate outside the ordinary course of business pursuant to section 363(b)(1) of the Bankruptcy Code.   *See* 11 U.S.C. § 363(b)(1).   However, analysis of case law demonstrates that the preferred course of action is to have sales of substantially all of a debtor's assets take place pursuant to 11 U.S.C. § 1129 and the terms of a chapter 11 plan, rather than on a stand-alone basis under 11 U.S.C. § 363.

43.     Courts have been particularly troubled in cases where a debtor seeks quick approval of substantially all of its assets outside of the plan confirmation context.   In *In re Wings Digital Corporation*, Case No. 05-12117, 2005 WL 3789334 (Bankr. S.D.N.Y. May 16, 2005), for example, the court summarily rejected a debtor's claim that such a sale had to take place in order to preserve value.   In a passage worth of full quotation here (with citations), the court stated:

> The Court finds that it is not necessary to deter-mine the good faith of either the Debtor or Bhasin at this time. The law in the Second Circuit is clear; *a debtor cannot routinely sell all of its assets at the beginning of a Chapter 11 case over objection. In Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983), the Court considered whether a sale of the debtor's most valuable asset, "out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization" could be effectuated over objection under § 363 of the Bankruptcy Code. 722 F.2d at 1066. Lionel's CEO testified at

the sale hearing that the asset was not depreciating, that there was no reason why the asset could not be sold as part of a reorganization plan, and that the sole reason for the sale at the time was the creditors' committee's insistence upon it. *Id.* at 1065. The Second Circuit held that an asset that could form the basis of a reorganization plan *could not be sold outside of a plan unless there was a compelling business justification therefor. Id.* at 1070. *See also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Beker Indus. Corp.*, 64 B.R. 900, 906 (Bankr. S.D.N.Y. 1986) *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988) ("a sale of assets out of the ordinary course of business prior to a formulation of a plan of reorganization is entirely inappropriate at this early crucial stage where the path the Debtor will take is to be determined") (internal quotations omitted).

2005 WL at *2 (emphasis supplied to text).

44. Then, in a footnote, the court noted:

> The rule against a sale of all assets prior to a plan of reorganization *is even stricter in the Fifth Circuit.* In *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935 (5th Cir. 1983), the Circuit Court held that the trustee could not sidestep the confirmation requirements under Chapter 11 by entering into agreements that would "specify the terms whereby a reorganization plan is to be adopted", noting that the "parties ... must first scale the hurdles erected in Chapter 11." *Id.*

2005 WL 37899334 at *2, n.1 (emphasis supplied to text); see *Pension Benefit Guaranty Corp. V. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983) (Parties must first scale hurdles erected in Chapter 11 before entering into transactions that would change the composition of a debtor's assets and have the practical effect of dictating some of the terms of a future reorganization plan); *In re Crutcher Resources Corp.*, No. 86-42209, 1986 Bankr. LEXIS 4681, *8 (Bankr. N.D. Tex. Dec. 31, 1986) (sale denied where there was scarcely any time for the formation of a creditors committee and for a thorough evaluation by the those committees of the assets and financial circumstances of the debtor).

**OBJECTION OF TRICADIA CDO MANAGEMENT, LLC, TO DEBTOR'S MOTION FOR ORDERS RELATED TO THE SALE OF DEBTOR'S INTERESTS IN JEFFERSON BANK**
i_1583851v.1

Page 14 of 22

45.     The Debtor has not demonstrated compelling reasons for completing the Sale outside of a chapter 11 plan. The Debtor has no business operations. Its only substantial asset is ownership of stock, and it is that stock ownership interest the Debtor seeks to sell. There is absolutely no reason to proceed with a sale outside of a chapter 11 plan, other than, perhaps: (i) to bypass creditor protections that exist in the context of plan confirmation but do not come into play in the context of a section 363 sale, or (ii) to have the Sale pushed through the case so quickly that parties who may oppose it, or who may pay more, will not have a chance to do so. Neither of those reasons would justify proceeding as the Debtor would like; but they would both require the appointment of a trustee or examiner. The Debtor's Motion should be denied.

## C.     The Sale Does Not Satisfy The Business Judgment Test

46.     In determining whether to approve a sale of estate assets, a debtor must demonstrate that the sale represents an exercise of sound business judgment. *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see Fulton State Bank v. Shipper (In re Shipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (sales are an exercise of a fiduciary duty that requires an articulated business justification); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986).  A debtor has a duty to maximize the value obtained from a sale. *Psychrometric Systems*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007); *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir. 1985) (sale must result in the estate obtaining the best price possible under the circumstances).

47.     In the context of reviewing the appropriateness of asset sales that occur before the confirmation of a plan of reorganization, under the "sound business purpose" test, a debtor-in-possession has the burden of establishing the following: (1) that a sound business reason justifies

a pre-confirmation sale; (2) the sale has been proposed in good faith; (3) the value of the asset to the estate as a whole; (4) the proceeds to be obtained from the sale in relation to any appraisals of the assets; (5) the purchase price is fair and reasonable; and (6) the asset is decreasing in value. *In re Continental Air Lines, Inc.*, 780 F.2d 1223; *In re Crutcher Resources Corp.*, 1986 Bankr. LEXIS 4681, *6.

48.     Where the sale is to insiders who stand to benefit from the sale, the standard for approval is higher.  *In re Texas Std. Oil Co.*, 2008 Bankr. LEXIS 3576 *29, 36 (insider transactions are subject to heavy scrutiny as the bankruptcy process is not a tool to effectuate insider deals under the guise of legitimacy); (*In re Bidermann Indus. USA Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997) (sales to insiders are subject to heightened scrutiny because they are rife with potential for abuse); *see also In re Summit Global Logistics Inc.* No 08-11566, 2008 Bankr. LEXIS 896, (Bankr. D.N.J. March 26, 2008).   When reviewing sales to insiders, Courts have considered the sale process, exposure of the assets to the market, openness of the proceedings and fairness of the price paid by the insiders.  *See In re Summit Global Logistics Inc.*, 2008 Bankr. LEXIS 896.

49.     The Motion does not address the heightened standard the Sale must satisfy, and devotes just a few cursory or "boilerplate" paragraphs to discussing the Sale under the business judgment test.  The Debtor's conclusory and self-serving statements merely state that "some sort of sale, merger, or other transaction must be accomplished within the next few months to preserve the value of Jefferson Bank and the Debtor's stock in that institution," and that the proposed Sale will provide cash to the Debtor's estate.  The Debtor does not address, let alone justify, how a sale to an entity that is controlled by the Debtor's existing officers and directors /

equity holders, satisfies these tests. The Debtor's showing is insufficient to satisfy the "sound business purpose" test, let alone meet the heightened standard applied to insider transactions.

50.     Before commencing an expedited sale process, the Debtor should explain why a sale of substantially all of its assets, for what is at best, speculative and at worst, hypothetical consideration, makes sense. The Debtor has made no showing that the Assets are being sold for a fair purchase price. Despite having hired an investment banker, no valuation is provided. Moreover, the purchase price of the Assets is dependent upon the financial status of the Jefferson Bank Assets as determined by MidSouth, including the unpaid principal balances at closing of loans of Jefferson Bank that are sold to MidSouth, the amount of deposits at Jefferson Bank that are assumed by MidSouth, and Jefferson Bank's cash on hand.

51.     The Motion provides no discussion as to these considerations and how they are expected to impact the ultimate proposed Sale price of the Debtor's Assets; creditors (and the Court and the Office of the United States trustee) are entitled to this information. There is no discussion of even estimated number of loans and average amounts of unpaid principal balances, the amount of deposits and cash at Jefferson Bank. There is no indication of what impact the Sale (based on the variety of contingencies and potential adjustments) will have on the value of the Assets as a whole. The Motion is completely devoid of such analysis, and the absence of this basic information is troubling.

52.     There also is no indication of how long the Assets were marketed and the nature of that marketing process. The only information provided in passing is the claim by Debtor's counsel that the Debtor marketed the Assets for more than one year with the assistance of an investment banking firm. Comments of counsel are not evidence. No information is provided by the Debtor as to what comparable business and assets may be selling for in the market. Nor

does the Debtor explain how only providing notice to parties who previously expressed interest in the Assets, *but have not pursued a transaction*, rather than publishing notice in an effort to attract *new bidders*, could possibly result in the highest and best price being obtained at the auction. The failure to provide this basic information is consistent with insider self-dealing and a state of facts that is cause for concern.

53. Further, there is no committee of unsecured creditors appointed in this case at this time. A committee, when appointed, will need to review the significant issues raised by the Sale of the Debtor's Assets or to discuss those issues with the Debtor and/or the Debtor's creditors, and will need to be provided (and digest) related and necessary information.

54. The Motion provides no reliable, relevant information to demonstrate why the proposed Sale to the Purchasers satisfies the heightened scrutiny that must be met here as a result of the fact that insider relationships have infected every aspect of the proposed Sale, let alone demonstrate why the proposed Sale is an exercise of sound business judgment.

**D. The Proposed Procedures Do Not Provide For Sufficient Notice And Lack Sufficient Information Regarding Valuation**

55. The Motion does not indicate the extent to which the Debtor has exposed the Assets and the Jefferson Bank Assets, to which the sale price of the Assets is tied, to the market in order to ensure that the sale of such Assets will bring the highest and best price for the Assets. The Debtor does not even propose to advertise the sale of the Assets in any publication.

56. The Debtor should at least re-visit some of the sources previously identified by KBW as potential investors/purchasers. Moreover, the due diligence information made previously available by KBW should be brought up to date by the Debtor and supplied to interested parties and creditors. Without a more focused marketing process, there can be nothing more in this case than a co-operative sale to insider officers and directors who are also equity

holders, which is the polar opposite of the fundamental purpose for having a sale and auction process: to achieve the best and highest return for the estate. A marketing program focused on specific publications and direct solicitation should, at a minimum, be required.

57.     Finally, the Debtor has not disclosed information regarding a valuation for the Debtor's Assets and the Jefferson Bank Assets, nor is this information contained in the Motion, which makes it impossible to analyze how the proposed firm purchase price of $2,021,000 plus the hypothetical or potential additional $8,979,000, compares to market value. This information should be readily available to the Debtor and supplied to interested parties and creditors. It is also likely that the Debtor has such information in its possession – it is reasonable to infer from the circumstances that an investment banking firm whose fee for a single transaction may be $400,000, would at the very least perform a valuation analysis for its client.

**E.     The Sale Terms Are Too Vague**

58.     Pursuant to Fed. R. Bankr. P. 2002(c), the notice of a proposed sale is sufficient "if it generally describes the property." Fed. R. Bankr. P. 2002(c).

59.     First, the Motion provides that the proposals of the Purchasers include a variety of contingencies and potential adjustments. Accordingly, the Debtor and its insider officers and directors / equity holders will have to exercise their business judgment numerous times to make decisions about qualifying bids and highest and best offers.

60.     One example is that the Proposed Procedures provide that qualifying bids will have to be better in terms of price, genuineness and feasibility. The qualifying bids must provide greater consideration and demonstrate financial wherewithal, and ability to obtain regulatory approvals. If the Debtor receives qualifying bids that can be easily compared and adjusted it will

hold an auction. If it cannot be easily compared and adjusted, it will conduct a private sale process.

61.     First, whether any of those requirements are met, is determined by interested parties – the insider officers and directors / equity holders that are on both sides of the transaction. Beyond that fatal flaw, the Proposed Procedures do not provide clear guidelines and, instead, create ambiguity and confusion. The Proposed Procedures do not provide what types of offers would be considered better as far as price or the types of factors that would make it difficult for the Debtor to compare the qualifying bids to the current offers and thus result in an auction versus a private sale. Moreover, the Debtor fails to indicate how potential bidders will be notified, if at all, whether the Debtor was able to compare qualifying bids and whether it will hold an auction or sell the Assets in a private sale.

62.     The descriptions of the purchase price, the adjustments it is subject to, and qualifying bids, as well as the extent of the Assets and assumed obligations, are incomplete and elusive, and thus would require any party interested in the proposed transaction to expend substantial time and effort to investigate the nature of the assets and obligations being sold. Further hindering the investigation is the fact that it is unclear whether the Debtor has properly evaluated the Assets and the Jefferson Bank Assets. These ill-defined procedures implement a process that appears to have as its goal the exclusion of anyone that is not an insider.

**F.     The Break-Up Fee Is Excessive And Should Not Be Approved**

63.     Tricadia recognizes that generally speaking, break-up fees are acceptable and approved by bankruptcy courts as part of section 363 sales. A break-up fee is designed to help a stalking horse bidder defray its costs in the event that another purchaser ultimately prevails at

auction. Generally speaking, the amount of a proposed break-up fee is tied to the amount of fees and expenses that the stalking horse bidder has incurred in connection with its bid.

64.     Here, MidSouth seeks approval of a break-up fee of $500,000, which is to be ultimately paid by Jefferson Bank, in the event that the Purchase and Assignment Agreement is terminated.  Moreover, FBLB seeks approval of reimbursement of costs and expenses of $200,000 from the Debtor.  Accordingly, the break-up fee of $700,000 (35% of the firm price of $2,012,000) is not tied to costs but is instead a thinly-veiled attempt to discourage competing bidders.

## CONCLUSION

WHEREFORE, Tricadia respectfully requests that the Court deny the relief sought by the Debtor pursuant to the Motion, and further respectfully requests that the Court appoint a trustee or examiner to displace current management and oversee an orderly sale and chapter 11 plan process for the benefit of all creditors and the estate.

Dated: April 22, 2011.

Respectfully submitted,

/s/ Stephen A. Goodwin
Stephen A. Goodwin
  TX Bar No. 08186500
  Lisa M. Lucas
    TX Bar No. 24067734
**Carrington Coleman Sloman
& Blumenthal, LLP**
901 Main Street, Suite 5500
Dallas, TX 75202
Telephone: 214.855.3000
Facsimile: 214.855.1333
                *and*
Gerard S. Catalanello, Esq.
William H. Heuer, Esq.
**Duane Morris**
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1000
Facsimile: 212.692.1020

*Counsel for Tricadia CDO Management, LLC*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that true and correct copy of the foregoing was served on all parties listed on the attached Service List via ECF-Notice and/or U.S. First Class Mail, on this 22nd day of April 2011.

/s/ Lisa M. Lucas
Lisa M. Lucas

**SERVICE LIST**

[1583402.1]

Outsource Holdings, Inc.
7806 Indiana Avenue
Lubbock, TX 79423

*VIA ECF*
Jeff P. Prostok
Forshey & Prostok, LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102

*VIA ECF*
Lynda L. Lankford
Forshey & Prostok, LLP
777 Main Street, Ste. 1290
Fort Worth, TX 76102

U.S. Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-1496

MidSouth Bank, N.A.
Bank of America Plaza
600 Peachtree Street, N.E., Suite 5200
Atlanta, GA 30308-2216

*VIA ECF*
The Mitchell Law Firm, L.P.
c/o Gregory W. Mitchell
8140 Walnut Hill Lane, Suite 301
Dallas, TX 75231

BNY Mellon
Attn: Valerie Nuhfer
525 William Penn Place, 7th Floor
Pittsburgh, PA 15259

Barry Brown
3801 85th St.
Lubbock, TX 79423

Barry Orr
3805 85th St.
Lubbock, TX 79423

Bruce Orr
3617 Woodedcreek Cr.
Arlington, TX 76016

Doug Boyd
5124 Arrowhead
Plano, TX 75093

Duncan Burkholder
4515 Marsha Sharp Freeway
Lubbock, TX 79407

*VIA ECF*
First Bank & Trust, Lubbock, Texas
c/o Andrew E. Jillson
Hunton & Williams LLP
1445 Ross Avenue, Suite 3700
Dallas, TX 75202-2799

*VIA ECF*
First Bank Lubbock Bancshares, Inc.
c/o Andrew E. Jillson
Hunton & Williams LLP
1445 Ross Avenue, Suite 3700
Dallas, TX 75202-2799

First Bank Lubbock Bancshares, Inc.
9816 Slide Road
Lubbock, TX 79424

Gary Grossman
1515 Bridgewater
Mansfield, TX 76063

Greg Garland
5723 83rd Lane
Lubbock, TX 79424

Hare & Co.
c/o The Bank of New York Mellon
PO Box 11203
New York, NY 10286-1203

James Mills
8160 Sundance Dr.
Mansfield, TX 76063

James Young
5010 91st St., #8
Lubbock, TX 79424

Jefferson Bank
18333 Preston Rd., Ste. 100
Dallas, TX 75252

Jim Burke
8136 Sundance Dr.
Mansfield, TX 76063

John Walton
4718 S. Loop 289
Lubbock, TX 79414

Keefe, Bruyette & Woods
787 Seventh Ave., 5th Flr.
New York, NY 10019

Larry Rother
3601 Misty Creek Dr.
Austin, TX 78735

Ricky Green
4903 97th St.
Lubbock, TX 79424

Ronnie Malone
5506 Vista Meadow
Dallas, TX 75248

Sami Ebrahim
11551 Forrest Central Dr., Suite 230
Dallas, TX  75243

Terry Grantham
8404 Salem
Lubbock, TX  79424

Terry Grantham
8405 Salem
Lubbock, TX  79425

Texas State Comptroller
111 E. 17th St.
Austin TX  78774-0001

***VIA ECF***
MidSouth Bank, N.A.
c/o  Jeffrey W. Kelley
Troutman Sanders LLP
600 Peachtree Street, NE, #5200
Atlanta, GA  30308-2216